UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:07CR57(MRK) |
| | : | |
| | : | |
| v. | : | **FILED UNDER SEAL** |
| | : | |
| | : | |
| HASSAN ABUJIHAAD | : | OCTOBER 19, 2007 |

### MOTION IN LIMINE AND MEMORANDUM IN SUPPORT OF THE ADMISSION OF EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 801(d)(2)(E) AND 801(d)(2)(A); NOTICE OF INTENTION TO INTRODUCE CERTAIN EVIDENCE OF INTENT; AND NOTICE OF INTENTION TO RELY ON OTHER ACT EVIDENCE PURSUANT TO RULE 404(b)

The government submits this motion in limine and memorandum in support of the

admission of evidence pursuant to Federal Rule of Evidence 801(d)(2)(E).  The government

seeks to introduce at trial certain statements made by Derrick Shareef ("Shareef") to a

government informant, in which Shareef indicated that the defendant herein, Hassan Abujihaad

("Abujihaad"), told Shareef that he (Abujihaad) was the individual responsible for the disclosure

of information regarding the upcoming movements of a U.S. Naval battle group – information

which was subsequently found on a computer floppy disk in the possession of members of an

alleged terrorist support cell in London.  Although Shareef is not anticipated to be a witness at

trial, the government respectfully submits that these statements are nevertheless admissible as co-

conspirator statements under Rule 801(d)(2)(E) because the statements were made in furtherance

of a conspiracy involving Shareef and Abujihaad (1) to commit sedition, i.e., to put down the

government of the United States, or levy war against it, or to oppose by force its authority, in

violation of 18 U.S.C. §2384; and/or (2) to kill or attempt to kill officers or employees of the

United States (namely, members of the uniformed services), in violation of 18 U.S.C. §§ 1114

and 1117. The Court has scheduled a hearing on November 28-30, 2007 at which the government intends to present evidence establishing, by a preponderance of the evidence, both the existence of the conspiracies and that the statements at issue were made in furtherance of these conspiracies.

The government also submits this memorandum to provide notice of its intention to rely upon certain of the material set forth below in its case-in-chief at trial as admissions or statements by a party-opponent under Rule 801(d)(2)(A) to show, for example, consciousness of guilt; efforts to avoid detection; motive; state of mind and direct evidence of intent. Such evidence would include, for example, Abujihaad's:

- Statements expressing support for sniper attacks against U.S. military personnel;

- Statements about his current vs. former ability to obtain intelligence in connection with contemplated attacks on the U.S. military;

- Statements regarding his consciousness of law enforcement and efforts to avoid detection;

- Statements regarding his having sent the July 2001 email discussing, among other things, the October 2000 attack on the *U.S.S. Cole*;

- Statements during which Abujihaad confronts Shareef for telling the CI and others things that Shareef knows about Abujihaad;

- Statements regarding his possession and destruction of Azzam materials;

- Statements during which Abujihaad speaks in code

- Admonitions to speak about jihad in code or only in person;

- Instructions not to speak openly about jihad over the telephone or the internet; and

- Statements regarding secrecy, discretion and maintaining operational security.

This memorandum is also intended to provide additional notice of the government's intention to introduce evidence of other *acts* at trial under Rule 404(b).[1]  Specifically, because the question of Abujihaad's intent will be a central issue at trial, the government intends to introduce evidence regarding other acts of Abujihaad that demonstrate his state of mind, motives and intent with respect to the crimes charged.  As set forth in greater detail below, such evidence of other acts would include Abujihaad's:

- Participation in discussions about attacking a U.S. military recruiting station in 2003;

- Proposing in 2004 and later pursuing in 2006 a plan to engage in a coordinated sniper attack on U.S. military personnel at a U.S. military base in San Diego; and

- Efforts to obtain weapons and ammunition in connection with the proposed sniper attack.

In addition, to the extent that the court believes that any of the above-referenced admissions or statements are more appropriately considered "other act" evidence under Rule 404(b), the government would seek admission of the above-referenced material on that additional, or alternative, basis as well.

Along the same lines, it is also the government's intention to introduce – in its case in chief and/or in response to any claims, whether express or implied, about the absence of a computer forensic link between Abujihaad and the electronic version of the battle group document that was recovered in London – evidence of Abujihaad's attention to secrecy and efforts to avoid detection of his activities relating to acts of violent jihad, including, but not limited to, his use of coded conversation, his admonitions to speak about jihad in code or only in

---

[1]  The government previously disclosed its intention to rely on such evidence in discovery letters to the defense dated May 18, 2007 and July 16, 2007.

person; his instructions not to speak openly about jihad over the telephone or the internet; and his destruction of materials and communications relating to violent jihad.[2]

## I.     BACKGROUND

On or about October 6, 2004, a grand jury sitting in Bridgeport, Connecticut, returned a four count indictment that charged Babar Ahmad, a British national, with conspiring to provide and providing material support to terrorists, and conspiring to kill or injure persons in a foreign country.

### *Babar Ahmad, Syed Talha Ahsan and Azzam Publications*

Prior to his being charged with terrorism-related offenses in the District of Connecticut in August of 2004, Babar Ahmad was the leader of a terrorist support cell in London.  Together with Syed Talha Ahsan and others, and through an entity called "Azzam Publications," Ahmad covertly engaged in efforts to provide material support and assistance to the Chechen mujahideen, the Taliban and associated terrorist groups.[3]  They did so through money laundering and by assisting in the provision of funds, military equipment, communications equipment, lodging, training, expert advice and assistance, facilities, personnel, transportation and other

---

[2]   Although detailed, the material set forth herein is not intended to be exhaustive.  Because the government continues to review Abujihaad's communications that have been produced in discovery, the government reserves the right to notice and rely upon additional material as it is encountered.

[3]   The term "mujahideen" refers to militant Islamic guerrilla fighters, for example Taliban fighters in Afghanistan and militant Muslim guerrilla fighters in Chechnya, who engage in jihad and fight against persons or governments that are deemed to be enemies of a fundamentalist version of Islam.

supplies to these groups, with the knowledge and intent that such conduct would support the military activities of these and associated terrorist groups.

One of the means Ahmad and his coconspirators used in this effort was the management of various Azzam Publications websites that promoted violent jihad – principally "azzam.com," "qoqaz.net," and "waaqiah.com." For a period of time, the Azzam Publications website, along with associated administrative email accounts, were maintained through the services of a web hosting company located in the State of Connecticut.

The Azzam websites were truly among the first of their kind. As the premier mujahideen propaganda and support sites they were the precursor to many more that would follow. The Azzam websites were among the first to successfully utilize the internet on a global scale to propagate the call to jihad; among the first to provide articles, training materials and videos on a global scale depicting and promoting violent acts of jihad; and among the first to successfully utilize the internet to provide a global support network for violent jihad through recruiting and fund-raising efforts and by assisting those who responded to the websites' calls for support.

The Azzam websites were specifically designed to incite readers and to provide a support network for terrorist related entities including the Taliban and the Chechen mujahideen. Indeed, the Azzam sites expressly stated that their purpose was to "incite the believers and also secondly to raise some money for the brothers." Among other things, the Azzam sites: (1) published Usama bin Laden's 1996 Declaration of War; (2) translated and published an exclusive September 2002 interview with Al-Qaeda's second in command Ayman al-Zawahiri; (3) posted various manuals and articles on how to train for jihad before traveling abroad to fight, including instructions on obtaining physical, martial arts, survival and firearms training; and (4) provided

specific guidance on how to support the jihad and the mujahideen, including: overt appeals for people to physically fight in the jihad battle fronts; requests to raise, collect and donate money to support the jihad; and solicitations to join or otherwise support the organization. The sites also: (1) set forth postings extolling the virtues of martyrdom and describing it as "exactly what is needed at this time"; (2) provided postings on a female's role in jihad, which included raising funds, physical training, firearms training and raising mujahid children by obtaining for them martial arts training, target shooting and camping/survival training; and (3) posted a practical guide to dealing with law enforcement, which contained specific advice on how to prevent and deal with law enforcement interviews, house or premises searches, raids, visits from intelligence agents, and arrests.

The Azzam sites also provided detailed instructions, many of which were specifically directed at U.S. residents, on how to make financial donations and provide other direct assistance to terrorist-related groups. At various times, for example, the sites included: (1) an urgent appeal for large quantities of gas masks and NBC (nuclear-biological-chemical) suits for the Taliban; (2) an urgent appeal for cash donations to support the Taliban, which contained explicit and detailed instructions on how U.S. residents were to personally deliver cash in amounts in excess of $20,000 (US) to the Taliban Consul General in Pakistan; and (3) an express solicitation of Pakistani nationals around the world to travel to Afghanistan to fight for the Taliban.

The efforts of Ahmad and his coconspirators extended beyond cyberspace as well, as the available evidence demonstrates real-world effects and consequences flowing from the criminal activity, regardless of the media used to plan, coordinate and execute the conduct. For example, in addition to their postings on the websites, members of Azzam Publications also operated and

administered the various email accounts associated with the sites.  Through those email accounts,

members of Azzam Publications engaged in efforts to assist those who responded to the

websites' calls for support.  Recovered emails and other electronic materials include, for

example, discussions regarding:  donations; shipments of gas masks; procurement of night vision

goggles; safe routes into Afghanistan; and the type of personnel needed to support the jihad.

Through the Azzam email accounts, members of the support cell also checked on the bona fides,

through direct contact with then Chechen mujahideen leader Shamil Basayev, of an individual

seeking to return from the United States to Chechnya with hand warmers for the Chechen

mujahideen.[4]  Members of Azzam Publications also sold various products through the websites,

including graphic videos of the murders/executions of captured Russian soldiers.  At the end of

one video, Ibn Khattab, the then-Commander of the foreign mujahideen in Chechnya, personally

acknowledged the brothers at Azzam Publications for publicizing the jihad, explicitly thanked

them for their support and efforts, and advised the viewer that he or she could support the

---

[4]    Until his death in 2006, Shamil Basayev was the leader of what is known as the Riyadus-Salikhin Reconnaissance and Sabotage Battalion of Chechen Martyrs, also known as the "Riyadus Salikhin Martyrs' Brigade (hereinafter referenced as "RSRSBCM"), a group of Chechen mujahideen that has employed violence and military action to kill, injure and maim people and to damage and destroy property in an effort to promote the political goals of its members, which include establishing the independence of Chechnya from Russia.  Basayev, as the leader of the RSRSBCM, took part in the planning and execution of a number of terrorist acts, including: (1) the bloody school siege and hostage crisis in Beslan from September 1-3, 2004, which resulted in the deaths of approximately 338 people, including many children; (2) the seizing of the Dubrovka Theater in Moscow in October 2002 that resulted in the deaths of 129 people, including one U.S. citizen; (3) the December 27, 2002 destruction of the Chechen administration complex in Grozny by Chechen suicide bombers, which resulted in the deaths of 78 people and wounded 150 others; and (4) the May 12, 2003 truck bombing of a government compound in the Chechen town of Znamenskoye, which resulted in the deaths of 60 people, including 7 children, and the wounding of an additional 200 people.

Chechen mujahideen by contacting the brothers at Azzam Publications, who Khattab described as being in direct contact with him and other Chechen mujahideen.[5]

Ahmad and his coconspirators also personally attempted to procure and provide military equipment, communications equipment and other materials to support the Taliban, the Chechen mujahideen and associated terrorist groups. For example, Ahmad sought to personally and directly provide assistance to these groups by purchasing 100 cold-weather woodland camouflage uniforms he procured from a Long Island-based company. Ahmad also procured GPS equipment and a bullet-proof vest while visiting the United States in 1998.

### The Battle Group Document

During a December 2003 search of Babar Ahmad's room at his parent's house in London, British law enforcement officers recovered a computer floppy disk that, among other things, contained a password-protected Microsoft Word file that set forth previously classified information regarding the movements of a United States Navy battle group that was charged with enforcing sanctions against the Taliban and engaging in missions against Al Qaeda – information which included details on the battle group's movements as it was to transit from California to the Gulf region in the Spring of 2001.[6] The document went on to discuss the battle group's perceived vulnerability to terrorist attack. Additional investigation and computer forensic analysis by the Department of Homeland Security ("DHS") later determined that Ahmad's now

---

[5] Until his death in March 2002, Ibn Khattab was the mujahideen leader of the Islamic International Peace Keeping Brigade (IIPB), a group of Chechen mujahideen that has employed violence and military action to kill, injure and maim people and to damage and destroy property in an effort to promote the political goals of its members, which include establishing the independence of Chechnya from Russia.

[6] The file was not a U.S. Navy document, but a Microsoft Word document setting forth the foregoing material.

co-defendant, Syed Talha Ahsan, had previously possessed, accessed, modified and re-saved the electronic battle group document before it was found in Ahmad's possession.

The electronic document, which forensic analysis by DHS determined was last modified and saved on April 12, 2001, discussed, in considerable detail, the makeup of a U.S. Navy battle group, each of its member ships (including a Navy destroyer, the *U.S.S. Benfold*), the specifications, assignments and missions of each ship, the battle group's planned movements, and a drawing of what was believed to be the group's formation when it was to pass through the Straits of Hormuz. The document specifically noted that the battle group was tasked with enforcing sanctions against Iraq and conducting operations against Afghanistan and Al Qaeda. The document stated that the battle group was scheduled to pass through the Straits of Hormuz on April 29, 2001, at night, under a communications blackout, and explicitly described the group's vulnerability to a terrorist attack:

> **Weakness:**
>
> They have nothing to stop a small craft with RPG etc, except their Seals' stinger missiles.
>
> **Deploy ops in Gulf 29 April - 04 October.**
>
> **29th APRIL is more likely the day through the Straits. For the whole of March is tax free - a moral booster. Many sailors do not like the Gulf.**
>
> **Please destroy message.**

[sic] (emphasis in original).

Navy officials subsequently confirmed that the battle group composition; and the dates and location of the movements of the battle group in the document were accurate. Navy officials also confirmed that, at a minimum, the advance knowledge of the ships' movements through

restricted waters would have been classified SECRET in or about early March 2001, the time the information appears to have been disclosed.

### *E-mail Between Abujihaad and Azzam Publications*

Search warrants executed upon the various email accounts associated with the Azzam websites disclosed several email exchanges between late 2000 and the Fall of 2001 with an individual who was as an enlistee in the United States Navy on active duty in the Middle East and stationed onboard the *U.S.S. Benfold*. Specifically, the searches recovered various emails between Azzam Publications and the defendant, Hassan Abujihaad, from Abujihaad's military-based email accounts: abujihah@benfold.navy.mil and AbujihaadH@benfold.navy.mil, and his personal email account, abujihaad01@hotmail.com. Header information indicated that Abujihaad sent certain of the recovered emails from the *U.S.S. Benfold* and sent other recovered emails from a Navy-based IP address.

Abujihaad was granted a SECRET clearance on January 6, 1998, and Navy officials have confirmed that Abujihaad's position, duties and responsibilities would have given him access to the information contained in the battle group document. Specifically, while aboard the *U.S.S. Benfold*, Abujihaad's primary position and responsibilities were those of a Signalman in the Navigation Division – a position that afforded him access not only to the "signal shack" and the bridge, but also to the ship's "sail or transit plans," its navigational charts and "planned intended movements" (or "PIM").

Recovered emails between Abujihaad and Azzam Publications include discussions regarding: (1) videos Abujihaad ordered from Azzam Publications that promoted violent jihad; (2) a small donation of money Abujihaad made to Azzam; and (3) whether it was "safe" to send

materials to Abujihaad at his military address on board the *U.S.S. Benfold*. In one email in particular, Abujihaad: (1) described a recent force protection briefing given on board his ship; (2) voiced enmity towards America; (3) praised Usama bin Laden and the mujahideen; (4) praised the October 2000 attack on the *U.S.S. Cole*; and (5) advised the members of Azzam Publications that such tactics were working and taking their toll. The response from Azzam Publications encouraged Abujihaad to "keep up the psychlogical warefare" [sic].

In addition, searches executed in 2004 on email accounts that were associated with administering the Azzam websites determined that Hassan Abujihaad's contact information – that is, his abujihah@benfold.navy.mil email account – was among the relatively few saved by, and found in the possession of, the members of Azzam Publications, insofar as it was proactively saved in the Azzam Publications online Yahoo Address Book (list of contacts). In other words, of the estimated hundreds of individuals who contacted Azzam Publications through their websites by email, only a much smaller subset of those addresses were saved to the Azzam Publications Yahoo Address book. Hassan Abujihaad's military email address was among those saved and recovered during the 2004 search.

### Derrick Shareef's Statements Regarding Abujihaad

As discussed in greater detail below, in September 2006, an individual named Derrick Shareef ("Shareef") became acquainted with an individual in Rockford, Illinois, a suburb of Chicago. During the course of their acquaintance, Shareef advised this individual that he (Shareef) wanted to commit acts of violent jihad against targets in the United States and to obtain funds to further goals of violent jihad. Unbeknownst to Shareef, his acquaintance was a government informant who was cooperating with the FBI. Investigators soon learned that, in

2003-2004, for a total of approximately seven months, Derrick Shareef had lived with Abujihaad in Phoenix, Arizona – where Abujihaad had settled after completing his military service.

During the course of Shareef's relationship with the CI, and specifically, between October and November 2006, Shareef stated on several occasions that Abujihaad told him that he (Abujihaad) was the individual responsible for the disclosure of the battle group information that was subsequently found on the computer floppy disk. It is these statements that the government seeks to introduce at trial as statements made in furtherance of the then-ongoing seditious conspiracy and/or conspiracy to kill or attempt to kill U.S. military personnel that is described in detail below. The government also intends to introduce certain of the material described below at trial as admissions by the defendant and/or as other acts demonstrating, e.g., state of mind, motive and intent.

## II.     EVIDENCE OF CONSPIRACY, INTENT AND OTHER ACTS

At the evidentiary hearing scheduled for November 28-30, 2007, the government anticipates establishing that: (1) from 2001 through at least late 2006, the defendant, Hassan Abujihaad, had an ongoing and demonstrated interest in plotting and supporting attacks on U.S. military personnel; (2) for a period of time in 2003-2004, and again in October through late November 2006, Abujihaad and Derrick Shareef participated in discussions about engaging in an attack on a domestic U.S. military recruiting station and engaging in a coordinated sniper attack on a domestic U.S. military base / barracks; and (3) a preponderance of the evidence demonstrates that from at least early October 2006 through November 2006, Hassan Abujihaad

and Derrick Shareef conspired to commit sedition in violation of 18 U.S.C. §2384 and/or

conspired to kill or attempt to kill U.S. military personnel in violation of 18 U.S.C. §§ 1114 and

1117. The evidence that the government anticipates eliciting at the hearing is set forth below, as

much as possible, in chronological order.[7]

**Abujihaad's July 2001 email to Azzam Publications.** The first evidence of

Abujihaad's interest in attacks on U.S. military personnel is his provision, in or about March

2001, of the information that was subsequently found in the electronic battle group document

recovered in London. That is, of course, the subject matter of this case. Abujihaad's July 2001

email to Azzam Publications (which he has specifically admitted in recordings to sending) is also

relevant to the alleged conspiracy as background, evidence of intent, and to explain the

development in 2004 of Abujihaad's relationship with Shareef, and later, their conspiracy to

attack United States military installations that had its beginnings in 2004 and became active

again in 2006.

Specifically, in or about July 2001, Abujihaad sent an email to Azzam Publications, in

which Abujihaad described part of the substance of, and the reaction of officers and other

---

[7] It is the government's understanding that the purpose of the November evidentiary hearing is to determine preliminary questions of admissibility regarding certain evidence and, accordingly, it is one at which the Federal Rules of Evidence do not apply. *See* Fed. R. Evid. 104 ("Preliminary Questions"): "(a) Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges."; *see also Bourjaily v. United States*, 483 U.S. 171, 179, n.2 (1987) (when determining their admissibility, the trial court may consider hearsay statements including the coconspirator's statements themselves); *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993); *United States v. Rastelli*, 870 F.2d 822, 838 (2d Cir. 1989); *United States v. Ortiz-Rengifo*, 932 F.2d 722, 725 (2d Cir. 1987) (citing *Bourjaily* for the proposition that the court is permitted to use hearsay evidence is assessing admissibility of coconspirator statements).

enlistees to, a briefing given on the ship. The email indicated that the briefing was provided to help Naval personnel protect against terrorist attacks similar to the October 2000 attack on the *U.S.S. Cole*. Voicing enmity towards the "American enemies" and strong support for the "Mujihideen Feesabilillah," Abujihaad's email praised those who attacked the *U.S.S. Cole* and "the men who have bro[ught] honor . . . in the lands of Jihad Afghanistan, Bosnia, Chechnya, etc." The response sent on July 19, 2001 from an Azzam Publications email account praised Abujihaad's comments and encouraged him to "Keep up with the Dawah and the psychlogical warefare [sic]."[8]

The full text of the email, sent from abujihaad01@hotmail.com approximately six months after the *Cole* attack, read as follows:

> Assalaamu'Alaikum [Peace be upon you]
> Brothers/Sisters of Al-Islam
>
> i am a muslim station onboard a u.s. warship currently operating deployed to the arabian gulf. it shall be noted before usama's latest video was viewed by massive people all over the world. that psychological anxiety had already set in on america's forces everywhere. all this is due to the martyrdom operation against the uss cole. since then every warship station either on the western or eastern shores of america who come to operate in the 5th fleet op area has tobe given a force protect brief. well during the brief, i attended there was one thing that stuck out like thorns on a rose bush. i do not know who was the originator of this either top brass or an american politician. well here is his/her statement: "america has Never faced an enemy with no borders, no government, no diplomats,nor a standing army that pledges allegiance to no state." Allahu Akbar! [God is Great] Allahu Akbar! i give takbirs [a proclamation of the greatness of God] because i know deep down in my heart that the american enemies that this person has discribe is the Mujahideen Feesabilillah. these brave men are the true champions and soldiers of Allah in this dunya [this world – and its earthly concern and possessions, as opposed to more spiritual realms]. i understand fully that they are the men who have brong honor to this weak ummah [Muslim community] in the lands of jihad afghanistan,bosnia,chechnya, etc. Alhamdulillah! With their only mission in life to make Allah's name and laws supreme over this world. i want to let it be known that i have been in the middle east

---

[8]    "Dawah" is an Islamic term that means missionary work for Islam.

for almost a total of 3 months. for these 3 months you can truly see the effects of this psychological warfare taking a toll on junior and high ranking officers. but after the latest video supporting palestine. the top brass and american officials wererunning around like headless chickens very afraid, wondering if there is a possible threat. but this time the american population got wind of this and they came to know just how afraid the u.s. government is. thomas l. friedman wrote an article in the new york times called: "what it takes to make the americans turn tail, run." thisarticle was distributed on my ship and most of the sailors said it was so true about the american government, and they feel like they are working for a bunch of scary pussies..........a Brother serving a Kuffar [non-Muslim / non-believer] nation..
Astaghfir'Allah....Hassan

[sic]. The reply email dated July 19, 2001, sent from "Qoqaz.Net" from the email account

azzampublications@yahoo.com to both abujihaad01@hotmail.com and qoqaz@azzam.com read:

> AsSalaamAlaikum brother hassan,
> What can we?
> You said it all, and all I can add is that the Kuffar know that they cannot defeat the Mujahideen (the warriors of Allah). I trust that you are doing your best to make sure that the other brothers & sisters in uniform are reminded that their sole purpose of existence in this dunya is purely to worship our Lord and Master, Allah (SWT).
> May Allah be with you & your brothers and sisters and keep you from all harm.
> Keep up with the Dawah [call to Islam] and the psychlogical warefare.
> WasSalaam,
> From just another slave of Allah at Azzam Publications......

[sic].

**Background Regarding Hassan Abujihaad and Derrick Shareef.** Following

Abujihaad's discharge from the Navy in early 2002, he returned to and settled in Phoenix,

Arizona. Beginning sometime in 2003, Abujihaad befriended then seventeen- or eighteen-year-

old Derrick Shareef, who he met at the Islamic Community Center of Phoenix.

According to Shareef, he and Abujihaad instantly bonded. Shareef had converted to

Islam at the age of sixteen (16) while living in Detroit, Michigan. Abujihaad was a convert as

well, having converted sometime in or about 1995, prior to his enlistment in the U.S. Navy.[9] Shareef started to spend a lot of time with Abujihaad and eventually wound up moving in with and living with Abujihaad at two different times in 2003/2004, for a total of approximately seven (7) months.  During that time, among other things, Abujihaad supported Shareef; tried to help Shareef in finding work; helped Shareef in getting his General Education Diploma; and encouraged Shareef to take college-level courses.

According to Shareef, he looked up to Abujihaad like a brother.  Abujihaad became Shareef's guide and helped him in getting his life in order.  Abujihaad even encouraged Shareef to join the Navy.  Shareef took the entrance ASVAB (Armed Services Vocational Aptitude Battery) test but decided against joining.

Abujihaad and Shareef began discussing the terms and justification for jihad early in their relationship.  According to Shareef, the topic first arose when the two were watching an Azzam Publications video entitled "Martyrs of Bosnia," a video which depicted attacks by mujahideen against military targets.  While living with Abujihaad, Abujihaad also showed Shareef his AK-47 on a few occasions.

Shareef owned an SKS rifle, which he purchased for $275.00 in Phoenix when he was eighteen (18) years old.  On one occasion, Shareef went to a range with Abujihaad to engage in target practice with the weapon.

Shareef moved away from Phoenix sometime in late 2004, relocating to the Chicago, Illinois area.  Shareef kept in touch, but had only intermittent contact with Abujihaad from approximately December 2004 through July 2006, when Shareef sought Abujihaad out for advice

---

[9]   After converting, Abujihaad legally changed his name from Paul R. Hall, to Hassan Abujihaad (meaning "father of jihad").

and in connection with other efforts, as more fully described below.  Shareef also traveled to Phoenix in late October 2006, during which time he again stayed with Abujihaad.

**Background Regarding Derrick Shareef and the Government Informant.**  In or about September 2006, Shareef became acquainted with a Muslim convert in Rockford, Illinois, a suburb of Chicago.  As with Abujihaad, the two bonded and soon Shareef was living with and being supported by this individual.  During the course of their acquaintance, Shareef advised this individual that he (Shareef) wanted to commit acts of violent jihad against targets in the United States.  Unbeknownst to Shareef, his acquaintance was a confidential informant ("CI"), who was cooperating with the FBI.

Shareef made an introduction between the CI and Abujihaad and, between October and December 2006, the CI was in a position to engage in numerous conversations with Shareef and Abujihaad.  These conversations provided further evidence that, during at least October and November 2006, Abujihaad and Shareef conspired to commit sedition, in violation of 18 U.S.C. § 2384, and/or conspired to kill or attempt to kill U.S. military personnel, in violation of 18 U.S.C. §§ 1114 and 1117.  This evidence revealed the following.[10]

**Shareef Tells the CI of his Relationship with Abujihaad.**  On or about October 1, 2006, Shareef first told the CI that he (Shareef) learned his Islamic ideology as well as some weapons training from a friend who resides in Phoenix, who he referred to as "Hassan," and "Abujihaad."  Shareef told the CI that he met Abujihaad at a masjid [mosque] in Phoenix, where

---

[10]  The government is in the process of preparing transcripts of the various recordings on which it intends to rely for the November evidentiary hearing and subsequent trial.  Accordingly, quoted conversation or transcriptions set forth herein are derived from what remains a work in progress.  The conversations are set forth, however, by way of notice and in the spirit of cooperative discovery, and the government reserves the right to make any changes before finalizing any transcripts.

Shareef had moved to be with his father, after Shareef had had disagreements with his mother and stepfather in Illinois.

The very first time Shareef told the CI about Abujihaad and his relationship with him, Shareef also told the CI that Abujihaad was previously a member of the United States Navy. Shareef told the CI that Abujihaad had connections to Islamic militants outside the United States, including a well known Pakistani Imam who resides in England and is connected to Al Qaeda. Shareef told the CI that Abujihaad had previously provided coordinates for Navy ships, specifics on the weapons on those ships, and the number of personnel on those ships. Shareef told the CI that, after the recovery of the information on computer disk(s), the information was reported in the media. Shareef told the CI that, following the news reports, Abujihaad destroyed evidence related to his actions.

**Abujihaad and Shareef Discussed Attacking a U.S. Military Recruiting Station in 2003.** On October 4, 2006, during a conversation with the CI, Derrick Shareef stated that he had previously thought about bombing U.S. military recruitment centers. On November 12, 2006, during another conversation with the CI, Shareef stated that a few years back (i.e., in or about 2003), he and Abujihaad had discussed attacking a specific U.S. military recruiting station located in a Phoenix mall. Shareef stated that Abujihaad sent him (Shareef) to the recruiting station to take the ASVAB (Armed Services Vocational Aptitude Battery) test. Upon his return, Shareef reported to Abujihaad that the recruiting station had representatives from each branch of the armed services (Army, Navy, Air Force and Marines). Shareef reported to Abujihaad that the military recruiters at the station were very relaxed and that they appeared to be unarmed. Shareef told the CI that Abujihaad told Shareef that it would be easier to hit a recruiting station than other

-18-

targets. Shareef told the CI that he and Abujihaad "talked about attacks there because you could get them all at once" and that "you could go in with a gun or grenade and get them all at once." Shareef told the CI "we could go in again and pretend to recruit."[11]

**Abujihaad and Shareef Discussed Attacking San Diego Military Barracks in 2004.**
During a conversation on October 13, 2006 – (a conversation which also included comments that Abujihaad maintained an active interest in jihad and could be trusted because of his involvement with the battle group material) – Shareef told the CI that while he and Abujihaad were still both living in Phoenix in 2004, Abujihaad had conceived a plan to attack U.S. military installations in or near San Diego, California. According to Shareef, Abujihaad's plan called for diversionary weapons fire that would draw soldiers from their barracks after which pre-positioned attackers would shoot the soldiers as they left their barracks. Shareef expressed his support for targeting military installations, indicating that Abujihaad was "the first brother" who "put him on" to the idea and describing it as a "respectful action" that "cannot be refuted." Shareef also advised the CI that Abujihaad was "down for the cause" and could be trusted because Abujihaad's trouble with the battle group incident was a while ago; Shareef and Abujihaad were friends after that trouble; and Abujihaad is more subtle now and "trying to stay off the radar."

**Shareef and Abujihaad's Intended Travel to Morocco Together.** On October 10, 2006, Shareef told the CI that he (Shareef) and Abujihaad were planning to go to Morocco

---

[11] During post-arrest statements, Shareef confirmed much of what he had previously said to the CI, but also backed off certain statements in an arguably self-serving way. For example, in post-arrest statements, Shareef claimed that his and Abujihaad's discussions about attacking a military recruiting center in Phoenix and a U.S. military base in San Diego were "idle talk," which never went beyond that. Shareef's post-arrest minimization of his and Abujihaad's plans, and Abujihaad's role therein, appear self-serving and intended to protect Abujihaad given Abujihaad's mentor-like relationship with Shareef; Shareef's stated loyalty to Abujihaad, and the recorded, inculpatory statements by Shareef and Abujihaad.

together and that Abujihaad was going to sponsor him or help pay for his trip.

**Shareef took an Oath to Abujihaad.**  On October 11, 2006, Shareef told the CI that he took an oath to Abujihaad not to speak about certain things.  Shareef indicated that he had broken that oath by telling the CI about Abujihaad's provision of the battle group material.  Similarly, during a conversation on October 12, 2006, Shareef told the CI that he took an oath to Abujihaad and, as a result, could not talk about certain things.

**Shareef and Abujihaad's Secrecy and Coded Communication.**  On October 16, 2006, Shareef told the CI that Abujihaad was smart and would not discuss jihad operations over the telephone or the internet.  Shareef stated that Abujihaad's heart is on the battlefield.  Shareef stated to the CI that Shareef and Abujihaad used codes when communicating – specifically, they used the number seven (7) to mean "jihad."

**Shareef's Introduction of Abujihaad to the CI in 2006.**  As the relationship between Shareef and the CI progressed, Shareef eventually made an introduction of the CI to Abujihaad on or about October 12, 2006 and, after that, the CI occasionally communicated with Abujihaad directly.  According to the CI, during the communications with Abujihaad, Abujihaad advised the CI that he was still "up for the seven (7)," which the CI understood to be their code for jihad.

**Shareef and Abujihaad's Interest in Recruiting a Caucasian like the CI.**  On October 5, 2006, Shareef told the CI that he (Shareef) and Abujihaad had been looking for a Caucasian to join them to facilitate getting things and to give them credibility.  A portion of that conversation follows.

| | |
|---|---|
| CI: | So was he [Abujihaad] good with a gun? |
| Shareef: | Yeah, he was cold with it.  He had modifications on it and everything. |

| | |
|---|---|
| CI: | I mean he could shoot though. |
| Shareef: | Yeah, I helped him modify that mother. |
| CI: | (UI). I got to take you with me, dude. I got to show you my skills, baby boy. I'm cold. You don't think I'm cold? |
| Shareef: | I, man, you Caucasian dude, we got big respect for brothers like you. We used to be talkin' about tryin' to find a brother like you, like, man, we need to find us a, a Caucasian brother. |
| CI: | 'Cause I, I . . . |
| Shareef: | So we can have him . . . |
| CI: | . . . but I was trained as a sniper in ROTC and all that, man. |
| Shareef: | Just have him use his name and credibility so we can get everything we need to get done. (Laughs). Have him do everything. |

During this, and other, similar discussions, the CI understood Shareef to mean that Shareef and Abujihaad were looking to recruit a Caucasian individual like the CI to join them because they believed that a Caucasian might be in a better position to obtain weapons and pursue other, similar efforts, without drawing or attracting attention to them.

**The Ongoing Interest in the Sniper-Attack on a U.S. Military Base.** On or about October 16, 2006, Shareef told the CI, in regards to the prior discussions about attacking U.S. military bases, "I want to hit a base with an R.P.Gizzle" (meaning rocket propelled grenades or "RPGs").

On October 17, 2006, Shareef and the CI discussed logistics for a possible attack. Shareef stated that, even if Abujihaad would not participate on the actual "battlefield," he would nevertheless support with "financial aid and logistics." Shareef specifically spoke again about

Abujihaad's plans to attack San Diego military bases:

> CI:          So he told you Ak that he had plans to hit a military base?
>
> Shareef:     Man, he told me he had . . . he was like, like tellin' me how he already knew how he was gonna do it, when and what time of day. You know what I'm saying? I mean people he needed, like he had it all mapped out. It was like, it's all, it's all here . . . Just let me know when and where. I said something like where do I sign up. Where do I sign. Like just let me know when and where, man.

During the conversation, Shareef also explained to the CI how he and Abujihaad came up with the code word of "seven" for jihad, explaining that it relates to the seven levels / pillars of Islam, with seven being the highest reward. Shareef also told the CI that the last time he spoke with Abujihaad about jihad was not a couple years ago, but "right before [he] came here."

During a conversation on October 20, 2006, while discussing a potential attack, Shareef stated that they should be able to kill at least ten (10) people for each mujahideen fighter that they had.

During a conversation on October 21, 2006, Shareef and the CI discussed traveling to Phoenix to discuss their plans further with Hassan Abujihaad and to re-confirm his participation and support. During the conversation, the CI asked: "You think Has will be in it? You think Has will help us? See I don't want to waste my time and trip." Shareef assured him: "In one way or another I believe that Has is down to help." The CI asked: "You think, you think he'll give us logistical support?" Shareef responded: "I think he'll give us logistical support or financial support." The CI said: "I don't want him in the mix, AK. I don't want him out on the battlefield, okay. 'Cuz the heat's on him. I don't care what anyone says. Just 'cuz he didn't get caught don't mean they're not watchin'. But at the same time, Akhi, I want, at least if he could

tell us what, who, you know, the condition, you know, with information that he has . . ." Shareef agreed. Later in the conversation, the CI suggested that they do some research to locate military recruiting stations. Shareef responded: "I already know where some are out of state. I know where the ones in Phoenix are. They got recruitin' centers at the mall."

On October 24, 2006, Shareef reported to the CI that Shareef and Abujihaad wanted and needed to have a face-to-face meeting to discuss operations regarding a potential attack. Shareef confirmed again that Abujihaad would provide logistical and financial support for the operation.

**Shareef's Travel to Phoenix in late October 2006.** Reports from the CI as well as independent physical surveillance by law enforcement officers established that on October 27, 2006, Shareef traveled by train to Arizona and met with Abujihaad in Phoenix from October 28-29, 2006; and on October 31, 2006, Shareef returned by train to Rockford, Illinois.

During his trip, Shareef called the CI on a number of occasions to report on developments. Shareef reported to the CI that he had been picked up at the train station in Flagstaff, Arizona by Abujihaad, who then gave him a ride to Phoenix. Shareef told the CI that Abujihaad would not agree to meet in a hotel because that is how law enforcement operates. Shareef said that, if anything, Abujihaad would go for a walk to speak about things. After his meeting with Abujihaad, Shareef told the CI "we got the green light, we got the go-ahead."

Upon his return home, Shareef reported further on the results of his trip to the CI. Specifically, on October 31, 2006, Shareef told the CI that San Diego was still on the list, referring to Abujihaad and Shareef's previous interest in attacking a U.S. military base in San Diego. Shareef told the CI that while meeting with Abujihaad in Phoenix, they discussed again their interest in attacking U.S. military installations. According to Shareef, they discussed hitting

barracks or a cafeteria; and the cafeteria was deemed a safer target because of their belief that the personnel would not be expected to have weapons in a cafeteria.

Shareef stated that, while in Phoenix, he learned of an individual who could train them to use a sniper rifle. Shareef told the CI that Abujihaad had been to a shooting range and had dressed like a non-Muslim when seeking such training.

Shareef also told the CI that he and Abujihaad discussed naming their group either AIM (American Islamic Movement) or AMMO (American Muslim Mujahideen Organization).[12] Abujihaad proposed that they use the name "AIM" as a public name for the purpose of raising funds for charity, while AMMO could serve as the name for their "militant wing."

During the conversation, among other things, Shareef specifically stated that Abujihaad remained supportive of the jihad and confirmed that he would at least support with logistics:

Shareef:     Dude, Has said, uh . . . anything defensive, he down with. Any defensive operation . . .

CI:          What does he mean by that though?

Shareef:     By that he means that . . . Kuffar made an act and we are reacting. You know what I'm sayin'? Which nothing has called for that to date, but for example, when that sister out here got her hijab snatched off, she got beat down. Let's say one of the girls that did it dropped her ID, and it was time to ride. That would be defensive. He said he'd be down for anything like that, no questions asked, let him know. Offensive, which would be, you know what I'm sayin', targeting a place, figuring out stuff. He said you gotta make istikhar because you want to do everything accordingly. So he said, he said he didn't say he was in opposition. He just said you gotta make istikhar about it. I said okay. Didn't pressure him. I asked him if he was down with offering help with logistics, help with uh, with pickin' out stuff, help with organizing the operation. He said all that is cool. He's with all of that.

_____

[12] These names were proposed by the CI and discussed between the CI and Shareef during previous conversations.

CI:                    Okay.

Shareef:               And then he offered uh, offered us what's goin' on right now, which
                       is information . . . Which is information about the dude who could do
                       the sniper training.

Shareef added: "the dude is all for it, man.  I mean, I know Has, I know how Has get down, he

don't just kick it with anyone."  When the CI asked: "What does he mean by logistics though?"

Shareef responded:

Shareef:               He means like . . . like Has, he's, he's a smart dude, man.  He can
                       help coordinate some, you know, so where it's not just like some
                       random ass raid with niggers goin' in there sprayin'.  You know, to
                       where it is, it's co – , it's coordinated, to where everything is mapped
                       out, escape route, you know what I'm sayin', entrance route.

CI:                    You sure he be down . . . you sure he'd do that though?

Shareef:               Yeah, he told me he was.  He said he's down with it.  He said he's
                       down with it.

Shareef went on to say that he told Abujihaad "about AIM and AMMO" and Abujihaad "said we

should use both names."  Shareef continued:

Shareef:               He said we should use AIM as our, as our forefront name because we
                       can use that name and be able to do things with it.  We can, we can
                       be political with it . . . We can, we can like print up pamphlets and
                       papers . . . anything we do with that thing we can do, legally, and
                       have it to where that's like our corporation.  You know, AIM,
                       American Islamic Movement.  Bam.  That's just the business front.
                       You know what I'm sayin'?  And then with the other one that's just
                       straight seven . . . Nobody knows about it.  Nobody knows these two
                       organizations are even together.  You know what I'm sayin'?"

CI:                    What about weapons?  Does he want me to do it?  To leave it up to
                       me?  'Cuz I . . .

Shareef:               I, I told 'em you had the connect.  So he was like ready to place
                       orders.  I'm like, you know, let me get back and see what's up.

Later, Shareef told the CI: "Another thing [Abujihaad] spoke of was like, you know, nobody has

to relocate. We can, we can operate in cells. You know what I'm sayin'? He could be out there doin' his thing. We keep in contact. He will recruit out there. Do his thing out there. We do our thing out here. If he got something he need extra people for, he need arms, or he need this, we give 'em what he needs and vice versa. That's another thing he said." Towards the end of the conversation the following exchange occurred:

Shareef:        . . . So whatcha think, man? Did I do what I was supposed to do?

CI:             Na'am, na'am, humdillah. At least we know he's down. I just wanted to know if he had plans in the works.

Shareef:        He did . . . and we can carry 'em out Insha'Allah. But them were in Diego. The stuff he had planned and mapped out.

CI:             I mean did he talk about that?

Shareef:        We, we talked about it a little bit. He was tellin' me to uh, that it would involve him goin' on a base, like during their lunchtime, so you would need clearance for it.

CI:             You wouldn't?

Shareef:        No you would. He was talkin' about hittin' it, you know, where everybody at, at lunch. You don't just gonna roll up in there, you know. We can't just go up in there five deep. You know what I'm sayin'? Everybody camou'd up. We just roll up in there, you know, sightseeing. It, it ain't that type of ball game.

CI:             No, I've been on bases before.

Shareef:        So apparently you need some type of clearance. But, um, he said he was gonna go up in there while they on lunch. Someplace. He like, he like knows exactly where it's at and how it's set up. He said if you pop 'em from that angle, then everybody rush out 'cuz ain't nobody gonna be in the cafeteria armed up. Then you got a flank over there, that's just poppin' 'em.

CI:             Cross fire.

Shareef:        That's where a sniper will come in, dude. He said with two dudes

<blockquote>you can go in there and put it down.  And I remember him tellin' me about this back when we first hooked up.</blockquote>

CI:          But he still had that plan?

Shareef:     Yeah.  But it's still the same plan.

**Abujihaad's November 3, 2006 Conversation with the CI.**  On or about November 3, 2006, Abujihaad had another discussion with the CI directly.  Abujihaad asked whether Shareef had discussed "the business" with the CI.  The CI responded "yes."  Abujihaad then inquired, "what do you think?"  The CI replied, "I'm down with it."  The CI understood the discussion to be about the potential for an attack.

**Shareef and Abujihaad's Efforts to Obtain Weapons Through the CI.**  During the course of the relationship between Shareef, Abujihaad and the CI, Shareef and Abujihaad also negotiated the purchase of weapons and ammunition through a source introduced by the CI.

For example, in the same October 13, 2006 conversation in which Shareef told the CI that in 2004 Abujihaad had proposed planning an attack on a San Diego military installation, Shareef and the CI discussed weapons to be obtained through the CI.  The CI asked Shareef to write down his weapons request on a piece of paper.  Shareef told the CI that he was "waiting for what Abujihaad wants him to do."  During the conversation, Shareef also told the CI that he (Shareef) and Abujihaad, in an earlier effort to obtain weapons, had dressed like "kaffirs" (non-Muslims / non-believers) and attended gun shows where Abujihaad had purchased weapons.

According to the CI, in November 2006 Abujihaad instructed Shareef to obtain or purchase AR-15 rifles in lieu of AK-47s or other automatic weapons.  Abujihaad advised Shareef to purchase "the cheap stuff" because Abujihaad could modify semi-automatic weapons to make them fully automatic.

On November 9, 2006, the CI introduced Shareef to an undercover federal law enforcement agent ("UC"), who showed Shareef, among other things, multiple MAC-10s; a Glock pistol; and miscellaneous other firearms.  During the meeting, Shareef repeatedly told the UC that, among other things, he wanted to obtain two AR-15s for his associate in Phoenix. ("One of my guys in Phoenix wanted to know if you can come up on two AR-15s." . . . "My dude in Phoenix he just want two AR's . . . an AK and a Glock." . . .  "I think definitely, he definitely wants to come up on the two AR's.").  Shareef inquired about the price of AR-15s, AK-47s, Glock 33s, body armor and hand grenades.

Later that day, Shareef spoke with Abujihaad.  After their conversation, Shareef told the CI that Abujihaad thought that $600 per rifle was a good price because the weapons could not be traced back to them and that they had not been used to kill anyone.  Shareef also told the CI that Abujihaad wanted 1,500 rounds of ammunition because that was the amount of ammunition that a U.S. Marine would carry.

According to the CI, on November 12, 2006, Abujihaad contacted Shareef on multiple occasions to discuss the potential weapons purchase further.  Shareef told the CI that Abujihaad believed that a more recently discussed price of $1500.00 for the two AR-15s was still a good deal because it was better than buying the weapons legally, as they could be traced.  Abujihaad asked that Shareef and the CI personally transport the weapons and deliver them to him in Phoenix.

On November 15, 2006, Abujihaad and the CI spoke directly again.  During the conversation, Abujihaad told the CI specifically what type of weapon he (Abujihaad) would like to acquire, stating that he (Abujihaad) had found the model he preferred while searching the

Internet.  Abujihaad stated that he wanted a "STAG" which manufactures a model for left-handed shooters.  Abujihaad also told the CI that he could shorten the stock and barrel on this particular model.

**Corroborating Evidence Pre-Dating Shareef's Arrest.**  Additional information not only corroborates much of the above, but provides even further evidence of the seditious conspiracy and the conspiracy to kill U.S. military personnel, as well as evidence of Abujihaad's intent.  As much as possible, these materials are also set forth in chronological order.[13]

On November 11, 2006, Abujihaad called the CI.  During the conversation, the CI told Abujihaad that "Talib" (their name for Derrick Shareef) had "told him [the CI] everything, you know, about the brothers."  The CI expressed concern to Abujihaad that "Talib, man has been talking a little too much to me."  The CI told Abujihaad, however, that Shareef – "he trusts me." Abujihaad responded "Talib, he be slippin' though.  I mean, for real . . . for real."  Abujihaad goes on to tell the CI that "I was just like, critiquing like, you know, Talib . . . he came at me and he, you know, he shared something with me, but Talib is like, he is like, inexperienced, you know what I mean?  He ain't seen me in like three years or something, or maybe two . . . first thing he didn't do . . . he should have just sit back and observed, like my actions, you know what I mean?"  The CI says, "He's learning.  I mean, he's learning."  Abujihaad responds, "yeah."

Later that day, in the evening, Abujihaad and Shareef talk over the phone.  During the conversation, Shareef asks Abujihaad "what was all that stuff you was sayin on the computer,

---

[13]  The dates and times for the intercepted calls that have been produced on CDs in discovery as well as the intercepted calls that will be introduced on CDs at the hearing and at trial are in Greenwich Mean Time (GMT).  As best as possible, any dates and times for such calls in this brief have been adjusted to relate to the actual local date and time in Phoenix or Chicago when the call took place (i.e., six or seven hours earlier).

man, I couldn't understand you?" Abujihaad responds, "I don't talk on the phone about that . . . I just hope you ain't . . . If I shared something with you that I thought that should be secure, I hope you keepin' it secure, that's all I'm saying." Shareef responds, "man, everything is all good, dude. I only kick it with the trustworthy, man." Abujihaad responds, "that don't mean nothin . . . if I told you something . . . that means that I hope it's secure – as secure as a dead man's mouth." Shareef replies, "oh, no doubt." Abujihaad goes on to say "once a man is being tortured, any man can be forced to say anything, hopefully he won't but that's not a guarantee . . . you see what I'm saying? That's what I mean by that . . . and I ain't gotta, there's no more to elaborate besides that point, you know what I mean . . . I'm just saying, you know what I'm saying, if you told me something that should be, uh, secure as a dead man's mouth, then it should be between me and you. That's what I'm telling you." Abujihaad continues: "What these kaffirs [non-believers] are doing to the movement, you know, as far as sending you to these special places and giving you, uh, these narcotics and shit to get you to run your mouth, you know what I'm saying? I'm just talkin' in those terminologies, you know what I'm saying? I'm not – believe me, as far as me – I'm not upset with you, don't take it in that manner." Abujihaad continues: "That's nothin' to talk about on the phone . . . the pigs they probably already got my new phone number . . . you know, just put it like this . . . I'm getting to know your boy . . . I'm always suspect of people, but I mean, your dude, he seems like a cool dude, you know what I mean, but when your, uh, name is out there and these fools they want you . . ." Abujihaad goes on to say: "If I told you something, uh . . . something that I'm saying you should keep to yourself so it doesn't compromise the sutra . . . know what I'm saying? Because, if you did . . . say you shared something with somebody that you shouldn't and you left me in the dark, that means my sutra compromised because it doesn't

give me time to prepare or to be having a sense of awareness for what can come at *any* time –
this year, next year, next month, next day.  Got me?"  Abu-jihaaad goes on to say "You got me? .
. . I mean, everything is in piecemeal . . .  You know I don't trust the phones, the phones are
tapped, you got me? . . . 'bout as tapped as the internet, so . . . I try to give it to you as well as I
can."  Shareef responds, "I dig what you're saying."  Abujihaad says, "there's nothing more
important than someone's sutra."  A little later in the conversation Abujihaad explains, "I'm also
about securing myself . . .  I'm not going to hand myself to a kaffir . . . just when he was here . . .
and the kaffir he asked me, 'What do you think about this?  What do you think about that?  What
do you think about this?'  Even if I thought about it, you think I'm gonna sit there and inform the
kaffir, yes, I thought that was a good M.O. [martyrdom operation] . . . you don't tell the kaffir
that . . . yes, I support . . . yes, I like this and that . . . man, that's a dumb brother, feeding these
kaffirs."  Shareef goes on, however, to ask Abujihaad to confirm that he's still down with the
plans that they previously discussed.  Abujihaad asks, "the time you came down here, did you do
a good job of telling me?"  Shareef says, "I thought so."  Abujihaad says, "didn't I give you an
answer?"  Shareef says, "I just need to know basically, you know, that your goin' to be, you
know, open to politic with the brother about what's going on."  Abujihaad says, "Man, I'm not
here to play games with nobody . . . I do have my own agenda, you know what I'm saying? . . .
I'm not saying that what you're bringing conflicts with my own agenda . . . so I can tell you about
that personally . . . if whatever conflicts with that, that can be up for discussion."  Shareef says, "I
mean, basically, as blunt and clear cut as I can be, it's stuff that, you know, I just need to know
from you . . . and I just to need to know if you goin' to be, wantin to let me know these things . .
."  Abujihaad says "and don't forget that's all on conditions of people, too . . . if you talkin'

about, uh, an oath . . . not as an oath as I told you before when you were here, I'm not talking about that . . . I'm just talking about physical conditions as far as when you seen me before and physical conditions as you see me know . . . like when I told you what's wrong with my leg, you know what I'm saying?  I'm working on it . . . like last Tuesday my leg swolled up, I couldn't even walk . . . what I mean, is, there's been physical changes . . . that have affected people that can play sometimes . . . that can be a handicap at certain times, you know what I'm saying?"

Abujihaad continued: "I told you something before you took off, you know what I'm saying? . . . Like I said, I'm suspect of the phone, so . . . I'm suspect of a lot of things, let me put it that way, you know what I'm saying? . . .  And everybody should be that way . . . I'm not saying I don't trust you . . . I'm not saying I don't trust your boy, but . . . first and primary thing for anybody should be their own security."  In reference to outdated versus viable plots, Abujihaad says, "No need to be talkin', come on now . . . I mean there's various levels of things, you see what I'm saying? . . . But you did talk about 'L' . . . now 'L' for me is like a 'cold meal,' 'cuz it ain't fresh. You got me? . . . You'll figure out what the "L" is . . . you put that out there . . . but, uh, you should figure out what 'fresh meal' is . . . and if it ain't fresh it's outdated . . . like it got a bad date on it . . . you got me?  You feelin me? . . . Well you not, you'll know what a 'fresh meal' is by the time your ass leaves here . . . If it ain't fresh, it's unfresh and unbeneficial to you, let's put it that way."  Shareef says, "just know man, we got people, man."  Abujihaad responds, "we don't even gotta speak, I told you about that."  Abujihaad explains, "the people you know . . . keep it to yourself, you got me? . . . I'm talking about you keep them to yourself because the people that you know – keep them secure, that's what I'm talking about . . . you understand what I'm saying?  If I meet 'em, let it be this is Abu Whatever . . . this is Abu Whatever . . . this is Abu

. . . you ain't gotta put a brother's name out there . . . to me, I don't know them, but their secureness is more important to me than knowing what their real name is. You got me? I'm a real dude, put it that way." Shareef indicates that he understands, but says, "I just need to know that you're gonna comply or not – that's what this is about. It's a yay or nay." Abujihaad says "I know, you're saying something serious . . . don't show me nothing concrete, but you know what I'm saying, we already hit bases on some basic things . . . that all depends on what it is . . . I already discussed some things with you . . . as I told you before . . . I told you before, I said, what I told you before . . . when you was here . . . I said I like this, I don't like this . . . or I like this in this situation, that's what I said." Abujihaad goes on to reassure Shareef, however, saying "but yeah – come on, now, I'm down, you know what I'm saying . . . with whatever I can . . . with whatever Allah has instilled me to . . . help out with . . . if I can do that, then I'm for it . . . if that's what you're asking me." Shareef then puts the CI on a speaker phone with him and tells Abujihaad "I just need you to confirm something . . . now, I mean, we just basically need a confirmation as to if you gonna contribute to the efforts that are being made by us in some way, shape or form." Abujihaad responds: "And I said, and I'll say it again, with whatever I can give you that's beneficial, I'll give it to you. But whatever's cold turkey . . . if it's cold turkey, I can't give it to you." Abujihaad goes on to explain, in reference to his ability to provide logistics and current intelligence about U.S. military targets: "'Cuz that means that, if it's cold turkey . . . I'm talking about 'L,' you figure it out . . . I haven't been on that job, so I don't, you know what I'm saying . . . I haven't been there to see what the fresh meal is . . . you understand that? I can't give you the fresh meal I ain't been there in X amount of years. You see what I'm saying?" Instead, Abujihaad told Shareef to speak with an individual who had left the military within the past few

-33-

months and could "give you a fresh meal. Now you put that together . . . But I . . . I mean, in

those terms, in Ls, I be giving you a cold meal. You got me? . . . And I can elaborate on that

more, if you want me to . . . to your face . . . not on the phone, I'm just saying . . . you got me? . .

. A fresh meal and a cold meal . . . ." Shareef then disconnects the speaker phone and confers

with Abujihaad alone. Shareef explains that's all they wanted to know. Abujihaad reiterates,

"but you got me, though? 'Cuz, I mean, you should want a fresh meal . . . I can tell you how to

get a fresh meal though . . . [they laugh] . . . in various ways . . . in various manners and ways . . .

I can tell you how to get a fresh meal . . . that's like, let me see, one, two, three . . . there's three

ways right now to get a fresh meal . . . three ways . . . and you ain't gonna get no better than

that." Shareef says "well this is stuff that we'll talk about when I come see you, Insha'Allah . . .

you can explain them ways . . . but for now I got what we needed to know . . . that's it."

Abujihaad goes on to say "I got you . . . I'm throwing it out . . . cold and hot meals . . . you know

what I'm saying? Yeah, old boy . . . if he said that he can give himself a hot meal, he can give

you a hot meal. He said he can give himself a hot meal in a conversation me and him had, so, if

he wanted to, you know what I'm saying? Ain't got nothin to do with you, he said he can give

himself a hot meal . . . where he can eat a whole lot . . . [they both laugh] . . . put it that way . . .

now I'm saying, is he willing to give it? I didn't ask him. I didn't ask if he willing to share that

hot meal . . . I ain't even go into details with him on that type of stuff . . . he just put it out there

that he give himself a hot meal and eat a lot . . . and, um . . . far as I can give you, that meal that

he got, looks like it's a good meal . . .'cuz it's a place where, uh . . . it's a place where, um . . .

you can go and eat and, uh . . . man, it'd be a good meal . . . it'd be a lot of, uh . . . hmmm . . . I

mean it's just . . . they got, uh, higher caliber meal, you know what I mean? . . . high up on the

plate . . . that meal would be something . . . something tasty." Abujihaad ends the conversation

by reassuring Shareef: "Yeah, man, whatever man, the conversation is open, you know what I'm

saying? I told you. We'll have all the conversations you want – me, you and my shredder, you

know what I'm saying? . . . No electronic components you will be frisked at the door."

Shortly thereafter, the same evening, Abu-jihad called Shareef back and told him that if

the CI is not comfortable with coming to Phoenix to meet in person or if he doesn't feel like

spending the money to travel to Phoenix, then Shareef needs to travel to Phoenix again, by

himself, with concrete information so the CI can "get a big, better picture of what he's looking

at." Abujihaad says that "if $1300, you know . . . if he considers that's a lot of money, you know

what I'm saying . . . and he's not getting nothing out of the deal . . . he needs to send you by

yourself, so . . . I can feed you, or we can, you know, you can feed me, I can feed you . . . and, so

you can create a picture for him." Shareef responds: "We lookin' at tryin' to do more this, time,

though . . . I told him Insha'Allah, that uh, we should try and leave early enough to get down

there and make it to . . . that masjid to check it out while it's open." Abujihaad says, "aw, man

that masjid is beautiful . . . that masjid is beautiful and vacant." Abujihaad says "I'm trying to

aid the situation as best way . . . that I see fit, you know what I mean? . . . If he's [the CI] looking

at it as in a waste of finances . . . or are you gonna leave . . . as he feel that he has . . . left with

nothing." Shareef says "No, see, the thing is, is that, he's talking about coming down there . . .

and getting established . . . if, you know what I'm saying, things are in the, in proper perspective .

. . and I don't think that that's something that I will be able to let him know in just my word, I

think you have to witness and see for himself, you know what I'm saying?" Abujihaad responds,

"Oh for sure. Why not?" During the conversation Shareef says: "nah, what I'm saying is there's

a lot more going into this one than just, you know, comin down there to talk.  He will be coming down there to check the scenery, you know, see the climate, see the masjid . . . ."  During the conversation Abujihaad again returns to the topic of being discreet and counsels Shareef not to talk too much.  Abujihaad tells Shareef about people at the masjid who "be running their mouth."  Abujihaad also tells Shareef that someone even "tried to get me to talk to the gumshoes, when I had that fitna [trouble / upheaval] . . . I'm like, man, you crazy.  I don't talk to the enemy.  I don't talk to those kaffirs, are you crazy? . . . I ain't got nothing to tell you, man.  You're gonna have to be, uh, torturing me like Gitmo or something . . . but I ain't goin out like that, right?  Not myself.  Not me."  During the conversation the CI also asks, through Shareef, it there's anything that Abujihaad wants him (the CI) to bring.  In regard to their ongoing weapons deal, Abujihaad tells Shareef to tell the CI "since I'm left-handed, I might have to get me an Area 15 from somewhere else."  When Shareef asks if that makes a difference, Abujihaad explains that it does because of the direction in which hot shells would eject: "yeah – it does make a difference . . . kinda . . . only certain places they make 'em left . . . that's why I said what's the model of it . . . if he can get anything, that mean he can get 'em from anywhere, any type of brand . . . 'cuz what happens is . . . is that when it's going out, them hot things will touch you . . . it be going like, towards your face, instead of out the other way, see what I'm saying? . . . it's not ejecting out one way."  Shareef tells him "I can see if he can get it lefty."

On November 12, 2006, Abujihaad called Shareef to follow up on the weapons deal.  Abujihaad asks "yeah, man you say you put the order in already?" Shareef responds: "yeah, the order was already placed."  Abujihaad says, "yeah, but the other one was for somebody else and he don't even have a job right now . . . that's not gonna be . . . that's not feasible."  Shareef asks

"I see . . . well, I mean, do you want me to cancel the order and find out what they are first? Does it make a difference to you?" Abujihaad responds: "Yeah, it makes a difference, because I want to trick it out . . . you can't trick it out if . . . there's only certain models you can trick out . . . I know you know this terminology, like when you trick a car out . . . only certain things to modify certain things on there . . . I ain't BS-ing with you, but I do need to know . . . 'cuz a Colt is a piece of crap . . . the C – O – L – T . . . like the Colts that play football . . . it's a piece of crap . . . if it's a Colt, like the Colts that play football, then it ain't no good . . . it ain't good for tricking out, you can't even change certain things on it." Shareef says: "I'm gonna find out, though." Abujihaad says, "I mean, that's the most important thing . . . that's what I thought you was gonna do at first . . . ." Shareef says: "I didn't know that it was, it was, uh . . . separate." Abujihaad says: "Man, I know things like you know Reeboks and Nikes, homey . . . you should know that already, you should be already up on that, I took you . . . places . . . I mean, we already went to them . . . I can name 'em to you . . . there wouldn't be a reason why I be asking . . . I mean . . . and I'm not mad, but I'm just saying I wouldn't have asked you if I didn't want one . . . I mean, I wouldn't care . . . but I'm like . . . I'm trying to do some things . . . to it . . . I'm not trying to just leave it like, like it is . . . If I'm going to leave it like it is I'll accept anything." Shareef says: "I'll find out, man." Abujihaad then asks: "How much was those cupcakes?" Shareef responds: "Them cupcakes are . . . are like three-something, four-something . . . I don't remember . . . I didn't talk about that with him when I just talked to him." Abujihaad replies: "Yeah, but if it was a cupcake, I'd take that *automatically* . . . I know, I know what they can do . . . or what I can do with that, know what I'm saying? . . . I wouldn't even matter who made it . . . I know about them, too . . . if it's coming from the . . . if the 'T-Shirt's' Chinese manufacturer, it's

cheap . . . the ones that's made in Bulgaria is uh, the Bulgarian one, is uh . . . T-Shirt . . . and the, uh . . . Romanian T-Shirt . . . is a better quality – metal . . . it ain't like I don't know what I'm talking about as far as clothing line and food line, so . . . I know what I'm talking about."

Throughout the duration of the conversations in which Abujihaad conspired with and offered to support Shareef, Abujihaad repeatedly expressed concern to other people over Shareef's lack of operational security and discretion. In particular, Abujihaad was worried that Shareef was telling people things about him (Abujihaad) and his involvement in Shareef's plans. Abujihaad criticized Shareef as being inexperienced and volatile. He also grew increasingly suspicious of the CI for multiple reasons. While speaking with other people, Abujihaad attempted to downplay his relationship and interactions with Shareef and also disclaimed being focused solely on jihad or "7."

Notwithstanding these concerns, Abujihaad nevertheless continued to deal with Shareef. On the afternoon of November 13, 2006, Abujihaad called Shareef to tell him that the "beautiful and vacant" masjid where they were planning to meet in Phoenix would not be open that day. Further in the conversation, the two continue to negotiate the weapons deal. Specifically, Abujihaad asks: "So, I mean, you got the make, the model for me or what?" Shareef responds: "No, dude didn't hit back yet, man, left him a message, he ain't called back yet, though . . . we gonna cop 'em regardless or we gonna put hands on him, dude." After Abujihaad explains again why he doesn't like Colt weapons, Shareef asks "is there a specific one you looking for?" Abujihaad says that "I'm looking for a whole lot of shit, you know what I'm saying? . . . I got the money for it? . . . uh, no . . . I mean, if you talking about, what do I like? . . . I like a whole lot of things, I like G-36s do you know what that is? . . . I like the UMP-45s, you know what that is? . .

. ." Shareef says, "In terms of what we already done put the order in for, is there anything else that you're not looking for, besides Colt?" Abujihaad says: "I like, uh, Bushmaster . . . I like the uh, the Stag, the Stag Arms . . . I like the Knights, Knights is really military-type of shit, but they don't even sell that in the store . . . I like Wilson Combat Arms, anything that's good, I don't like no garbage . . . matter of fact, I like, for the receiver at the top, I mean, the top pieces to come off, to um, to be unscrewin', you know – the one that you can hold, I like for that to screw off and be able to put like, objects on it . . . flashlight . . . you don't know nothing about this, huh? . . . Man, you don't even know nothing . . . I'll give you an order, like I give you an order from, uh, Burger King." When Shareef asks how soon Abujihaad can have the money, Abujihaad says it depends on what he's getting. Abujihaad tells Shareef that he'll get one for "$750 . . . I'm not buying nobody else nothing . . . I'm not buying that dude nothing, anything he wanted, he would've put his money up." Shareef responds: "All right, man, so I'm a tell dude you only need one . . . and, uh . . . and that's a lefty . . . and then find out the model." During the conversation Abujihaad describes a sniper rifle as "one shot, one kill." Shareef responds, "that's it . . . that's all it takes." Abujihaad asks Shareef "What is a sniper's paradise?" After Shareef guesses incorrectly, Abujihaad tells him: "a sniper's paradise is patience . . . I'm saying anybody sit there for one, two, three, four or five days, before he sees his tango." In regards to obtaining both intelligence and ammunition in connection with the contemplated sniper attack, Abujihaad then says: "Our boy wanted to know was you serious . . . was you gonna get that knowledge from old dude? . . . That knowledge from his boy . . . that his boy got the handout." Shareef says: "Oh . . . I mean, Insha'Allah . . . somebody will . . . it may not be me specifically." Abujihaad says: "Then if you gonna get it, get the knowledge, then . . . then you might wanna work with a couple things, or

whoever gonna get the knowledge might want to work with a couple things, like something that take 6.8." Although Shareef indicates that he is unclear what a "6.8" is, he says "what I do know is I understand what you're getting at." Abujihaad explains "6.8 is the hottest thing out . . . 6.8 is a round . . . 6.8 round is something they introduced after Afghanistan because the 5.6, the 5.56 millimeter is not a potent round." Abujihaad goes on to educate Shareef, who he calls "rookie," on various rounds and what weapons take various rounds. Abujihaad says "let me tell you what I want right now . . . let me just name it to you . . . so you know . . . that way we see eye to eye." Abujihaad and Shareef then proceed to discuss various weapons.

On November 16, 2006, Abujihaad and the CI spoke again. The CI told Abujihaad that he is having trouble getting Shareef to travel to Phoenix at the moment, so he's doesn't know what to do. The CI explains that Shareef met some brothers in DeKalb, Illinois, that he's "admiring now," so "now, you know, he wanna get with them." Abujihaad says "The brothers out there, they Tabliqis?" The CI says: "No man, the jihadis, man . . . I mean you know how he is, man . . . So, now he's saying why do I have to run to Phoenix and kick it with those brothers you know, when, you know, they ain't gonna be much of a benefit basically . . . ." Abujihaad asks "I mean, have you met 'em? . . . Is that his main aim right now? . . . ." The CI says "To be with these kind of guys?" Abujihaad says "yeah." The CI says: "Aki, the brother sways with the wind, man." Abujihaad says: "No, I mean like, you know, there's more to deen [faith / religion or "the way" or "the path" in Islam] than that . . . that's cool and all, if you like that and all, but you know, how about you know, studying deen or just, being on deen or being on the truth?" Abujihaad continues: "'Cuz, I mean I know he's young, you know . . . he's hard-headed, you know . . . but it seems to me that he be going about some things differently . . . you just don't

cling to people 'cuz you think they on 'J' you know what I mean? . . . you just said he just met 'em, you know, he just met ''em . . . I mean, what'd they say one word, or one sentence that you just like "wow – I like you, let's hang out." The CI says "I guess they kicked it last night, you know what I'm saying?" Abujihaad says, "Nah . . . he better be careful . . . ." A little later in the conversation Abujihaad says: "I don't know what his problem was . . . I ain't seen Talib since you sent him out here last time . . . I mean, I understand, you know, some people they wanna just be shaheed [a martyr], just to be shaheed . . . but he should just watch his company." The CI responds: "Plus, the brother, Humdillah, I mean I like him, he's a good brother, but he be talking too much." Abujihaad says: "Yeah, that too." The CI says: "And that's what makes me worry, too, man." Abujihaad says he and Shareef recently had an argument because Shareef was talking too much to a female in the UK that Shareef didn't even know. The CI says: "It just make me nervous, man, because, you know, young brother be talking too much to me, man . . . I be getting nervous because of it . . . 'cuz, you know, I got some dirt I did in the past, too, you know, and it's like, I don't tell him everything . . . ." Abujihaad says "Yeah, that's true." The CI says: "because, he be telling me about everything . . . I'm a like, man, you just can't be running around telling people's business like this . . . . 'cuz he's gonna put a lot of brothers in jeopardy, man." Abujihaad replies: "I had some fitna [trouble] in my life recently. [Laughs]." The CI says, "Ak, trust me, I know . . . [they laugh] . . . he told me . . . I told him you tell the wrong person, you in big trouble." Abujihaad says: "He don't even know . . . I mean, really, he don't know . . . that's why I was asking – I figured he told you something, but I'm like, man, uh . . . are you sure? You know what you're talking about? . . . I mean, whatever he told you, are you sure? Were you there?" The CI says: "I don't really care personally . . . 'cuz I've done some dirt, too . . . I just

don't like when brothers be telling everybody what they do." Abujihaad says: "I mean, there's many things not to be talking about, though, you know what I mean? That's for real, you know what I'm saying? 'Cuz, first of all, the kaffir ain't stupid . . . I mean, I tried to tell this dude . . . when somebody's in a bind, I mean, people try to find a way out of it . . . simple as that . . . you know what I mean? . . . if a brother's getting tortured . . . or about to get his manhood taken, a brother might say anything." Abujihaad tells the CI: "Talking is not the way . . . tell him that's from me! . . . Talking ain't the way." A little later in the conversation, Abujihaad says: "I ain't got no death wish on myself, you know what I'm saying, but, you know . . . I gotta take care of business, you know . . . Allah knows best, you know . . . I ain't no jihadi . . . and this brother, he don't even know nothing . . . I don't agree with what Abu Musaba Zarqawi did before he died where he send people into a wedding party and then blew 'em up, I don't agree with that type of stuff, you know what I mean? . . . There's some things in the field that you see happen . . . happening in certain fields . . . and you be like, wow, you can't even believe that . . . type of things that they be doing out there, you know? . . . So, I mean, like, just like with M.O.'s . . . martyrdom operations . . . there's people that don't even see that as an M.O. . . . So, I mean, I don't know what he . . . what type of, you know, stuff he on, or what he perceives to be, uh . . . "7" . . . I ain't feeding it to him . . . you know what I'm saying? If I did, I mean, if I did feed him something . . . I'd like to correct that . . . whatever he got in him or wherever he getting it now, he ain't getting it from me."

No more than an hour after the CI's having told Abujihaad that Shareef had told the CI "everything" about Abujihaad and about the "fitna" or "trouble" that he had, Abujihaad called Shareef and, in a heated conversation, Abujihaad confronts Shareef about his having told people

that Abujihaad disclosed the battle group information:

| | |
|---|---|
| Abujihaad: | Yeah . . . let me ask a question, man.  Why you putting things that might be true or . . . not true . . . out there and telling people stuff, you know what I mean? |
| Shareef: | What are you talking about? |
| Abujihaad: | About me, you know what I'm saying?  You can't be, you can't be doing that. |
| Shareef: | I ain't said nothing about you. |
| Abujihaad: | Man, this brother that you stay with said that you told him some stuff.  I mean, if you know something – |
| Shareef: | I didn't . . . every . . .  everything I . . . |
| Abujihaad: | Just listen . . . listen . . .  just listen to me, man . . . if I known something about you, would you share that with somebody else?  If you wrote a book, and you the copywriter, I mean, you have the print on that book, do you put that out there, if it wasn't my book? |
| Shareef: | I only said . . . I . . . |
| Abujihaad: | Hey . . . listen . . . listen . . . I ain't sayin' that you did . . . and I . . . I don't talk on the phone . . . but if you puttin' serious issues out there, you know what I mean, on people . . . whether you showin' them the website . . . of the latest and greatest story written about me, or whatnot . . . that's not good business . . . and uh, don't be Judas to me homey, you know what I mean? |
| Shareef: | I don't know what you're talking about, man, and I don't appreciate you coming down on me . . . . |
| Abujihaad: | No, listen, I'm just gonna tell you . . . no, I'm just saying I'm gonna put it out there like that . . . I mean, you know these people they came and botherin' me . . . I mean, if you shared that story with him . . . with uh, you know, the Navy and the *L.A. Times* and . . . whatever and whatnot . . . that's not even cool, that's what I'm talking about . . . puttin' that out there, that's not cool. |
| Shareef: | Man, that thing is . . . on the website . . . for a free-for-all, man, what are you talking about? |

Abujihaad:     That's not what I'm saying, 'lib . . . that's not what this brother say .
               . . he just said that you, you know, you be talking a lot . . .

Shareef:       That's a negative . . .

Abujihaad:     And that's not good, you know what I'm saying? . . .

Shareef:       You must've took that outta context . . .

Abujihaad:     First of all, I'm not accusing you of anything, all right?  You know
               what I'm saying? . . . I love you like my little bro, I hope you ain't out
               there doing that, you know what I mean? . . . 'cuz, first of all that
               issue ain't even over.  You got me?

Shareef:       All right.

Abujihaad:     So, that's still a hot issue with these kaffirs . . . I don't need . . . like
               I told you that day, I don't need nobody kicking the door down . . .
               while I'm taking a shit . . . and I ain't got nothing to defend myself
               with . . . or don't know what the fuck is goin' on . . . and, uh . . . like
               I said . . . I don't like to talk on no phone, I'll talk to you personally
               one-on-one . . . I'm not, I'm not heated or mad, believe me . . . but
               you gotta be my witness, but I'm like wow, this dude. . . he talking
               about me we ain't even seen each other in about two or three years .
               . . and I just barely ran into you . . . and I ain't had a good
               conversation with you . . . since then . . . that's all I'm asking you . .
               . You got me?

Shareef:       Yeah.

Abujihaad:     So what I'm saying, you know, you gotta go back, you ain't gotta say
               nothing to this brother right here, I'm just saying, you know what I'm
               saying . . . whether you did or whatnot, or whether you didn't . . .
               'cuz, you know what I'm saying . . . first of all, I never told you
               anything about that . . . if I did . . . Allahu [U/I] . . . Second to that .
               . . um . . . I'm not trying to end . . . I'm not trying to be like people at
               Gitmo . . . See what I'm saying?

Shareef:       Mmmm-hmmm.

Abujihaad:     Allah, I mean . . . Allah is like . . . Allah is the best of knowers about
               . . . Allah knows what is honesty and what isn't, you know what I
               mean? . . . And, uh . . . I would rather not . . . what I mean . . . I

would rather be assassinated from a kaffir than be executed by a brother's mouth.

Shareef:        Okay.

Abujihaad then asks Shareef why he didn't want to come to Phoenix and why he was "hanging out with some other dudes?"  Abujihaad asks Shareef: "Is it good to socialize or to keep your ear open? . . . I'd rather be an ear hustler any day because I like to put things into perspective . . . I ain't gonna be the one running the mouth."  Shareef says, "I didn't go over there and say nothing."  Abujihaad says: "Yeah, I ain't tripping on you, man . . . people been bothering me all week . . . on some bullshit . . . talking about calling the police on me, and . . . screaming all kinds of 'T-bombs' on me and shit . . . . And that was two days ago . . . I don't need to go into detail on that, but I was like, damn! . . . Like that?! . . . . And I think you know her name."[14] Abujihaad then instructs Shareef to keep his mouth shut again:

Abujihaad:      But anyway . . . these phones ain't secure.  Ain't nothing secure but a close conversation face-to-face.

Shareef:        All right.

Abujihaad:      So . . . I'm saying, anybody asks you anything about me . . . you don't know nothing about me, just like I don't know nothing about you.

Shareef:        All right, man.

---

[14]  This is believed to be a reference to the heated November 14, 2006 call between Abujihaad and his ex-wife, discussed during the detention hearing, during which Abujihaad's ex-wife told Abujihaad that she's "got a whole bunch on [him] that she is just going to spit out" to the police. Abujihaad responded "You gonna tell, you gonna talk about me to, to police?  You stupid.  You stupid."  As the Court may recall, later in that conversation, when Abujihaad's ex-wife says that if Abujihaad tried to take steps to get his fiancee in Morocco into the country, she would also take steps to prevent her entry.  Abujihaad, in response, then threatened to kill his ex-wife, saying: "I'll fucking kill you, man.  I swear to God, I'll kill you.  I'll get somebody.  I'll get somebody to kill you, too.  You can take that to the bank.  You wanna play fucking war?  You wanna fuck with my life? . . . I'll fuckin' make sure you die.  Believe that."

| | |
|---|---|
| Abujihaad: | All right? |
| Shareef: | Yeah. |
| Abujihaad: | No – that's some real shit. |
| Shareef: | All right, man! |
| Abujihaad: | Whether I know something about you or not . . . ain't nobody's business . . . somebody come ask me about 'lib, you know what I'm gonna tell 'em? . . . You gonna have to go talk to him.  That's what we told . . . when the gumshoes came to this one brother, um . . . came and asked somebody about somebody we said you can go ask him yourself.  You go talk to him.  You know that I mean? |
| Shareef: | Yeah. |
| Abujihaad: | You go ask, you ask old boy what you want, I mean, what you want to know about him.  Why you asking me?  You know?  I say "you harassing me." . . . But anyway, man, Insha'Allah we'll see you tomorrow, then, or whatever day you all get here . . . . but man, be more ears than mouth . . . that's all I can tell you. |
| Shareef: | Yup. |
| Abujihaad: | 'Cuz the world is dangerous . . . When I tell you I don't trust people, believe me . . . for a reason . . . even if I said I didn't trust you . . . it's better to put your trust in Allah than to put your trust in man, believe me . . . Listen to this . . . I want you to let it sink in your ears . . . Man fails man, all right? |
| Shareef: | Yup. |
| Abujihaad: | But Allah never fails anybody.  You got me? |
| Shareef: | Yup. |
| Abujihaad: | Put your trust in a dude, sometime, even intentionally or unintentionally, he can let you down, all right?  But Allah ain't gonna fail you no time.   You got me? |
| Shareef: | Mmmm-hmmm. |

Although Abujihaad begins to distance himself from Shareef and the CI, and claims that

-46-

he is doing so, Abujihaad nevertheless (1) continues to pledge at least logistic and financial support to Shareef; (2) continues to pursue the illicit weapons deal with Shareef and the CI; and (3) continues to engage in discussions and express support for acts of violent jihad targetted at U.S. military personnel.

On November 19, 2006, for example, Abujihaad spoke again with Shareef. During the call Shareef tells Abujihaad that he had to postpone the second trip to see Abujihaad in Phoenix, this time with the CI, because the CI had suffered a panic attack and, accordingly, they had to turn around and return home. Shareef reassures Abujihaad, that the train tickets they purchased to travel to Phoenix, however, were "still good for like, six months." Referring to their ongoing weapons deal, Shareef informs Abujihaad: "I talked to dude about the, uh . . . about the biscuits . . . and uh . . . basically let him know, you know, you don't want a Colt and all the other specifications."

Similarly, on November 21, 2006, when Shareef calls to confirm again that Abujihaad will continue to assist Shareef with logistics and financial support, Abujihaad again pledges logistical and financial support to Shareef:

> Shareef:      I mean, I'm just, I'm just saying, uh . . . right now, you know . . . I know things aren't . . . things aren't exactly how you want 'em to go, so you know, your hands are tied from doing a lot of things that I'm sure you would like to do . . . but, um . . . I mean, brothers are still, you know, on that path and . . . I was hoping you could possibly make a contribution, man, so we can . . . so we can, you know . . . do some of the things that we need to do? . . . I'm hoping that, you know, brother would be willing to contribute towards the path, man . . . it's been forked . . . in the cause of Allah, man.

> Abujihaad:   Yeah but, you be speaking in riddles, you know what I'm saying? . . . And, first of all, I mean, I'm understanding, but I'm not understanding, you know what I'm saying? You ain't been clear, you know what I'm saying?. . . And you didn't want to even come sit

|  | here, to be clear . . . or when you did come, you know what I mean, you should've been clear. |
|---|---|
| Shareef: | I still got the ticket, don't even trip. |
| Abujihaad: | I don't know what you're talking about . . . . |

. . . .

| Shareef: | I'm talking about, man, for the path, man . . . you know what I'm talking about, dude . . . I ain't gotta spell it out in bright orange letters . . . |
|---|---|
| Abujihaad: | I already know all about that . . . I'm saying, contributing . . . contributing can be many different things. |
| Shareef: | I'm talking about a financial contribution for brothers to be able to get these supplies . . . . |
| Abujihaad: | That's possible . . . it all depends on timing, you know what I mean? |
| Shareef: | We can't do nothing without supplies, man, and . . . |
| Abujihaad: | Yeah. Okay. I got – |
| Shareef: | I mean . . . don't get me wrong, don't get me wrong. You know, things aren't just, you know, dried up and ain't nothing popping . . . I'm just saying that, you know, brothers need a little bit more support from, from others . . . who . . . who aren't able to, you know, be there in the, in the way that, you know, they'd like to be there . . . Dig what I'm saying? |
| Abujihaad: | Yeah, yeah . . . |
| Shareef: | Anything to help, man . . . anything to help . . . |
| Abujihaad: | Time framing . . . time framing . . .  you know what I mean? . . . What's a good time for you? |
| Shareef: | I mean, whenever you can do something, just let me know. |
| Abujihaad: | Yeah, all right. That's possible. I'm pretty sure later on I want something myself. Know what I'm saying? |

| | |
|---|---|
| Shareef: | The overall goal right now is to be able to get to, uh . . .to Maine, so I can do my thing there. You know? |
| Abujihaad: | Yeah, humdillah. I understand that. |
| Shareef: | Like I already told you, man, we got . . . we got numbers . . . you know. |
| Abujihaad: | First of all, I mean, yeah . . . humdillah . . . first of all, a guy like me, I don't like talking on the phone or internet. |
| Shareef: | I dig . . . I dig. |
| Abujihaad: | Know what I'm saying? |
| Shareef: | Yeah. |
| Abujihaad: | And, uh . . . that's just for security purposes, you know what I'm saying? |
| Shareef: | I already know, man. |
| Abujihaad: | So . . . I'm hearing you . . . I'm feeling everything you're saying. You know what I mean? |
| Shareef: | Humdilillah. |
| Abujihaad: | You just told me that . . . you know, first of all . . . you want to get to . . . from Point A to Point B . . . and Point B, it starts with an, um . . . an "M" . . . an "M" with an "N" . . . Okay? . . . Humdillah . . . |
| Shareef: | Okay. 'Cuz, this is . . . this is . . . I mean, I'm real with it, man. |
| Abujihaad: | No need to go further than that. You know what I'm saying? |
| Shareef: | Humdillah. |
| Abujihaad: | You know, as you see me, I don't ask any questions . . . 'cuz, you know what I'm saying, asking questions means compromising . . . you know I ain't trying to compromise anybody . . . okay? . . .and, what's important is that you stay . . . tight, you know what I'm saying . . . and you don't introduce many people to . . . what you want . . . 'cuz once you start introducing many people . . . you look like them dumb ass dudes that . . . over there in the U.K. . . . couple months ago |

|  | . . . so that's why, you know what I'm saying, I don't ask many questions, because I don't want . . . . |
|---|---|
| Shareef: | Hold on . . . I'm breaking up . . . I'm breaking up . . . what you say? |
| Abujihaad: | I said . . . if you have a tight outfit, keep it tight. |
| Shareef: | Okay. |
| Abujihaad: | Don't be introducing a lot of dudes to your outfit. |
| Shareef: | Oh – no, hell no, man. |
| Abujihaad: | Well, I'm just saying, you know what I'm saying . . . or you gonna be looking like them dudes in the U.K. . . . who was on some, some B.S. |
| Shareef: | That's a negative. |
| Abujihaad: | Okay, then. |
| Shareef: | You dealing with the finest. |
| Abujihaad: | Insha'Allah . . . I'll see . . . or hear, whatever . . . Then I'll say, wow . . . I like . . I'll say, I like that, you know what I mean? . . . |
| Shareef: | Okay, okay. |
| Abujihaad: | That's all I gotta say . . . you know? . . . But, uh . . . Insha'Allah . . . you know what I'm saying . . . I'll keep you posted, whatever . . . we can talk . . . I mean . . . if you need . . . a camelback, or whatever . . . you know, finances . . . we'll just . . . whatever you need . . . If I have it, you know, I'll let you know. |
| Shareef: | Anything to help, man . . . anything to help, Ak . . . This'd be for . . . this'd probably be the best way for you to spend your money, man. |
| Abujihaad: | Man, I already know. |
| Shareef: | So, uh . . . so just, just keep that in mind, man . . . keep us in mind, Ak . . . and know that we out here, man, and, you know what I'm saying . . . brothers is . . . brothers is on the path, Insha'Allah. |
| Abujihaad: | I'll make dua [prayer / supplication] for you, Insha'Allah. |

| | |
|---|---|
| Shareef: | Insha'Allah, man, just let me know what's up.  All right, Ak? |
| Abujihaad: | Yeah, man . . . I'll keep you, uh . . . I'll keep you, uh . . . I'll keep you updated. |
| Shareef: | All right, man . . . Humdillilah . . . I ain't gonna hold you long, man. We got . . . |
| Abujihaad: | That all you wanted from me? |
| Shareef: | I mean that ain't all I wanted . . . but I'm just letting you know, you know what I'm saying . . . that right now that was what, that's what this call was for . . . I'm about to sit down with the other brother and we gonna assess the situation and finish gettin' things in perspective. |
| Abujihaad: | Well . . . humdillah . . . I'm not, you know what I'm saying . . . if I was 15 minutes away I'd probably, I'd probably sit down with you, but I'm not . . . . |
| Shareef: | I got a couple more brothers to call, on the same note . . . You was just, you know what I'm saying . . . first on the list. |
| Abujihaad: | All right. Humdillah. |
| Shareef: | All right, Ak . . . take care, man . . . keep me in – keep me in mind, man . . . don't forget about me, Ak. |
| Abujihaad: | Have I ever forgot about you? |

During the evening of November 22, 2006, Shareef called Abujihaad to ask whether he might have the money that he promised ready for him when Shareef and the CI come to Phoenix. Shareef says: "I was calling to see if, uh . . . if you could possibly have that ready for me when we come through there."  Abujihaad says: "Have what ready?"  Shareef says: "Some 'faluce' for the cause."  Abujihaad says: "Brother, I'm . . . I'm like, tapped, you know what I mean? . . . You talkin' about right now? . . . No I ain't have money like that."  Shareef says: "Do you have any idea . . . time frame when you could possibly made a contribution?"  Abujihaad replies: "Whenever I get some money."  Shareef replies: "Insha'Allah."  A little further in the

conversation, however, Abujihaad expresses a lack of confidence in Shareef because the weapons deal is still pending. Abujihaad says: "Well, I don't know, man . . . I didn't even know you was coming through, tell you the truth? You hit me up, man. Why you keep calling me in a manner and talking in like, these mazes, you know what I'm saying? First you ask me something, then you talking about you coming though . . . You know I'm saying, where my goodies at? . . . I ain't got money for that . . . I'm saying you ain't even got it . . . so, that's not even . . . there ain't even . . . even something to discuss." Shareef says: "All right, Ak . . . I'll holler back at you then."

Abujihaad also continued to engage in discussions and express support for acts of violent jihad aimed at killing U.S. military personnel. For example, in November Abujihaad praised the killings of U.S. soldiers allegedly perpetrated by the so-called "Juba Sniper."[15] In particular, on two occasions, Abujihaad discussed a video that contained an interview with the supposed commander of the Baghdad sniper division and footage which showed numerous fighters being trained in the use of sniper rifles. The video showed "Juba" returning from a sniper mission, marking a tally of 37 on a wall and sitting down to make a diary entry. The rest of the video shows numerous clips of American soldiers apparently being "sniped," with music in the background. During one conversation Abujihaad compares the tactics of an American sniper who uses a "spotter and a sniper" with those of "Islamic, uh, groups . . . they use a sniper, a spotter – and a cameraman." During the conversation the sniper deaths of the "kaffirs" are

---

[15]  The "Juba sniper" is the *nom de guerre* of a sniper involved in the Iraqi insurgency who is claimed to have shot 37 American soldiers and is featured in several videos of Iraqi insurgents in action. A November 2005 video that was circulating in Iraq and which appeared on the internet, for example, showed American soldiers falling to the ground, apparently due to attacks by Juba. The video starts with a character saying, "I have nine bullets in this gun and I have a present for George Bush. I am going to kill nine people. I am doing this for viewers to watch. Allah u Akbar. Allah u Akbar. [God is great]." With that, he makes his way from his vehicle, and a series of separate scenes begin, showing several U.S. soldiers shot in action.

referred to as "ESPN highlights." In a subsequent conversation, Abujihaad expressed hope that Juba was still alive and killing U.S. soldiers in Iraq, stating: "Juba was a cold dude . . . if he's still breathing, may Allah still let him be pluggin' them dudes. If not, I know he done train more . . . in the skills and tactics that he got . . . 'cuz he was layin' 'em down!"

Evidence of Abujihaad's motives and intent regarding acts of jihad targeted at U.S. military personnel, as well as his knowledge regarding Azzam Publications websites and materials, also include conversations in November 2006 during which Abujihaad: (1) discusses an Azzam Publications article that he had from the waaqiah.com website, stating that a fatwa [religious edict] from a scholar in the field carries more weight than from a scholar who is not – particularly when it relates to issues of jihad; (2) questions the Salaafi bona fides of the CI because he was not "down" with Usama bin Laden, who Abujihaad refers to in code as "Under the Black Leaves," (3) recommends the article (discussed during the detention hearing in this case) entitled "Allah is Preparing Us for Victory"; and (4) laments the lack of availability of videos relating to violent jihad, other than those being produced by the Maktabah Al-Ansar bookshop.[16]

On November 30, 2006, Abujihaad spoke with the CI. During the conversation the CI asked Abujihaad, "What's up with your boy, Talib, man? . . ." Abujihaad says: "I don't know, I don't know." The CI says: "That brother he's a loose firecracker, Ak." Abujihaad laughs. The CI says: "I'm about ready to tell the brother to leave, man, before he got the feds knockin' on my

---

[16]    The Maktabah Al-Ansar bookshop is based in London and sells books, videos, tapes and other material relating to violent jihad. During the existence of the Azzam family of websites, Maktabah Al-Ansar's website was cross-referenced and linked to the Azzam sites. Later, Maktabah Al-Ansar became the exclusive distributor of the Azzam Publications books, videos and tapes glorifying violent jihad that were offered for sale on the Azzam websites.

door, man." Abujihaad says: "I mean, I tried to talk to him yesterday, with it, you know." The CI says: "He got mad at you, he told me." Abujihaad says: "he ain't understanding, though . . . I'm talking about a balance, you know . . . being balanced in deen, you know what I mean . . . he got a . . . one track mind." The CI says: "he be getting mad at me, man . . . because he be thinking I'm soft or something, I guess." Abujihaad replies: "I haven't even met you physically, you know what I'm saying . . . Insha'Allah, by the will of Allah, may Allah let me . . . possibly be in your company, you know what I mean . . . to benefit, you know what I mean . . . to benefit . . . from whatever I can benefit from . . . I don't know what part fires him up . . . ." The CI says: "He's fired up over everything . . . and the problem is, Ak, I told him, okay . . . that I got a few brothers that I be messin' with, but not like on a level that we're gonna go do something . . . it's on a level to try and stay in shape, to stay prepared." Abujihaad replies: "And that's what you're supposed to do." The CI says: "This brother here, talking about, going out . . . on missions and surveillance, and . . . and he be talking too damn much for me, Ak . . . I know everything about everybody in Arizona . . . ." Abujihaad responds: "You know what? And things like that? Between whatever brother he done share things about . . . I mean, not you, but I mean . . . he should be careful, I mean . . . 'cuz, I mean, he could be oppressing another brother . . . and get him locked up on some garbage." A little further in the conversation Abujihaad says: "He talkin' to me like me and you soft . . . and I'm like man, first of all, I mean, with things . . . I try to talk about security, you know what I mean . . . 'cuz all that talkin' man . . . ain't good . . . See what I'm saying? . . . So I told, I told him yesterday I wouldn't even let you, um . . . I wouldn't let you lead me into a bull, a bull's pen . . . you know what I mean . . . I wouldn't let you lead me nowhere! . . . First of all, he's undisciplined . . . you know what I mean . . . no security . . . he

don't care about nobody's security . . . then you're not disciplined with it . . . and, man . . . you're a loose cannon!" Abujihaad goes on to say: "I've been trying to, trying to talk about, like . . . like, for you, you got five kids, right . . . and 'lib talking about "7" . . . you know, it's just not about somebody out there sluggin', throwin' punches, you know what I mean . . . or I'm just gonna use that word, punches . . . I mean you have to have somebody like, sponsor you . . . I mean you got children, you know what I'm saying . . . you don't know who your . . . I mean, if your woman ain't tight . . . if her half is not strong . . . then, you know what I'm saying, you leaving your kids with someone who's weak!" A little further in the conversation Abujihaad says: "Yeah, man, I don't understand him . . . so I'm like, man I ain't even gonna deal with him." A little further in the conversation the CI says: "When I went downstairs last night, he was, like, dazed . . . I said, 'what's wrong, Ak?' . . . He's like, 'man, brother I'm gonna tell you I'm just the only one on this thing, man . . . I feel like I'm a stranger.' . . . I said, "man, you are – you a terrorist, Ak." Abujihaad laughs and responds: "I mean like . . . but it's like . . . you know what I'm saying . . . I'm like where you going with it? . . . You know what I mean? . . . I mean he ain't going nowhere yet." A bit further in the conversation, the CI says: "His sheikh is Osama, man . . . I mean, I don't care what anyone says . . . that's his sheikh . . . Osama." Abujihaad laughs and says: "That's his boy." A little further in the conversation Abujihaad says: "He gotta look at the reality of things . . . and this brother he act like people scared of "7" . . . I mean, first of all, you gotta be in condition . . . I'm pretty sure . . . I mean, what he think you gonna do, get in the car and be who-bangin'? . . . "Yo – where you from? . . . We gonna do this drive-by real quick" . . . . You what I'm saying, it's like, man, we ain't gang bangin' . . . on a whole 'nother level, you know what I mean? . . . Gang members don't go runnin'."

On December 8, 2006, two days after Shareef is arrested, but before news of his arrest became public, Abujihaad initiates another call to the CI and Shareef. Abujihaad first asks what Shareef has been up to. The CI tells Abujihaad: "I ain't seen Talib, man . . . in like two days . . . that brother went down to DeKalb with them other brothers, man." Abujihaad responds: "Brother crazy." Abujihaad then proceeds to pursue the pending weapons deal. Abujihaad says: "Anyway, man . . . um . . . if your boy still, um, selling some things . . . when I, when I get some, uh, money . . . I'm just gonna send the money to whoever, you or Talib . . . and then, if, you can hook that up, just let me know." The CI says: "All right, Insha'Allah." Abujihaad continues: "And then I'll just send you the money . . . and then I'll figure . . . I'll figure out how to, you know what I mean, how to ship it from here to there . . . whatever." The CI then tells Abujihaad: "Talib on some bull crap, man . . . I think he's a fruitcake . . . He talking about he gonna go down there with them brothers and hook up some missions . . . I don't know if he told you about them dudes in DeKalb." Abujihaad says: "Yeah, no – you told me." The CI says: "He's stupid, man . . . 'cuz I said look, man . . . you gotta leave [U/I] and get outta my house." Abujihaad says: "I don't, I don't blame you." When the CI continues: "He be talking too damn much anyway, man . . . for me," Abujihaad responds: "Yeah, yeah, yeah . . . that talking man . . . he be getting himself in trouble . . . and everybody else!" Towards the end of the conversation Abujihaad returns to the pending weapons deal. Abujihaad says: "I wanna do it . . . I want to do it professional, you know what I'm saying . . . I wanna see, 'cuz, you know . . . I think Talib was saying before he left, he told me to deal with, well actually, on the internet, he told me to deal with you . . . if I want anything, I'll just send you the money . . . when I tell you what . . . I'll tell you what I want, you give me the price, I send you the money Western Union, or whatever." The CI says: "Okay,

Insha'Allah . . . we do it, Insha'Allah."

Approximately two hours later, the CI calls Abujihaad back to follow up on the weapons deal. Abujihaad, who was apparently still unaware of Shareef's arrest, continued to negotiate the purchase of two AR-15 assault rifles for approximately $1300:

CI:          I talked to my boy and he said as soon as you can get the money, uh, we can get 'em down to you or whatever we gotta do.

Abujihaad:     All right. Cool.

CI:          So, I mean, whatever man . . . um . . . when do you think you can come up, so I can let him know exactly, 'cause he's been holdin' 'em like two weeks.

Abujihaad:     What'd he got?

CI:          The two ARs, that Derrick discussed with you . . . . He said he can give you a deal, I think, Derrick said fifteen hundred, that's because Derrick was trying to make a hundred dollars. So he said he give 'em to you for like, thirteen fifty, fourteen hundred.

Abujihaad:     All right. Is that the one that's . . . you know . . . you don't know what side that it, the uh, shell eject out, right?

CI:          Yeah, yeah, yeah, yeah. He said that . . . he said that he got 'em like that . . . but he also said that at the same time there's a . . . there's a lever that you can flip, where it can go on either side. But he said he does have the left-handed ones, and that . . . I, I told him . . . not today . . . but this was prior because he wanted 'em modified. He's like you can modify 'em if you want.

Abujihaad:     Oh, yeah? So he does have it? So he's like thirteen hundred?

CI:          Yeah, yeah. 'Cuz he gets 'em off of the . . . the dock ships up in Chicago . . . up off Navy Pier. So . . .

Abujihaad      So is it straight like . . . I mean like . . . sometime like . . . at the beginning . . . I'll see the money at the beginning of next month.

CI           Okay, that's fine.

| Abujihaad | Are . . . |
|---|---|
| CI: | Yeah, yeah . . . I'll let him know.  I mean, I mean, if you can get it sooner, that's fine.  But if not, that's fine too. |
| Abujihaad: | It might be sooner than that too.  You know what I mean? |

The CI then goes on to discuss the current situation with Shareef and the fact that Shareef has been talking too much about Abujihaad.

| CI: | Okay, now listen, Ak . . . I'm gonna be honest with you, man.  I didn't wanna talk earlier because my wives were around. |
|---|---|
| Abujihaad: | Yeah. |
| CI: | Derrick, man . . . he, he, he's a firecracker, ready to explode.  You understand what I'm sayin'? |
| Abujihaad: | Yeah, yeah. |
| CI: | I mean, because, you know he, he talking too damn much to me, dude.  I mean, 'cuz you know, you know that what I do with my boys out in Buffalo and stuff. |
| Abujihaad: | Yeah. |
| CI | And he went to DeKalb dude . . . Ak, I, I threw him out.  He just didn't leave, I threw him out.  Because he's tellin' these guys down there that he's got connections with brothers in Phoenix.  He's tellin' these brothers he got connections with me . . . and they wanted to hook up with me.  I don't know these guys.  These guys could be . . . 007. |
| Abujihaad: | You know, man?  That's why . . . that's why . . . |
| CI: | I mean, that's why, dude, you gotta be nerv – . . . you know, lay low for a while . . . because he's talking about . . . the Navy ship crap . . . you know, he told me, he told them . . . you know, this is somethin' that you don't wanna get involved with, man.  You just wanna lay low.  Don't . . . I wouldn't even email him, I wouldn't I.M. him . . . I'm gonna let you know brother to brother, right now . . . lay low. Tell Abdullah . . . . |

| | |
|---|---|
| Abujihaad: | No, I'm, I'm . . . I'm chillin'. |
| CI: | Na'am, na'am, just chill out, Ak. Na'am. I mean, don't . . . I mean, he's still got his computer at my house. But everything else has been gone . . . he took his clothes and just broke . . . I'm about ready to contact his mom and tell her to come get his computer. |
| Abujihaad: | Yeah, yeah. |
| CI: | I mean, I don't trust him . . . I mean, Ak, he only met me two days, man . . . he told me and this other brother Muneer about you . . . About overseas and everything . . . and about you sending stuff off to web sites and all that. I'm thinking, you don't know us, man. |
| Abujihaad: | He don't know you. |
| CI: | No, so . . . |
| Abujihaad: | Know what I'm saying? I mean, I send, uh . . . you know, uh . . . I mean, corresponded with an e-mail site . . . it wasn't sendin' nothing, it wasn't nothing, top secret like these people are sayin' . . . You know what I mean? . . . I was just talkin' about like the *Cole*, whatever . . . what I thought about it. You know what I mean? Like, this dude here, idiot, you know what I mean? I mean, he's an idiot. I mean, no . . . |
| CI: | I mean . . . that's how I knew, that's how I knew about uh, Abdullah, going AWOL . . . and, and stabbing [U/I] . . . and beatin' up his woman and all that. |
| Abujihaad: | He's an idiot, I mean, from even telling you that . . . I mean, 'cuz that don't even benefit you. You know what I mean? Telling you a . . . |
| CI: | I know, brother . . . it don't benefit me because . . . it makes me more worried about him to tell him anything . . . and the dude livin' in my house. |

A bit further in the conversation, Abujihaad tells the CI that he does not want to deal further with

Shareef because Shareef is undisciplined, does not listen and talks too much:

| | |
|---|---|
| Abujihaad: | You know what? You know why I don't wanna mess with Talib? . . . It ain't nothin' to do with you, you know what I mean? 'Cuz he's, he's undisciplined . . . he don't listen. You know what I'm saying? |

|             | . . . Like say if you was Emir [commander or chief] right now.  If you was Emir you'd tell him to shut his mouth.  Shut up! |
|-------------|------------------------------------------------------------------------|
| CI:         | Right. |
| Abujihaad:  | Simple as that!  Just shut the hell up!  Ain't no, ain't no ifs, ands and buts.  You know what I mean?  You . . . you supposed to be somebody who . . . you want some . . . 'cuz he ain't no leader . . . you want a leadership role, I mean he ain't even ready for it.  Just shut up!  You gotta be somewhat self-disciplined.  You know what I mean? |
| CI:         | No, he's an idiot. |
| Abujihaad   | I . . . I . . . I don't see him havin' that.  I'm like, man, you'll have the brothers on channel, whatever news. |

A little further in the conversation the CI and Abujihaad discuss Shareef's lack of discretion again:

| CI:         | Man, so all I'm sayin' to you Akhi [U/I] . . .  Man, don't even holler at dude, man . . . just lay low . . . because he's talkin' too damn much.  I mean, I met this one brother named Mohammed Sharizi, okay, the other night.  We . . . you know, this is why I got mad at Derrick.  He . . . Mohammed came to me – one of them Pakistani dudes that was down in DeKalb – he's like, man, I heard about you. |
|-------------|------------------------------------------------------------------------|
| Abujihaad:  | Aaahhhh! |
| CI:         | Man, can you put us down with your boys out in Buffalo? |
| Abujihaad:  | Aaahhhh! |
| CI:         | And then like, I heard about your boy out in Phoenix, man with the ship crap. |
| Abujihaad:  | Aaahhhh! . . . .  See what I'm talking about that dude, that dude's stupid . . . That'll be their favorite story. |

At this point in their conversation, the call is disconnected, but the CI immediately calls

Abujihaad back and the conversation continues:

| Abujihaad:  | Yeah, that boy crazy. |
|-------------|------------------------------------------------------------------------|

CI:         Assalaamu'Alaikum. [Peace be upon you].

Abujihaad:   Alaikum-Salaam. [And on you be peace].

CI:         My, uh . . . I went into the basement . . . the basement of my house, man . . you know I got all them damn, uh, pipes down there, and I been losin' the signal, so . . . . But anyway, man, you know, I'm just saying lay low, man. Because he told these dudes about you, he told them about Abdullah, he even talkin' about Ibrahim, or someone out there, sayin' that they could, uh . . . be a doctor for us in the field.

Abujihaad:   That dude, he's stupid . . . he told me the same thing . . . ain't no brother . . . Ibrahim ain't even a doctor. [Laughs]. This brother, I swear . . . This brother only . . . this brother only . . . this brother only twenty-two, man. He read a lotta books, this brother tryin' to go study in Medina. I mean, he got a heart of a lion, but this dude, he, he, uh . . . yeah, Ibrahim came to me to operate on me, boy, I'd rather just die . . . just make some du'a.

CI:         Man, he's, he's gonna get everybody in some big ass trouble, Ak.

Abujihaad:   Yeah, man, he's crazy.

CI:         Plus, I mean, he told this white dude here named Muneer about you and Abdullah. And Muneer don't even . . . he didn't even know or nothing. This brother . . . this is bullshit.

Abujihaad:   Yeah, he tried to tell me about, he tried to tell me about your boy, uh we . . . sit and we watched this flick with him. I think he's kind a soft. And I was lookin' at this dude like he stupid. You know what I mean?

CI:         I mean, yeah . . . why you telling him about everybody?

Abujihaad:   Yeah, but he . . . I was like, he's stupid for that and he's just stupid because . . . you know what I'm sayin'? . . . That's 'cuz he's like, he call your boy soft because, ah, he's one of those privileged persons. So what? Humdillah. I mean . . .

CI:         I mean, I mean, the way dude be talkin' man . . . I mean, he's just bullshit, man.

. . . .

CI:         I just . . . what I would do, man . . . just don't talk, because he . . . he's

-61-

|            | talking too much, man . . . He, he also said stuff like, that you and him burnt all your records together and all your videotapes together and all this and that, man. I mean this is stuff . . . . |
|------------|---|
| Abujihaad: | And he's, and he's a liar, he ain't burned nothin' with me, you know what I'm saying? I had some "J" flicks and they ain't got nothing to do with nobody, you know what I'm saying? All I did was take my "J" flicks and got rid of 'em. I mean, 'cuz I mean, it's stupid, these people they bother you for stupid stuff, like . . . my boy was watchin' somethin' on, uh . . . on, uh . . . National Geographic, and he says that uh . . . there's this dude that be selling videos in, uh, London for Maktabah Al-Ansar . . . . and he's like, they talkin' about puttin' people in jail for videos. You know what I mean? He's like how can you put you in jail for buyin', buyin', jihadi flicks, when you sell porno? [Laughs]. You got me? |
| CI:        | Right, right. Yeah. |
| Abujihaad: | It's not even a big deal, it's just like . . . first of all, I don't own anything with "J" . . . I don't own any, any articles with "J" because it doesn't benefit you. |

Towards the end of the conversation, the two return to the subject of their pending weapons deal:

| CI:        | No, no, no. Check it out, man, look . . . my boy, you know, he . . . the problem is, though, Derrick's been runnin' through the hole, man. Derrick's out there buyin' Final Fantasy games. My boy's been waiting for Derrick to come up with the money for his stuff. |
|------------|---|
| Abujihaad: | Yeah. |
| CI:        | I mean, I need to know around about exact time you think you can get the money, man . . . I mean, if you can get it sooner, we can probably come up with some deal, you know? |
| Abujihaad: | How much he said for two? |
| CI:        | I mean, these things are hot. You know, it's just like a drug dealer, he's not gonna, he's not gonna sit on a quarter key if he can't get rid of it. |
| Abujihaad: | Yeah, yeah. But I'm saying . . . how . . . I mean, how much for two? |
| CI:        | I mean, maybe thirteen hundred. I mean, I might be able to get a |

better deal.  Let me call him and I can call you later . . . .

Abujihaad:     I'll let . . . I'll let you know, uh . . . concrete, um . . . next week.

CI:            Okay.  All right.

Abujihaad:     Yeah.  I'll give you a concrete offer next week.

CI:            Okay, brother.  Insha'Allah, man.  Just like I said, man.  If he call you
               . . . man, just forget about that dude.

Abujihaad:     I ain't gonna even talk to him.  I'm gonna give him, I'm gonna give
               him some tough nothin'.

A few hours later, the CI breaks the news of Shareef's arrest to Abujihaad.[17]  After the CI

tells Abujihaad of Shareef's arrest, there is a noticeable change in Abujihaad's statements and his

willingness to acknowledge his relationship with both Shareef and the CI.  At the outset of the

call, the CI asks Abujihaad "Man, what's goin on, Aki?"  Abujihaad replies: "What happened?"

The following conversation ensues:

Abujihaad:     Assalaamu'Alaikum.

CI:            Alaikum-Salaam, Ak.  I mean, I get a phone call from you this
               morning, right?

Abujihaad      Yeah.

CI:            Man, right now I'm watchin' CNN and shit and Derrick got popped.

Abujihaad:     Oh, I don't know – see, that's what I'm saying . . . I don't know
               nothing!  I swear to God . . . I swear to God.  I don't know nothin'

---

[17]     In the intervening hours, Abujihaad and the CI had another, brief, three minute
conversation during which they discuss and negotiate the pending weapons deal further.  The CI
tells Abujihaad that he spoke to their weapons connection and, since their weapons connect had
waited so long and held on to the weapons for approximately three weeks, he wanted a little
money to hold them further and as a sign of Abujihaad's good faith in purchasing the weapons.
Abujihaad says he will send money next week.  Abujihaad says "I'll buy one, then you can send
it . . . and then I'll buy the other one a week or afterward or two . . . Let me get at you, um . . .
next week and then I'll try to make that happen."

-63-

that's goin' on with him.

CI: Ak, you see, you been watchin' the news?

Abujihaad: I ain't watch no news.

CI: The dude . . . man, you turn on CNN, man. That, that dude, remember I told you he left a couple days ago, man? He must've got hooked up with the wrong crowd. They charged him with terrorist attack, uh, uh, crap . . . Now I'm a little worried, man, because dude's been at my house . . . .

Abujihaad: Who?

CI: Derrick!

Abujihaad: No – I know, I know. But, I'm telling you, I don't know . . . anything. I ain't heard nothin'.

CI: Now, uh, look. Look, look, Ak . . . I'm going to Maine, man. I gotta, I gotta worry about my family.

Abujihaad: Look, I don't even know nothin'. I'll ditch your number or whatever. Whatever you want me to do, man. I don't even know nothin' about him.

CI: Man, uh, yeah, you be . . . .

Abujihaad: I swear to, I swear to God.

CI: Man, what if he talks about us, Aki? What are, what the fuck are we supposed to do?

Abujihaad: I don't know, man. We just . . . gotta be . . . patient, man . . . [U/I] . . . Man, listen, I'm gonna try and talk to this dude . . . talk sense into him.

CI: He's got a big-ass mouth . . . that's the problem, man.

Abujihaad: I haven't seen . . . I haven't . . . I haven't seen the dude in, in years, you know what I mean? I ain't seen the dude in years. I swear to God. He ain't came back into my life until you sent him over here. And when he came over here, I seen he was on some bullshit . . . try to talk to the dude, man . . . I seen him . . . .

CI:             He was actin' like . . . He was actin' like you and him were tight like brothers.

Abujihaad:      We ain't tight like that. You know what I'm sayin'? We ain't tight like that. I ain't seen him in years. He came in here, he start talkin' that T-shit, I ain't gonna tell you, my blood pressure shot through the roof . . . You know what I mean?

CI:             Uh, he got hooked up with the wrong cats. I told him not to fuck with them dudes down there . . . .

Abujihaad:      Hey . . . .

CI:             They popped, they popped all of 'em. Right now they just got Derrick arraigned, so his ass is all over the news . . . I'm listenin' to . . . local news right now and they're talkin' about they're gonna arraign the other guys next week. I mean, what the hell are we supposed to do, Ak? I mean, if he talks about me . . . and my boy . . . I got a family!

Abujihaad:      Yeah, that's what I'm sayin'. That's what I was gonna tell you earlier. I got kids. All you gotta do is like . . . all you, I mean . . . all I'm sayin' is this . . . this is what I'm gonna say . . . Look, he came at me with some bullshit, I told him to get outta my face. That's it. I don't even know you.

CI:             Man . . . you can't trust him, man. I'm gonna be honest, man.

Abujihaad:      I'm telling you, I'm . . . I'm telling you right now – I don't know you. You don't know me, I don't know you.

CI:             Na'am, na'am. That't the way it's gonna be, Ak. Because I don't want none of this crap gettin' out.

Abujihaad:      That's it. I'm just sayin' I don't know you, I don't know nothin' about what this dude talkin' about. I don't know you.

CI:             Okay.

Abujihaad:      I don't know you. He . . . the, the phone number if they say . . . if they look at records . . . that's because, you know what I'm sayin' . . . that phone number is 'cuz he called me from this number . . . I tried to talk some sense into him.

-65-

CI:             I mean . . .

Abujihaad      I don't know . . . I don't know nobody.

CI:             I been wonderin' why he hadn't contacted me for like three days,
                man.  This brother . . . he was like a damn balloon ready to blow up.

Abujihaad:      Well, I don't know them either.  I don't know you.  I don't know him
                . . . All I just try to follow . . . look, I try to follow Salaafi [U/I] . . .
                Salaafi [U/I] don't teach nothin' about terrorism . . . Simple as that.

CI:             I'm just worried, Aki, that he's gonna talk about . . . connections . .
                . like with me and my boy with the guns . . . my gang connections . .
                . my, uh . . . my boys in, in Maine . . . uh, the bullshit with Abu Ji –
                . . . uh, not you, but, uh, Abdullah because he said Abdullah was
                down with doin' some shit with some sniper guy out there . . . you
                and that bullshit from the past . . . with the e-mails . . . I mean, I'm
                nervous as hell, Ak . . . because I might get caught up in all of this.

Abujihaad:      Yeah, well . . . I ain't sayin' nothin'.  You know what I'm sayin'?  All
                I can do is be patient.  You know what I'm sayin'? . . . I know, I know
                he, he . . . I mean, I ain't gonna tell you a lie, I felt like . . . you know
                what I'm sayin' . . . this dude walked in my life . . . recently with this
                bullshit . . . I felt like, you know what I'm sayin' . . . this, this dude
                over here, um . . . tryin' to mess my life up.

CI:             That's why I really didn't wanna go down there, man . . . that was
                givin' me panic attacks.

Abujihaad:      You know what I'm sayin' . . . he tryin' to mess my life . . . tryin' to
                mess my life up.  If you . . . if you see any of his e-mails that I sent
                him I told him I didn't want nothin' to do with him.

CI:             Yeah, yeah, I know.  He told me.  He's like, that's why he got mad at
                you guys.  He said waiting for Hassan and them, I'll be waitin' 20
                years for jihad.

Abujihaad:      First of all . . . first of all, listen.  I'm a tell you . . . I'm not . . . about
                . . . jihad that way . . . .  You know what I mean? . . . Because . . .
                because what I'm a . . . I'm a try, what I'm about is trying to . . . first
                of all, I follow like, you know what I'm sayin', Quran and Sunna . .
                . the Salaafi way, you know what I'm sayin' . . . so I'm tryin' to get,
                I'm tryin' to really get down with this . . . .  That's what I'm about.
                So, when this dude walk up in my life . . . you know what I'm sayin'

                                    -66-

|  |  |
|---|---|
|  | . . . like I told you, I told you before, it's like dealin' with a schizophrenic . . . . See what I'm sayin'? |
| CI: | I already told you I thought he was bipolar. |
| Abujihaad: | Because, when I talk to you . . . when I, when I talk to you, um . . . I'm like, man, cool. I'm really, you know, I'm really feelin' this. |
| CI: | Right, right. |
| Abujihaad: | You know, you know what I'm sayin' . . . and then I talk to this dude, he like a . . . you know, he's – he's, he's the crazy part, like, like he Doc, he do a Doctor Jekyll and Mister Hyde. |
| CI: | I'm just worried for everybody, Aki. Me personally, I think you need to break him out. I'm about ready to pack my family up and take myself to Maine. I think you need to tell Abdullah, lay low. 'Cuz, to me, this brother just all talk, Ak. And he, he, he's caught up now on some, on some bullshit charges, on some gun charges and stuff . . . . |
| Abujihaad: | Oh . . . first of all, I ain't never . . . the, the best thing about me and you . . . I ain't, I ain't . . . first of all I'm, who's tryin', who's tryin' to do' uh . . . fighting somewhere . . . you know what I'm sayin'? |
| CI: | No, no. I'm sayin' but you don't know what he's gonna talk about, because I done told him about my boys out in, uh . . . . |
| Abujihaad: | Yeah, I understand that. |
| CI: | You know what I'm sayin'? |
| Abujihaad: | Yeah, I understand. But, you know what I'm sayin', for me. . . . |
| CI: | And you know he got a big mouth already, 'cuz he come at me with your bullshit. You know what I'm sayin'? |
| Abujihaad: | Yeah. |
| CI: | So, it's like, man . . . what are we supposed to do? You know what if he talks to the government about this? . . . We already know from the past that, you know . . . that, that we're screwed, man. I mean, 'cuz they're already lookin' at you probably . . . they, they done, they done told Derrick that he was on a terror watch list but that dumb-ass still runnin' around talkin' about . . . jihad! |

Abujihaad:     Say what again?

CI:            When, when Derrick was comin' back from Flagstaff, did he tell you
               . . .

Abujihaad:     Yeah.

CI:            . . . that they told him that he was on a jihad--uh, terrorist watch list?

Abujihaad:     Who?  That, yeah, he told me that they told him that.

CI:            That's what I'm sayin' . . . so, why the hell he still runnin' around
               talkin' shit?

Abujihaad:     'Cuz he's stupid.  Somebody just got paid off his dumb-ass.

CI:            He, he, he's usin' my phone and everything, Ak?  Livin' in my house!

Abujihaad:     He's stupid.

CI:            He, he met my boy!  Man, I'm, I'm, I'm . . . .

Abujihaad:     Hey, look – I'm a tell you like this . . . I don't even know your boys.
               You know what I told Talib about your boys?

CI:            Huh?

Abujihaad:     I told him don't even tell me nobody name.  That's – you know what
               I'm sayin'? . . . I don't know 'em and don't wanna hear it because .
               . . you know what I'm saying? . . .  I, I, I said, I don't even know your
               friends . . . but their security is about . . . as, as, as secure as my
               security.  You know what I mean?

CI:            Right.

Abujihaad:     I don't know them.  So . . . what I mean by that . . . since I don't know
               your friends . . . and I see what happened to like those dummies,
               they're not even Muslims, in um . . . what's that country?  I mean, in
               Florida . . .

CI:            Right, right.

Abujihaad:     I keep tryin' to, tryin' to educate this dude.  Look, look, man, he's so
               stupid, he's gonna be like them dudes on that, on that T.V. in Florida.

Do you watch T.V., I told him. Do you watch news?

CI: Man, he don't care, though . . . he said . . . like he said to you, he said, fuck the FBI. I was sittin' right there when he said it. He said . . .

Abujihaad: Yeah, but, you know what I'm sayin' . . . that – that's what I'm saying, you got children and I got two kids.

CI: I got five kids . . .

Abujihaad: You know what I'm sayin'?

CI: . . . and I got one of the way.

Abujihaad: And is he gonna . . . is he gonna take care of my kids? No. He ain't gonna do nothin'. When the police come to me, I'm gonna be like, look, I don't know this dude. I ain't seen him in two years, he came at me with some bullshit. You know I'm sayin', I turned around, I didn't want nothin' to do with it . . . that's it.

CI: I think what we're gonna do, man . . . them guns and stuff right now . . . don't . . . man, we need to chill out on that shit . . . .

Abujihaad: Hey, don't even . . .

CI I'm outta here . . .

Abujihaad: You're cool . . .

CI: You need to – you need to decide . . . what the hell you're gonna do . . . I mean if I were you, I'd sit back . . . it's all over CNN, Ak . . . . it's all over the local news . . .

Abujihaad: Yeah, I'm gonna . . . I'm gonna just chill.

CI: I'm worried about you . . . . I'm worried about what happened in the past with you . . . . because he talks too damn mu – I know every damn thing.

Abujihaad: But he don't even know nothing, though . . . He can say what he knows. He can say he knows somethin' about me. He, he . . . I mean, first of all I ain't send nobody nothin'. You know what I'm sayin'? If I, if I sent somebody somethin' they woulda had me. Look this dude from the Navy came to me, confronted me, and he's already

Navy. He used to be my boy, Muslim and everything . . . .

CI:    I know, I know, I know, I know. You told me about, about him already.

Abujihaad:    You know what I'm sayin'? I'm just, I'm just, I'm just sayin'. You know what I'm sayin'? I don't know this dude, you know? Maybe he's your . . . maybe he working for you, you know what I'm saying? Maybe he the dude to shit on me. I've been chillin', workin'. Nine to – nine to five, you know what I mean, doin' my thing . . . Takin' care of my family.

CI:    All right, man . . . [U/I] . . . 'cuz that brother, man . . . 'cuz that brother, man, like I said, man, he turn me in . . . 'cuz I had some shit in my house, too, man. I had some weapons in my house, you know. I'm a felon. I can't be jackin' around . . . .

Abujihaad:    Yeah, I . . . Yeah, I – I understand that . . . and I ain't even . . . as far as you know what I'm sayin', like I said, you know . . . as far as him, I didn't know what was goin' on with him. I knew, like this dude's a loose cannon. Didn't wanna, didn't have nothin' to do with him.

CI:    All right. I mean, I just don't want him to bring up none of that shit, man. I mean, like with the . . . like with . . . the records. I mean, he told Muneer. Of all people he could tell – some lily white dude about burnin' records in our – in, in, in, in Phoenix with you.

Abujihaad    But I ain't burn no record. What kind of record he talkin' about? He's stupid. He don't even know nothin'.

CI:    That's what I'm sayin', man, you know . . . .

Abujihaad:    I had no records. What that was is . . . you know, um, I had this article from the internet called, uh . . . *How to Train Yourself for "J."* And, um . . . some dude from, um, the Oregon . . . you know, from Oregon . . . those dudes that were in Oregon, when they arrested those dudes, they had the same article. You know what I mean? At they house. So, I was figurin' like, you know I'm sayin', these people were already puttin' my name in the spotlight and all this bullshit, so I just got rid of stupid internet articles. What record's he talkin' about?

CI:    I don't know, Aki. You have to ask him. But . . . you probably won't be able to ask him for a lifetime, so you'll probably see him in yama-

-70-

ki-yama, then you could ask him, because all I know is . . . he knows too much about me like a dumbass . . . I mean, he lived in my house.

Abujihaad:    Yeah.  He doesn't even know what he's talkin' about.  You know what I'm sayin'?  It was like articles that you get off the internet.  That's why I said, that's not even beneficial.  I mean, you can read a book . . . I can read the book [U/I] if I wanna learn about . . . what's goin' on, political-wise.  I can buy . . . kaffir books . . . I mean there's good kaffir books . . . I mean, like, um, *Interior [U/I]* or *Through the Eyes of the Enemy*.  You know what I mean? . . . To learn more about . . .

CI:    My opinion, Ak . . . and – and take this from a brother who's been overseas and who's studied, and a lot of brothers know me personally and [U/I] . . .

Abujihaad:    Yeah.

CI:    Just take my advice, Aki . . . if I were you, man, I would . . . I'd lay low, I wouldn't talk to nobody.  I wouldn't talk to even my closest . . . because you don't what these people are on.  They could come to any of your friends . . .

Abujihaad:    Yeah.

CI:    . . . and scare 'em.  Plus, I mean, Aki . . . .

Abujihaad:    Yeah.

CI:    Derrick's got a big mouth, Ak.  I mean, he done told me personal things, like you –  and I'm not sayin' you did – he sayin' . . . this is what I'm sayin' he sayin' to people . . . .

Abujihaad    Yeah.

CI:    That you were, uh . . . e-mailin' Azzam's website on some . . . ordinance crap in the Navy.

Abujihaad:    He lyin'.

CI:    Now listen.  He done told . . . he done told my boys in Buffalo – not the ones I've be goin' with . . . but he done told these other dudes I know in Buffalo that Jameel can get weapons.  So, let's hook it up.

-71-

Abujihaad:     So, he's crazy.

CI:            I'm like, man, you know, you just can't be tellin' people stuff.

Abujihaad:     First of all . . . like . . . yeah, but first of all, on some ordinance stuff, he's stupid, 'cuz like I told the dudes in, um . . . the Moroccan dude that was from the Navy ship, I was like, man, if I did anything, you know, on the internet . . . first of all, those articles that . . . you read any articles about me . . . I sent the things *from* the ship . . . See what I'm saying?  There's nothing that . . . when you have a, you know every computer has a IP address, you know what I mean?

CI:            Right, right.

Abujihaad:     If you're doin' somethin' like that, they gonna catch you anyway doin' that.  So, he's a, he's a idiot.  You know what I'm sayin'?  So, like I'm gonna say, I ain't seen this dude in x-amount of time . . . this dude came over here with some bullshit, told him I wasn't wiggin' . . . on whatever the hell he was on . . . and he just tryin' to blow himself up so he throwin' my name out there like cupcakes.

CI:            Yeah, man, that's why, you know, because what happened was he told me that he had some brothers out in Phoenix who were down with the "seven" . . . and – and I said, look, we just . . . we just get together . . . Now, listen, listen.  I'm not talkin' about . . . missions.  I'm not talkin' about missions.

Abujihaad:     Yeah.

CI:            I'm just talkin' about like, even [U/I] said, you know, it's the Sunna [the "trodden path" / way of the Prophet Mohammed] to be in shape.

Abujihaad:     Yeah.

CI:            So I said the brothers, you know, since they had military background . . . you know, and I got the land . . . we could just hook up to do somethin' . . . I didn't say we . . .

Abujihaad:     Yeah.

CI:            . . . had to go out and bomb, uh, uh, uh, the Synagogue.

Abujihaad:     Yeah.

CI:             You know what I'm sayin'?  This brother on some . . . .

Abujihaad:      Yeah.

CI:             . . . bombin' Synagogues.

Abujihaad       Yeah.

CI:             You know and that's when he started spillin' his guts.  I mean, he just
                told my boy, Muneer, he told another boy named Rami.  He told
                everybody . . .

Abujihaad:      Yeah, I know.

CI:             . . . about you brothers, man.  And that's when I called you . . . .

Abujihaad:      Man, ain't, ain't nobody . . . .

CI:             . . . and I said you need to tell this brother to shut up.

Abujihaad:      I was talkin' to him.  He just, he didn't wanna listen.  You know what
                I'm sayin'?  I was talkin' to him on the internet . . . [U/I] . . . fuckin'
                people life up . . . you know what I mean? . . . That's for real.

CI:             I'm tellin' you right now, dude . . . if somethin' happen to me, I still
                got connections.  I'm gonna take this whole family out the box.

Abujihaad:      Hey, whatever you gotta do, man.  You know what I'm sayin',
                though, you know what I'm sayin?  All right, hey . . . like I said, I, um
                . . . you got a family – bigger than mine . . . I got a family, you know
                what I'm sayin? . . . their mom ain't even here, that's why I was like,
                man, what are you talkin' about? . . . I was asking him, you know
                what I mean?

CI:             I'd break out to Morocco or somethin', man.  Be honest.

Abujihaad:      Huh?

CI:             Ak, if I were you, I'd be breakin' out to Morocco for a few months.

Abujihaad:      Yeah.

CI:             I mean, honestly, especially with that Navy crap because he be
                runnin' his mouth to everybody about that stuff.

| Abujihaad: | 'Cuz he's an idiot. |
|---|---|

| CI: | All it . . . all it . . . all it takes is for him now just to say somethin'.. It's over. |
|---|---|

| Abujihaad: | Uh, yeah, he probably already did . . . or wanted them to say somethin' . . . and he didn't say somethin' . . . . |
|---|---|

At the end of the conversation Abujihaad tells the CI again that he isn't going to talk, and tells the CI what he is going to say if approached:

| Abujihaad: | Yeah, well, you know what? . . . I ain't, like I said, I just seen this dude, he came at me with some garbage . . . I wasn't down with him . . . You know what I'm sayin'? . . . Hey . . . So, I mean, I'm gonna be like, go talk to him.  You know, he's the one put my name out there.  I ain't got nothin' to say. |
|---|---|

| CI: | Man, just . . . if I was . . . I mean, get you a plane ticket, Ak.  That's all I'm gonna tell you. |
|---|---|

| Abujihaad: | Yeah. |
|---|---|

| CI: | Get the hell outta here, man. |
|---|---|

| Abujihaad: | All right, fine. Assalaamu'Alaikum. |
|---|---|

| CI: | Alaikum-Salaam, Aki. |
|---|---|

**Evidence Post-Dating Shareef's Arrest.**  Not surprisingly, there is a fair amount of self-serving material in conversations that take place *after* the news of Shareef's arrest becomes public and after Abujihaad identifies the CI as an informant.  These conversations, however, nevertheless contain evidence supporting consciousness of guilt as well.

For example, almost immediately after learning about Shareef's arrest, Abujihaad contacted several people to inform them about Shareef's arrest, warn them that law enforcement may approach them and to discuss plans to meet in person to discuss the situation further.  As

suspicions about cooperation with law enforcement grow, Abujihaad also makes statements that "snitches don't live long in the streets or in jail."

## III. __SHAREEF'S VARIOUS STATEMENTS TO THE CI REGARDING ABUJIHAAD'S PROVISION OF THE BATTLE GROUP INFORMATION THAT THE GOVERNMENT SEEKS TO INTRODUCE UNDER RULE 801(d)(2)(E)

Shareef discussed Abujihaad's provision of the battle group information with the CI on several occasions.  Because Shareef is unlikely to be a witness at trial, and because this is the evidence that the government seeks to introduce at trial under Rule 801(d)(2)(E), each of these instances is described separately for the court's convenience below.

- **October 1, 2006.**  The very first time Shareef told the CI about his friend in Phoenix, Hassan Abujihaad – (who he describes as having taught him his Islamic ideology as well as some weapons training) – he also told the CI about Abujihaad's having disclosed the battle group information.

  Specifically, on October 1, 2006, while introducing the topic of his associate, Abujihaad, Shareef told the CI that Abujihaad is a good guy who is a 31-year-old former member of the United States Navy who previously served in the Gulf region.  Shareef told the CI that Abujihaad had connections to Islamic militants outside the United States, including a well known Pakistani Imam who resides in England and was connected to Al Qaeda.  Shareef told the CI that Abujihaad used Azzam's internet websites to pass military information and had previously provided Navy logs, coordinates for Navy ships, docking places, docking times specifics on the weapons on those ships, and the number of personnel on those ships.  Shareef told the CI that, after the recovery of the information on computer disk(s), the information was reported in the media.  Shareef also told the CI that, following the news reports, Abujihaad believed the news story was about him and he destroyed all remaining records and jihad tapes.  Shareef stated that he was present when Abujihaad destroyed the material.  Shareef indicated that Abujihaad also destroyed Shareef's videotape depicting Bosnian mujiahideen.

- **October 5, 2006.**  During a conversation on October 5, 2006, Shareef and the CI were looking for news stories about Abujihaad on the internet.  During the conversation, Shareef told the CI more about Abujihaad's having provided the battle group material; discussed his (Shareef's), Abujihaad's and the CI's relative expertise with weapons; and specifically informed the CI how he and Abujihaad had been looking for a Caucasian like the CI to join them, to facilitate getting

-75-

things, to give them credibility and, the CI would explain, to do so without drawing attention to themselves. Specifically, during the conversation, and while the CI and Shareef search for articles about Abujihaad, the following occurs.

CI:        Remember you were tellin' me, you think your boy be on the, on the internet?

Shareef:   Right now?

CI:        Yeah.

Shareef:   Hard to tell.

CI:        No, I'm sayin' with that fitna [trouble / upheaval] he got in to.

Shareef:   Like, like, who you mean would he be on the internet?

CI:        No, like, ain't that, you told me that, that newspaper went up there.

Shareef:   Oh, it was on here, I mean, I'm sure they got archives.

CI:        'Cuz I'm on the internet, too. For gang history.

Shareef:   They didn't, they didn't show his name or nothin' though.

CI:        Was it like Phoenix Daily Herald or somethin'?

Shareef:   No, man, that was on CNN. (Laughs) That was on CNN . . . Cable News Network.

CI:        Oh I ain't worried about that. Uh, news . . . paper, uh . . . let me think . . .

Shareef:   That's it on Yahoo. That will pull up all the (UI) newspapers.

CI:        Yeah, that's what, what they say terrorist suspect or anything like that?

Shareef:   No, they ain't use the word terror.

CI:        No, see, it ain't up there . . . I like readin' about people . . . I show you a couple of my boys I grew up with . . . . They're in here . . . See it's all [U/I] . . . Arizona . . .

-76-

| | |
|---|---|
| Shareef: | It would be from 2004.  No . . . go, go back to Yahoo. |
| CI: | I'm gonna do this.  Hold on, hold on, hold on, I'm gonna do this.  Naval . . . . |
| Shareef: | I don't think it was in the Arizona paper. |
| CI: | Well, you told me that, uh . . .  that the, uh . . . that the people came to talk to him. |
| Shareef: | Yeah, but I don't, that was like, that was like some, some weekday, he wasn't even from like the major Phoenix paper. |
| CI: | That dude was probably from the government. |
| Shareef: | Probably was . . . Let me see . . . |
| CI: | Here we go.  I'm surprised he still lives there.  I'd be movin' the hell up out of there . . . Who is Benfold? |
| Shareef: | That's the name of the ship – that they did say.  This is it. |
| CI: | Where? |
| Shareef: | Right there. |
| CI: | San Diego? . . . Trying to determine whether a San Diego sailor passed . . . . He was in the Navy or the Marines? |
| Shareef: | He was in the Navy. |
| CI: | While security . . . (UI) . . . British man, to a British man . . . . Is that him? |
| Shareef: | No, that's the dude he apparently sent it to.  Or the dude who was found with it, it was an e-mail, he didn't know who he was hollerin' to. |
| CI: | Yeah, he thought he, he, just sent it to Azzam's web site, right? |
| Shareef: | Yeah. |

. . . . .

CI:            Did he get, uh, discharged?

Shareef:       He was already out of there.

A bit further in the same portion of the conversation the CI and Shareef continue to discuss Abujihaad and his provision of the battle group information. During this portion of the conversation, Shareef tells the CI more about Abujihaad's reaction to reading the article about Babar Ahmad's arrest and the recovery of the electronic version of the battle group document; discusses his (Shareef's), Abujihaad's and the CI's relative expertise with weapons; and specifically informs the CI how he and Abujihaad had been looking for a Caucasian like the CI to join them, to facilitate getting things and to give them credibility.

CI:            Is he a computer specialist?

Shareef:       I don't know what he was.

CI:            Man, they must not have nothin' on him, man.

Shareef:       They didn't mess with him earlier. I mean the only dude that came and said anything was that cat.

CI:            'Cuz it says and U.S. officials are seeking his extradition. Oh, Ahmad's.

Shareef:       Yeah, that dude . . . okay.

CI:            That's the English guy.

Shareef:       Yeah . . . . Funny thing is they don't say nothin' about him.

CI:            Na-uh.

Shareef:       He just happened to . . . when it came on the news . . . he was always into reading the news and stuff . . . He happened to read an article, man, he was like, oh, shit . . . . [laughs]

CI:            It's me. Allah protected him though.

Shareef:       Humdullah. But, still, though can you imagine that, man? Immediately, immediately, he knew, he immediately started gettin' rid of everything, man. I was, I was kinda salty because he say he tried to call me first to see if he could come and give me the stuff 'cuz I would of took it, man, all the, all the videos, man, I (UI). He

said he couldn't reach . . .

CI:        The videos, Aki, you can't do nothin' with videos.  It's all freedom
           of speech.

Shareef:   Ak, but at the same time, you're not really thinkin' about that when
           you're readin' some stuff like that on the news, about yourself,
           you're not really thinkin' about your rights at that time.  You're
           thinkin', man, I don't want to have nothin' for them to even
           potentially think about holding against me. 'Cuz that's treason.
           Then you got, fortunately, it was all Chechnyan.  You know what
           I'm sayin'.  It was all Chechnyan.  It wasn't like nobody who was
           deemed to be, you know, unofficial by the American Kufar.

CI:        So was he good with a gun?

Shareef:   Yeah, he was cold with it. He had modifications on it and
           everything.

CI:        I mean could he shoot though?

Shareef:   Yeah, I helped him modify that mother.

CI:        (UI) I got to take you with me, dude. I got to show you my skills,
           baby boy.  I'm cold.  You don't think I'm cold?

Shareef:   I, man, you Caucasian, dude, we got big respect for brothers like
           you.  We used to be talkin' about tryin' to find a brother like you,
           like, man, we need to find us a, a Caucasian brother.

CI:        'Cuz I, I . . .

Shareef:   So we can have him . . .

CI:        . . . but I was trained as a sniper in ROTC and all that, man.

Shareef:   Just have him use his name and credibility so we can get
           everything we need to get done.  (Laughs).  Have him do
           everything.

A bit further in the same portion of the conversation the CI and Shareef continue
to discuss Abujihaad and his provision of the battle group information.

CI:        . . . Man, this happened in '99, Aki, what the hell are they bringin'

-79-

it up in 2004 for?

Shareef:    I don't know.  That, that was like the whole point.  You know what I'm sayin'?  It was almost like it was irrelevant and absolute, it was no reason for them to even bring it up or make it public.  They just made it public just to say, you know, we doin' somethin' and we know about stuff.  So, it was a definite wake up call, though.  But for everyone else, for like, people who don't know, don't care, it was, it was nothin', it was like . . . it was like, okay, and?

CI:    (Laughs)

Shareef:    You know what I'm sayin'.  They didn't say a name . . .

CI:    I could see why that brother be scared to death though because I could see them sendin' him straight down to, uh, Quantico, and holdin' him for life.

Shareef:    He tellin' me Homeland Security had him hands up when he came back from Morocco.

CI:    I'm surprised they even let him leave . . . Here it is right here.  Hassan Abujihaad.

Shareef:    Oh, they say his name.

CI:    25 years old.

Shareef:    What, where they say his name at?

CI:    Right there.

Shareef:    Oh, man.

CI:    The convert to Islam and former communication specialist for the Navy . . . he stands accused . . . See.

Shareef:    Man, they, dude, the dude who came and seen him was from LA, that's right.  That is right.

CI:    Federal agents are trying to determine how Ahmad ended up in possession of detailed, highly classified information . . . He was in the Navy – it ain't that hard . . .  Man, if I were you, Aki, I would've told dude to move them to Maine.

-80-

| | |
|---|---|
| Shareef: | (Laughs). |
| CI: | I'm serious. |
| Shareef: | Like I would of known that, that's where it was found. |
| CI: | Man, you ain't goin', I mean Maine they ain't gonna find you. This is it right here. (UI). Hassan Abujihaad. |
| Shareef: | Hmmm. |
| CI: | Man, that is all over the damn computer. |
| Shareef: | (Laughs). |
| CI: | I'd be out of here. |
| Shareef: | Hold on, hold on, hold on . . . Pro Taliban . . . run by Babar Ahmad. |
| CI: | But this was before 9/11, right? |
| Shareef: | Yep. |

A bit further in the same conversation, the CI inquires whether Abujihaad's trouble with the battle group incident, and the resulting attention, would adversely impact any of their ongoing plans. The following occurs.

| | |
|---|---|
| CI: | All right, let me ask you a question real quick though. When it comes to dude, right . . . . |
| Shareef: | Hassan? |
| CI: | Yeah, I mean, you think too much heat's on him? To the point where we don't really want to hang out with him? Is he gonna go to Maine and stuff? |
| Shareef: | I don't know. It just . . . it just depends on . . . |
| CI: | 'Cuz I really don't want to get involved with him if there's too much heat on him. |
| Shareef: | See, this was a while ago . . . and then . . . like you said, it happened like '99 and then 2004 they brought it up and then I was |

there. I lived with him at the time it happened and . . . at that point . . . it was like we didn't know. He was askin' me like what you think, man? I'm like, I don't know. I was like . . .

CI: Why didn't he leave?

Shareef: Why did he leave where?

CI: Why didn't he break out? I would've left, personally.

Shareef: But, like, why did he leave the Navy?

CI: No, why, I would have left Phoenix.

Shareef: Oh, I mean, he only lived in Phoenix (UI).

CI: Yeah, that's true.

Shareef: (Laughs). He would of had to leave the whole, the whole place. But, uh . . . I don't know. Maybe they didn't, you know, well, I don't know what the Gov thought about it.

CI: They probably didn't think it was too . . .

Shareef: They maybe didn't see him as like a threat.

CI: No, because they would've done somethin'.

Shareef: Yeah, that's what I think they would've, especially at the time where doin' somethin' would've helped their cause. Like we caught, a- another one. There was, there was, what they were sayin' on the news, it's funny, though they were sayin' somethin' like the Anti-Patriot or somethin'. (Laughs). It was funny as heck, Ak. (Laughs).

CI: What did they say?

Shareef: They was like . . . you know how they got like the headlines and stuff for the title of a story, like, they give they story a name . . .

CI: Uh huh.

Shareef: ...they were sayin', it was somethin', it was called somethin' like the Anti Patriot or somethin' and I remember laughin' but he

-82-

wasn't laughin' but I was laughin', dude, I was laughin' hard, too . . . . Exclusive access . . . Restarting . . . Yes . . . I didn't know I could do this.

CI:         They're saying he had ties to Sheik Ahmed Khan.

Shareef:    Who is Ahmed Khan?

CI:         Khalid Sheik Mohammed.

Shareef:    (Laughs). See that, that ain't the case. 'Cuz I think if anybody knew that I would of known that. I'm, I'm like the closest brother to him, Ak, because when he met me I was, when we met, I was 18 and . . . and we were like me and you, we were just able to just kick it, you know, and be real. Plus, I didn't even know anybody out there just like I don't know anybody out here. You know what I'm sayin'.

CI:         No, they're talkin' about, they ain't talkin' about him, they're talkin' about Ahmad Babar.

Shareef:    Oh, I don't know nothin' about that dude.

. . . . .

CI:         But, see, Aki, if he did it, man, you know I'm sayin', what if he put too much heat on himself . . . to where we got to be worried ourself.

Shareef:    Well, if he, if . . . one thing I do know for sure is that since that day, the dude has been layin' the utmost low. You know what I'm sayin'.

CI:         Hell, yeah.

Shareef:    He been, he told me, man, he's keepin' off all radars. He's like, man, I'm tryin' to stay off all, all their radars. So he ain't be on nothin' and . . . and basically since . . .

CI:         Or like even, even goin' to the firin' range, man.

Shareef:    He ain't did none of that since then.

CI:         Okay.

-83-

| Shareef: | I know this for a fact. And, and, and when we went this was before he knew about that. Before it went public, you know what I'm sayin'. |
|---|---|
| CI: | Mm hmm. |

- **October 9, 2006.** On October 9, 2006, Shareef again told the CI that Abujihaad emailed U.S. Navy coordinates and information to Azzam via a contact in England.

- **October 11, 2006.** During a conversation on October 11, 2006, the CI and Shareef again discuss Abujihaad's disclosure of the battle group information. During this discussion, the CI wants to tell what Shareef has told him about Abujihaad's transmittal of the battle group material to another individual present with them in Chicago. Shareef indicates that he wasn't even supposed to tell the CI about it, because he took an oath to Abujihaad. Shareef ultimately agrees to give the CI permission to tell the third party. Although much of the conversation about Abujihaad's provision of the battle group information thereafter comes from the CI in this conversation, Shareef adds that Abujihaad told the recipients that they should destroy the material; that Abujihaad was upset when he learned that they had not destroyed the information; and Abujihaad destroyed all his materials as a result.

- **October 13, 2006.** On October 13, 2006, Shareef and the CI discussed the weapons that Abujihaad and Shareef were to obtain from the CI. The CI asked Shareef to write down his weapons request on a piece of paper. During the conversation, Shareef told the CI that he (Shareef) and Abujihaad, in an earlier effort to obtain weapons, had dressed like "kaffirs" (non-Muslims) and attended gun shows where Abujihaad had purchased weapons.

  Shareef assures the CI that Abujihaad is down with jihad and with their plans, he is just trying to stay off the radar and is less open about it.

  Shareef also assures the CI that Abujihaad can be trusted and is "down for the cause" because the trouble with the battle group incident was a while ago. Shareef reassures the CI by telling him that he and Abujihaad were friends after that trouble and that now, Abujihaad is underground, more subtle and doesn't like to talk about things over the computer.

  During the conversation, the CI tells Shareef that he wishes that Abujihaad hadn't destroyed his materials. Shareef again confirms that Abujihaad destroyed tapes of Chechen fighters he got from the Azzam sites, which Shareef says were not short 30 second clips like Shareef has on his computer, but approximately 90 minute long "full length features." Shareef indicates that he also deleted a bunch

of computer files that included materials from the sites. Shareef again confirms that Abujihaad is still up for jihad, however.

It is during this consensually recorded discussion that Shareef also tells the CI that while he (Shareef) and Abujihaad were both living in Phoenix in 2004, Abujihaad had conceived of the plan to attack U.S. military installations in San Diego. Shareef tells the CI that Abujihaad had proposed shooting at a military barracks and then, as soldiers ran out of the barracks, other attackers would shoot those soldiers from another angle.

Specifically, Shareef tells the CI that, while together in Phoenix in 2004, he and Abujihaad had discussed a plan to attack a United States military installation in or near San Diego, California. According to Shareef, Abujihaad's plan called for diversionary weapons fire that would draw soldiers from their barracks after which pre-positioned attackers would shoot the soldiers as they left their barracks. During the October 13, 2006 conversation, Shareef expressed his support for targeting military installations, indicating that Abujihaad was "the first brother" who "put him on" to the idea. When the CI asks what Shareef thinks about targeting military installations, Shareef describes it as a "respectful action" that "cannot be refuted."

## IV. THE ADMISSIBILITY OF THE CO-CONSPIRATOR STATEMENTS

### 1. Legal Framework

It is well settled that, when relevant, statements made by coconspirators in furtherance of a conspiracy are admissible as nonhearsay pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence even when they are made in furtherance of a conspiracy that is uncharged in the instant case. *See, e.g., United States v. Russo*, 302 F.3d 38, 45 (2d Cir. 2002) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment.") (quoting *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) and citing *United States v. Olweiss*, 138 F.2d 798, 800 (2d Cir. 1943) (admission of such declarations "does not depend on the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are

competent against his principal.")).

Before such statements are admissible against a defendant, the trial court must be satisfied – by only a preponderance of the evidence – that a conspiracy existed at the time the statements were made; that the defendant was a member of the conspiracy; and that the statements were made in the course and in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Ortiz-Rengifo*, 832 F.2d 722, 724-25 (2d Cir. 1987); *United States v. Terry*, 702 F.2d 299, 320 (2d Cir. 1983); *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028 (1970). In making that determination, the trial court may consider hearsay statements including the coconspirator's statements themselves when determining their admissibility. *Bourjaily*, 483 U.S. at 179 n.2, 180-81; *see also United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993); *United States v. Rastelli*, 870 F.2d 822, 838 (2d Cir.), *cert. denied*, 493 U.S. 982 (1989); *United States v. Ortiz-Rengifo*, 932 F.2d 722, 725 (2d Cir. 1987) (citing *Bourjaily* for the proposition that the court is permitted to use hearsay evidence is assessing admissibility of coconspirator statements). In the Second Circuit, the court's determination as to the admissibility of such coconspirator's statements is often referred to as the *Bourjaily* or "*Geaney* finding." *See Geaney*, 417 F.2d at 1120.

A preponderance of the evidence establishes that during at least October and November 2006, Abujihaad and Derrick Shareef conspired together to commit sedition and conspired to kill or attempt to kill U.S. military personnel.

Section 2384 of Title 18 provides: "If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose

by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force, to seize, take, or possess any property of the United States contrary to the authority thereof, they shall [be guilty of a crime]."

Section 1117 of Title 18 provides: "If two or more persons conspire to violate section . . . 1114 . . . of this title, and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be [guilty of a crime]." 18 U.S.C. § 1114 provides: "Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall [be guilty of a crime]."

"The gist of conspiracy is, of course, agreement." *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989); *see also Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act."). "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Salameh*, 152 F.3d 88, 234 (2d Cir. 1998) (per curiam); *see also United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003) ("The agreement that is the gist of conspiracy may be tacit rather than explicit and where the existence of a conspiracy has been proved, evidence sufficient to link another defendant with it need not be overwhelming and it may be circumstantial in nature.") (citations omitted).

With respect to the admissibility of a co-conspirator statement, the standard of proof for

participation in the conspiracy is not high – and not as high as that needed to submit a charge of conspiracy to the jury. *Terry*, 702 F.2d at 320. The proof may be totally circumstantial and is to be viewed in the context of all the evidence. *Id.* Moreover, "[o]nce a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming." *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989); *see also United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992). The evidence must merely establish "a likelihood of illicit association between the coconspirator and the defendant." *United States v. Matos*, 905 F.2d 30, 34 (2d Cir. 1990).

A statement will then qualify as "in furtherance" of the conspiracy if, for example, it prompted the listener to respond in a way that facilitates the criminal activity, *see United States v. Katsougrakis*, 715 F.2d 769, 778 (2d Cir. 1983); or encourages or convinces someone to participate in the conspiracy, *see United States v. Heinemann*, 801 F.2d 86, 96 (2d Cir. 1986); or apprises of progress or induces assistance, *see id.*; *United States v. Paone*, 782 F.2d 386, 391 (2d Cir. 1986); or provides reassurances and maintains trust and cohesiveness among conspirators, or informs them of the current status of the conspiracy, *see United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987); *Rastelli*, 870 F.2d at 837 (statements that serve to "induce a coconspirator's assistance"); *Maldonado-Rivera*, 922 F.2d at 959 (statements providing new information as to conspiracy's "status and solvency" or providing encouragement for future activities of conspiracy held to have been made in furtherance of conspiracy); or advances the interests of the conspiracy, *see United States v. Lang*, 589 F.2d 92, 99-100 (2d Cir. 1978); or tells the listener with whom he will be working, *see United States v. Perez*, 702 F.2d at 37; or identifies another co-conspirator, *see Rahme*, 813 F.2d

at 36.

In short, the Government needs to establish, by a preponderance of the evidence: "(1) that there was a conspiracy; (2) that its members included the declarant and the party against whom the statement is offered; [and] (3) that the statement was made both (a) during the course of *and* (b) in furtherance of the conspiracy." *Tracy*, 12 F.3d at 1196. In other words, the government merely needs to demonstrate, by a preponderance of the evidence, that the declarant and the defendant against whom the statements are offered were members of a conspiracy in furtherance of which the statements were made. *United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985); *United States v. Barnes*, 604 F.2d 121, 156 (2d Cir. 1979). Moreover, so long as the declarant and the party against whom the statement is offered were members of a conspiracy at the time the statement was made, any witness who heard the statement may recount it at trial, whether the statement was made to a conspiracy member or not, and regardless of whether the witness was a member of the conspiracy. 4. J. Weinstein & M. Berger, Weinstein's Evidence 801(d)(2)(E) [01] 305. Thus, statements need not necessarily be made to a co-conspirator, but may be made to any person outside the conspiracy, including a government informant. *See, e.g., United States v. Minicone*, 960 F.2d 1099, 1109 (2d Cir. 1992).

## 2. *Discussion*

The evidence set forth above demonstrates that during at least October and November 2006 (the time period when the statements at issue were made), Hassan Abujihaad and Derrick Shareef conspired to commit sedition and/or conspired to kill or attempt to kill U.S. military personnel.

### a. Evidence of the Conspiracy

The evidence demonstrates that from 2001 through 2006, Abujihaad maintained an ongoing and demonstrated interest in attacks on U.S. military personnel. The conspiracy between Abujihaad and Derrick Shareef formed as early as 2003, when Abujihaad and Shareef discussed attacking a U.S. military recruiting station in Phoenix, and continued from 2004 through 2006 when Abujihaad and Shareef further pursued Abujihaad's idea of attacking a U.S. military base in San Diego with a sniper-like attack.[18]

Specifically, sometime in 2003, Abujihaad and Shareef first discussed plans to attack U.S. military targets when they conceived of a plan to attack a specific U.S. military recruiting station located in a Phoenix mall. As set forth above, according to statements Shareef made to the CI, Shareef cased the recruiting station and reported to Abujihaad that the recruiting station had representatives from each branch of the armed services and that the recruiters were very relaxed and appeared to be unarmed. Abujihaad told Shareef that it would be easier to hit a recruiting station than other targets. Shareef and Abujihaad talked about attacks there because "you could get them all at once . . . you could go in with a gun or grenade and get them all at once." Shareef first disclosed his relationship with Abujihaad to the CI on or about October 1, 2006, and first shared the idea of bombing recruiting centers with the CI on or about October 4, 2006.

Abujihaad and Shareef's interest in plotting attacks on U.S. military targets continued in

---

[18] That the plans Abujihaad and Shareef discussed in 2003 and 2004 may have lain dormant until they were actively revisited in 2006 is of no moment because a preponderance of the evidence demonstrates that the conspiracy was certainly alive and active in October and November 2006 – the time period during which the statements in furtherance of the conspiracy were made.

2004 when Abujihaad conceived of a plan to engage in coordinated sniper-like attacks on a U.S. military installation in San Diego. Shareef first shared Abujihaad's idea of attacking a San Diego military barracks – a plan that he and Abujihaad had discussed in 2004 – with the CI on or about October 13, 2006. Specifically, on that date, Shareef told the CI that Abujihaad had proposed shooting at a military barracks and then, as soldiers ran out of the barracks, other attackers would shoot those soldiers from another angle. Shareef told the CI that he and Abujihaad had discussed a plan to attack a United States military installation in or near San Diego, California. According to Shareef, Abujihaad's plan called for diversionary weapons fire that would draw soldiers from their barracks after which pre-positioned attackers would shoot the soldiers as they left their barracks. During the October 13, 2006 consensual recording, Shareef expressed his support for targeting military installations, indicated that Abujihaad was "the first brother" who "put him on" to the idea and described it as a "respectful action" that "cannot be refuted."

As further evidence of Abujihaad and Shareef's unlawful agreement and their membership in conspiracy, on October 11 and 12, 2006, Shareef told the CI that he had taken an oath to Abujihaad not to speak about certain things. Shareef also stated that he had broken the oath by telling the CI about Abujihaad's provision of the battle group information.

On October 16 and 17, 2006, Shareef told the CI that he "want[ed] to hit a base with" rocket propelled grenades; Shareef and the CI discussed potential logistics for such an attack; and Shareef stated that even if Abujihaad did not join them on "the battlefield," he would support with "financial aid and logistics." During the conversations Shareef specifically spoke again about Abujihaad's plans to attack a San Diego military base.

On October 20, 2006, while discussing a potential attack with the CI, Shareef stated that

they should be able to kill at least ten people for each mujahideen fighter that participated in the attack.

On October 24, 2006, Shareef reported to the CI that Shareef and Abujihaad needed to have a face-to-face meeting to discuss operations further and Shareef again confirmed that Abujihaad would at least provide logistics and financial support for the operation.

In one of the various overt acts made in furtherance of the conspiracy, between October 27 and 31, 2006, Shareef traveled to Phoenix and met with Abujihaad in Phoenix on October 28th and 29th. During either updates by phone or reports made in person upon his return, Shareef told the CI: (1) that he had met with Abujihaad and told the CI "we got the green light, we got the go-ahead"; (2) that Abujihaad remained supportive of the jihad and confirmed that he would at least support with logistics including: picking out targets; organizing the operation, and assisting in the provision of intelligence and obtaining sniper training; (3) that Abujihaad and discussed naming their group "AIM" (the "American Islamic Movement"), but having a separate, covert and militant wing devoted to jihad; and (4) that Abujihaad had mentioned the potential for establishing "cells" in other cities, but that no one else would need to relocate, as each group could "do their thing" in their respective locations.

Significantly, Shareef also told the CI that San Diego was still on the list, referring to the plan to attack a U.S. military base in San Diego. Specifically, Shareef told the CI that while meeting with Abujihaad in Phoenix, they again discussed attacking U.S. military installations. According to Shareef, they discussed hitting barracks or a cafeteria; and the cafeteria was deemed a safer target because of their belief that the personnel would not be expected to have weapons in a cafeteria. According to Shareef, Abujihaad stated that they would need to obtain a pass to enter

the military installation. Shareef further indicated that they discussed the use of a sniper to flank any military personnel. Shareef stated that, while in Phoenix, he also learned of an individual who could train them to use a sniper rifle.

On November 3, 2006, Abujihaad asked the CI whether Shareef had discussed "the business" with him. When Abujihaad asked the CI what he thought, the CI told him he was "down with it."

On November 11, 2006, Shareef and Abujihaad have the first of several conversations in which Shareef re-confirmed Abujihaad's willingness to participate in, or at least provide logisitics and financial support for, their plans. During that conversation, Abujihaad explains to Shareef – by referring, for example, to "fresh" or "hot" versus "cold meals" – about outdated versus viable plots. In reference to his ability to provide current intelligence about U.S. military targets, Abujihaad explains that he "ha[s]n't been on that job, so I don't, you know what I'm saying . . . I haven't been there to see what the fresh meal is . . . I can't give you the fresh meal I ain't been there in X amount of years." Abujihaad tells Shareef, however, that another individual could "give you a fresh meal . . . I can elaborate on that more, if you want me to . . . to your face . . . not on the phone." Abujihaad tells Shareef that "I can tell you how to get a fresh meal, though . . . in various ways . . . ." During the conversation Shareef asks Abujihaad point blank to re-confirm his participation. Abujihaad says: "I know, you're saying something serious . . . don't show me nothing concrete, but you know what I'm saying, we already hit bases on some basic things . . . that all depends on what it is . . . I already discussed some things with you . . . as I told you before . . . I told you before, I said, what I told you before . . . when you was here . . . I said I like this, I don't like this . . . or I like this in this situation, that's what I said." Abujihaad goes on

to say: "*but yeah – come on, now, I'm down, you know what I'm saying . . . with whatever I can . . . with whatever Allah has instilled me to . . . help out with . . . if I can do that, then I'm for it . . . if that's what you're asking me.*" Shareef then puts the CI on a speaker phone with him and tells Abujihaad "I just need you to confirm something . . . now, I mean, we just basically need a confirmation as to if you gonna contribute to the efforts that are being made by us in some way, shape or form." Abujihaad responds: "*And I said, and I'll say it again, with whatever I can give you that's beneficial, I'll give it to you.*" At the end of the conversation, Abujihaad reassures Shareef: "Yeah, man, whatever man, the conversation is open, you know what I'm saying? I told you. We'll have all the conversations you want – me, you and my shredder, you know what I'm saying? . . . No electronic components you will be frisked at the door."

Later that evening Abujihaad calls Shareef and tells him that if the CI does not accompany him when he travels to Phoenix again they will have to talk more so the CI could "get a better picture of what he's looking at." Abujihaad tells Shareef that when he comes down the second time: "I can feed you, or we can, you know, you can feed me, I can feed you . . . and, so you can create a picture for him." Abujihaad again confirms his support and participation, saying "I'm trying to aid the situation as best way . . . that I see fit."

As set forth in great detail above, during October and November 2006 Abujihaad and Shareef also engaged in efforts to obtain weapons and ammunition. The evidence suggests that Abujihaad's and Derrick Shareef's interest in obtaining weapons was related to their interest in attacking U.S. military targets. For example, on November 13, 2006, Abujihaad tells Shareef that if he was going to pursue obtaining current intelligence to support an attack, then he might also want to obtain weapons and ammunition that would be best suited for such an attack.

Abujihaad tells Shareef: "Our boy wanted to know was you serious . . . was you gonna get that knowledge from old dude? . . . That knowledge from his boy . . . that his boy got the handout." Abujihaad continues: "Then if you gonna get it, get the knowledge, then . . . then you might wanna work with a couple things, or whoever gonna get the knowledge might want to work with a couple things, like something that take 6.8." Although Shareef indicates that he is unclear what a "6.8" is, he says "what I do know is I understand what you're getting at." Abujihaad explains "6.8 is the hottest thing out . . . 6.8 is a round . . . 6.8 round is something they introduced after Afghanistan because the 5.6, the 5.56 millimeter is not a potent round." Abujihaad goes on to educate Shareef, who he calls "rookie," on various rounds and what weapons take various rounds. Abujihaad says "let me tell you what I want right now . . . let me just name it to you . . . so you know . . . that way we see eye to eye." Abujihaad and Shareef then proceed to review various weapons together.

Although Abujihaad *says* that he is distancing himself from Shareef, he continues to interact with Shareef; pledge his support to Shareef; and pursue the weapons deal up through at least Shareef's arrest. For example, during their conversation on November 21, 2006, Abujihaad, at Shareef's request, unequivocally re-confirms that he will provide logistics and financial support. Specifically, in response to Shareef's request that he re-confirm his willingness to "make a contribution" to the "brothers that are still on the path," Abujihaad tells him "Yeah, all right. That's possible. I'm pretty sure later on I'll want something myself." Abujihaad tells Shareef: "I don't like talking on the phone or internet," but "I'm hearing you. I'm feeling everything you're saying . . . . You just told me that . . . you know, first of all, you want to get from Point A to Point B . . . and Point B it starts with an, um . . . an "M" . . . an "M" with an "N"

[money] . . . Okay? . . . No need to go further than that." After admonishing Shareef again not to talk in greater detail on the phone so they can keep the group tight and not compromise anyone's security, Abujihaad tells him: "I'll keep you posted, whatever . . . we can talk . . . I mean . . . if you need a camelback, or whatever . . . you know, finances . . . we'll just . . . whatever you need . . . If I have it, you know, I'll let you know." Indeed, Abujihaad goes on to tell Shareef: "if I was 15 minutes away, I'd probably, I'd probably sit down with you" to discuss plans further in person.

Further evidence of the conspiracy is also demonstrated in the numerous conversations in October and November 2006 that contain coded conversation, repeated references to and admonitions about maintaining operational security and efforts to avoid detection by law enforcement, such as: (1) Abujihaad's repeated indications that the phones are tapped; and his unwillingness to talk openly on the phone; (2) that anything he told Shareef better be "as secure as a dead man's mouth;" (3) references to jihad as "J" or "7"; (4) references to outdated or viable plots as "cold" versus "hot" or "fresh" meals; (4) references to having discussions only in person and "with a shredder" and (5) references to Usama bin Laden, in code, as "Under the Black Leaves."

Additional conversations detailed above also demonstrate Abujihaad's intent – i.e., his interest in and support for killing U.S. military personnel – including, for example, Abujihaad's conversations regarding videos of the "Juba Sniper" – a sniper who was claimed to be responsible for the death of approximately 37 American soldiers in Iraq. Among other things, during these conversations Abujihaad stated: "Juba was a cold dude . . . if he's still breathing, may Allah still let him be plugging them dudes . . . If not, I know he done train more . . . in the

skills and tactics that he got . . . 'cuz he was laying 'em down!"

       Additional consciousness of guilt evidence that further supports the conspiracy includes Abujihaad's efforts to identify – as well as his views regarding – those who might be cooperating with law enforcement / the "kaffir."

       ***b. The Statements the Government Seeks to Introduce at Trial Were Made in Furtherance of the Conspiracies.***

       The statements that Shareef made to the CI in October and November 2006 about Abujihaad's provision of the battle group information were also made in furtherance of the seditious conspiracy and the conspiracy to kill U.S. military personnel. The evidence demonstrates that Shareef *used* his relationship with Abujihaad and consistently marketed the fact of Abujihaad's involvement with the battle group incident to apprise the CI of the status of the conspiracy; to tell the CI with whom he would be working; to assure the CI of the bona fides of Shareef and Abujihaad; and perhaps more importantly – to *recruit* the CI into the conspiracy. Shareef also used his knowledge of Abujihaad's provision of the battle group information to reassure the CI not only that Abujihaad maintained an active interest in jihad, but also to reassure the CI that Abujihaad was discreet and that they could both be trusted.[19]

---

[19] There is no "double hearsay" issue because the recordings also indicate that Abujihaad discussed his provision of the battle group with Shareef. For example, during the October 5, 2006 conversation, Shareef tells the CI that Babar Ahmad is "the dude [Abujihaad] apparently sent 'it' to," or the person who was found with it. Shareef further states that "it was an email," sent to Azzam's web sites and that Abujihaad "didn't know who he was hollerin' to." The only way that Shareef would know whether Abujihaad knew the people to whom he had sent the battle group information, would be if Abujihaad told him – a fair and reasonable inference not only from the statement itself, but from Shareef's other statements in which he specifically states that Abujihaad spoke to him about the matter. *See, e.g.*, October 5, 2006 Recording (Shareef: "See, this was a while ago and then, like you said, it happened like '99 and then 2004 they brought it up and then I was there. I lived with him at the time it happened and at that point it was like we didn't know. *He was askin' me like what you think, man, I'm like I don't know.*") (emphasis added). This is further corroborated by the various recordings during which

Indeed, during the October 5, 2006, consensual recording, in the middle of the conversation about Abujihaad's provision of the battle group information, Shareef – in an explicit effort to recruit the CI – specifically told the CI that he and Abujihaad had "big respect" for Caucasian "brothers like you" and that they had been talking about how they were "tryin' to find a brother like you, like, man, we need to find us a, a Caucasian brother . . . So we can have him . . . Just have him use his name and credibility so we can get everything we need to get done." *See United States v. Katsougrakis*, 715 F.2d 769, 778 (2d Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984) (statements will qualify as "in furtherance" of the conspiracy if, for example, it prompted the listener to respond in a way that facilitates the criminal activity); *see United States v. Heinemann*, 801 F.2d 86, 96 (2d Cir. 1986) (or encourages or convinces someone to participate in the conspiracy); *United States v. Paone*, 782 F.2d 386, 391 (2d Cir. 1986) (or apprises of progress or induces assistance).

Shortly thereafter, in the same portion of the conversation, the CI, however, expresses concern about whether Abujihaad's trouble with the battle group information, and the resulting attention, would adversely impact any of their plans:

| | |
|---|---|
| CI | All right, let me ask you a question real quick though. When it comes to dude, right . . . . |
| Shareef | Hassan? |
| CI | Yeah, I mean, you think too much heat's on him? To the point where we don't really want to hang out with him? Is he gonna go to Maine and stuff? |

---

Abujihaad confronts and dresses down Shareef for telling people about his provision of the battle group information, such as the November 16, 2006 recording during which Abujihaad tells Shareef not to "be a Judas to him;" that battle group issue was not over for the kaffirs; and that he would "rather be assassinated by a kaffir than executed by a brother's mouth."

| Shareef | I don't know. It just . . . it just depends on . . . |
|---|---|
| CI | 'Cuz I really don't want to get involved with him if there's too much heat on him. |

Shareef reassures the CI, however, that the trouble was a while ago, Abujihaad survived it, he is more discreet now, and can be trusted:

| Shareef | See, this was a while ago . . . and then . . . like you said, it happened like '99 and then 2004 they brought it up and then I was there. I lived with him at the time it happened and . . . at that point . . . it was like we didn't know. He was askin' me like what you think, man? I'm like, I don't know. I was like . . . |
|---|---|
| . . . . . | |
| CI | But, see, Aki, if he did it, man, you know I'm sayin', what if he put too much heat on himself . . . to where we got to be worried ourself. |
| Shareef | Well, if he, if . . . one thing I do know for sure is that since that day, the dude has been layin' the utmost low. You know what I'm sayin'. |
| CI | Hell, yeah. |
| Shareef | He been, he told me, man, he's keepin' off all radars. He's like, man, I'm tryin' to stay off all, all their radars. So he ain't be on nothin' and . . . and basically since . . . |
| CI | Or like even, even goin' to the firin' range, man. |
| Shareef | He ain't did none of that since then. |
| CI | Okay. |
| Shareef | I know this for a fact. And, and, and when we went this was before he knew about that. Before it went public, you know what I'm sayin'. |
| CI | Mm hmm. |

*See, e.g., United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); *United States v. Rahme*,

813 F.2d 31, 36 (2d Cir. 1987) (statements that provide reassurances and maintain trust and

cohesiveness admissible as in furtherance of the conspiracy); *see also United States v. Perez*, 702

F.2d at 37 (statements that tell the listener with whom he will be working admissible).

Similarly, on the October 13, 2006 recording (in which obtaining weapons and Abujihaad and Shareef's interest in attacking the U.S. military base in San Diego is discussed), Shareef discusses Abujihaad's problems with the battle group document in the course of providing assurances to the CI about both the status of the conspiracy and the fact that Abujihaad can be trusted. Specifically, Shareef assures the CI that Abujihaad is down with the jihad and with their plans, he is just trying to maintain a low profile. Shareef specifically assures the CI that Abujihaad can be trusted and is down for the cause *because* the trouble with the battle group document was a while ago. Shareef reassures the CI by telling him that he and Abujihaad were friends after that trouble and that now, Abujihaad is underground and is more subtle. Shareef also tells the CI that notwithstanding the fact that Abujihaad destroyed his materials in 2004, Abujihhad is still up for jihad. *See, e.g., United States v. Heinemann*, 801 F.2d 86, 96 (2d Cir. 1986) (statements admissible where they encourage or convince someone to participate in the conspiracy); *United States v. Paone*, 782 F.2d 386, 391 (2d Cir. 1986) (or apprises of progress or induces assistance); *see United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987) (or provides reassurances and maintains trust and cohesiveness among conspirators, or informs them of the current status of the conspiracy); *Maldonado-Rivera*, 922 F.2d at 959 (statements providing new information as to organization's "status and solvency" or providing encouragement for future activities of organization held to have been made in furtherance of conspiracy).

In short, Shareef *used* his relationship with Abujihaad and his knowledge of Abujihaad's disclosure of the battle group information to apprise the CI of the status of the conspiracy; to tell

the CI with whom he would be working; to assure the CI of their bona fides; and perhaps more importantly – to *recruit* the CI into the conspiracy. Shareef also used his knowledge of Abujihaad's provision of the battle group information to reassure the CI not only that Abujihaad maintained an active interest in jihad, but also to reassure the CI that Abujihaad was discreet and that they could both be trusted. Because Shareef's statements to the CI were made in furtherance of the seditious conspiracy and the conspiracy to kill U.S. military personnel, they are properly admissible at trial under Rule 801(d)(2)(E).

## V.      THE ADMISSIBILITY OF ADMISSIONS BY ABUJIHAAD

In addition to laying out its theory of admissibility for the co-conspirator statements, the government has also submitted this memorandum to provide notice of its intention to rely upon certain of the material set forth above in its case-in-chief at trial as admissions and/or as evidence of Abujihaad's intent to commit the crimes charged. The government submits that most of Abujihaad's recorded statements showing, for example, consciousness of guilt; efforts to avoid detection; and direct evidence of intent are admissions or statements by a party-opponent that are admissible simply under Rule 801(d)(2)(A) and Rule 403.

Abujihaad's admissions include his knowledge of, and familiarity with the Azzam websites and the Maktabah Al-Ansar bookshop; his dressing down Shareef for speaking about Abujihaad's provision of the battle group information; and Abujihaad's indications that he can no longer provide current intelligence in support of contemplated attacks on the U.S. military.

Abujihaad's statements or admissions evidencing his motives and intent – specifically, his support and praise for acts of violent jihad against U.S. military personnel – include his

criticizing and questioning the bona fides of the CI because he is not down with Usama bin Laden / "Under the Black Leaves"; his recommending *Allah is Preparing Us for Victory*; and Abujihaad's statements supporting the "Juba Sniper."

Abujihaad's statements and admissions showing consciousness of guilt and efforts to avoid detection by law enforcement include his admonitions not to speak about jihad openly; his statements about taking efforts to avoid detection (such as the various conversations during which he talks to Shareef about being discreet and maintaining secrecy and operational security; not talking too much; keeping your "group" or "outfit" "tight" by not using names; having conversations about jihad only in person, with his "shredder" and after everyone has been frisked for electronic components, etc.); his use of coded conversation (such as his use of the terms "J" and "7" to refer to jihad; his use of code words such as "hot meals," "cold meals" and "fresh meals" to refer to outdated or current intelligence or plots; his practice of referring to Usama bin Laden as "Under the Black Leaves," etc.); his efforts to detect cooperation with law enforcement and his views about "snitching"; and the November 2006 conversation during which he dresses Shareef down for telling the CI about his provision of the battle group information. *See, e.g.*, *United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400-02 (9th Cir. 1991) (distinguishing subsequent *statements* made by defendant, admissible as admissions under Rule 801(d)(2)(A), and evidence of subsequent *acts*, admissible under Rule 404(b)); *see also United States v. Manafzadeh*, 592 F.2d 81, 89 (2d Cir. 1979) (finding defendant's subsequent statement that the criminal conduct "had been done several times [before] and nothing ha[d] happened" was an admission under Rule 801(d)(2)(A), rather than a subsequent *act* subject to Rule 404(b); *cf. United States v. Hammoud*, 381 F.3d 316, 340 n.11, 341 (4th Cir. 2004) (noting, while upholding

government's playing at trial of jihadi-related videotapes found in defendant's apartment, that "Rule 404(b) is simply not relevant here. To the extent the 'bad act' is the playing of the videotapes during Thursday night prayer meetings, it was intrinsic to the charged crime of providing material support to Hizballah"; "the district court did not abuse its discretion in ruling that the excerpts played for the jury were relevant. The excerpts played for the jury [were] probative of Hammoud's intent . . . i.e., to solicit donations to Hizbollah – and his knowledge of, and agreement with the terrorist objectives of Hizbollah.").[20]

## VI.    THE ADMISSIBILITY OF OTHER ACTS BY ABUJIHAAD

To sustain a conviction on the crimes charged in this case, the government needs to establish:  (1) that Abujihaad, in providing material support to terrorists in violation of 18 U.S.C. § 2339A, intended that such support would be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 2332(b) (conspiring to kill United States nationals); and (2) that Abujihaad, in communicating national defense information to persons not entitled to receive it, in violation of 18 U.S.C. § 793(d), had reason to believe that the disclosure could be used to the injury of the United States, and acted unlawfully, knowingly, and willfully when he communicated the information.

Because the question of Abujihaad's intent will be a central issue at trial, the government also intends to introduce evidence regarding other *acts* of Abujihaad that demonstrate his state of

---

[20]    The Fourth Circuit's decision in *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) (en banc), was vacated by *Hammoud v. United States*, 543 U.S. 1097 (2005), so that the Fourth Circuit could reconsider the decision in light of *United States v. Booker*, 543 U.S. 220 (2005). On remand, the Fourth Circuit reinstated those portions of its opinion unrelated to the determination of his sentence.  *See United States v. Hammoud*, 405 F.3d 1034, 1034 (4th Cir. 2005).

mind, motive and intent with respect to the crimes charged – such as his having discussed

attacking a U.S. military recruiting station with Derrick Shareef in 2003; his proposing and

conspiring to attack a U.S. military installation in San Diego with a coordinated, sniper-like

attack in 2004 and again in 2006; and his efforts with Shareef to obtain weapons and ammunition

on the black market in furtherance of that interest.[21]

### a. *The Admissibility of Subsequent Acts Under Rule 404(b)*

Rule 404(b) of the Federal Rules of Evidence provides, in pertinent part:

> Evidence of other crimes, wrongs or acts is not admissible to prove
> the character of a person in order to show action in conformity
> therewith. It may, however, be admissible for other purposes, such
> as proof of motive, opportunity, intent, preparation, plan, knowledge,
> identity or absence of mistake or accident. . . .

*See* Fed. R. Evid. 404(b); *United States v. Pipola*, 83 F.3d 556, 565 (2d Cir. 1996).

The Second Circuit follows the "inclusionary" approach to the admission of other act

evidence, so that evidence of other crimes, wrongs or acts, is admissible for any purpose other

than to show a defendant's criminal propensity if the court determines that the probative value of

the evidence is not substantially outweighed by its potential for unfair prejudice. *United States v.*

*Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *United States v. Germosen*, 139 F.3d 120, 127 (2d Cir.

1998); *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996); *United States v. Stevens*, 80

F.3d 60, 67 (2d Cir. 1996); *Pipola*, 83 F.3d at 565; *United States v. Muniz*, 60 F.3d 65, 69 (2d

Cir. 1995); *United States v. DeVillio*, 983 F.2d 1185, 1194 (2d Cir. 1993); *United States v. Pitre*,

---

[21]     To the extent that the Court believes that any of what the government believes to be
admissions by Abujihaad are more properly characterized as "other act" evidence, the
government would, in the alternative, seek the admission of the evidence referenced above under
Rule 404(b) as well. To the extent that the Court believes any of the material may be admissible
under *both* Rule 801(d)(2)(A) and Rule 404(b), the government would respectfully urge the
Court to make alternative findings to that effect.

960 F.2d 1112, 1118-19 (2d Cir. 1992). Case law confirms that the purposes for which such evidence is admissible include: proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. *See Huddleston v. United States*, 485 U.S. 681 (1998); *Pipola*, 83 F.3d at 565.

Although the "'other crimes, wrongs or acts' referred to in Rule 404(b) are customarily referred to . . . as 'priors,' . . . the federal courts overwhelmingly have embraced . . . 'the soundest view,' namely, that the existing exceptions to Rule 404(b)'s general bar against the admission of propensity evidence allow for the introduction of *both* prior *and* subsequent bad acts evidence." *United States v. Sioux*, 362 F.3d 1241, 1246 (9th Cir. 2004) (citations omitted) (emphasis in original). The Second Circuit has joined numerous other Circuits in this approach, having unequivocally stated: "The fact that the evidence involved a subsequent rather than prior act is of no moment. 'Subsequent act' evidence may be admitted under Rule 404(b)." *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998); *see also United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990); *United States v. Mohr*, 318 F.3d 613, 617 (4th Cir. 2003); *United States v. Anifowoshe*, 307 F.3d 643, 646-47 (7th Cir. 2002); *United States v. Jones*, 145 F.3d 959, 964 (8th Cir. 1998); *United States v. Latney*, 108 F.3d 1446, 1449 (D.C. Cir. 1997); *United States v. Delgado*, 56 F.3d 1357, 1364-65 (11th Cir. 1995); *United States v. Osum*, 943 F.2d 1394, 1404 n.7 (5th Cir. 1991); *United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400 (9th Cir. 1991) ("By its very terms, 404(b) does not distinguish between 'prior' and 'subsequent' acts."). As the Second Circuit stated in *Ramirez*, "relevancy cannot be reduced to mere chronology; whether the similar act evidence occurred prior to or subsequent to the crime in question is not necessarily determinative to its admissibility." *Ramirez*, 894 F.2d at 569. Accordingly, "rather than adopt a

rigid approach," the Second Circuit "leave[s] it to the district court to exercise its discretion in reaching determinations about relevancy based on the *Huddleston* analysis." *Id.*

In *Huddleston v. United States*, 485 U.S. 681, 687 (1988), the Supreme Court outlined the test for admissibility of other act evidence under Rule 404(b). First, to be admissible the evidence must be offered for one of the identified proper purposes – such as proof of state of mind, motive and intent. Second, the offered evidence must be relevant to an issue in the case. Third, the probative value of the similar act evidence must substantially outweigh the potential for unfair prejudice. Fourth, if requested to do so, the court must give an appropriate limiting instruction to the jury. *Id.*; *see also Ramirez*, 894 F.2d at 568 (before admitting other act evidence under Rule 404(b), a district court must insure that it is: "[1] advanced for a proper purpose; [2] relevant to the crime for which the defendant is on trial; [3] more probative than prejudicial; and, [4] if requested, admitted with limiting instruction to the jury.") (citing *Huddleston*, 485 U.S. at 691-92).

The other act evidence proposed in this case satisfies every aspect of the *Huddleston* test for admissibility.

### b. The Similar Act Evidence is Offered for a Proper Purpose.

Among other things, Rule 404(b) provides that other act evidence is admissible to prove state of mind, motive and intent. The government's proposed evidence would be offered for these permissible purposes.

First, it is important to bear in mind that the two violations with which Abujihaad is charged in this case require the government to prove a relatively specific intent in connection with his alleged provision of the battle group information. In Count One, Abujihaad is charged

with providing material support – knowing or intending that such support would be used in preparation for, or in carrying out a conspiracy to kill United States nationals. Count Two charges that Abujihaad, having had lawful access to, and being entrusted with classified information relating to the national defense, knowingly and willfully communicated, delivered, or transmitted such information to a person not entitled to receive it (or caused that to happen), with reason to believe that the information could be used to injure the United States. As the Supreme Court was careful to point out in *Huddleston*, where, as here, a defendant's state of mind is an issue in the case, other acts that bear upon the defendant's intent are all the more significant because a defendant's conduct is often the only way of establishing the requisite intent. *See Huddleston*, 485 U.S. at 685 ("'"Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.").

Abujihaad's interest in attacking a U.S. military recruiting station in 2003 and his proposing and conspiring to attack a U.S. military base in San Diego in 2004 and 2006 would allow the jury to reasonably infer that he intended and was motivated to provide material support to a conspiracy to kill United States military personnel; and that he intended and was motivated to knowingly disclose then-classified information that could be used to the injury of the United States – because he bears animus and ill-will against the United States military, and the "gumshoes" (law enforcement) – a state of mind and intent which is evident not only from his discussions regarding, among other things, the Juba Sniper, but also manifested in his subsequent *acts* of pursuing attacks against U.S. military targets and personnel. In other words, Abujihaad's

interest in attacking U.S. military personnel and installations in 2003, 2004 and 2006 demonstrates his state of mind – i.e., that he had a motive to disclose the battle group information in 2001 *because* he considers himself to be at war with the "American enemies" and those "serving a Kuffar nation." *See, e.g., United States v. Yousef*, 327 F.3d 56, 120-22 (2d Cir. 2003) (upholding admission, under Rules 403 an 404(b), in trial of defendant for conspiring to bomb United States commercial airliners in southeast Asia and charges relating to the 1993 bombing of the World Trade Center, of a letter found in defendant's apartment that contained evidence of other, uncharged acts – including threats against France, Britain and Sweden, as well as threatened attacks against American nuclear facilities; Court held that "the probative value of the letter was high" because "it supported an inference that the defendants intended to commit imminent attacks on United States targets and made clear that the strike was motivated by America's support of Israel."; "the threats against the United States" in particular, "were highly probative of the defendants' motives"; and the evidence demonstrated "a motive for the crimes for which the defendants were indicted: retaliation against the United States for its support of Israel."); *see also United States v. Brand*, 467 F.3d 179, 197-98 (2d Cir. 2006) (upholding admission of child pornography where it demonstrated defendant's desire to have sex with minor, and therefore had illicit intent when crossing state lines to meet minor); *United States v. Lehder-Rivas*, 955 F.2d 1510, 1518 (11th Cir. 1992) (upholding admission of evidence of drug smuggler's admiration for Hitler and "revolutionaries," since these political views had "considerable probative value in proving [defendant's] motives"); *United States v. McKinney*, 954 F.2d 471, 480 (7th Cir. 1992) (upholding admission of previous incidents explaining "early manifestations" of defendant's hatred for murder victim, since "the motive for committing a

crime is directly relevant to proving the crime").[22]  Indeed, the evidence indicates that Abujihaad *proposed* the idea of targeting U.S. military installations to Shareef, such as in the October 13, 2006, consensual recording in which Shareef stated that Abujihaad was "the first brother" who "put him on" to the idea of attacking U.S. military personnel and installations.  The fact that Abujihaad *initiated* the idea of attacking U.S. military targets in 2003, 2004 and 2006 is strong evidence that Abujihaad also had the requisite state of mind and intent to support a conspiracy to kill U.S. military personnel and harm the United States when he disclosed the battle group information in 2001.

The evidence also indicates that Abujihaad told Shareef that, because he (Abujihaad) was no longer in the military, he could no longer provide current intelligence for attacking U.S. military personnel.  This is not only tantamount to an admission, but also compelling evidence that Abujihaad had the requisite state of mind and intent to support a conspiracy to kill U.S. military personnel and harm the United States when he disclosed the battle group information in 2001.

### c.  The Other Act Evidence is Relevant to Issues in the Case

The proposed other act evidence is relevant to issues in the case – namely, Abujihaad's

---

[22]    Indeed, Abujihaad's motives and intent manifested by the other acts in 2003, 2004 and 2006 are consistent with the motives and intent he demonstrated, for example, in his July 2001 email, which he signed "a brother serving a Kuffar nation," and in which he described the attack on the *U.S.S. Cole* as a "martyrdom operation"; praised the fact that "America has never faced an enemy with no borders, no government, no diplomats, nor a standing army that pledges allegiance to no state"; praised acts of jihad by mujahideen soldiers because "their only mission in life [is] to make Allah's name and laws supreme over this world"; and advised the members of Azzam Publications that acts of violent jihad were working, saying: "you can truly see the effects of this psychological warfare taking a toll on junior and high ranking officers."  That Abujihaad harbored similar motives and intent in 2003, 2004 and 2006 makes it more likely that Abujihaad also had the requisite state of mind and intent to support a conspiracy to kill U.S. military personnel and harm the United States when he disclosed the battle group information in 2001.

state of mind, motives, and intent.

Under Rule 401 of the Federal Rules of Evidence, all evidence is relevant that makes the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* Fed. R. Evid. 401. "Under Rule 402, all evidence that is relevant – that is logically probative – is admissible." *United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990); *see also United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).

The Second Circuit has indicated that other act evidence "is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." *United States v. Brand*, 467 F.3d 179, 197 (2d Cir. 2006) (quoting *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993)). "The government is required to establish only a 'similarity or some connection' to establish that a[n] [other] act is relevant to one of the elements (in this case, intent) of the crime charged." *Brand*, 467 F.3d at 197 (citing *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002)).

The fact that Abujihaad has, on at least two other occasions, conspired to engage in attacks on U.S. military personnel demonstrates and makes it more probable that he had the requisite state of mind for the two crimes charged, because the other acts tend to show that Abujihaad had both motives and intent to support a conspiracy to kill U.S. military personnel and harm the United States when he disclosed the battle group information in 2001. First, there is a very precise "similarity and connection" between the charged crimes and the other acts – and more importantly, between the state of mind and intent required to establish the charged acts and the state of mind and intent demonstrated by the other acts. In essence, the government needs to

show that Abujihaad had the intent to kill or conspire to kill U.S. soldiers. That is *precisely* the intent that Abujihaad demonstrates when discussing attacks on a U.S. military recruiting station in Phoenix in 2003 and when he proposes in 2004, and then pursues in 2006, the sniper-like attack on U.S. military personnel in San Diego. This intent is evident, for example, in Abujihaad's instructions to obtain "more potent" rounds and when Abujihaad and Shareef favored hitting a barracks or a cafeteria because it would be more likely that their targets would be unarmed.

There are also significant similarities between the planning surrounding the 2003, 2004 and 2006 acts and the manner and methods in which the battle group information was disclosed. For example, the battle group information represents a collection and compilation of intelligence in support of a contemplated attack on U.S. military targets and personnel. During their discussions in 2003 about attacking a U.S. military recruiting station, Shareef and Abujihaad discussed what Shareef had learned from his having gone to the recruiting center (i.e., that the recruiting station had representatives from each branch of the armed services; the military recruiters at the station were very relaxed and that they appeared to be unarmed; and that it would be easier to hit a recruiting station than other targets). Similarly, during the planning for the contemplated sniper attack in 2006, Abujihaad recommended that Shareef gather similar intelligence and then obtain 6.8 millimeter ammunition because it is more potent.

Another similarity between the acts is that the battle group document references a potential motive for the attack: that the battle group was tasked with upholding sanctions against Iraq, carrying out maritime interception operations; and launching potential strikes against Usama bin Laden, the mujahideen and the Taliban. During conversations that take place in

connection with the attack contemplated in 2006, Abujihaad repeatedly manifests support for acts of violent jihad against the U.S. military, expresses enmity towards the "American enemy" and the "kaffirs" and expresses support for "Under the Black Leaves" a/k/a bin Laden.

The battle group document also makes a point of highlighting where and when a particular ship with high ranking officials will be docked. Similarly, during their discussions about the contemplated sniper attack in 2006, Abujihaad recommends that Shareef get his intelligence from an individual who more recently left the military because the place where that individual had proposed an attack was "a place where . . . they got, uh, higher caliber meal, you know what I mean? . . . high up on the plate," suggesting a reasonable inference that they were discussing higher ranking targets.

The battle group document also instructs: "please destroy message." Abujihaad's discussions in 2006 are replete with references to maintaining secrecy and operational security, not speaking about plans on the phone or the internet, and actually destroying materials relating to their plans (such as Abujihaad's indication to Shareef that they will speak in person, with his shredder).

These similarities and connections highlight the relevance of the proposed other act evidence – namely, that Abujihaad had the same state of mind, motives and intent in 2003, 2004 and 2006 as he did in 2001 – a significant issue in the case because the government has to prove, in essence, that Abujihaad intended that his disclosure would be used to injure the United States and intended that it would be used in furtherance of a conspiracy to kill United States military personnel.

It is anticipated that the defendant may argue that his defense is simply that he did not do

the charged act at all and, accordingly, intent is not truly at issue, *see, e.g.*, *United States v. Sampson*, 385 F.3d 183, 193 (2d Cir. 2004); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States v. Colon*, 880 F.2d 650, 656 (2d Cir. 1989) ("In some circumstances the nature of a defense put forth by the defendant may reveal that '[k]nowledge and intent, while technically at issue, [are] not really in dispute.'") (quoting *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir. 1978)); *United States v. Ortiz*, 857 F.2d 900, 904 (2d Cir. 1988) ("intent is not placed in issue by a defense that the defendant did not do the charged act at all . . . [w]hen a defendant unequivocally relies on such a defense, evidence of other acts is not admissible for the purpose of proving intent."); *United States v. Manafzadeh*, 592 F.2d 81 (2d Cir. 1979).[23]  Such a claim here would be without merit.

First, the government's proffered evidence goes not only to establishing Abujihaad's intent, but also to establishing the fact that Abujihaad had a motive to disclose the battle group information.

Second, because the government must prove that Abujihaad intended that his disclosure would be used to injure the United States and intended that it would be used in furtherance of a conspiracy to kill United States military personnel – an intent that is more specific than simply proving knowledge or willfulness – in the government's view, a general denial by the defendant puts that further intent at play.  In other words, implicit in a general denial by the defendant is the claim that he did not have, and does not have, the intent to kill U.S. military personnel, kill United States nationals or harm the United States.

---

[23]  *But see United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) ("Germosen's reliance on . . . *Manafzadeh* . . . is misplaced.  *Manafzadeh* held that evidence of other crimes was inadmissible . . . because they were 'not relevant to the charge against the defendant'").

Third, under Second Circuit case law, successfully forestalling the admission of other act evidence on the issue of intent would require the defendant to "express a decision not to dispute that issue with sufficient clarity that the trial court will be justified (a) in sustaining an objection to any subsequent cross-examination or jury argument that seeks to raise the issue and (b) in charging the jury that if they find all the other elements established beyond a reasonable doubt, they can resolve the issue against the defendant because it is not disputed." *Sampson*, 385 F.3d at 193 (indicating that such a defense must be "unequivocal" and suggesting that a stipulation is required); *United States v. Tarricone*, 996 F.2d 1414, 1421-23 (2d Cir. 1993). In the government's view, this would, as a practical matter, mean that the defense would have to entirely forgo *any* efforts to challenge the notion that Abujihaad had an intent to support a conspiracy to kill U.S. military personnel or injure the United States – a defense which, in the government's view, would mean forgoing any attempt to explain away Abujihaad's July 2001 email, forgoing any claims regarding the meaning of "jihad," etc.[24]

---

[24] There is a substantial argument that a more recent decision of the Supreme Court has significantly narrowed the circumstances in which a defense-sponsored stipulation can prevent the government from choosing how to prove its case. In *Old Chief v. United States*, 519 U.S. 172, 176-77 (1997), the defense had offered to stipulate to the prior-conviction element of a gun prosecution under 18 U.S.C. § 922(g), but the prosecution had declined, in favor of introducing evidence on that issue. The Court held that the district court abused its discretion by not insisting on the stipulation. In reaching that conclusion, however, the Court observed that the "peculiarities of the element of felony-convict status" dictated a rare exception to the general rule that, in other contexts and subject to Rule 403, "the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away." *Id.* at 189. "[I]f, indeed, there were a justification for receiving evidence of the nature of [other] acts on some issue other than status (i.e., to prove 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident'), Rule 404(b) guarantees the opportunity to seek its admission." *Id.* at 190; *see also id.* at 179 (holding that evidence can be relevant for purposes of Fed. R. Evid. 401 regardless of whether the fact to which it is directed is "in dispute") (citing Advisory Committee's Notes on Fed. R. Evid. 401)). The decision in *Old Chief* therefore appears to undercut prior circuit case law that a defendant's stipulation can, in fact, limit the government's ability to introduce evidence to prove an element of its case.

Finally – and perhaps most importantly – both the spirit and the letter of the *Ortiz* and *Manafzadeh* line of cases do not and cannot apply here because the defendant has already made his intent an issue in attempting to explain away and proffer innocent explanations for his 2001 conduct in statements that are inextricably intertwined with inculpatory admissions by the defendant that the government intends to introduce. For example, during the December 8, 2006, conversation during which the CI not only informs Abujihaad of Shareef's arrest, but also tells Abujihaad what Shareef told him about Abujihaad and the battle group information, Abujihaad not only makes significant admissions, but he also attempts to offer innocent explanations for his conduct.

For example, while expressly admitting to having sent the July 2001 "*Cole* email," Abujihaad also claims that what he sent to Azzam Publications was not classified and suggests that all he sent to Azzam Publications were innocuous emails expressing his opinions and views about the attack on the *U.S.S. Cole*:

> Abujihaad:    Know what I'm saying? I mean, I send, uh . . . you know, uh . . . I mean, corresponded with an e-mail site . . . it wasn't sendin' nothing, it wasn't nothing, top secret like these people are sayin' . . . You know what I mean? . . . I was just talkin' about like the *Cole*, whatever . . . what I thought about it.

During the same conversation, Abujihaad admits that after news of the battle group document was reported in the media, he destroyed jihadi-related materials. The government would, of course, point to this as obstructive conduct demonstrating consciousness of guilt. The defendant, however, while admitting to destroying jihadi-related videos, again makes an effort to negate this intent / consciousness of guilt and to provide an innocent explanation for the conduct:

> Abujihaad:    . . . he ain't burned nothin' with me, you know what I'm saying? I had some "J" flicks and they ain't got nothing to do with nobody, you

know what I'm saying?  All I did was take my "J" flicks and got rid of 'em.  I mean, 'cuz I mean, it's stupid, these people they bother you for stupid stuff, like . . . my boy was watchin' somethin' on, uh . . . on, uh . . . National Geographic, and he says that uh . . . there's this dude that be selling videos in, uh, London for Maktabah Al-Ansar . . . . and he's like, they talkin' about puttin' people in jail for videos.  You know what I mean?  He's like how can you put you in jail for buyin', buyin', jihadi flicks, when you sell porno?  [Laughs].  You got me?

CI:            Right, right.  Yeah.

Abujihaad:     It's not even a big deal, it's just like . . . first of all, I don't own anything with "J" . . . I don't own any, any articles with "J" because it doesn't benefit you.

While admitting to having possessed an Azzam Publications internet article entitled "How to Train Yourself for Jihad," Abujihaad makes similar attempts to explain away and offer innocent explanations for his having destroyed it:

Abujihaad:     I had no records.  What that was is . . . you know, um, I had this article from the internet called, uh . . . *How to Train Yourself for "J."* And, um . . . some dude from, um, the Oregon . . . you know, from Oregon . . . those dudes that were in Oregon, when they arrested those dudes, they had the same article.  You know what I mean?  At they house.  So, I was figurin' like, you know I'm sayin', these people were already puttin' my name in the spotlight and all this bullshit, so I just got rid of stupid internet articles.  What record's he talkin' about?

. . . .

Abujihaad:     Yeah.  He doesn't even know what he's talkin' about.  You know what I'm sayin'?  It was like articles that you get off the internet. That's why I said, that's not even beneficial.  I mean, you can read a book . . . I can read the book [U/I] if I wanna learn about . . . what's goin' on, political-wise.  I can buy . . . kaffir books . . . I mean there's good kaffir books . . . I mean, like, um, *Interior [U/I]* or *Through the Eyes of the Enemy*.  You know what I mean? . . . To learn more about . . .

Indeed, during the same conversation, the defendant even expressly disavows that he has *any*

-116-

interest in jihad or terrorism:

> Abujihaad:  . . . I just try to follow . . . look, I try to follow Salaafi [U/I] . . . Salaafi [U/I] don't teach nothin' about terrorism . . . Simple as that.
>
> . . . .
>
> Abujihaad:  First of all . . . first of all, listen.  I'm a tell you . . . I'm not . . . about . . . jihad that way . . . . You know what I mean? . . . Because . . . because what I'm a . . . I'm a try, what I'm about is trying to . . . first of all, I follow like, you know what I'm sayin', Quran and Sunna . . . the Salaafi way, you know what I'm sayin' . . . so I'm tryin' to get, I'm tryin' to really get down with this . . . . That's what I'm about . . .

Where, as here, a defendant has put intent at issue and "claims that his conduct has an innocent explanation, [other] act evidence is generally admissible to prove that the defendant acted with the state of mind necessary to commit the offense charged." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (quoting *United States v. Zackson*, 12 F.2d 1178, 1182 (2d Cir. 1993)).

### d.  The Probative Value of the Similar Act Evidence Substantially Outweighs its Potential for Unfair Prejudice

Once evidence is found to be relevant to a material issue in dispute, the court must determine whether the risk of unfair prejudice substantially outweighs the probative value of the evidence.  *See* Fed. R. Evid. 403, 404; *Huddleston*, 485 U.S. at 686.  The Advisory Committee defines "unfair prejudice" as an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *See Old Chief*, 519 U.S. at 180 (citing advisory committee note to Rule 403) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").  Along the same lines,

the Second Circuit has stated that "[e]vidence is prejudicial [within the meaning of Rule 403] only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *Figueroa*, 618 F.2d at 943.[25]

Although the proposed other act evidence is certainly prejudicial (as all inculpatory evidence is), it is not unfairly so and the high probative value outweighs the prejudicial effect. The fact that the defendant engaged in *precisely* the same conduct in 2003, 2004 and 2006 – namely pursuing and supporting an attack aimed at killing U.S. military personnel – is highly probative of Abujihaad's state of mind and the particular intent required in connection with his having disclosed the battle group information in 2001. The other act evidence also is strong and compelling evidence that Abujihaad had a motive to do so. The highly probative nature of the other acts outweighs the obvious prejudicial effect of the evidence. *See, e.g., Yousef*, 327 F.3d at 120-22 (upholding admission, under Rules 403 and 404(b), in trial of defendant for conspiring to bomb United States commercial airliners in southeast Asia and charges relating to the 1993 bombing of the World Trade Center, of a letter found in defendant's apartment that contained evidence of other, uncharged acts – including threats against France, Britain and Sweden, as well as threatened attacks against American nuclear facilities; Court held that "the probative value of the letter was high" because "it supported an inference that the defendants intended to commit

---

[25]    Although not required, the Second Circuit has strongly suggested that "it facilitates appellate review when the district court expressly mentions the Rule 403 factors." *Ramirez*, 894 F.2d at 569-70. A trial court's ruling after a conscientious balancing of probative value versus unfair prejudice will not be reversed on appeal absent a clear showing of abuse of discretion. *See Pipola*, 83 F.3d at 566; *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995); *Ramirez*, 894 F.2d at 569. Indeed, "the appellate court 'must look at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.' To find abuse, the appellate court must find that the trial court acted arbitrarily or irrationally." *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir. 1983) (citations omitted).

imminent attacks on United States targets and made clear that the strike was motivated by America's support of Israel."; "the threats against the United States" in particular, "were highly probative of the defendants' motives"; and the evidence demonstrated "a motive for the crimes for which the defendants were indicted: retaliation against the United States for its support of Israel.").

### e. *The Court Should Give an Appropriate Limiting Instruction*

As set forth above, if requested to do so, the district court must give a limiting instruction to the jury explaining the purpose for which the evidence may be considered. *See, e.g., Huddleston*, 485 U.S. at 691-92; *United States v. Thomas*, 54 F.3d 73, 81 (2d Cir. 1995). To that end, the Government respectfully submits the following proposed instruction in connection with this submission:

> The Government has offered evidence against Hassan Abujihaad, which if believed, tends to show that on different occasions, he engaged in conduct similar to that charged in the indictment.
>
> In that connection, let me remind you that the defendant is not on trial for any acts not alleged in the indictment. Accordingly, you may not consider the evidence of the other acts as a substitute for proof that Hassan Abujihaad committed the charged offenses. Nor may you consider this evidence as proof that the defendant has a criminal personality or a bad character. The evidence of the other acts was admitted for a much more limited purpose and you must consider it only for that limited purpose.
>
> If you determine that Hassan Abujihaad committed the acts charged in the indictment and the other acts as well, then you may, but need not draw an inference that in doing the acts charged in the indictment, Hassan Abujihaad acted knowingly and intentionally – i.e., that in providing material support he did so knowing or intending that such support would be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 2332(b) (conspiring to kill United States nationals) and in disclosing information relating to the national defense, the defendant had reason to believe that such information could be used to the injury of the United States and that he acted unlawfully, knowingly, and willfully when he communicated, delivered, or transmitted such information, or caused such information to be communicated – and

not because of some mistake, accident, or other innocent reason.

Evidence of similar acts may not be considered by you for any other purpose. Specifically, you may not use this evidence to conclude that because Hassan Abujihaad committed the other acts, he must also have committed the acts charged in the indictment.

*See* Sand, Instruction 5-25.

### f. Conclusion

In short, in order to establish the elements of the two charged offenses, the government bears the burden of proving that Abujihaad had a particular intent – namely, that in providing material support he did so knowing or intending that such support would be used to carry out a conspiracy to kill United States nationals, and that he disclosed information relating to the national defense with reason to believe that such information could be used to the injury of the United States and that he acted unlawfully, knowingly, and willfully when he did so. The proposed evidence regarding Abujihaad's participation in discussions about attacking a U.S. military recruiting station in 2003; and his proposing and then pursuing an attack on U.S. military personnel at a San Diego base are highly probative of critical issues in the case – namely, Abujihaad's state of mind, intent and motives when providing material support for a conspiracy to kill U.S. military personnel and disclosing classified information in 2001. Because the other act evidence is offered for a proper purpose, is relevant to key issues in the case and is highly probative and not unfairly prejudicial, the court should admit the evidence together with an appropriate limiting instruction given both at the time the evidence is admitted and during the court's final charge.

## VII.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court find: (1) that the statements by Shareef to the CI about Abujihaad's provision of the battle group information are admissible as co-conspirator statements under Rule 801(d)(2)(E); (2) that Abujihaad's various recorded *statements* showing, for example, consciousness of guilt; efforts to avoid detection; and other direct evidence are properly admissible as admissions or statements by a party-opponent under Rule 801(d)(2)(A) and Rule 403; and (3) that the other *acts* evidence – namely, Abujihaad's participation in discussions in 2003 regarding attacks on a U.S. military recruiting station and Abujihaad's proposing in 2004 and then pursuing in 2006 an attack on U.S. military personnel – are properly admissible under Rule 404(b) to demonstrate Abujihaad's state of mind, intent and motives with respect to the crimes charged.  To the extent that the court believes that a determination on the third issue (i.e, the admissibility of the other *act* evidence under Rule 404(b)) is premature in the absence of knowing precisely what the defendant's claims at trial will be, the government would respectfully urge the Court to reserve judgment on the third issue until trial and make a determination depending on how the actual trial proceeds, up to and including a rebuttal case from the government.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

/s/
STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct19105
United States Attorney's Office
915 Lafayette Boulevard
Bridgeport, Ct 06604
(203) 696-3000
(203) 579-5575 (fax)
Stephen.Reynolds@usdoj.gov

/s/
WILLIAM J. NARDINI
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct16012
157 Church Street, 23d Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5377 (fax)
William.Nardini@usdoj.gov

## CERTIFICATION

This is to certify that on October 19, 2007, a copy of the foregoing was sent by first-class

mail, postage pre-paid, to the defendant's counsel of record:


Dan E. LaBelle, Esq.                 Robert G. Golger, Esq.
Halloran & Sage LLP                  Quatrella & Rizio
315 Post Road West                   One Post Rd., PO Box 320019
Westport, Connecticut 06880-4739     Fairfield, Connecticut 06432


　　　/s/_____
STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY