UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :    Crim. No. 3:07-CR-57 (MRK) |
|    v. | : |
| | :    November 27, 2007 |
| HASSAN ABU-JIHAAD | : |

**MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS FISA DERIVED EVIDENCE**

This Memorandum is submitted in support of Defendants Motion to

Suppress FISA Derived Evidence dated November 12, 2007 ("the Motion").  By

the Motion, defendant Hassan Abu-Jihaad seeks an order suppressing all

information and evidence obtained or derived from electronic surveillance and

physical search purportedly authorized by the United States Foreign Intelligence

Surveillance Court, including the fruits of any evidence developed from such

surveillance or search (collectively, "FISA Derived Evidence")

**Facts**

Defendant Hassan Abu-Jihaad is accused in a two count Indictment of

Providing Material Support to Terrorists in violation of 18 U.S.C. § 2339A and of

Communicating National Defense Information to Persons Not Entitled to Receive

It in violation of 18 U.S.C. § 793(d).  Mr. Abu-Jihaad is a U.S. citizen who served

in the United States Navy from December 1997 until January 2002.  The

Indictment alleges that, in or about March or April 2001, while he was still serving

in the Navy, Mr. Abu-Jihaad communicated classified information about the

movements of a U.S. Navy Battle Group to persons in London, England who

operated what the government alleges was an internet based terrorist organization.

On or about October 29, 2007, the government filed an Amended Notice of Intention To Use Foreign Intelligence Surveillance Act Information Pursuant 50 U.S.C. §§ 1806(c) and 1825(d) ("the Amended Notice"). The Amended Notice indicates that the government intends to use FISA Derived Evidence at pretrial hearings, the trial and other related proceedings in this case. The Amended Notice does not specify what FISA Derived Evidence the government intends to use, but discovery provided to date suggests that the government intends to use (at a minimum) evidence derived from electronic surveillance (intercepted telephone conversations) and from physical search of the defendant's e-mail accounts.

Defense counsel do not have access to the affidavits and other papers which the government may have submitted to the Foreign Intelligence Surveillance Court (the "FISC") to support an order by the FISC authorizing the electronic surveillance and/or physical search(es). As a result, the defense does not know when the government made its application(s) to the FISC or what information might have been presented to the FISC in support of the application(s). Therefore, this statement of facts and the arguments which follow in this Memorandum represent defense counsel's best guess as to what sort of information might have been submitted to the FISC and, consequently, what sort of arguments might appropriately be made in support of the instant motion to suppress.

Because defense counsel does not have access to the actual application papers supporting the FISC orders, this memorandum will assume that the affidavit supporting the FISC applications looked something like the Affidavit in support of the complaint and arrest warrant dated March 1, 2007 (the "Arrest Warrant Affidavit").  The Arrest Warrant Affidavit will be referred to and used in this memorandum as a surrogate for the absent FISC application papers.  FISC applications submitted in 2004 or 2005 probably contained the same information found in the Arrest Warrant Affidavit, except that portion of the Arrest Warrant Affidavit described as "Recent Investigative Developments" (Arrest Warrant Affidavit ¶¶ 31-40).  The Recent Investigative Developments relate to Mr. Abu-Jihaad's alleged association with Derrick Shareef and statements Mr. Abu-Jihaad allegedly made to Mr. Shareef and to another individual in Chicago who was/is cooperating with the Government in the investigation of Mr. Shareef and Mr. Abu-Jihaad.  The Recent Investigative Developments occurred or were discovered by the government at the end of 2006.  FISC Applications submitted in 2006, therefore, may have included some, but probably not all, of the information contained in the Recent Investigative Developments portion of the Arrest Warrant Affidavit.

The date of the seizure of Mr. Abu-Jihaad's e-mail accounts is unknown, but it probably occurred in early 2004 following the recovery of the so-called Battle Group Document in London in December 2003.  It appears that search warrants were first executed upon various e-mail accounts associated with the Azzam Publications websites.  When those searches disclosed the e-mail

communications between Azzam Publications and the defendant, the government probably then applied to the FISC for orders authorizing the seizure of Mr. Abu-Jihaad's personal e-mail accounts. Thus, for purposes of this memorandum, the defense will assume that the e-mail account seizure applications included information about the recovery of the Battle Group Document and the discovery of the e-mail communications between the defendant and Azzam Publications. The pertinent e-mail communications are attached as exhibits to the Arrest Warrant Affidavit. None of the e-mail communications between the defendant's e-mail addresses and the Azzam Publications web site contain any information related to or referring to the information contained in the Battle Group Document. The last communication from any of Mr. Abu-Jihaad's e-mail addresses and Azzam Publications occurred on or about September 2, 2001. The application also probably included assertions similar to those contained in the Arrest Warrant Affidavit about the classified nature and the accuracy of the information contained in the Battle Group Document and about the defendant's duties and responsibilities in the Navy which supposedly gave him access to the sort of information contained in the Battle Group Document. Assuming that the FISC application for the e-mail account seizure orders occurred in 2004, the government would not as of that date had any of the information described in the Arrest Warrant Affidavit as "Recent Investigative Developments."

The government has disclosed recordings of phone calls intercepted from the defendant's telephones and these recordings date from November 2006.

Assuming that the FISC application for an order authorizing the interception of

these phone calls was made shortly before these interceptions began, at the time

of the telephone intercept application, the government had obtained some of the

information relating to Mr. Shareef and the statements allegedly made by Mr.

Abu-Jihaad.  Again, for purposes of this memorandum, the defense assumes that

the FISC application for orders authorizing the interception of the defendant's

phone calls was supported by an affidavit which looked similar to the Arrest

Warrant Affidavit and would have included some, but not all, of the Recent

Developments information described in the Arrest Warrant Affidavit.

## Legal Argument

The FISA Derived Evidence should be suppressed for the following

reasons:

- The Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801, *et seq.* is unconstitutional on its face because it violates the Fourth Amendment of the United States Constitution;

- The Foreign Intelligence Surveillance Act is unconstitutional as applied to the defendant under the circumstances of this case because the connection between the defendant's alleged conduct in 2001 and any exigency presented by an ongoing foreign intelligence investigation was too attenuated;

- The FISC application papers fail to demonstrate that a "significant purpose" of the searches and surveillance was to obtain "foreign intelligence information;"

- The FISC application papers fail to demonstrate probable cause to believe that Mr. Abu-Jihaad was a "foreign power" or an "agent of a foreign power;"

- The FISC application papers fail to demonstrate probable cause to believe that the defendant's e-mail accounts which were seized were owned, used or possessed by a "foreign power" or an "agent of a foreign  power;"

- The FISC application papers fail to demonstrate probable cause to believe that the defendant's telephones which were subjected to electronic surveillance were being used or were about to be used by a "foreign power" or an "agent of a foreign power;"

- The certifications submitted as part of the FISC application papers were "clearly erroneous" within the meaning of 50 U.S.C. §§ 1805(a)(5) and 1824(a)(5); and

- The FISC application papers contain false statements, recklessly made, in violation of *Franks v. Delaware,* 438 U.S. 154 (1978).

<u>The Foreign Intelligence Surveillance Act Is Unconstitutional</u>

Congress enacted the Foreign Intelligence Surveillance Act in 1978 in an effort to provide some legal framework for government surveillance activities conducted within the United States for foreign intelligence purposes. Pub.L. 95-511, October 25, 1978, 92 Stat. 1783. As originally enacted, FISA allowed a federal officer to obtain an order from a judge of the specially created FISC authorizing electronic surveillance or searches targeting "a foreign power" or "an agent of a foreign power" "for the purpose of obtaining foreign intelligence information." The 2001 Patriot Act amendment of FISA permitted the issuance of such orders where "a significant purpose" of the order was to obtain "foreign intelligence information." 50 U.S.C. § (a)(7)(B) and 50 U.S.C. § 1823(a)(7)(B) as amended by Pub.L. 107-56, Title II, § 218, October 26, 2001. For a detailed discussion of the legislative history of FISA and the development of the dichotomy between domestic investigations for foreign intelligence purposes and domestic investigations for law enforcement purposes, see "The Rise and Fall of the FISA Wall," David S. Kris, Stamford Law and Policy Review 2006, 17

Stan.L.& Pol'y Rev. 487.  See also, *In re All Matters Submitted to the Foreign Intelligence Surveillance Court*, 218 F Supp.2d 611 (FISC 2002), reversed in part, *In re Sealed Case*, 310 F.3d 717 (FISA Court of Review 2003).

    Before the decision in *In re Sealed Case,* several Circuit Court cases had recognized an exception to the Fourth Amendment warrant requirement where domestic surveillance was conducted "primarily" for the purpose of gathering foreign intelligence.  *U.S. v. Truong Dinh Hung*, 629 F.2d 908, 912-916 (4th Cir. 1980); *United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973); *United States v. Butenko*, 494 F.2d 593 (3rd Cir. 1974); *United States v. Buck*, 658 F.2d 871 (9th Cir. 1977).  See also, *United States v. Duggan*, 743 F.2d 59, 78 (2nd Cir. 1984) (affirming the denial of a motion to suppress, but only upon the express finding that the purpose of the surveillance was foreign intelligence gathering and was not "directed towards criminal investigation or the institution of a criminal prosecution.")  These cases support the proposition that the traditional Fourth Amendment warrant requirements may be relaxed where investigations are undertaken for foreign intelligence purposes if, but only if, the primary purpose of the investigation is to gather foreign intelligence information and not to gather evidence to mount a criminal prosecution.  In *United States v. United States District Court (Keith)*, 407 U.S. 297 (1972), the U.S. Supreme Court approached but did not decide the issue of the applicability of the Fourth Amendment warrant requirement to national security investigations involving foreign powers or their agents.  In *Keith*, defendants who were suspected of involvement in the bombing of a CIA office were subjected to electronic surveillance upon the authorization of

the Attorney General without prior judicial approval. The U.S. Supreme Court held that such surveillance violated the Fourth Amendment and rejected the government's contentions that national security investigations are too subtle and complex for judicial evaluation and that prior judicial approval will fracture the secrecy essential to official intelligence gathering. 407 U.S. at 318-321. Although *Keith* did involve a national security investigation, no foreign element was implicated and the Supreme Court expressly left open the question of the Fourth Amendment's limitations on national security investigations involving the activities of foreign powers or their agents. 407 U.S. at 321-322.

The 2001 amendment of FISA and the FISA Court of Review decision in *In re Sealed Case* bring back into focus the constitutional question of how, if at all, the traditional warrant requirements of the Fourth Amendment apply to government investigations undertaken wholly or in part for foreign intelligence purposes. In *In re Sealed Case*, the Court of Review upheld the Fourth Amendment constitutionality of FISA and rejected the historic dichotomy that had grown up between intelligence gathering and law enforcement. The Court of Review determined that the primary purpose test as enunciated by *Truong* and its progeny was never constitutionally required and that the Patriot Act's disavowal of that standard (by substitution of the "significant purpose" language) passed constitutional muster. 310 F.3d at 742-746. More recently, however, FISA as amended has come under constitutional scrutiny again and found to be lacking. *Mayfield v. United States*, 504 F.Supp.2d 1023 (D. Ore. 2007).

In *Mayfield*, the court granted declaratory relief that the Foreign

Intelligence Surveillance Act, as amended by the Patriot Act, is unconstitutional.

The *Mayfield* case was originally filed as a civil rights action seeking

compensatory damages for unlawful arrest and imprisonment and unlawful

searches and seizures.  The compensatory damages claims were settled

between the parties and the allegations of an Amended Complaint seeking

declaratory relief were decided by the Court on summary judgment motions.  In

ruling for the plaintiff, the Court in *Mayfield* determined that FISA is

unconstitutional because it now permits the Executive Branch to conduct

electronic surveillance and searches of American citizens without satisfying the

traditional probable cause and warrant requirements of the Fourth Amendment.

In particular, the Court held that FISA violated the Fourth Amendment for the

following reasons:

> FISA orders may be issued without a showing that a crime has been or is being committed;
>
> With respect to the nexus to criminality required by the definition of "agent of a foreign power," the government need not show probable cause as to each and every element of the crime involved or about to be involved;
>
> When the FISC reviews a FISA application, the government satisfies most FISA requirements simply by certifying that the requirements are met;
>
> The statute directs that the reviewing court is not to scrutinize statements contained in the governments certifications submitted with a FISA application but must defer to such certifications unless they are "clearly erroneous;"
>
> FISA procedures allow the government to avoid traditional Fourth Amendment judicial oversight when it obtains search and surveillance orders;

FISA allows the government to retain and use the collected
information in criminal cases without providing any meaningful
opportunity for the target of the investigation to challenge the
validity of a FISA order;

FISA notice provisions are impermissibly broad, allowing the
government to conduct searches and electronic surveillance
without notifying the target of such intrusions within a reasonable
period of time after the government activity has occurred and,
except in instances where criminal prosecutions follow and the
government gives notice of its intention to use FISA derived
evidence, no notice is ever given to the targets of such intrusions;

FISA does not require any showing of "particularity" in the
traditional Fourth Amendment sense, allowing the government to
search or conduct electronic surveillance at its broad discretion,
something akin to a "general warrant;"

FISA authorizes electronic surveillance terms up to 120 days which
violates Fourth Amendment duration requirements for criminal
investigations.

504 F.Supp.2d at 1030-1043.  The defendant adopts all of the constitutional

arguments advanced by the plaintiff in *Mayfield* and adopts the Court's holding in

support of his argument that FISA, as amended by the Patriot Act, is

unconstitutional.  Because the authorizing statute is unconstitutional, all evidence

seized pursuant to FISC orders, and the fruits of all evidence derived from such

orders, should be suppressed.[1]

### FISA Is Unconstitutional As Applied To The Defendant
### Under The Circumstances Of This Case

By the time the Battle Group Document was discovered in London in

December 2003, Mr. Abu-Jihaad was no longer in the U.S. Navy and the Azzam

---

[1] The defense acknowledges that another District Court recently upheld the constitutionality of
FISA against a Fourth Amendment challenge.  *United States v. Mubayyid*, __ F.Supp.2d __, 2007
WL 3287393 (D.Mass. 2007).

Publications web site was in the process of being shut down.  The allegedly
classified information contained in the Battle Group Document was time sensitive
and related to the movement of the Constellation Battle Group in the spring of
2001.  By the time it was discovered in December 2003, the information
contained in the Battle Group Document no longer posed a national security
threat to the United States (if it ever had) and, not being in the Navy since
January 2002, Mr. Abu-Jihaad was no longer in a position to supply classified
information to anyone.   In 2004, Babar Ahmad, the individual most closely
associated with the Azzam Publications web sites, was indicted in the District of
Connecticut and detained in London on a U.S. extradition warrant.  Syed Talha
Ahsan, another individual associated with Azzam Publications, was subsequently
indicted in July 2006 and also detained pending extradition.  The Azzam
Publications web site has been shut down since some time in 2004 and Mr.
Ahmad and Mr. Ahsan remain in custody in London.

By the time the Battle Group Document was discovered and government
began investigating Hassan Abu-Jihaad, there was no exigency of the sort
typically associated with the gathering of "foreign intelligence information."
There was no indication that Mr. Abu-Jihaad in 2004 or later had any ongoing
relationship with Azzam Publications or any other "foreign power."  All the
government knew then, and apparently all the government knows now, is that Mr.
Abu-Jihaad communicated with the Azzam Publications web site in 2000 and
2001 on subjects having nothing to do with the Battle Group Document or any
other classified information.  The government may have suspected that Mr. Abu-

Jihaad engaged in some unlawful conduct (passing classified information to

Azzam Publications) in 2001, but the possible connection between that

suspected but unproven conduct in the past was simply too attenuated by 2004

to justify the invocation of FISA investigative procedures against Mr. Abu-Jihaad

in that year or in the years thereafter. The attenuation was not eliminated or

diminished by the Recent Investigative Developments in 2006 involving Derrick

Shareef. There is no evidence that Mr. Abu-Jihaad was involved in Mr. Shareef's

conduct involving an alleged plan to bomb a shopping mall and the evidence of

Mr. Abu-Jihaad's involvement with Mr. Shareef in some other uncharged

seditions conspiracy is shaky at best.[2] Furthermore, and more importantly for

purposes of FISA analysis, Mr. Abu-Jihaad's alleged communications or other

involvement with Mr. Shareef does nothing to demonstrate that Mr. Abu-Jihaad,

in his dealing with Mr. Shareef or otherwise, was acting as an "agent of a foreign

power" in 2006. Mr. Shareef, like Mr. Abu-Jihaad, is a U.S. citizen and the

investigation of their activities together might involve the investigation of a

domestic security risk, but it would have nothing to do with a "foreign power" or

"foreign intelligence information." In this regard, the Court of Review made the

following observation in *In re Sealed Case*:

> Similarly, FISA surveillance would not be authorized against a
> target engaged in purely domestic terrorism because the
> government would not be able to show that the target is acting for
> or on behalf of a foreign power. As should be clear from the
> foregoing, FISA applies only to certain carefully delineated, and
> particularly serious, foreign threats to national security.

310 F.3d at 739.

---

[2] The available evidence regarding Mr. Abu-Jihaad's alleged involvement in an uncharged
seditious conspiracy will be the subject of an evidentiary hearing at the end of November

Mr. Abu-Jihaad is a U.S. citizen who is entitled to all of the protections afforded by the Fourth Amendment.  Even if FISA is constitutional on its face, the unique factual circumstances of this case do not justify the invocation of FISA procedures to investigate Mr. Abu-Jihaad's past contacts with Azzam Publications.  If the government wanted to investigate the possible commission of a crime by Mr. Abu-Jihaad in the past, it should have invoked traditional law enforcement investigative techniques which would have afforded Mr. Abu-Jihaad all of the Fourth Amendment protections to which he is entitled.

The FISC Application Papers Fail To Demonstrate That
A "Significant Purpose" Of The Searches And Surveillance
Was To Obtain "Foreign Intelligence Information"

Even if FISA is constitutional, the government still must satisfy all of the statutory requirements before the FISA investigative procedures may be invoked. For the same reasons stated above with respect to the constitutionality of FISA as applied to Mr. Abu-Jihaad in the particular circumstances of this case, the FISC application papers could not have demonstrated in 2004 (when the e-mail accounts were presumably seized) or in 2006 (when the telephonic surveillance was undertaken) that a "significant purpose" of the searches and surveillance was to obtain "foreign intelligence information." 50 U.S.C. §§ 1804(a)(7)(B) and 1823(a)(7)(B).  Simply stated, as of 2004 and more certainly in 2006, there was no evidence that Mr. Abu-Jihaad had any ongoing relationship with any foreign power such that an investigation of his activities would have lead to the development of "foreign intelligence information."  This deficiency is most glaring in the fall of 2006, more than five years after the last known e-mail

communication between Mr. Abu-Jihaad and Azzam Publications, when the

government still apparently certified to the FISC that "a significant purpose" of

conducting electronic surveillance *at that time* was to obtain "foreign intelligence

information.  At best, when FISA was invoked in 2004 and 2006, the government

might have had a suspicion that Mr. Abu-Jihaad had committed a criminal

offense in the spring of 2001, the alleged passing of classified information to

persons not entitled to receive it.

Although the Patriot Act amendments to FISA may have diluted the

primary purpose test to the lesser standard of "a significant purpose," a purpose

based statutory standard still exists.  The unique circumstances presented by Mr.

Abu-Jihaad's situation as it existed in 2004 and 2006, closely resemble a

theoretical situation discussed by the Court of Review in *In re Sealed Case*.

There, the Court of Review commented upon the FISC's role in evaluating the

government's foreign intelligence purpose certification in light of the Patriot Act

amendment.

> If the certification of the application's purpose articulates a broader
> objective than criminal prosecution – such as stopping an ongoing
> conspiracy – and includes other non-prosecutorial responses, the
> government meets the statutory test.  Of course, if the court
> concluded that the government's sole objective was merely to gain
> evidence of past criminal conduct – even foreign intelligence crimes
> – to punish the agent rather than halt ongoing espionage or terrorist
> activity, the application should be denied.

310 F.3d at 735.

Again, by 2004 and certainly by 2006, any relationship which may have

existed between Hassan Abu-Jihaad and Azzam Publications was long over.

Azzam Publications itself had ceased to exist by 2006 and its principals were in

prison awaiting extradition. By the time the FISC orders were obtained, Mr. Abu-Jihaad had long ago been discharged from the U.S. Navy and was in no position to communicate classified information to anyone. At the time the search and surveillance applications were made, there simply was no evidence that the FISC orders were needed to investigate or to stop an ongoing foreign agency conspiracy. Rather, the situation as it existed in 2004 and in 2006 reveals that the government's true objective was to gain evidence of past criminal conduct.

### The FISC Application Papers Fail To Demonstrate Probable Cause To Believe That Mr. Abu-Jihaad Was A "Foreign Power" Or An "Agent Of A Foreign Power"

### The FISC Application Papers Fail To Demonstrate Probable Cause To Believe That The Defendant's E-Mail Accounts Which Were Seized Were Owned, Used Or Possessed By A "Foreign Power" Or An "Agent Of A Foreign Power"

### The FISC Application Papers Fail To Demonstrate Probably Cause To Believe That The Defendant's Telephones Which Were Subjected To Electronic Surveillance Were Being Used Or Were About To Be Used By A "Foreign Power" Or An "Agent Of A Foreign Power"

FISA requires that the government certify and that the FISC find probable cause to believe that the target of the requested orders is a "foreign power" or an "agent of a foreign power" and that facilities to be surveilled and the premises or property to be searched were being used by a "foreign power" or the "agent of a foreign power." 50 U.S.C. §§ 1804(a)(4), 1805(a)(3)(A) and (B), 1823(a)(4) and 1824(a)(3). For the reasons stated above, the FISC application papers submitted in 2004 or 2006 could not have demonstrated that Hassan Abu-Jihaad was then acting as an "agent of a foreign power," that his e-mail accounts were used or possessed by an "agent of a foreign power" or that his telephones were

being used or were about to be used by an "agent of a foreign power." Whatever communication Mr. Abu-Jihaad might have had with Azzam Publications in 2000 and 2001, those contacts were far too attenuated from the situation as it existed and from Mr. Abu-Jihaad's activities in 2004 and 2006 to support a finding of probable cause to issue FISA orders. The government had traditional law enforcement methods available to it to investigate Mr. Abu-Jihaad in 2004 and in 2006 and it should have resorted to those methods rather than invoke FISA under circumstances when that statutory scheme did not fit.

### The Certifications Submitted As Part Of The FISC Applications Were "Clearly Erroneous" Within The Meaning Of 50 U.S.C. §§1804(a)(5) and 824(a)(5)

Although the scope of judicial oversight with respect to the issuance of FISA orders is more limited than that of a the traditional "neutral and detached magistrate" (which is one of the constitutional infirmities with the statute), FISC and the District Court when deciding motions to suppress need not accept the governments application certifications blindly. Where the target of a FISA order is a U.S. citizen, the courts must review the government certifications to determine if they are "clearly erroneous." For the reasons stated above and for the reasons stated below with respect to potential *Franks* violations, the certifications submitted by the government in support of the FISC applications were "clearly erroneous." In this particular case, the government invoked FISA when the facts and circumstances did not justify it.

<u>The FISC Applications Contain False Statements, Recklessly Made,</u>
<u>In Violation of *Franks v. Delaware*, 438 U.S. 154 (1978)</u>

In *Franks v. Delaware*, 438 U.S. 154 (1978) the Supreme Court held the

following:

> [W]here the defendant makes a substantial preliminary showing
> that a false statement knowingly and intentionally, or with reckless
> disregard for the truth, was included by the affiant in a warrant
> affidavit, and if the allegedly false statement is necessary to the
> finding of probable cause, the Fourth Amendment requires that a
> hearing be held at the defendant's request.  In the event that at that
> hearing the allegation of perjury or reckless disregard is established
> by the defendant by a preponderance of the evidence, and, with the
> affidavit's false material set to one side, the affidavit's remaining
> content is insufficient to establish probable cause, the search
> warrant must be voided and the fruits of the search excluded to the
> same extent as if probable cause was lacking on the face of the
> affidavit.

438 U.S. at 155-156.

Preliminary investigation by the defense suggests that the government

may have made material misstatements in the FISC application papers.  The

information set forth in the argument which follows is submitted for the limited

purpose of making the preliminary showing required by *Franks* and does not

purport to set forth all of the facts and circumstances known by the defense

which might be relevant to a *Franks* inquiry.  Instead, the information set forth in

this Memorandum is only that which defense counsel believes is necessary to

compel a determination by the Court that a *Franks* hearing is necessary.  The

argument which follows is also based upon the assumption that the government's

applications for FISA orders included the same sort of assertions regarding the

Battle Group Document as are found in the Arrest Warrant Affidavit. If that is so, there is cause for concern under *Franks*.[3]

The central thrust of the government's assertions about the Battle Group Document is that the Document contained confidential information, in detail, about the composition and movement of the Constellation Battle Group and that this information was accurate. The inference clearly intended to be drawn from the wording of the Arrest Warrant Affidavit, and that which would have been drawn by the FISC if similar assertions were made in the FISC application papers, is that the information contained in the Battle Group Document was highly confidential. The further inference which was also clearly intended was that, because of its detail and its accuracy, the information contained in the Battle Group Document must have had as its source a Navy insider such as Mr. Abu-Jihaad. For example, Paragraph 16 of the Arrest Warrant Affidavit states the following:

> 16. The electronic document, which forensic analysis by DHS determined was last modified and saved on April 12, 2001, discussed in considerable detail, the makeup of a U.S. Navy battle group, each of its member ships (including a Navy destroyer, the *U.S.S. Benfold*, the specifications, assignments and missions of each ship, the battle group's planned movements and a drawing of the group's formation when it was to pass through the Straits of Hormuz. The document specifically noted that the battle group was tasked with enforcing sanctions against Iraq and conducting operations against Afghanistan and Al Qaeda. The document stated that the battle group was scheduled to pass through the Straits of Hormuz on April 29th at night, under a communications

---

[3] The affiant on the Arrest Warrant Affidavit is SA David G. Dillon of the Federal Bureau of Investigation. The *Franks* argument advanced here is not intended to suggest anything about Agent Dillon's integrity. Obviously, with respect to the analysis of the information contained in the Battle Group Document, Agent Dillon relied upon the representations which were made to him by other government officials, including officials of the U.S. Navy.

blackout, and explicitly described the group's vulnerability to a terrorist attack:

**Weakness:**

They have nothing to stop a small craft with RPG etc. except their Seals' stinger missiles.

**Deploy ops in Gulf 29 April – 04 October.**

**29th APRIL is more likely the day through the Straits.  For the whole of March is tax free – a moral booster.  Many sailors do not like the Gulf.**

**Please destroy message.**

Paragraph 17 of the Arrest Warrant Affidavit goes on to state that "Navy officials have confirmed that the battle group composition, and the dates and location of the movement of the battle group in the document are accurate."

The suggestion that the mission of the Constellation Battle Group when it deployed to the Persian Gulf in the Spring of 2001 was confidential could not be further from the truth.  Since the end of the first Gulf War in 1991, the United States regularly deployed Carrier Battle Groups to the Persian Gulf.  These deployments were in support of Operation Southern Watch (the enforcement of a "no-fly zone" over Iraq) and for the purpose of conduction Maritime Interception Operations (MIO) in the Arabian Gulf.  Attached as Exhibit 1 are three pages from the U.S. Naval Forces Central Command web site, as that site existed in 2001,[4] which describe that command's area of operation and its OSW and MIO missions.  Attached as Exhibit 2, collectively, are three articles describing typical Carrier Battle Group deployments to the Persian Gulf.  An article dated April 22,

---

[4] An Internet Archive has been established at www.archive.org through which it is possible to search website content as it existed in years past

1999 announces the arrival of the USS Kitty Hawk Battle Group in the Persian

Gulf where it relieved the USS Enterprise Battle Group. Similarly, an article

dated January 1, 2000 announces the departure of the Abraham Lincoln Battle

Group and its relief by the Harry S. Truman Battle Group. Finally, an article

dated May 2, 2001 announces the arrival of the Constellation Battle Group in the

Persian Gulf in relief of the USS Harry Truman Battle Group. This is the

deployment which is the subject of the Battle Group Document.

Just as the mission of the Constellation Battle Group was well known, so

too was the specific composition, armaments and capabilities of the Battle

Group. When the core elements of the Battle Group left San Diego in mid-

March 2001, the Navy issued a press release announcing the deployment.

Exhibit 3. The press release stated that the USS Constellation Battle Group and

the USS Boxer Amphibious Ready Group was on a six month deployment to the

Western Pacific and Persian Gulf nations and the press release identified each

ship assigned to the Battle Group. In 2001, at the time that the Constellation

Battle Group deployed, the Navy published detailed information regarding the

specifications, capabilities and armaments on its warships. Similar information

about U.S. Navy warships was available from other open sources as well.

Attached as Exhibit 4 is a print out from the USS Benfold website as it existed in

2001 and information obtained from the 2001 publication Jane's Fighting Ships.

The information from Jane's pertains to the specifications and capabilities of the

Kitty Hawk class of aircraft carriers (of which the Constellation was one), the

Wasp class of amphibious assault ships (of which Boxer is one) and the Arleigh

Burke class of destroyers (of which Benfold is one).

The Arrest Warrant Affidavit also contains serious misstatements about

the accuracy of the critical information contained in the Battle Group Document

regarding the date of passage through the Strait of Hormuz. The Battle Group

Document states that the Battle Group will transit the Strait on the night of April

29, 2001 and that the group will be deployed in a two column formation with the

ships in a particular order. The formation is depicted graphically in the Battle

Group Document. The Arrest Warrant Affidavit (and presumably the FISC

application papers) states without qualification that this information was accurate.

Arrest Warrant Affidavit, ¶17. Documents obtained through discovery

demonstrate, however, that the information contained in the Battle Group

Document regarding the date of transit through the Strait of Hormuz and

formation of the Battle Group while making that transit was not accurate.

Attached as  Exhibit 5 is an excerpt from the Ships Log of the USS Benfold for

May 2, 2001. As clearly indicated by this Exhibit, the Benfold and the other ships

of the Battle Group did not transit the Strait on the night of April 29th. Rather, the

Battle Group transited the Strait on the early morning of May 2nd. Furthermore,

as demonstrated by attached Exhibit 6, the formation of the Battle Group was

more likely a single file formation, not the two column formation shown in the

Battle Group Document. Exhibit 6 is an excerpt from the report of interview of a

Lieutenant Commander who served as the Benfold's Weapons Department Head

and Ship's Force Protection Officer. In the experience of this officer, the Battle

Groups always transited the Strait at night in a single file. With respect to the order of the ships in the Battle Group formation, Exhibit 7 indicates that the order of the ships shown in the Battle Group Document is also incorrect.  Exhibit 7 is an excerpt from the report of interview of a Quartermaster who was on the bridge of the Benfold when it transited the Strait of Hormuz.  He had a specific recollection that the USS Kincaid was in a position other than that shown in the Battle Group Document because something funny happened during the transit involving the Kinkaid.

     If the same sort of misstatements appear in the FISC application papers as appear in the Arrest Warrant Affidavit, the Court should order a hearing pursuant to *Franks v. Delaware*.  The subject matter of the misstatements go to the heart of the probable cause allegations against the defendant and the defendant has made the necessary preliminary showing required under *Franks*.

### Conclusion

For all the reasons stated, the Court should suppress the FISA derived

evidence or, in the alternative, should order a hearing pursuant to *Franks v.*

*Delaware*.


THE DEFENDANT.


By_/s/_____

Dan E. LaBelle of
HALLORAN & SAGE LLP
Fed. Bar #ct 01984
315 Post Road West
Westport, CT 06880
(203) 227-2855
labelle@halloran-sage.com

1081611-1                           23

## CERTIFICATION

I hereby certify that on November 27, 2007, a copy of the foregoing Memorandum in Support of Motion to Suppress was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/_____
Dan E. LaBelle