UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:07-CR-57 (MRK) |
| | : | |
| v. | : | |
| | : | January 11, 2008 |
| HASSAN ABU-JIHAAD | : | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM OF LAW
RE: ADMISSIONS OF PARTY-OPPONENT**

At the conclusion of the hearing held on January 4, 2008, the Court invited the parties to submit supplemental briefing regarding the admissibility of certain statements by the defendant himself, which constitute non-hearsay pursuant to Fed. R. Evid. 801(d)(2)(A). Specifically, the Court requested briefing on the standards for admitting evidence to prove *modus operandi* and consciousness of guilt.

The following brief advances three arguments. First, certain statements by the defendant – for example, those involving "hot meals" and "cold meals" – constitute admissions that directly relate to the charged offense that he previously disclosed national security information. Second, a number of the defendant's statements – such as his use of carefully coded references to violent jihad, and his obsession with security – can reasonably be viewed to demonstrate his consciousness of guilt. Third, upon further review of the case law, the Government submits that the theory underlying *modus operandi* evidence does not, in fact, apply in the present case. Accordingly, the Government does not advance that theory here.

**I.     Some of the Defendant's Statements Constitute Admissions That Are Directly Relevant to the Charges That He Disclosed National Security Information.**

As a preliminary matter, it bears emphasis that a number of the defendant's statements constitute admissions that are directly relevant to the charged offenses, and therefore do not implicate

Rule 404(b) as acts or statements that are somehow extrinsic to those offenses.  For example, in Exhibit AR010, recorded on November 11, 2006, Abu-Jihaad tells Shareef, "I don't know how to get him no hot meal," and admits "*I ain't been working ah in, in, in the field of making meals* and or, you know, in a, in a long time.  I've been out of that for, ah, over ah, quatro years, you know."  A jury could reasonably conclude that "meals" refers to intelligence that would be useful to strike U.S. military targets; that "making meals" refers to providing such intelligence; and that Abu-Jihaad's statement that he was previously "working . . . in [that] field" is an admission that he previously did, in fact, provide such intelligence, and that such activity occurred over four years earlier – that is, while he was still in the military.  The defendant's other statements regarding "hot" and "cold" meals would help the jury to understand precisely what the defendant means by those terms, and they are accordingly quite probative of the issues in dispute in this case.

As another example, some of the defendant's statements to the CW on the day of Shareef's arrest are directly probative of the charged offenses.  At one point, for example, the defendant admits that he corresponded with the Azzam website, and even that he sent the e-mail discussing the bombing of the *U.S.S. Cole*.  *See* AR033-035.  (Note that prior to this conversation, the Government had no recorded statements or testimony linking Abu-Jihaad personally to the e-mail accounts from which those e-mails were sent.)  These admissions directly prove some of the allegations in the indictment [doc. #6, ¶¶ 14-15 17-20], and illustrate the ongoing relationship that Abu-Jihaad had with the Azzam site.  Likewise, in the two calls listed on pages 11-12 of the Government's enumeration of statements it is seeking to introduce into evidence [doc. #146], the defendant admits his knowledge of the bookstore Maktabah al-Ansar – whose materials were openly marketed on the Azzam websites – and "waaqiah," which was one of the Azzam family of websites.

Further, the defendant's numerous statements regarding his obsession with operational security, his regular use of codes to conceal his meaning, and his suspicions that he is under surveillance, all help to explain why there is no forensic fingerprint that directly links the defendant to the battle group document. *See, e.g.,* AR009 (lecturing Shareef on security; expressing misgivings that phones are tapped; advising Shareef not to speak openly about jihad over phone or internet; referring to "L" and "fresh meals"; "We can have all the conversations you want. Me you and my shredder . . . No electronic components. You will be frisked at the door."); AR010 (again discussing "making meals"); AR017 (lecturing Shareef about security); AR020 (lecturing Shareef on security).

## II.    Some of the Defendant's Statements Demonstrate the Defendant's Consciousness of Guilt.

The Court of Appeals for the Second Circuit has outlined how courts should evaluate consciousness-of-guilt evidence:

> Evidence of a party's consciousness of guilt may be relevant if reasonable inferences can be drawn from it and if the evidence is probative of guilt. See 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 401.08 (2d ed.1997). Such evidence is admissible if the court (1) determines that the evidence is offered for a purpose other than to prove the defendant's bad character or criminal propensity, (2) decides that the evidence is relevant and satisfies Rule 403, and (3) provides an appropriate instruction to the jury as to the limited purposes for which the evidence is introduced, if a limiting instruction is requested. *United States v. Mickens*, 926 F.2d 1323, 1328-29 (2d Cir. 1991).

*United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004).[1] Among other things, the Second Circuit

---

[1] The Second Circuit has provided some additional observations about these issues when discussing the admissibility of "flight" evidence as a subspecies of consciousness-of-guilt evidence. The Court has explained about flight that

> "[i]ts probative value as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from

3

has "upheld the admission of evidence of attempted witness or jury tampering as probative of a defendant's consciousness of guilt." *Id.* (citing *Mickens*, 926 F.2d at 1329); *United States v. Hammond*, 781 F.2d 1536, 1540 (11th Cir. 1986) (In a conspiracy case "[c]ourts may consider evidence of attempts to influence a witness as relevant in showing a consciousness of guilt."). Within this category would fall, for example, the defendant's statements to the CW on the day of Shareef's arrest that he would deny knowing, or having spoken with, the CW if questioned by authorities. *See* AR035.

Some of the other statements offered by the Government bespeak the defendant's consciousness of guilt. For example, in AR009, the defendant scolded Shareef for speaking openly about jihad, and he speaks in code about jihad, providing logistical support ("L") for attacks on military bases, and refers to intelligence that would support such attacks as "fresh meals." As argued in the preceding section, the Government believes that Abu-Jihaad's distinction between "fresh meals" and "cold meals," together with his own inability to provide "fresh meals" since his departure from the military, constitute direct admissions that he had, in fact, previously provided such intelligence. The Government further submits that Abu-Jihaad's use of coded references throughout these conversations also demonstrates his consciousness of guilt. That is, the jury can properly infer

---

consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977); *United States v. Beahm*, 664 F.2d 414, 420 (4th Cir. 1981) ("If the government wishes to offer evidence of flight to demonstrate guilt, it must ensure that each link in the chain of inferences leading to that conclusion is sturdily supported.") (citing *Myers*, 550 F.2d at 1049); *see also* 1 New Wigmore Evid. § 1.3 (Leonard Rev.2000).

*United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005) (holding that defendant's efforts to obtain plane tickets and to renew his passport through his wife were not suggestive of flight, and therefore did not satisfy first inference).

that Abu-Jihaad would not have attempted to mask his discussions about jihad and providing intelligence both presently and in the past if he did not believe that he had done something wrong, which needed to be hidden. Particularly when these statements are coupled with Abu-Jihaad's expressed belief that phones may be monitored (e.g., AR009, AR020), the jury could reasonably conclude that Abu-Jihaad used code to hide discussions of these matters – e.g., that he "ain't been working ah in, in, in the field of making meals and or, you know, in a long time," (AR010) – precisely because he knew that his previous work in that "field" was unlawful and needed to be concealed from authorities.

Although the probative value of consciousness-of-guilt evidence "diminishes if the defendant has committed several unrelated crimes," this "does not make such evidence inadmissible; it means only that such evidence alone is insufficient to demonstrate consciousness of guilt of the charged crime." 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence [hereinafter Weinstein's] § 401.08[4], at 401-62.4 (Joseph M. McLaughlin ed., 2007). For example, in the present case the defendant sought to distance himself from the CW after learning of Shareef's arrest, offering to disclaim any acquaintance with him. The defendant will likely argue that such denials stem from his desire to avoid being implicated in the offense for which Shareef was arrested in Illinois, or perhaps for the planned attack on U.S. military targets that had been discussed during Shareef's visit to Phoenix in late October 2006, or for the gun purchases Shareef was brokering for Abu-Jihaad. Consistent with Weinstein's treatise, however, those are nothing more than permissive inferences; they should not limit the jury's discretion to decide for itself whether to ascribe the defendant's consciousness of guilt to his contacts with the Azzam website and his leak of the battle group document. Specifically, as argued above, the Government believes that a reasonable juror

5

could, in fact, conclude that Abu-Jihaad's efforts to cover his tracks – by speaking in code, berating Shareef for his lack of security-consciousness, fretting about government surveillance, and telling the CW that he will falsely deny any knowledge of him – relate at least in part back to wrongdoing that antedates the 2006 conspiracy to attack U.S. military targets. If the Court agrees that certain statements by Abu-Jihaad could be reasonably construed as indicating a consciousness of guilt, at least in part, with respect to his prior actions, then they are probative and admissible. *Cf. Al-Sadawi*, 432 F.3d at 424 (discussing requirement in evidence-of-flight cases that jury may draw inference "from consciousness of guilt to consciousness of guilt concerning the crime charged").

### III.   The Government Does Not Advance *Modus Operandi* as an Evidentiary Theory.

Upon further review of the case law, the Government does not seek admission of any of the defendant's statements to establish *modus operandi*. As a leading treatise has explained, this evidentiary theory is designed to focus on the identity of a crime's perpetrator, and is correspondingly quite narrow: "Other-crime evidence may be admitted if the evidence of other crimes is so distinctive that it can be seen as a 'signature' identifying a unique defendant, such as the infamous Jack the Ripper." 2 Weinstein's § 404.22[5][c], at 404-123; *see also United States v. Sampson*, 385 F.3d 183, 192 n.7 (2d Cir. 2004) (quoting Weinstein's treatise); *United States v. Mills*, 895 F.2d 897, 907 (2d Cir. 1990) ("[E]ven where intent is not in issue, Rule 404(b) permits evidence of similar acts to prove a 'signature crime,' i.e., a *modus operandi* where the crimes are 'so nearly identical in method as to ear-mark them as the handiwork of the accused.'"). Put another way, the question in *modus operandi* cases is whether "the details of the other crime show an individuality that is highly probative of the conclusion that the charged crime was committed by the same person." 2 Weinstein's § 404.22[5][c], at 404-123; *see also United States v. Tubol*, 191 F.3d 88, 95-96 (2d

6

Cir. 1999) (holding that court improperly admitted Rule 404(b) evidence that someone paid defendant to plant bomb in Israeli residence, where there were insufficient similarities with charged offense of robbing a bank while carrying a fake bomb); *United States v. Sappe*, 898 F.2d 878, 880 (2d Cir. 1990) (upholding admission under Rule 404(b) that defendant had previously robbed four banks by hiding a gun in a newspaper and placing it on the counter so only the teller could see the gun – as happened in the charged offense – where prosecution introduced evidence that no other armed bank robberies in the New York area had been committed in that way).

Although identity will be a central question in this case, and although there are substantial similarities between the defendant's 2006 scheme to provide intelligence useful in striking a U.S. military base and the 2001 leak of intelligence useful to strike a U.S. naval force, the Government does not contend that the methods implicated by the 2006 scheme were so "distinctively" similar to those involving the battle group document that they constitute two episodes of the same type of "signature crime," such that one must necessarily infer from Abu-Jihaad's actions in the latter plot that he must have been the perpetrator of the earlier plot.

**IV.     Conclusion**

The foregoing supplemental analysis is offered to assist the Court in ruling on the pending motion in limine [doc. #110]. The Government takes this opportunity to point out what may be obvious: That to the extent the Court would be concerned that admitting certain statements by Abu-Jihaad himself might inadvertently disclose to the jury certain statements by Shareef which the Court has already ruled are inadmissible, such concerns can be accommodated by carefully structuring the parties' presentation of evidence. The Court could permit the Government to play only specified portions of recordings, or it could allow the parties to pose carefully framed leading questions to the CW that avoid mention of any matters that the Court rules inadmissible. The Government adheres to the arguments made in its earlier briefs, and remains available to provide any additional information or legal briefing that the Court may deem helpful.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

/s/

STEPHEN B. REYNOLDS
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct19105
157 Church Street, 23d Floor
New Haven, CT 06510
(203) 821-3700
fax (203) 773-5377
Stephen.Reynolds@usdoj.gov

/s/

WILLIAM J. NARDINI
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct16012
157 Church Street, 23d Floor
New Haven, CT 06510
(203) 821-3700
fax (203) 773-5377
William.Nardini@usdoj.gov

**Certificate of Service**

I hereby certify that on January 11, 2008, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/
William J. Nardini, Assistant U.S. Attorney