UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : NO. 3:07CR00057 (MRK) |
| | : |
| HASSAN ABU-JIHAAD | : |

## RULING AND ORDER

Currently before the Court are Defendant Hassan Abu-Jihaad's MOTION *in Limine* to Conduct *Daubert* Hearing and to Exclude Testimony of Evan Kohlmann [doc. # 191] and Motion *in Limine* to Preclude the Introduction into Evidence re: Certain Government Exhibits [doc. # 206]. As Mr. Abu-Jihaad requested in his motion, the Court held a *Daubert* hearing on February 14, 2008, at which Evan Kohlmann testified and was cross-examined by Mr. Abu-Jihaad's counsel. The Government proffered Mr. Kohlmann as an expert in terrorism who would provide testimony regarding the history, structure, and goals of al Qaeda, the recruitment of Muslim fighters, mujahideen activities in Bosnia, Chechnya, and Afghanistan (among other places), and the role of Azzam Publications among the mujahideen. At the conclusion of the testimony, the Court heard arguments on the *Daubert* motion as well as on Mr. Abu-Jihaad's other *in limine* motion. The Court orally ruled on both motions, and the purpose of this decision is to memorialize the Court's rulings. The Court assumes familiarity with its previous evidentiary rulings in this case. *See* Memorandum of Decision [doc. # 173]; Ruling & Order [doc. # 185].

1.     **The *Daubert* Motion**

Rule 702 of the *Federal Rules of Evidence* provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court tasked district judges with the responsibility of acting as "gatekeepers" to exclude unreliable expert testimony, and the Court in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), clarified that the trial court's gatekeeping function applies to all expert testimony, not just to scientific testimony. *See* Fed. R. Evid. 702, Advisory Comm. Notes to 2000 Amendments. Thus, under Rule 702, a district court has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quotation marks omitted).

To decide whether Mr. Kohlmann's proposed testimony is "relevant to the task at hand," the Court must make a "common sense inquiry" into whether the "untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locascio* 6 F.3d 924, 936 (2d Cir. 1993) (quotation marks omitted). Expert testimony is generally admissible so long as it will assist the trier of fact to understand the evidence or to determine any fact in issue. *See Daubert*, 509 U.S. at 592; *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts. Because of their specialized knowledge, their testimony can be extremely valuable and probative.").

2

It is readily apparent that the testimony Mr. Kohlmann proposes to provide is relevant to the task at hand and will assist the jury. Mr. Abu-Jihaad is charged with supplying classified information to Azzam Publications, and the jury will be required to determine, among other things, whether Mr. Abu-Jihaad provided material support to Azzam Publications knowing or intending that the support be used to kill United States nationals. Therefore, the jury will need to understand the role of Azzam Publications in disseminating information supporting al Qaeda and the mujahideen and its connections to various terrorist groups and leaders. Similarly, background information about the conflicts in Chechnya and Bosnia, and the activities of foreign mujahideen fighters, are also relevant to the Government's case against Mr. Abu-Jihaad since Mr. Abu-Jihaad purchased various videos regarding those conflicts from Azzam Publications.

The Second Circuit has on many occasions approved of the use of experts to provide historical context and structural information to juries in gang and drug conspiracy cases. *See, e.g.*, *United States v. Amuso*, 21 F.3d 1252 (2d Cir. 1994); *United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003); *Locascio*, 6 F.3d at 936. In *Amuso*, the Second Circuit explained that the rationale for permitting such expert testimony is that "[a]side from the probability that the depiction of organized crime in movies and television is misleading, the fact remains that the operational methods of organized crime families are still beyond the knowledge of the average citizen." 21 F.3d at 1264. Thus, the Court of Appeals concluded that "[d]espite the prevalence of organized crime stories in the news and popular media, these topics remain proper subjects for expert testimony." *Id.* So, too, here. Despite the relatively widespread news coverage of al Qaeda and other terrorist organizations, the operations of al Qaeda – and certainly those of Azzam Publications – as well as the conflicts in Bosnia and Chechnya, are still beyond the knowledge of ordinary jurors.

While the Second Circuit has not yet had an opportunity to consider the use of experts in terrorism cases, other circuits have approved of the use of experts to provide historical context and background information in such cases. *See United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005); *United States v. Hammoud*, 381 F.3d 316, 337-38 (4th Cir. 2004), *vacated on other grounds by* 543 U.S. 1097 (2005), *relevant portions reinstated by* 405 F.3d 1034 (4th Cir. 2005). As the Fourth Circuit explained in *Hammoud*, the expert "testified regarding the structure of Hizballah and identified its leaders. [He] also explained the significance of Hammoud's contact with those leaders . . . [a]nd discussed the nature of Hizballah's funding activities with specific reference to Hammoud's activities. This testimony was critical in helping the jury understand the issues before it." *Id.* at 337-38. Furthermore, numerous district courts in the Second Circuit and beyond have approved of the use of terrorism experts in cases that are similar to the present case. *See, e.g.*, *United States v. Abdi*, 498 F. Supp. 2d 1048, 1069-70 (S.D. Ohio 2007); *United States v. Sabir*, No. S4 05 Cr. 673(LAP), 2007 WL 1373184, at *11 (S.D.N.Y. May 10, 2007); *United States v. Aref*, No. 04-CR-402, 2007 WL 603508, at *16 (N.D.N.Y. Feb. 22, 2007); *United States v. Paracha*, No. 03 CR. 1197(SHS), 2006 WL 12768, at *18 (S.D.N.Y. Jan. 3, 2006).

Turning next to reliability, the Second Circuit has instructed district courts to consider the indicia of reliability set forth in Rule 702 itself: "namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Williams*, 506 F.3d at 160 (quotation marks omitted). But these criteria are not exhaustive. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004). *Daubert* enumerated a list of additional factors bearing on reliability that district courts may consider:

> (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the technique's known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

*Id.* (quoting *Daubert*, 509 U.S. at 593-94). However, *Daubert*'s list of specific factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. Instead, the district court's inquiry into the reliability of expert testimony under Rule 702 is a "flexible one." *Daubert*, 509 U.S. at 594; *see Williams*, 506 F.3d at 160.

Mr. Kohlmann is certainly qualified to provide expert testimony on the issues he proposes to address, and Mr. Abu-Jihaad does not contend otherwise. Mr. Kohlmann's CV was marked as an exhibit at the *Daubert* hearing. He has published a book entitled *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, which was cited as an authoritative source in the 9/11 Commission's Report. It is also used in courses taught at Harvard University and at Johns Hopkins University, among others. Mr. Kohlmann has published peer-reviewed articles on the subjects about which he intends to testify, including articles for *Foreign Affairs*. He also regularly lectures and speaks on these subjects. Mr. Kohlmann has testified as an expert in seven trials held in the United States and in several cases before foreign courts.

In this Circuit, two judges of the United States District Court for the Southern District of New York have expressly concluded that Mr. Kohlmann is qualified to provide expert testimony on terrorism similar to that which he intends to provide in this case. *United States v Sabir*, 2007 WL 1373184, at * 1; *United States v. Paracha*, 2006 WL 12768, at *18. In *Paracha*, Judge Sidney Stein found that Mr. Kohlmann "possesses sufficient education, training and experience to qualify as an

expert on the origins, leadership and tradecraft of the al Qaeda organization." 2006 WL 12768, at *20. And in *Sabir*, Judge Loretta Preska found that Mr. Kohlmann was qualified to offer testimony on the origins and history of al Qaeda as well as Azzam Publications. *See* 2007 WL 1373184, at *8-*9; *see also Aref*, 2007 WL 603508, at *16 (holding that Mr. Kohlmann could provide expert testimony on political groups in Bangladesh). The Court agrees with Judges Stein and Preska. Mr. Kohlmann is qualified by means of his education, training, background, and experience to testify as an expert on terrorism and Azzam Publication's role in international terrorism.

Mr. Abu-Jihaad's principal attack on Mr. Kohlmann's proposed testimony is that it is not based upon sufficient facts or data and is not the product of reliable principles and methods. The Court disagrees. Mr. Kohlmann has conducted first-hand interviews of several leaders of terrorist organizations and has reviewed reams of information about al Qaeda, Azzam Publications, and the other subjects on which he will offer testimony. Indeed, though he is relatively young to be an expert, it is apparent that these subjects are Mr. Kohlmann's life work, and he has, therefore, acquired a considerable amount of information and documentation on these subjects. He testified that he applies to his expert testimony the same social science methodologies that he learned at Georgetown University and that are applied to other subjects that cannot be tested scientifically. Mr. Kohlmann's work receives a considerable amount of peer review from academic scholars and others, and by all accounts, Mr. Kohlmann's work is well regarded.

While Mr. Kohlmann must, perforce, rely often on hearsay, he testified that he gathers information from multiple sources and cross-checks factual information he receives with existing information from other sources. He also works collaboratively with his peers and relies upon original information provided directly by the terrorists organizations themselves. As it relates to

6

Azzam Publications, Mr. Kolhmann has tracked the organization since nearly its founding and has expert knowledge concerning its internet activities and support for jihad. In commenting on an expert's reliance on hearsay in *Locascio*, the Second Circuit explained that the issue is whether the evidence on which the expert relies is "[o]f a type reasonably relied upon by experts in the particular field. Fed. R. Evid. 703. . . . An expert who meets the test of Rule 702 . . . is assumed to have the skill to properly evaluate the hearsay, giving it probative force appropriate to the circumstances." *Locascio*, 6 F.3d at 938 (quotation marks and emphasis omitted); *see Damrah*, 412 F.3d at 625 (holding that the district court did not abuse its discretion in allowing expert testimony based on, inter alia, books, press releases, and newspaper articles and quoting the district court's opinion that "[g]iven the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon").

In *Paracha*, Judge Stein rejected a similar challenge to Mr. Kohlmann's sources and methodology:

> Paracha challenges the reliability of this methodology, characterizing it as a mere culling from a handful of cases and internet reports information that the user deems reliable. Although Kohlmann's methodology is not readily subject to testing and permits of no ready calculation of a concrete error rate, it is more reliable than a simple cherry-picking of information from websites and other sources. The testimony and evidence at the hearing demonstrate that Kohlmann's opinions and conclusions are subjected to various forms of peer review and that the opinions he proposes to offer here regarding al Qaeda's origins, leaders and certain tradecraft are generally accepted within the relevant community. (*See* Tr. of Nov. 2, 2005 Hr'g at 168-73). Kohlmann's methodology, as he describes it, is similar to that employed by experts that have been permitted to testify in other federal courts involving terrorist organizations. *See United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005); *United States v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004) *vacated and remanded on other grounds by*, 125 S.Ct. 1051, 160 L.Ed.2d 997, *reinstated in relevant part by*, 405 F.3d 1034 (4th Cir. 2005). Whatever the general pitfalls of the "vetting process" that is employed by Kohlmann and others in his field, it is a sufficiently

7

> reliable methodology to meet the requirements of Fed. R. Evid. 702. *See Hammoud*, 381 F.3d at 337.

2006 WL 12768, at * 21; *accord Sabir*, 2007 WL 1373184, at *8-*9. The Court agrees with Judge Stein and for similar reasons rejects Mr. Abu-Jihaad's argument that Mr. Kohlmann's testimony is unreliable. Accordingly, in its role as gatekeeper, the Court finds that Mr. Kohlmann's expected testimony meets the requirements of Rule 702.

As the Court explained at the conclusion of the *Daubert* hearing, Mr. Abu-Jihaad retains the right to object to any testimony by Mr. Kohlmann that lacks a proper foundation or that implicates Rule 403's concerns regarding unfair prejudice and confusion. As the Court also cautioned, there are limits to what Mr. Kohlmann may provide by way of testimony. *See, e.g.*, *Dukagjini*, 326 F.3d 45. Mr. Kohlmann may provide the historical context the Government seeks, but he may not testify directly about Mr. Abu-Jihaad or his motivations lest his testimony "usurp[] the jury's function." *Id.* at 54 (quotation marks omitted). Thus, Mr. Kohlmann should not testify about why individuals like Mr. Abu-Jihaad would want to order jihadi videos from Azzam Publications or provide information to Azzam Publications. Nor should the Government use Mr. Kohlmann to turn this trial of a single alleged disclosure of classified information into an extended trial that is instead focused on al Qaeda, Bosnia, or Chechnya.

**2.   Evidentiary Objections.**

Mr. Abu-Jihaad's second *in limine* motion challenges several of the exhibits the Government proposes to introduce at trial. Specifically, Mr. Abu-Jihaad challenges the introduction of the following: photographs of Usama bin Laden, Ibn Khattab, and Shamil Basayev; three videos entitled *Martyrs of Bosnia, Part I*; *Russian Hell in the Year 2000*; and *Russian Hell in 2000, Part II*; and

8

copies of various materials available on Azzam Publication's website. Relying on Rule 403, Mr. Abu-Jihaad argues that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice. The Court has previously described the standards that govern a consideration of a Rule 403 challenge to evidence, and therefore will not repeat that discussion here. *See* Ruling & Order [doc. # 185]; *see also United States v. Pepin*, – F.3d –, 2008 WL 313806 (2d Cir. 2008). Suffice it to say that the Court has applied the same standards here.

The Government explained that Mr. Kohlmann will use the photographs during his testimony. After the Court expressed concerns, the Government withdrew its request to use a photograph of Usama bin Laden. The Court does not believe that the other photographs are particularly prejudicial, especially in light of the Court's ruling regarding the videos, and therefore the Court will deny Mr. Abu-Jihaad's request to exclude the photographs of Ibn Khattab and Shamil Basayev.

The Government does not intend to play the entire videos to the jury, but only portions of them. Prior to the hearing, the Court watched each video in its entirety and also specifically reviewed those portions that the Government would like to play for the jury during the course of Mr. Kohlmann's testimony. The videos depict fighting between the mujahideen and Russian troops, replete with numerous explosions, shootings, and dead soldiers as well as Muslim fighters. Mr. Abu-Jihaad is principally concerned that some portions of the videos are violent and depict bloody and sometimes dismembered fighters and soldiers. In particular, he is concerned that the jury's passions will be inflamed by the violence depicted in the videos, and also argues that the probative worth of the videos is low.

The Court shares Mr. Abu-Jihaad's concerns about the more gruesome portions of the videos, but disagrees completely regarding their probative value. In this case, the Government will have to prove that Mr. Abu-Jihaad sent the Battle Group document to Azzam Publications with the intent and knowledge that it would be used to inflict death on U.S. personnel. To shoulder that heightened *mens rea* burden, the Government wants to provide information about both Mr. Abu-Jihaad's mindset as well as Azzam Publication's. There is evidence in this case that Mr. Abu-Jihaad ordered the videos in question from Azzam Publications and had them in his possession until he destroyed them around the time articles appeared in newspapers about the Battle Group document. Mr. Kohlmann will testify that these videos were popular among jihadists and were used by Azzam Publications to recruit Muslim fighters. The videos themselves glorify martyrdom and also the killing of non-believers. The videos, therefore, provide circumstantial information that the jury could use to determine Mr. Abu-Jihaad's intent as well as the motives and intent of Azzam Publications. Also, the Government in this case will have to answer the question of why Mr. Abu-Jihaad would send information to terrorists that could be used to blow up the very ship on which he was stationed. As the Government points out, these videos glorify martyrs and also state explicitly that martyrs never actually die but instead dwell in paradise, thus possibly providing the jury with an answer to that important question. Therefore, the Court finds that the videos are probative of intent and motive.

They are also violent and even gruesome in places. But most of the portions that the Government wishes to play for the jury are not particularly violent. Indeed, nightly news dispatches from Baghdad are often far worse. Moreover, it is difficult – if not impossible – for the Government to give the jury an accurate sense of the nature of these videos without playing for the jury some of

the violent and graphic portions of the videos. Otherwise, the jury would have an inaccurate sense of their content. The Court is satisfied that the portions the Government wishes to play are representative of the videos as a whole. Moreover, the Court gave Mr. Abu-Jihaad the opportunity to play additional portions for the jury, an offer that he declined.

However, one portion that the Government wishes to play is a nine-minute segment with still photos of numerous Muslim martyrs, when alive and dead. Many of the shots of dead martyrs are bloody. The Court directed the Government to reduce this clip to about a minute or so and told the parties that the Court would then inform the jury that the video continues in the same vein for another eight minutes. Also, the Court instructed the Government to stop one clip before a badly severed neck is shown and to remove another portion that showed a headless body. Those particularly gruesome images are simply unnecessary to establish the point the Government is trying to make, and they are too graphic for the jury. Finally, the Court told counsel that it intended to give the jury two cautionary instructions at the time this evidence is received: first, that the videos are evidence only of intent and do not provide any evidence whatsoever that Mr. Abu-Jihaad ever sent the Battle Group document to Azzam Publications; and second, that the jury must not let this evidence, or any other evidence, inflame their passions, prejudices, or biases. Counsel are to confer and provide the Court with a suitable instruction. With the excisions ordered by the Court and the cautionary instructions, the Court believes that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice to Mr. Abu-Jihaad.

Finally, Mr. Abu-Jihaad objects to the Government introducing through Mr. Kohlmann or an FBI Special Agent various of the written materials that were available on the Azzam Publications website in 2001, at or around the time of Mr. Abu-Jihaad's U.S.S. Cole email to Azzam Publications.

11

These written materials include emails from website viewers as well as various manifestos, including Usama bin Laden's Declaration of War as well as advice to those who abstain from fighting in the cause of Allah. Unlike the videos, the Government does not have direct evidence that Mr. Abu-Jihaad reviewed each of the materials that were available on the website. However, the Government does have evidence that Mr. Abu-Jihaad was a visitor to the Azzam Publications website, that he spent considerable time surfing the net while aboard the U.S.S. Benfold, that he was familiar with at least some of the materials and information that appeared on the Azzam Publications website, and that the materials in question were available on the Azzam Publications website in the time period when the evidence will show that Mr. Abu-Jihaad was visiting the site. In short, therefore, all of these materials were available to Mr. Abu-Jihaad with a click of his mouse, and a jury might therefore find that he accessed them. Once again, the Government argues that this information is relevant to Mr. Abu-Jihaad's *mens rea,* as well as to the intentions and mindset of Azzam Publications, which posted these materials.

The Court agrees that these materials do offer evidence regarding the intent and motive of both Mr. Abu-Jihaad and Azzam Publications. Defense counsel appeared to have acknowledged this fact when he suggested that Mr. Kohlmann be allowed to describe these materials for the jury, rather than allowing the materials into evidence. But there is no reason why Mr. Kohlmann should have to describe these materials rather than making them available for the jury to peruse first-hand. The best evidence of what was on the Azzam Publications website are the materials themselves. There is, of course, some risk that these materials may inflame a juror's passions, but frankly, that is true of many aspects of this case, including the charges themselves. That is why the Court went to extraordinary lengths in connection with the selection of the jurors to ensure that those individuals

who have been chosen to hear this case would be able to put aside any personal biases or prejudices and follow the Court's instructions. That is also why the Court intends to provide the jury with appropriate cautions about not letting their biases or passions interfere with their dispassionate review of the evidence. Thus, the Court is prepared to give the jury the same two cautionary instructions mentioned previously. But having carefully weighed possible prejudice and probative value, the Court is not prepared to exclude this evidence under Rule 403, because the Court does not believe that the danger of unfair prejudice substantially outweighs the probative value of this evidence.

Accordingly, the Court DENIES IN PART and GRANTS IN PART Defendant's MOTION *in Limine* to Conduct *Daubert* Hearing and to Exclude Testimony of Evan Kohlmann [doc. # 191]. The motion is granted to the extent it requests a *Daubert* hearing; it is denied in all other respects. The Court also DENIES IN PART and GRANTS IN PART the Motion *in Limine* to Preclude the Introduction into Evidence re: Certain Government Exhibits [doc. # 206]. The Motion is granted to the extent of the portions of the videos that the Court has ordered excised and to the extent that the Court will give the jury the cautionary instructions requested by Mr. Abu-Jihaad. The motion is denied in all other respects.

IT IS SO ORDERED.

/s/      Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: February 20, 2008.**