# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :
                        :
        v.              :       NO. 3:07CR57 (MRK)
                        :
HASSAN ABU-JIHAAD           :

## <u>MEMORANDUM OF DECISION</u>

Following a six-day trial in March 2008, a jury convicted Defendant Hassan Abu-Jihaad on two charges: (1) disclosing national defense information to those not entitled to receive it in violation of 18 U.S.C. § 793(d); and (2) providing material support to terrorists in violation of 18 U.S.C. § 2339A and § 2. The Government alleged that in 2001, while Mr. Abu-Jihaad was serving as a U.S. Navy Signalman aboard the destroyer, the *U.S.S. Benfold*, he disclosed classified information regarding the movement of the Fifth Fleet Battle Group, which included the aircraft carrier, the *U.S.S. Constellation*, to individuals in London associated with Azzam Publications, an organization that the Government alleged supported violent Islamic jihad. According to the Government, Mr. Abu-Jihaad knew or intended that the information he disclosed would be used to kill United States nationals. By its verdict, the jury agreed with the Government's assertions. Mr. Abu-Jihaad now moves for judgment of acquittal and for a new trial under Rules 29 and 33 of the *Federal Rules of Criminal Procedure*.[1] *See* Motion for Judgment of Acquittal [doc. # 268]; Motion for New Trial [doc. # 266].

Mr. Abu-Jihaad's post-verdict motions are neither *pro forma* nor insubstantial. That is

---

[1] Mr. Abu-Jihaad timely moved for judgment of acquittal at the close of the Government's case and renewed the motion after submitting a defense case.

apparent from, among other things,  the Government's 112-page response to the motions.  Since the Government's case rested entirely on circumstantial evidence, and there was evidence in the record that favored Mr. Abu-Jihaad, his motions raise important questions regarding the quantum of evidence necessary to support a jury's finding of guilt beyond a reasonable doubt, as well as the proper role of the court and the jury in our criminal justice system.  And, of course, these motions arise in a case that from its inception has tested whether an individual accused of terrorism can receive a full and fair trial in the federal court system.

At the risk of sounding self serving, the Court is firmly convinced that Mr. Abu-Jihaad received a full, fair, and impartial trial.  Mr. Abu-Jihaad was represented by two experienced criminal defense lawyers, who were given access to experts, consultants, and investigators and to volumes of information provided by the Government in discovery.  The Court decided numerous issues in advance of trial, ruling for the Government on some issues and for Mr. Abu-Jihaad on others.  The jury was selected from a panel of more than 500 individuals who answered detailed questionnaires about their views and possible prejudices.  Both sides agreed on each for-cause strike of potential jurors.  Befitting the experience of the lawyers involved, the evidence at trial was submitted largely without objection and without dispute.  The same was true of the Court's jury instructions.  The jury listened carefully to the evidence presented and to the Court's instructions, and they deliberated conscientiously.   For these reasons, among others discussed below, the Court does not believe a new trial is necessary or appropriate.

Instead, the central issue raised by the pending motions is whether the evidence presented by the parties would permit a rational jury to find Mr. Abu-Jihaad guilty of both charges beyond a reasonable doubt.  In particular, the motions focus on the proper inferences that could be drawn by

a rational juror from the circumstantial evidence presented and whether the circumstantial support for a theory of guilt was equal to or nearly equal to a theory of innocence. For if so, a reasonable jury must necessarily entertain a reasonable doubt. After careful consideration, the Court believes that the evidence was sufficient to support a jury verdict beyond a reasonable doubt that Mr. Abu-Jihaad disclosed classified information. However, for reasons largely related to the language of the governing statute, the Court concludes that Mr. Abu-Jihaad's conviction on the material support charge should be set aside. The Court is acutely aware that its decision will not be the last word on these important issues.

Before turning to the pending motions, the Court would be remiss if it did not pause to note that throughout this case, it has been assisted by extremely able counsel on both sides. They have worked tirelessly and with great professionalism in support of their respective positions and to present the Court and the jury with all the tools needed to decide this case properly. The Court is grateful to them for their skill, sensitivity, civility, and candor. In the highest tradition, counsel for both the Government and Mr. Abu-Jihaad were scrupulously fair and candid with the Court and each other. The Court is particularly grateful to defense counsel, who volunteered for this difficult assignment and will not be properly reimbursed for all of the time they devoted to this case.

## I.

The following description of the evidence at trial is related in the light most favorable to the verdict. *See United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 158 (2d Cir. 2008) (quoting *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002)) (on judgment of acquittal, stating that courts must view evidence in the light most favorable to the Government). While there is much dispute about the proper inferences to be drawn from the evidence, there is no dispute about the

testimony and evidence presented at trial.  The Court has taken some pains in this initial section to describe the evidence presented in considerable detail so as to aid in understanding the Court's legal conclusions.

**Azzam Publications.**  In late September 2001, Supervisory Special Agent Craig Bowling of the Department of Homeland Security began investigating a group known as Azzam Publications ("Azzam"), which operated a number of related websites, including www.qoqaz.net ("qoqaz" meaning "Caucusus" in Arabic), www.azzam.co.uk, and its principle website, www.azzam.com. These websites were hosted in places like New York, Malaysia, Ireland, the United Kingdom, and other parts of the world.  Azzam was brought to the Government's attention by a Connecticut company that was then hosting www.azzam.com ("the website").  The investigation ultimately included a number of search warrants, subpoenas, and court orders allowing the retrieval of Azzam's computer records.  American and British authorities eventually began collaborating on the investigation, and some searches were undertaken in the United Kingdom in response to treaty requests by the United States.

From 1997 through 2002, the family of Azzam websites contained information that promoted violent Islamic jihad, or "holy war."  Evan Kohlmann, an expert in international terrorism and the internet, explained that Azzam advertised itself as a provider of breaking news about conflict areas like Afghanistan, Bosnia, and Chechnya.[2]  Azzam marketed English translations of books written

---

[2]  Mr. Kohlmann has previously testified as an expert in numerous other terrorism cases, including several cases in the Second Circuit.  *See, e.g., United States v. Sabir*, No. S4 05 Cr. 673(LAP), 2007 WL 1373184, at *1 (S.D.N.Y. May 10, 2007);   *United States v. Aref*, No. 04-CR-402, 2007 WL 603508, at *16 (N.D.N.Y. Feb. 22, 2007), *aff'd* 285 Fed. App'x 784, 792 (2d Cir. July 2, 2008);   *United States v. Paracha*, No. 03 CR. 1197(SHS), 2006 WL 12768, at *18 (S.D.N.Y. Jan. 3, 2006).

4

by its namesake, Sheikh Abdullah Azzam, who was instrumental in reviving the idea of violent jihad in the 20th century.  Azzam glorified the cause of martyrdom in the name of jihad by telling the stories of martyrs.  These biographies, according to Mr. Kohlmann, were "meant to show how individuals with no real connection to the jihad or to the mujahideen, including people living in western European countries and North America, people who had lived relatively normal lives, could all of a sudden jump up and join the mujahideen and become a hero figure among the mujahideen."

Azzam also published video and audio recordings extolling the exploits of the mujahideen in various places around the globe.  One section of the website was designated a "jihad photo library," which contained photos that claimed to have been taken "by the foreign mujahideen in Chechnya."  The photos were said to be "taken from actual events that took place," and "are exclusive to Azzam Publications."  Some of the photos depicted ambushes on Russian forces by foreign mujahideen. Viewers could download video clips of influential foreign mujahideen leaders fighting in Chechnya or order longer videos by mail.  Some of these videos were being newly marketed in September 2000, and their contents were described in the "Products" section of the website.

In November 2000, the website warned its readers of an imminent "Joint U.S.-Russian chemical attack on Afghanistan," which would be targeting the Taliban.  The website reported that the U.S. assault was meant to retaliate for the bombing of the *U.S.S. Cole* in Yemen only a month earlier in October 2000, an attack for which al-Qaida had publicly claimed credit.  Azzam recommended that its readers immediately come to the Taliban's aid by sending money or gas masks, or traveling to Afghanistan to provide battlefield medical services. The website provided a hyperlink to a news article from the *Guardian*, reporting that in 1998, the United States had fired cruise

missiles at Usama bin Laden's camps in retaliation for al-Qaida's bombing of U.S. embassies in East Africa.  The website sought cash donations for the Taliban and offered a copy of Usama bin Laden's "Declaration of War Against the Americans Occupying the Land of the Two Holy Places."  That Declaration asked Muslims to rise up in arms against the United States and to kill U.S. military personnel in the Arabian Peninsula as a way to rid the Peninsula of infidels.

**The Battlegroup Document.**  Beginning in December 2003, British authorities had been involved in an investigation of a man named Babar Ahmad, who worked as an information technology expert at Imperial College, London.  Detective Sergeant Ian Vickers of the London Metropolitan Police's counter-terrorism command, who had been involved in the investigation from its inception, testified that the investigation came to encompass Mr. Ahmad's involvement with Azzam.  On December 2, 2003, British authorities searched Mr. Ahmad's workplace, as well as his home and his parents' nearby residence, where he had lived just prior to the investigation.  In the front bedroom, Detective Sergeant Ian Elgeti testified that he found a floppy disk on the shelf of a wardrobe.  On the disk was written "password: lp."  Other items relating to Mr. Ahmad were also seized from the same bedroom.[3]

Forensic analysis of the floppy disk revealed that it contained a number of files, including a Microsoft Word document named "letter.doc."  This file was password protected with the password "lp," which had been written on the front of the diskette.  The file contained a three-page unsigned document discussing the anticipated deployment of U.S. Naval Forces from the west coast of the

---

[3]  For example, agents recovered Mr. Ahmad's frequent-flyer card and commercial correspondence addressed to him, together with an English version of Usama bin Laden's "Declaration of War Against the Americans Occupying the Land of the Two Holy Places."  They also found a small notebook bearing Mr. Ahmad's name, as well as what appeared to be a handwritten script for an Azzam audiocassette.

United States to the Persian Gulf in the spring of 2001.  The document contained the following notation in brackets: "[Necessary changes made in grammar and spelling, and for the sake of clarity.]" This notation, along with other bracketed notations throughout the document, suggested that the document had been edited by someone.

The document – which was often referred to at trial as the "Battlegroup Document" – purported to predict ship movements beginning on March 15, 2001, and therefore, the information contained in the document appeared to have been provided before that date.  The first page of the document began as follows:

In the coming days the United States will be deploying a large naval/marine force to the Middle East.

This will be a two group force: the Battle Group (BG) and the Amphibious Readiness Group (ARG) - these groups will be replacing the already deployed groups in the gulf.

The BG mission is to hold up the sanctions against Iraq, e.g. patrolling the No-Fly Zone, carry out Maritime Interception Operations (MIO) or launch strikes.

There is a possibility that the ships and submarines that are capable will carry out a strike against Afghanistan. Main targets: Usama and the Mujahideen, Taliban etc.

A two star admiral COMCRUDESRON 1 (his title), a high ranking officer of the BG said that "there will be certain ships of this BG sitting off the coast of Pakistan with 'launch pads.'"

Most of the ships that are part of the BG will deploy on March 15 2001 leaving their home ports out of California and Washington State.  They will meet up with the other ships that are part of the BG which are stationed in Hawaii. Their first port stop is Hawaii on March 20, 2001, where some ships will load Tomahawk D missiles. The same missiles used on Afghanistan and Sudan. It has a warhead and 166 [mm?] fragment bomblets. Then the whole BG will head towards Australia. The main ship with high ranking officials will be at Sydney on April 6 2001, other ships - Melbourne, Perth, Bunbary etc. The BG will be going through the straits of Hormuz on the April 29 2001 at night, cutting off certain "infocoms" and "Emcoms" to divert their enemies on how many ships are actually coming through. This will be a night time set-up.

7

Beneath this text was a diagram labeled "Formations Through Straits," which purported to show in a two-column formation each of the components of the battlegroup. Thereafter, the document described the capabilities of each vessel in the battlegroup, led by the aircraft carrier, the *U.S.S. Constellation*, plus smaller vessels including a destroyer named the *U.S.S. Benfold*.

The document then listed the ships to be included in the Amphibious Readiness Group ("ARG"), which was prefaced by the notation that "[t]hese consist of three ships which are deploying out of homeport San Diego, March 14 2001." The itinerary for the ARG was less detailed than that of the battlegroup: "The ARG port visit will be in South-East Asia before heading to the ME. Thailand (their favourite), Singapore, etc." The document contained the English spelling of the word "favorite." The document described the ARG operations as follows:

Mission covert ops for special forces, evacuate embassies or beach/land assaults.

Marine train off the coast of Qatar or Jordan or maybe even Saudi Arabia.

American arms: Berreta 9mm and tactical shotguns; plus 4 man Rhib team no arms connected to boat or personnel.

Canadians: same set-up, better weapons, MP5 and 9 mm pistols.

For risky missions, usually done alone by Navy Seals, Vessel-board search and siege teams (VBSS). These teams carry out MIO in the Northern part of the Gulf.

The document ended with an overall assessment of the battlegroup's vulnerabilities:

**Weakness:**

They have nothing to stop a small craft with RPG etc, except their Seals' stinger missiles.

**Deploy ops in Gulf 29 April - 04 October.**

29th APRIL is more likely the day through the Straits. For the whole of March is tax-free - a moral booster. Many sailors do not like the Gulf.

Please destroy message.

**Forensic Analysis of the Battlegroup Floppy Disk.**   On the floppy disk containing the Battlegroup Document were several other files, some of which were encrypted, that directly related to the administration of Azzam and its websites.   For example, one encrypted file on the floppy disk was entitled: "FOR THE GUY IN CHARGE TO READ (01_08_01).zip."[4] Agent Bowling explained that Microsoft Word automatically fills in the author field when a document is created, but that a user can later change the contents of the field by right clicking the file outside of Word, and editing the author field.   There was a one-minute gap between the time the file was "last saved" and "last modified," which indicated to Agent Bowling that the author field had been modified outside of Microsoft Word by right-clicking on the document icon after the document had been closed.   Another encrypted file, "readme 31 July 2001.txt," was apparently a response to the "guy in charge" document, and contained instructions for people to do certain things for Azzam and a related site, www.qoqaz.net, including to e-mail "MA" [Makhtaba al-Ansar, an Islamic bookstore in England that sold jihadi materials] regarding printing and money; and to "request from Mr. T that the products backlog must be finished by Monday evening 10 p.m."   The disk also included saved e-mail messages

---

[4]   Among other things, this document listed usernames and passwords to afford access to e-mail accounts for qoqaz.net@yahoo.co.uk and azzamcom@yahoo.com;  discussed how "our guy" edited material and "all the other guy has to do is put in html format and upload it";  how "EoS" [i.e, E-mails of Support] updates would be handled;  how to manage inventory of "JR000 CDs" [Russian Hell 2000], "MoB videos" [Martyrs of Bosnia"], "GB labels" [In the Hearts of Green Birds, which were books sold on the website], and "JC" [Join the Caravan, another book sold on the website];  working with "MA" [Makhtaba al-Ansar] contacts;  and their bank account details.  The document also described how to edit news to "put it online" in connection with translations.

that had been addressed to azzam@azzam.com, including one that had been saved in a directory called "stuff to give the boss." The floppy disk contained files with content that appeared verbatim on the Azzam websites, such as materials justifying the Taliban's destruction of the Bamiyan Buddhas in Afghanistan.

Agent Bowling testified that based upon his forensic analysis of the floppy disk, the evidence strongly suggested that it had been created and saved by a British citizen named Syed Talha Ahsan – the "Mr. T" who handled the products backlog for Azzam – who then transmitted the floppy disk to Babar Ahmad.  Forensic analysis of other documents obtained during the investigation linked a person named Syed Talha Ahsan to the Battlegroup Document.  For example, a number of computer files recovered from Mr. Ahsan's residence in London contained references to "S A Ahsan" in metadata.  These documents included two versions of his curriculum vitae, as well as class notes for an Islamic course that Mr. Ahsan had sent to Mr. Ahmad, and about which they had corresponded by e-mail.  These metadata references to "S A Ahsan" matched the metadata of the Battlegroup Document.  Moreover, the Government introduced evidence indicating that Syed Talha Ahsan was referred to as "Mr. T."  Mr. Ahsan was ethnically Bangladeshi, and it was common for someone like him to go by his middle name.  Mr. Ahsan's computer, seized from his residence, contained a log-in prompt for either "Ahsan" or "mrt."  Inside the "mrt" account was another version of Mr. Ahsan's personal curriculum vitae.  "Mr. T" was the same name that was used in the file on the floppy disk to refer to the person in charge of clearing Azzam's products backlog.  The name also was in the address book for azzamproducts@yahoo.com.

The Battlegroup Document had been saved in Microsoft Word 97 in "UK English."  The file had been opened and modified on only two occasions: when it was created on April 2, 2001, and

10

again when it was last saved on April 12, 2001. On that latter date, the graphic depicting the battlegroup's formation through the Strait of Hormuz was created and embedded, and the "author" field in the document's properties was changed from "S A Ahsan" to "Jon Greene."

Wiping software called BCWipe had been used on the floppy disk. Agent Bowling was, therefore, unable to recover whatever items had been wiped. Agent Bowling searched all of the electronic data he had accumulated during his lengthy investigation, including all the computers seized by British authorities from Messrs. Ahsan and Ahmad, but found no traces of the information contained in the Battlegroup Document anywhere other than on the floppy disk found on the wardrobe in Mr. Ahmad's bedroom. Agent Bowling's search of those computers also revealed no research relating to U.S. Naval Forces in the Pacific or elsewhere, the *Constellation* battlegroup, or the ARG. Nor did Agent Bowling find any evidence of communications between Azzam and anyone named "Jon Greene," or find anyone named Jon Greene who could have had access to this battlegroup information from the Navy.

**Hassan Abu-Jihaad and His E-mail Communications With Azzam**. British authorities sent their U.S. counterparts a copy, or "image," of the floppy disk containing the Battlegroup Document. Earlier, Agent Bowling had obtained through a search warrant the contents of e-mails from Yahoo accounts associated with the Azzam websites, as well as registration information pertaining to those accounts. The reference to the *Benfold* in the Battlegroup Document was significant to Agent Bowling because he had previously located Yahoo e-mails between Azzam and an American sailor stationed aboard the *Benfold*. That sailor was the Defendant, Hassan Abu-Jihaad.

Agent Bowling located eleven e-mails between Azzam and Mr. Abu-Jihaad dating from August 21, 2000, through September 3, 2001. Some e-mails were to or from his military e-mail

addresses (abujihah@benfold.navy.mil and later AbujihaadH@benfold.navy.mil), while others were from his private e-mail address (abujihaad01@hotmail.com).  Navy personnel records confirmed that Mr. Abu-jihaad was assigned to the *Benfold* during this period of time.  Mr. Abu-Jihaad had enlisted in the Navy on January 26, 1998, and was assigned to the *Benfold* from July 1, 1998, until his honorable discharge on January 25, 2002.  The Defendant had been born Paul Raphael Hall, but had legally changed his name in Arizona state court to "Hassan Abu-Jihaad" in 1997.  Evan Kohlmann testified that mujahideen often choose as a "nom de guerre" an Arabic "kunya," which begins with "Abu," meaning "father of."  He explained that the term "jihad" (often transliterated from the Arabic as "jihaad") literally means "holy struggle," and in the context of mujahideen "exclusively refers to individuals on a battlefield, fighting in the cause of Allah."

From the contents of the e-mails between Mr. Abu-Jihaad and Azzam, it was apparent that he made known to Azzam both his identity and his status as an active member of the U.S. Navy stationed aboard a warship deployed to the Persian Gulf.  The e-mails also showed that Mr. Abu-Jihaad was reading the Azzam websites and that he sent money orders to Azzam to purchase various videos that Azzam had created to support violent Islamic jihad.  In addition, the e-mails suggested that Mr. Abu-Jihaad and Azzam had other communications that were not among the e-mails recovered by Agent Bowling.  Finally, the e-mails showed that Mr. Abu-Jihaad himself supported the cause of violent Islamic jihad.

The Court describes the e-mails in some detail since they were so important at the trial.  The earliest e-mail correspondence between Mr. Abu-Jihaad and Azzam involved his ordering of various materials from the website.  In these e-mails, Mr. Abu-Jihaad used his Hotmail address, and the IP addresses were traced back to Navy computers in San Diego.  On August 21, 2000, Mr. Abu-Jihaad

followed up on previous correspondence he had with Azzam (apparently via physical mail), which

was not recovered:

> Salaamu"Alaikum
>    I will appreciated if you guys can tell me if you guys received the 30.00dollars
> I sent for the indocumentation of the bosnianwar that going to be issued on SEP 4th.
> Brothers I will appreciate if you guys can e-mail me at abujihaad01@hotmail.com to
> confirm my payment.
> Salaamu'Alaikum

The reference to documentation was apparently to a page from the Azzam website, which had been

last updated on August 13, 2000, advertising the upcoming release, on September 4, of a video titled

the *Martyrs of Bosnia*, and inviting pre-orders.  On August 26, 2000, Azzam responded that it had

indeed received Mr. Abu-Jihaad's video order, and would soon send him the video.  Azzam noted that

the video cost only $25, and inquired what to do with the remaining $5.  At the end of the Azzam e-

mail was their electronic signature file, which contained contact information for Azzam, as well as

an inspirational quotation extolling martyrdom:

> Azzam Publications >BCM Uhud,London WC1N 3XX,UNITED KINGDOM.
> http://www.qoqaz.net azzam2000@e-mail.com
> "And with the likes of all these (martyrs), nations are established,
> convictions are brought to life and ideologies are made victorious."
> [Shaheed Dr. Sheikh Abdullah Azzam, assassinated 1989].

The original version of the preceding e-mail (with complete header information) was not recovered

in the Yahoo account, having likely been deleted.  But the text and abbreviated header information

was embedded in Mr. Abu-Jihaad's reply the following day, August 27, 2000:

> Assalaamu alaikum
> Dear Brothers you guys can keep the remanding $5.00 and added to the
> funds that you Brothers are spending in the way of Allaah via videos,tapes
> and the great web sites Qoqaz & Azzam Pub .....etc.
> Assalaamu'Alaikum

13

Over Mr. Abu-Jihaad's objection, the jury was shown selected, and relatively brief, excerpts from the video, *Martyrs of Bosnia*, after receiving a limiting instruction from the Court. The Court had previously ruled on a motion in limine permitting certain limited excerpts from the videos that Mr. Abu-Jihaad had ordered from Azzam to be shown to the jury subject to a limiting instruction. *See* Ruling and Order [doc. # 221] at 9-11. The video was in Arabic with English subtitles and offered inspirational descriptions of martyrs who had died in violent jihad on behalf of Islam in Bosnia-Herzegovina. For example, the video discussed a "martyr" of Turkish origin who had been living in the United States and whose death had freed him from living with the "disbelievers" in America. The video included a number of combat scenes, in which the videographer was very close, just behind the Islamic fighters. At one point, Sheikh Abdullah Azzam – the website's namesake – was filmed giving a speech, in which he criticizes western Muslims for failing to shed any of their own blood in behalf of the cause. Toward the end of the film was an interview of Ibn Khattab, leader of the foreign mujahideen in Bosnia-Herzegovina, who instructed viewers who wanted to contact the mujahideen to do so through Azzam.

On March 12, 2001, Mr. Abu-Jihaad again wrote to Azzam from his Hotmail account, inquiring about another video order:

> Salaamu'Alaikum
> Br/Sis of Islam
> I am wondering did you guise recieve my two separate orders the first was
> Russian hell 2000. Then I ordered Chechnya from the Ashes at a later date.
> If you have any info please e-mail me back Insha'Allah.
> Salaam's
> Hassan Abu-Jihaad

The IP address for this message was traced back to Navy computers in San Diego. Less than six hours later, Azzam replied to the Hotmail account, asking that he e-mail them at

"products@azzam.com" with his name, mailing address, and the dates he ordered the CDs.  This exchange occurred three days before the date that the Battlegroup Document predicted that the *Benfold* and the rest of the battlegroup would leave San Diego.

Mr. Abu-Jihaad sent Azzam another e-mail on May 15, 2001, this time from his Navy e-mail account (abujihah@benfold.navy.mil) and from a *Benfold* IP address.  He noted that he was in the "middle of this giant ucean" and inquired about his order for the video titled *Chechnya from the Ashes*.  He also reported that his mother had received his order of the video *Russian Hell 2000*.  He listed his home mailing address as "1681 s. 9th street San Bernardino Ca,92411," and relayed both his Hotmail address (with a typographical error) and his Navy e-mail address.  Three days later, on May 18, Azzam sent an apologetic reply and promised to send Mr. Abu-Jihaad the video within a week.

Again over Mr. Abu-Jihaad's objection, the Court allowed the Government to play for the jury brief excerpts from both *Russian Hell 2000* and *Chechnya from the Ashes* (which included a number of features, including *Russian Hell 2000 Part II*).  The Court gave the same limiting instruction to the jury.  *Russian Hell 2000* included footage of mujahideen executing a captured Russian soldier in Chechnya, acting on the orders of Ibn Khattab.  *Russian Hell 2000 Part II* included scenes with Chechen mujahideen commander Shamil Basayev and a suicide bomber saying prayers, followed by footage of a suicide truck bombing.

On July 19, 2001, Azzam sent an e-mail to Mr. Abu-Jihaad's Hotmail address, praising him for an e-mail that he had previously sent them. The text of Abu-Jihaad's earlier e-mail, which was not recovered, appears in Azzam's reply. Mr. Abu-Jihaad's e-mail, which was referred to at trial as the "*Cole* e-mail," reads as follows:

Assalaamu'Alaikum

Brothers/Sisters of Al-Islam

i am a muslim station onboard a u.s. warship currently operating depolyed to the arabian gulf. it shall be noted before usama's latest video was viewed by massive people all over the world. that psychological anxiety had already set in on america's forces everywhere. all this is due to the martyrdom operation against the uss cole. since then every warship station either on the western or eastern shores of america who come to operate in the 5th fleet op area has to be given a force protect brief. well during the brief, i attended there was one thing that stuck out like thorns on a rose bush. i do not know who was the originator of this either top brass or an american poitician. well here is his/her statement: "america has Never faced an enemy with no borders, no government, no diplomats,nor a standing army that pledges allegiance to no state." Allahu Akbar! Allahu Akbar! i give takbirs [praise to Allah] because i know deep down in my heart that the american enemies that this person has discribe is the Mujahideen Feesabilillah [holy warriors fighting in the cause of Allah]. these brave men are the true champions and soldiers of Allah in this dunya [world]. i understand fully that they are the men who have brong honor to this weak ummah [Islamic community] in the lands of jihad afghanistan,bosnia,chechnya, etc. Alhamdulillah! [Praise to Allah!] With their only mission in life to make Allah's name and laws supreme all over this world. i want to let it be known that i have been in the middle east for almost a total of 3 months. for these 3 months you can truly see the effects of this psychological warfare taking a toll on junior and high ranking officers. but after the latest video supporting palestine. the top brass and american officials wererunning around like headless chickens very afraid, wondering if there is a possible threat. but this time the american population got wind of this and they came to know just how afraid the u.s. government is. thomas l. friedman wrote an article in the new york times.called:
"what it takes to make the americans to turn tail, run." thisarticle was distributed on my ship and most of the sailors said it was so true about the american government, and they feel like they are working for a bunch of scary pussies..........*a Brother serving a Kuffar [infidel] nation..*
Astaghfir'Allah [Forgiveness from Allah]....Hassan

(Emphasis added).[5]  Although there was no header information for the original e-mail, the Thomas Friedman column referred to in Mr. Abu-Jihaad's e-mail had run in the *New York Times* on June 26, 2001. Therefore, Mr. Abu-Jihaad must have authored his e-mail some time between June 26 and July

---

[5]  Agent Bowling provided the translations in brackets during his testimony at trial.

19;  that is, while the *Benfold* was in the Persian Gulf.  The jury heard testimony from Evan Kohlman

that the incident praised by Mr. Abu-Jihaad as a "martyrdom operation" involved the suicide boat

bombing of the *Cole* – a U.S. Navy destroyer like the *Benfold* – as it lay off the coast of Yemen in

October 2000.  Al-Qaida had taken public credit for the bombing, which killed seventeen U.S. sailors

and caused millions of dollars of damage.

> Azzam replied to Mr. Abu-Jihaad as follows:
>
> AsSalaamAlaikum brother hassan,
> What can we?
> You said it all, and all I can add is that the Kufar know that they cannot defeat the
> Mujahideen (the warriors of Allah). I trust that you are doing your best to make
> sure that the other brothers & sisters in uniform are reminded that their sole
> purpose of existence in this duniya [world] is purely to worship our Lord and
> Master, Allah (SWT) [praise being given to Allah].
> May Allah be with you & your brothers and sisters and keep you from all harm.
> Keep up with the Dawah [preaching Islam] and the psychlogical warfare.
> WasSalaam, [peace be upon you]
> From just another slave of Allah at Azzam Publications......

The jury was also shown pages from www.qoqaz.net, one of the Azzam websites, that solicited

readers to "keep sending your e-mails of support to qoqaz@azzam.com."  This was the same e-mail

address that had been included in the "to" and "reply-to" field of Azzam's July 19 response.  The

"e-mails of support" page on Azzam's website posted testimonials from readers around the world.

After receiving Azzam's reply to his *Cole* e-mail, Mr. Abu-Jihaad inquired again about his

video orders.  Writing from his Navy e-mail address (AbujihaadH@benfold.navy.mil), he explained

that he had received *Russian Hell 2000 Part II*, and had accidentally ordered a second copy (which,

he noted, "will be a good gift for someone" in any event), but apparently had not received the first part

of *Russian Hell 2000*.  He then noted that he had previously given his military address (though it does

not appear in any other e-mails recovered by the Government), and inquired about whether that

address was workable:

    the address i gave you Bothers is:

    Uss Benfold DDG-65
    Fpo Ap 96661-1283

    do you guys mail to military addresses
    plus do you guys ship through UPS
    i ask this because the address above
    do not except packages shipped through
    (UPS)....

    besides that i want to give you Bro/Sis a heads up that i will be sending an
    order form
    for "RUSSIAN HELL 2000 PART 1", how many days will it take? and should I
    send a different
    address than the one above.

    Your Brother of Al-Islam
    Hassan Abu-Jihaad

    Keep up the great work it is very well appreciated Alhamdulillah!!!

The IP address for this e-mail was traced back to the *Benfold*.

On July 26, Azzam wrote back to Mr. Abu-Jihaad, apologizing for the mishap, and stating that "[t]he address is OK as long as you think it is safe and you are confident that you will get our product." It was signed "Products department (Azzam Publications)." One day later, Mr. Abu-Jihaad wrote back – again from his Navy e-mail address, from a *Benfold* IP address – confirming that Azzam should send his order to his Navy FPO address.

Records produced by Yahoo disclosed that Mr. Abu-Jihaad's military e-mail address was saved in one of Azzam's electronic address books. Specifically, his e-mail account "Abujihah@benfold.navy.mil" was saved. Yahoo turned over more than 23,000 e-mail messages to and from Azzam's e-mail accounts, but only a small portion of the e-mail addresses – including Mr.

Abu-Jihaad's – had been saved to the online address books associated with these accounts.  Only an account user of the Azzam Yahoo e-mail account could have saved Mr. Abu-Jihaad's e-mail address, since it would not have been saved automatically.  Furthermore, Agent Bowling testified that he had searched for e-mail extensions such as .mil or .gov that would indicate use of a U.S. military or government e-mail account, for IP addresses associated with the Navy, or the military or government more generally; and for particular words that appeared to be unique to the Battlegroup Document itself, such as the names of the ships or other key terms.  With one exception, Mr. Abu-Jihaad was the only correspondent with a .mil address that showed up in the pool of Yahoo e-mails to and from Azzam.  The only exception was a disparaging e-mail sent by a Navy Commander to Azzam in late September 2001, which was met with a terse and unfriendly response from Azzam.

On September 2, 2001, Mr. Abu-Jihaad wrote the final e-mail of the eleven e-mails that Agent Bowling was able to recover.  This e-mail was sent to Azzam from Mr. Abu-Jihaad's Navy e-mail account with a *Benfold* IP address.  He complimented Azzam on their coverage of the Taliban in Afghanistan, but stated that in his opinion, the Taliban were too soft when enforcing Islamic law against foreign aid workers found guilty of converting Muslims to their faith.  He wrote as follows:

> Assalaamu'Alaikum
>
> I feel that Azzam Publication have done a great job on analyzing the notable quotes of the western media's and the Taliban officials themselves. I have been keeping myself updated with this particular incident that is occurring there. What disturbs me more is the two decrees. 1st stating that who ever commits apostasy and the one who incites it ,and are found guilty of such actions shall be punished by death. i personally agree with this decrement. 2nd decrement states that a foreign aid worker found guilty of converting Muslims to their faith shall be placed in jail for a month then expelled from Afghanistan. My opinion about this decrement is that it is to weak of a punishment (watered down ). I personally feel that the foreign aid workers shall get the same punishment that the Afghan Nationals shall receive. I feel that this will be real

justice according to Sharee'ah [Islamic law] in the sight of Allah and to the
true people who adhere to this Deen [religion]. i would like to know your
intake on this matter? That is if you like to share your opinion. Your Brother
of Al-Islam. Hassan

Agent Bowling did not find the Battlegroup Document or information from the Battlegroup
Document in any of the e-mails between Mr. Abu-Jihaad and Azzam.  Therefore, the Government's
case against Mr. Abu-Jihaad was built solely on circumstantial evidence regarding his motive and his
access to information contained in the Battlegroup Document.

**The Battlegroup Mission and Transit Plan.**  Retired Rear Admiral David C. Hart, Jr.,
testified about the mission of the *Constellation* battlegroup in 2001.  Admiral Hart served two years
out of San Diego as a carrier battlegroup commander, with the *Constellation* as his flagship.  He held
that position from October 1999 to June 2001, and participated in two deployments to the Persian
Gulf.  A battlegroup typically includes an aircraft carrier, five or six combat ships, two submarines,
and one or two replenishment vessels.  The composition of a battlegroup is determined by the
commander-in-chief of a particular fleet, here the Pacific Fleet.  In 2001, the *Constellation* battlegroup
was deployed to the Middle East to enforce Operations Southern and Northern Watch over Iraq, to
enforce U.N.-mandated no-fly zones in the south of that country, and to enforce the U.N. oil embargo
against Iraq through maritime shipping operations in the Persian Gulf.

The battlegroup proceeded from San Diego to the Persian Gulf according to a Transit Plan.
Drafting the Transit Plan was a labor-intensive project, taking months to plot out, and was subject to
numerous changes or iterations.  Admiral Hart's staff was responsible for promulgating the Transit
Plan for the *Constellation* battlegroup for the 2001 deployment.  The person who actually drafted the
Transit Plan was Quartermaster Chief Petty Officer Adam Conaway, who had spent nearly his entire

career working in navigation and had spent almost five years drawing up ship schedules. Chief Conaway explained that drawing up a battlegroup's schedule required "over a thousand hours of work." He and his supervisor would sit down and determine whether to use the northern or southern route to the Middle East, choose the port calls, and determine the amount of time needed to sail from San Diego to their area of operations. The Transit Plan would often undergo several revisions for any number of reasons before being finalized.

The first iteration of the *Constellation* Transit Plan was circulated on September 29, 2000, with successive revisions on the following dates:  October 3, 2000; December 20, 2000; February 10, 2001 (which could not be located in Navy archives); and finally February 24, 2001.  In each version of the Transit Plan, there was a general "milestones" section, or executive summary, at the front of the plan that listed the anticipated entry into the geographic region controlled by the U.S. Fifth Fleet. That date was April 30, 2001.  This entry was known as the "CHOP" point, referring to "change of operational control."  The more detailed section of each Transit Plan, however, described the precise dates, times, and locations for each milestone, and more precisely identified entry into the CHOP point as occurring just before midnight on April 29, 2001.  Notably, the Transit Plan did not list a date for when the battlegroup would transit the Strait of Hormuz, which the battlegroup had to transit in order to enter the Persian Gulf, where it would be deployed.  That is, the last date in the Transit Plan was the date of entry into the CHOP point.  Furthermore, at the time of deployment from San Diego, there was no transit plan for the battlegroup's return trip from the Persian Gulf back to San Diego.

The final version of the Transit Plan dated February 24, 2001, contained a port call that had not appeared in the September, October, or December 2000 revisions:  a brief stop for the *Benfold* to load ammunition at the naval magazine in Lualualei, Pearl Harbor, Hawaii on March 20, 2001.

21

This stop had first been added in either the February 10 or February 24 iteration of the Transit Plan. Commander Jay D. Wylie, who served on the *Benfold* during the events in question, recalled that the navigation division had to do significant last-minute work before deploying from San Diego on March 15, including adding charts for the Hawaii port call. He explained that the stop in Hawaii was added because the *Benfold* had been forced to stay at sea for a missile shoot that had cut into the crew's leave during the stand-down period. As compensation, the Navy agreed to reward the *Benfold* crew with a liberty port call in Hawaii. The *Benfold* was the only ship in the battlegroup to pull into Pearl Harbor to load ammunition.

The navigation division of each ship in the battlegroup, including the *Benfold*, received a copy of the Transit Plan revisions, and was responsible for plotting its ship's track over the course of the transit. Each revision of the Transit Plan would be electronically transmitted to each of the member ships of the battlegroup and certain Navy commands via classified message traffic. Testimony at trial indicated that access to the Transit Plan would have been limited to about 40 people out of the *Benfold's* crew of 300 sailors. However, Commander Wylie testified that before the *Benfold*'s deployment from San Diego on March 15, 2001, access to the Transit Plan would have been limited to the ship's officers, the operations specialists in the CIC, the quartermasters and signalmen, and the radio operators who processed the message. In the month-long "stand-down" period immediately before the March 15 deployment, the navigation division of the *Benfold* spent hours plotting out the ship's intended movements on paper charts, with a duplicate track being plotted by the operation division. Commander Wylie testified that during this period, the signalmen worked alongside the quartermasters to finish last-minute preparations for the ship's charts.

Mr. Abu-Jihaad was a signalman on the *Benfold* in 2001, and had access to the Transit Plan.

The *Benfold*'s navigation division was composed of four quartermasters, supplemented by four signalmen – an enlisted rating responsible for visual communications, which was then being abolished and folded into the quartermaster rating.  Signalmen on the *Benfold* at that time were cross-training to learn quartermaster skills.  Commander Wylie, who supervised all ship operations including the navigation division, recalled that Mr. Abu-Jihaad participated in that cross-training and had qualified as quartermaster of the watch.  Moreover, Mr. Abu-Jihaad regularly worked on the bridge where the chart room was located (where the ship's paper charts and classified transit plans were stored) and in the adjacent signal shack.  The jury was shown photographs of these locations.

**Confidential Information.**  The Transit Plan was classified at the "confidential" level, and that classification marking appeared on the face of each revision of the plan. The jury heard evidence about the importance of maintaining the integrity of classified materials.  By Executive Orders 12958 and 13292, information can be classified at different levels, ranging in increasing seriousness from "confidential," to "secret," to "top secret."  "Confidential" information is defined as "information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe."[6]  The jury also saw an operational instruction that guides the Navy's classification decisions, indicating that "precise current or future operational deployment, locations of surface combatant ships," and "planned foreign port calls" should be classified as "confidential" until after deployment or the visit has been approved by the host government.  Chief Conaway testified that diplomatic clearances sometimes do not get approved until the day before a ship pulls into port.  Another Navy document instructed that the

---

[6] "Secret" information is defined as information that, if disclosed, could cause "serious damage" to national security, and "top secret" as information that could cause "exceptionally grave damage."

"secret" level of classification should apply to transits of "choke points" and deployments in areas "when there are potentially hostile forces present and foreknowledge would permit adversaries to position forces secretly and mount attacks, particularly surprise attacks, on naval forces."

Commander Wylie was responsible for approving security clearances aboard the *Benfold*, and granted secret clearances for quartermasters and signalmen due to their work on the bridge.  He explained that someone in the navigation division would have no authority to release classified information to someone who lacked a security clearance. The jury also heard evidence about steps that the Navy took to maintain the secrecy of classified information, including the advance location of its ships.  Admiral Hart testified that the Navy did not ever publicize classified information, nor did it publicize in advance the dates of anticipated port calls or the dates of a transit of the Strait of Hormuz.  Chief Conaway testified that he had a security clearance to handle classified information up to the "secret" level.  Based on his training and experience in the navigation division, Chief Conaway testified that classified information cannot be transmitted to anyone without a clearance and a "need to know" the information.  Signalmen were likewise required to hold a secret clearance due to the nature of their work.  Navy records showed that Mr. Abu-Jihaad had been granted a secret-level clearance.

Senior Chief Dennis R. Amador testified that the *Benfold*'s transit plans were stored in the chart room on the bridge, and were accessible only to personnel with appropriate security clearances. Because advance knowledge of ship movements is classified, Chief Amador would not tell his wife the precise time and date of where and when he was going to be deployed.  Instead, he worked out a system to tell his wife in code the general region of the world where he was located, using coordinates on a map grid that he had drawn up.  Petty Officer Josh Kelly testified that as a deck

seaman and later a personnel specialist aboard the *Benfold*, he had no advance knowledge about where the ship was going. Before leaving San Diego in March, Petty Officer Kelly did not know which port calls the ship would make before reaching the Persian Gulf. He also did not know whether the ship would be taking the northern or the southern route to the Middle East.

The jury heard testimony that an officer in the battlegroup would have broader access to classified information via the Navy's SIPRnet (the secure intranet for classified information) than a signalman. The national security information in the Navy's SIPRnet was potentially more damaging to national security than the information contained in the Transit Plan or the Battlegroup Document. Chief Conaway testified that Navy personnel with SIPRnet access could have accessed significantly more information – including classified information – about the battlegroup than what was contained in the Transit Plan. For example, SIPRnet afforded access to the Pacific Fleet's overall deployment plan. Not all personnel with secret clearances were given SIPRnet access. Mr. Abu-Jihaad did not have access to the Navy's SIPRnet.

The jury also heard evidence about the relevance of the information contained in the Battlegroup Document. By way of background, Navy witnesses testified that force protection became an especially important concept after the suicide bombing of the *Cole* in October 2000 off the coast of Yemen. Admiral Hart explained that Navy ships can be particularly vulnerable while in port – as the *Cole* was – and they were "[a]bsolutely" more vulnerable during particular portions of their transits. An example of such a vulnerable area was the transit of the Strait of Hormuz, a choke point where geography narrows the Strait and limits vessels' opportunities to maneuver. The Strait is a high-traffic area containing many large ships that are very slow to maneuver, together with all sorts

of other vessels engaged in cross-Strait traffic.[7]   During a transit of the Strait of Hormuz, the battlegroup would enter a heightened state of readiness, manning additional weapon systems, posting additional watches, sending up patrol aircraft, and closing off more compartments below deck to protect the ship's watertight integrity if hit.   Admiral Hart testified that at that heightened state, and with all the traffic, it sometimes can be difficult to determine who may or may not pose a threat to the vessels of the battlegroup.

Admiral Hart and the other Navy personnel who testified acknowledged that the Battlegroup Document contained a number of inaccuracies, which will be discussed in greater detail below. Indeed, Admiral Hart agreed that it was "riddled with errors."   Nevertheless, he said that he regarded the information in the Battlegroup Document as a threat to the battlegroup's safety.   On direct, he testified as follows:

> Q.   If you had known, in 2001, prior to deployment or while you were underway that this document was in the hands of individuals in London who were running a website extolling the virtues of jihad and martyrdom, what if anything would you have done?
>
> A.   I would have immediately alerted my superior, in this case the commander of the Fifth Fleet, and would have sought an opportunity to change the time and nature of our transit through the strait of Hormuz.
>
> Q.   Why is that?
>
> A.   Once again, as you earlier indicated by your question in sequence, it's a very vulnerable period of time for us so one of the things you try to achieve, as best you can, is some element of surprise, as you transit through the strait.
>
> Q.   What specifically about the Battlegroup Document would have compromised that?
>
> A.   The actual date and time expected to transit the strait.

---

[7]   The Strait borders the countries of Iran, Oman, and the United Arab Emirates.

The Battlegroup Document predicted that April 29 was the most likely date for transiting the Strait of Hormuz, though the battlegroup had never planned to transit the Strait on April 29; that was the date for crossing the CHOP point, which was between 600 and 1000 nautical miles from the Strait.  Despite this inaccuracy, Admiral Hart said he would still have been concerned because "we have just given away one of the key tactical elements that you like to have on your side, which is surprise."  To Admiral Hart, the single most troubling aspect of the Battlegroup Document was "the time frame at which we would be operating in the Fifth Fleet area of responsibility and intent to try to transmit vulnerabilities, whether necessarily accurate or not, of the ships under my command."  Admiral Hart testified that in asymmetrical warfare, it would be critical for attackers to have advance information about where a ship could be located.

Commander Scott Graham testified that had he been aware that the Battlegroup Document was in the possession of someone in London who was affiliated with a website promoting violent jihad, he would have been greatly concerned.  He regarded the Battlegroup Document as containing classified information, and its release as a breach of security.  As an officer with force-protection responsibilities for the *Benfold*, Commander Graham would have considered the ship's vulnerabilities when approaching the Strait, and whether to go to a heightened condition level as a result of the disclosure of the Battlegroup Document.

The defense called one witness – Molly Raskin, a researcher – through whom it introduced numerous pages from publicly available websites in or about 2001.  She testified that simple internet queries regarding the *Constellation* battlegroup yielded thousands of responses.  Through Ms. Raskin, the defense sought to show that the battlegroup's schedule would have been available for anyone performing research on the internet.  For example, one of the ships in the battlegroup– the *U.S.S.*

*Thatch* – posted a schedule on its website.   The schedule itself was limited to describing each day as either "Deployed," "Port Visit," or "Inport San Diego"; and the names of the ports were never added to the website, even after the port calls were completed in March and April 2001.  The website had been retrieved in April 2001, after the *Thatch* had departed from San Diego on March 15, 2001. The defense also presented webpages posted by the *U.S.S. Boxer* about its port visits; those, too, were posted only after those visits had been completed. The defense also found news articles discussing the battlegroup's Australian port calls.  Those articles were all written in April 2001 – after the battlegroup had left San Diego, and well after the Battlegroup Document appears to have been written.

Ms. Raskin also testified about documents that she was able to locate on the internet predating March 15.  One that discussed the *Constellation*'s deployment was an entry in the MIT alumni website dating to February 11, 2001.  In a class note, a recent graduate told his classmates that he would be deploying for six months as a carrier pilot aboard the *Constellation* from San Diego on March 15, 2001, and that he expected port calls in Sydney, Perth, Bahrain, and Dubai.  The note made no mention of Hawaii, nor did it give dates for any of the anticipated port calls.  Also, the Canadian Navy posted press releases in early 2001 about the participation of the *HMS Winnipeg* in the battlegroup. One press release recited the March 15 departure date and stated that the battlegroup would arrive in the Arabian Gulf in early May.  Also, a February 2001 article about the Tarawa Amphibious Readiness Group described Phuket, Thailand as one of the favorite stops of sailors and Marines, a comment that was reminiscent of a similar comment in the Battlegroup Document.

The defense also showed that it was publicly known that the U.S. Navy regularly deployed carrier groups to the Persian Gulf to enforce sanctions against Iraq, and that these groups would

deploy for six months at a time. The Navy issued a press release listing the component ships and making a general statement about their mission only when the *Constellation* battlegroup deployed. Also, although there were two typical routes between the west coast of the United States and the Persian Gulf – either via Southeast Asia or Australia – ships could take either route westbound.  Ships typically, but not always, took one route outbound, and the other route on their return.  Likewise, although it was not uncommon for ships to sometimes stop in Hawaii, Chief Conaway testified that "it's definitely not necessarily the norm by any means."  At standard cruising speed, it took six days to sail from San Diego to Hawaii, yet the Battlegroup Document accurately predicted (as set forth in the last revisions of the Transit Plan) that the *Benfold* was scheduled to arrive there on March 20 for an ammunition load.  Admiral Hart acknowledged that it was not a secret that the *Constellation* would be following the Australian route to the Persian Gulf, though the route and dates contained in the Transit Plan were all classified as "confidential."  Because there are two possible general routes west, a member of the general public would not "be able to predict prior to deployment the dates and times of . . . port calls and the Strait of Hormuz transit . . . ."  Commander Wylie testified that he had been deployed to the Persian Gulf many times, but his route there had been different every time. The jury was able to view a number of publicly available command histories for various ships, showing that prior deployments had varied between the northern and southern routes, with different port calls.

**Mr. Abu-Jihaad's Post-Discharge Conversations.**  The jury also heard evidence presented by the Government that in late September 2006, nearly five years after the Battlegroup Document had been prepared, the Federal Bureau of Investigation ("FBI") in Rockford, Illinois, asked an informant – William Chrisman – to befriend an individual named Derrick Shareef.  Mr. Shareef soon came to live with Mr. Chrisman and his family for about three months beginning in October 2006.  During

that time, Mr. Shareef introduced Mr. Chrisman to Hassan Abu-Jihaad, who was then living in

Phoenix and with whom Mr. Shareef had once lived.  Messrs. Chrisman and Abu-Jihaad spoke over

the phone and via webcam and instant messaging on a computer.  The Government wiretapped Mr.

Abu-Jihaad's telephone, and recorded all phone conversations between Messrs. Chrisman and Abu-

Jihaad, as well as conversations that Mr. Abu-Jihaad had with others.  At trial, the jury heard excerpts

from a number of recorded calls from late 2006.

Some of the calls showed that Mr. Abu-Jihaad was familiar with the Azzam family of

websites.  The calls also showed that Mr. Abu-Jihaad was security-conscious and sometimes spoke

in code.  For example, he referred to jihad as "J" or "7" (a reference to the seventh heaven, where

battlefield martyrs go).  In one call, Mr. Abu-Jihaad cautioned Mr. Shareef that he did not "like

talking on the phone or, or internet . . . just for security purposes . . . ."  He continued, "I don't ask any

questions – 'cuz . . . asking questions means compromising . . . .  You know I ain't trying to

compromise anybody . . .  Okay?"  He emphasized the importance of staying "tight" and not

"introduc[ing] many people to . . . what you are."  In another call, he cautioned Mr. Shareef not to

"trust the phones.  The phones are tapped. . . . About as tapped as the internet . . . ."  He continued,

"I'm also about . . . securing myself.  I'm not gonna . . . hand myself to a Kafir [infidel]."

Mr. Abu-Jihaad also spoke with a number of individuals about "cold meals" as opposed to

"fresh" or "hot meals."  Mr. Chrisman, a participant in some, but not all, of these calls, testified that

he understood the term "meal" to refer to "intelligence about military bases."  When Mr. Abu-Jihaad

spoke about "cold meals," he meant outdated intelligence, whereas a "fresh meal" or a "hot meal"

referred to current intelligence.  For example, in one call Mr. Abu-Jihaad told Mr. Shareef that he had

talked about "L" (meaning "logistics"), but that at that time, "L" for Mr. Abu-Jihaad was "like a cold

meal. 'Cuz it ain't fresh. . . . you should figure out, what a fresh meal is. And if it ain't fresh, it's outdated. . . . it got a bad date on it . . . ."  In one three-way conversation in which Mr. Chrisman participated, Mr. Abu-Jihaad apologized for his lack of fresh military intelligence, but pointed Mr. Shareef to an associate who had just recently left the military:

> And I said, and I'll say it again, with whatever I can give, that's beneficial, I'll give it to you. But whatever's cold turkey, if it's cold turkey, I can't give it to you. . . . 'Cuz that means that, if it's cold turkey – I'm talking about "L" you figure it out – 'cuz then that means that, that's just saying that, *I haven't been on that job,* so I don't – you know what I'm saying, I haven't been there . . . to see . . . what the fresh meal is.
> . . . .
> If I can't, if I can't give you the fresh meal – I ain't been there in "X" amount of years. . . . See what I'm saying? Now if . . . the Hispanic, if the Mexican, he just, was there a minute ago – he can give you a fresh meal. . . . So you put that together. . . . If it's – if it's in those terms, he can give you a fresh meal 'cuz, you know what I'm saying, he just finished his job, there, less than a month ago, or . . . two . . . . But I, I mean – in those terms and "L's," – I would be giving you a cold meal.

(Emphasis added).  When Mr. Abu-Jihaad said the he hadn't "been on that job," Mr. Chrisman testified that he understood him to mean that he had been out of the Navy for a while.  Later in that same conversation, Mr. Abu-Jihaad again referred Mr. Shareef to an associate who could provide a "hot meal . . . where he can eat a whole lot."  Mr. Chrisman testified that he understood this associate – whom Mr. Abu-Jihaad referred to as the "Mexican" who "was there a minute ago" – to be Miguel Colon, who left the Marine Corps in September 2006.

Shortly after this call, Mr. Abu-Jihaad spoke with Miguel Colon, and told him about his conversation with Mr. Shareef.  When describing the earlier call, Mr. Abu-Jihaad said as follows:

> Abu-Jihaad:   I peep, I peep the game that he wants a hot meal. You know what I'm saying?
> Colon:   Yeah.
> Abu-Jihaad:   I don't know how to get him no hot meal. I told him I, *I ain't been working uh, in, in, in the field of making meals* and or, you know . . .
> Colon:   Yeah.

31

| Abu-Jihaad: | . . . in a, *in a long time. I've been out of that for, uh, over uh, quatro years you know.* |
| Colon: | Yeah. |
| Abu-Jihaad: | I ain't got nothing for you, homey. |

(Emphasis added). At the time this call was made in 2006, Mr. Abu-Jihaad had been out of the Navy for four years.

## II.

The parties are in agreement about the relevant standards for assessing a motion for judgment of acquittal and for a new trial under Rule 29 and Rule 33 of the *Federal Rules of Criminal Procedure*.

"'It is well settled that a defendant seeking to overturn a conviction based upon insufficiency of the evidence bears a heavy burden.'" *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (quoting *United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir.1995) (citation and quotation marks omitted)); *see also United States v. Reifler*, 446 F.3d 65, 94-95 (2d Cir. 2006). "Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor," *Martinez*, 54 F.3d at 1042, but the conviction must be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Hardwick*, 523 F.3d 94, 100 (2d Cir. 2008). Put differently, a court can overturn a conviction only if it is satisfied that "*no* rational trier of fact could have concluded that the Government met its burden of proof." *Triumph Capital Group, Inc.*, 544 F.3d at 158 (emphasis added and quotations marks omitted).

On a motion for judgment of acquittal under Rule 29, courts must "defer to the jury's

determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *Reifler*, 446 F.3d at 94. Furthermore, the Court must consider the Government's case "in its totality rather than in its parts, and may be satisfied by circumstantial evidence alone." *United States v. Hawkins*, 547 F.3d 66, 70-71 (2d Cir. 2008); *see also United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). A court must, therefore, be careful not to usurp the role of the jury. *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000). Caution in this regard is especially appropriate because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008).

A jury's decision to convict may rest entirely on circumstantial evidence, since in this respect circumstantial evidence is not intrinsically different from testimonial evidence. *See Holland v. United States*, 348 U.S. 121, 140 (1954). As the Second Circuit has instructed:

> While a conviction based on speculation and surmise alone cannot stand, the jury's verdict may be based entirely on circumstantial evidence, and may be inferred from the evidence. So long as the inference is reasonable, it is the task of the jury, not the court, to choose among competing inferences. Thus, where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.

*United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (citations and quotation marks omitted).

Nevertheless, whether based on circumstantial or testimonial evidence, a court must satisfy itself that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Recently, the Second Circuit explained that "[w]here a fact to be proved is also an element of the offense . . . 'it is not enough that the inferences in the government's favor are permissible.'" *Triumph Capital Group*, 544 F.3d at 159 (quoting *Martinez*, 54 F.3d at 1043). As the

33

court continued:

> A court must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt.  If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.

*Id.* (citations and quotations marks omitted).

Rule 33, on the other hand, permits the Court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33; *see also United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). On a Rule 33 motion, a district court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).  Though a district court is entitled, on a Rule 33 motion, to "weigh the evidence and in so doing evaluate for itself the credibility of the witnesses, it must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *Triumph Capital Group,* 544 F.3d at 159 (citations and quotation marks omitted).  Accordingly, a court should exercise its discretion under Rule 33 with caution and sparingly and with due respect for the jury's verdict.

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict.  The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted.  Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

*Ferguson*, 246 F.3d at 134 (citations and quotation marks omitted).

34

**III.**

With these legal principles in mind, the Court will turn first to the Motion for Judgment of Acquittal and address each charge, starting with the allegations of disclosure of classified information and thereafter turning to the material support charge. As the Second Circuit explained in *Triumph Capital Group*, if the evidence viewed in the light most favorable to the prosecution gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," then a reasonable jury must necessarily entertain a reasonable doubt. *Triumph Capital Group*, 544 F.3d at 159.[8]

**A.**

As the Court told the jury in its instructions on the law, to be found guilty of disclosing national defense information to those not entitled to receive it in violation of 18 U.S.C. § 793(d), the Government was required to prove the following essential elements:

(1)    *First*, that Mr. Abu-Jihaad lawfully had possession of, access to, control over, or was entrusted with information relating to the national defense.

(2)    *Second*, that Mr. Abu-Jihaad had reason to believe that such information could be used to the injury of the United States or to the advantage of any foreign nation.

(3)    *Third*, that Mr. Abu-Jihaad willfully communicated, delivered, transmitted or caused to be communicated, delivered, or transmitted such information.

(4)    *Fourth*, that Mr. Abu-Jihaad did so to a person not entitled to receive it.

---

[8]  Some Second Circuit decisions state that "[i]f the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Autuori*, 212 F.3d at 115 (quotations marks and brackets omitted); *see also Santos*, 541 F.3d at 70. For purposes of this decision this Court has applied the standard embraced by the Second Circuit in its *Triumph Capital Group* decision, and has not attempted to reconcile the description of the relevant standard in that decision with the above-quoted language from *Autuori* and similar language from *Santos*. For a general discussion of a court's task in reviewing a jury's verdict, *see* Jon O. Newman, *Beyond Reasonable Doubt,* 68 N.Y.U. L. Rev. 979 (1993).

Final Jury Instructions [doc. # 244] Ex. 7 at 30-31.  While Mr. Abu-Jihaad's arguments for a judgment of acquittal are substantial, the Court concludes that the evidence presented on the disclosure of classified information charge was neither equal, nor nearly equal, to the evidence in support of a theory of innocence.  Accordingly, the Court declines to set aside the jury's conviction on that charge.

Mr. Abu-Jihaad mounts essentially two main challenges to the jury's verdict on 18 U.S.C. § 793(d).  First, he contends that while he may have had access to the confidential information in the *Constellation* battlegroup's Transit Plan, the information in the Battlegroup Document itself does not relate to the national defense and was not "closely held," as that term is used in relevant case law and this Court's instructions to the jury.  Second, he argues that the evidence was insufficient to permit a rational juror to conclude beyond a reasonable doubt that he communicated national defense information to a person not entitled to receive it.

1.      **Closely Held National Defense Information.**  Mr. Abu-Jihaad's argument regarding the "national defense" element of this offense is that much of the information in the Battlegroup Document is flat wrong and/or was commonly known and therefore the information in the Battlegroup Document could not possibly relate to our national defense.  The Government rejoins that there are three specific pieces of information in the Battlegroup Document that the Government contends do relate to national defense and were closely held as of the date the Battlegroup Document was apparently created:

* The fact that vessels would stop in Hawaii on March 20, 2001 to load ammunition;

* The fact that the battlegroup would deploy from San Diego on March 15 and the *Constellation* would be in Sydney, Australia on April 6, 2001; and

* The fact that the battlegroup would transit the Strait of Hormuz at night on April 29,

2001.

The Court agrees with the Government that a rational jury was entitled to conclude beyond a reasonable doubt that each of these pieces of information constituted closely held national defense information at the time the Battlegroup Document was created.

The phrase "information relating to the national defense" is not defined in 18 U.S.C. § 793(d). Nonetheless, courts have uniformly held – and this Court instructed the jury – that "national defense" is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." *Gorin v. United States*, 312 U.S. 19, 28 (1941); *see, e.g.*, *United States v. Drummond*, 354 F.2d 132, 151 (2d Cir. 1965); *United States v. Heine*, 151 F.2d 813, 817 (2d Cir. 1945); *United States v. Truong Dinh Hung*, 629 F.2d 908, 918 (4th Cir. 1980); *United States v. Rosen*, 445 F. Supp. 2d 602, 619 (E.D. Va. 2006). In *Gorin*, for example, the information that was the subject of the criminal prosecution related principally to Japanese activities within the United States. The Supreme Court had little difficulty concluding that U.S. intelligence on the comings and goings of Japanese citizens and officials related to our national defense. According to the Supreme Court, the information gave U.S. opponents a "picture of the counter-espionage work of the Naval intelligence" and thus related to our national defense. *Gorin*, 312 U.S. at 29. In *Drummond*, the Second Circuit held that classified manuals for the installation and maintenance of guided missiles and bombs satisfied the definition of national defense information. *See Drummond*, 354 F.2d at 151. The court also approved of the trial court's instructions to the jury (similar to that which this Court gave the jury in this case) that it should examine the documents, and consider the testimony of witnesses as to their concerns and the significance to which the information could be put. And in *Rosen*, which involved information relating to U.S. strategy in the Middle East, the court

noted that "[i]n sum, the phrase 'information relating to the national defense' has consistently been construed broadly to include information dealing with military matters . . . ." *Rosen*, 445 F. Supp. 2d at 620; *see also Truong Dinh Hung*, 629 F.2d at 918 ("Congress intended 'national defense' to encompass a broad range of information and rejected attempts to narrow the reach of the statutory language.").

Given the breadth of the phrase "information relating to the national defense," a rational jury could conclude beyond a reasonable doubt that the particular information noted above qualifies as national defense information. As Admiral Hart testified, advance disclosure of where the battlegroup would be at any point in time was of significant concern to him. This was true even of the erroneous information regarding when the battlegroup would transit the Strait of Hormuz. The movement of vessels and the dates on which they will arrive in port or transit the Strait of Hormuz most certainly relates to U.S. Naval Forces and their preparedness. Finally, the jury heard the testimony, saw the relevant exhibits, and was properly instructed on the law. *See Gorin*, 312 U.S. at 32 ("The question of the connection of the information with national defense is a question of fact to be determined by the jury."); *Drummond*, 354 F.2d at 151 ("[I]t was for the jury to decide whether the documents defendant conspired to transmit" related to the national defense.); *United States v. Soblen*, 301 F.2d 236, 239 (2d Cir. 1962) (holding that whether materials at issue were "information relating to the national defense" was a question of fact for the jury).

To be sure, completely inaccurate information regarding the battlegroup may well not relate to the national defense. However, the date on which the *Benfold* would arrive in Hawaii to load ammunition was accurate, as was the date the battlegroup would deploy from San Diego and the date on which the *Constellation* would be in Sydney. The Battlegroup Document was wrong about the

date for transiting the Strait of Hormuz – it was not the evening of April 29 but rather was the evening of May 2 (with a transit of additional vessels in the battlegroup on May 3).  Nonetheless, given the proximity of the dates, Admiral Hart testified that he would still have been concerned if enemies of the United States knew that information.  As described, the Strait of Hormuz is a choke point where U.S. Navy vessels are particularly vulnerable to attack.  According to Admiral Hart, disclosure of where the battlegroup would be at any particular time is of significant concern because disclosure eliminates "one of the key tactical elements that you like to have on your side, which is surprise." Had there been a large discrepancy between the actual date of transiting and the date set forth in the Battlegroup Document, the Court would agree with Mr. Abu-Jihaad.  But given how close the date set forth in the Battlegroup Document was to the actual transiting (and that it preceded the actual transiting), the Court is satisfied that the jury was entitled to conclude beyond a reasonable doubt that this information related to the national defense.

Though the phrase "information relating to the national defense" is quite broad, it is cabined by two limitations, one judge-made and the other statutory.  First, the information must be "closely held."  In *United States v. Heine*, 151 F.2d 813 (2d Cir. 1945), the defendant was indicted for espionage because during the early stages of World War II he had provided a German automobile company with information about the U.S. aviation industries that he gathered from magazines, books, newspapers, and publicly available catalogs and journals.  All of the information provided by the defendant "came from sources that were lawfully accessible to anyone who was willing to take the pains to find, sift and collate it."  *Id.* at 815.  Writing for the Second Circuit, Judge Learned Hand explained that disseminating information that the Government had never kept secret could not support a conviction for espionage:

> As declared in *Gorin* . . . and as the judge himself charged, it is obviously lawful to transmit any information about weapons and munitions of war which the services had themselves made public; and if that be true, we can see no warrant for making a distinction between such information, and information which the services have never thought it necessary to withhold at all. There can, for example, be no rational difference between information about a factory which is turning out bombers, and to which the army allows access to all comers, and information about the same bombers, contained in an official report, or procured by a magazine through interviews with officers. The services must be trusted to determine what information may be broadcast without prejudice to the 'national defense,' and their consent to its dissemination is as much evidenced by what they do not seek to suppress, as by what they utter. Certainly it cannot be unlawful to spread such information within the United States; and, if so, it would be to the last degree fatuous to forbid its transmission to the citizens of a friendly foreign power. 'Information relating to the national defense,' whatever else it means, cannot therefore include that kind of information, and so far as Heine's reports contained it, they were not within the section.
> . . . .
> Obviously, this could not mean that it may not be to the advantage of a foreign government to have possession of such information; it can only mean that, when the information has once been made public, and has thus become available in one way or another to any foreign government, the 'advantage' intended by the section cannot reside in facilitating its use by condensing and arranging it.

*Heine*, 151 F.2d at 816-17; *see Soblen*, 301 F.2d at 239 ("The fact that the source of the information was classified as secret distinguishes this case from [*Heine*.]").

*Heine* has been understood to require that the information the defendant is accused of disclosing be "closely held" by the Government. *See, e.g., United States v. Squillacote*, 221 F.3d 542, 577-79 (4th Cir. 2000); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988); *Rosen*, 445 F. Supp. 2d at 621. That is precisely what the Court charged the jury:

> The national defense information must also be closely held by the Government.  In determining whether material is "closely held," you may consider whether it has been classified by appropriate authorities and whether it remained classified on the dates pertinent to the Indictment. . . . Where the information has been made public by the United States Government and is found in sources lawfully available to the general public, it is not "closely held."  Similarly, where sources of information are lawfully available to the public and the United States Government has made no effort to guard such information, the information itself is not "closely held."  In deciding this issue,

you should examine the information, and also consider the testimony of witnesses who testified as to their content and their significance and who described the purpose and the use to which the information contained therein could be put.

Final Jury Instructions [doc. # 244] Ex. 7 at 30-31.

Mr. Abu-Jihaad argues based on Ms. Raskin's testimony that there was so much information about the battlegroup – its schedule and its itinerary – that was publicly available that the information in the Battlegroup Document was not closely held.  However, viewing the evidence in the light most favorable to the Government, the Court believes that a rational jury could conclude beyond a reasonable doubt that the above-noted three pieces of information were closely held by the Government.  The Court says this for several reasons.  For one, the information in the Transit Plan, which the Government theorized was the source of some of the information in the Battlegroup Document, was classified confidential and was not to be shared with individuals who did not have authority to obtain that information.  *See, e.g., Truong Dinh Hung*, 629 F.2d at 919 (noting relevance of classification system for intelligence information);  *Soblen*, 301 F.2d at 239 (noting that information was classified as secret).  As one court has put it, "although evidence that the information was classified is neither strictly necessary nor always sufficient to obtain a prosecution under § 793, the classification of the information by the executive branch is highly probative of whether the information at issue is 'information relating to the national defense.'"  *Rosen*, 445 F. Supp. 2d at 623.  Mr. Abu-Jihaad received training on the classification of documents and therefore knew that information in the Transit Plan was not to be shared with unauthorized individuals.

For another, while there was ample public information available about the general movement of the battlegroup in April, there was no publicly available information admitted at trial that disclosed

an ammunition stop in Hawaii on March 20.[9]  As the witnesses testified, that stop was added to the Transit Plan late in the planning, in mid- to late-February.  Based on the phrasing of the Battlegroup Document (which uses the future tense throughout the document) and its date of creation, April 2, the jury could rationally have concluded that the information in the document was provided in the days leading up to the battlegroup's deployment from San Diego on March 15.  None of the information Ms. Raskin found discloses a stop in Hawaii to load ammunition on March 20, the exact date the *Benfold* arrived in Hawaii to load ammunition.  Nor did any publicly-available information in March 2001 place the *Constellation* in Sydney on April 6.[10]  Finally, while there was some generalized information from the Canadian Government about the movement of the battlegroup into the Arabian Gulf in early May and also publicly available information about the movement of the battlegroup from Australia to the Persian Gulf in mid-April, there was no publicly available information in March 2001 about the date on which the battlegroup would transit the Strait of Hormuz.  As the witnesses testified, they understand that specific dates for port calls or transiting the Strait are not to be disclosed in advance, even to close family members.  As a consequence, the Court concludes that a rational jury could conclude beyond a reasonable doubt that the specific information about the dates for the stop in Hawaii, the stop in Sydney, and the transit of the Strait was closely held.

---

[9]  The defense points out that the Battlegroup Document refers to "some ships" stopping in Hawaii to load ammunition, and only the *Benfold* proceeded from San Diego to Hawaii to load ammunition.  However, the jury also heard that the *U.S.S. Chosin* was based in Hawaii, so that more than one vessel from the battlegroup loaded ammunition in Hawaii and proceeded to the Persian Gulf from Hawaii.  The *Chosin* proceeded from Hawaii on March 26.

[10]  Mr. Abu-Jihaad points out that the Transit Plan had the *Constellation* arriving in Sydney on either April 4 or 5, not April 6 as is contained in the Battlegroup Document.  The problem with this argument is that the Battlegroup Document does not say that the *Constellation* will *arrive* in Sydney on the 6th, but that it will "be at Sydney" on April 6.  Thus, the Battlegroup Document was accurate in that regard.

A second limitation on the scope of national defense information is provided by the statute itself. Specifically, the statute requires that the individual who discloses national defense information have "reason to believe [the information] could be used to the injury of the United States or to the advantage of any foreign nation . . . ." 18 U.S.C. §793(d); *see Rosen*, 445 F. Supp. 2d at 621 ("As the Supreme Court has instructed, the statute only applies to information for which there is an occasion for secrecy, and there is no occasion for secrecy unless disclosure of the information implicates an important government interest such as the national security." (quotations marks omitted)). Mr. Abu-Jihaad makes no argument based on this element, and for good reason. According to the testimony of Navy personnel, which the jury was entitled to credit, advance disclosure of specific dates for ammunition loading, port calls, or transiting the Strait could be used to injure the United States. The structure and text of the Battlegroup Document, which focuses on vulnerabilities and weaknesses, only confirm that the information in the document is intended to injure the United States. Furthermore, the evidence presented permitted the jury to conclude beyond a reasonable doubt that Azzam was a conduit of information to violent Islamic jihadi groups. In view of what happened to the *Cole*, it is abundantly clear that advance knowledge of key battlegroup dates by Islamic jihadi groups would be injurious to U.S. interests.

**2.      Disclosure by Mr. Abu-Jihaad.**  This brings us to the core issue in the case, both before the jury and now with this Court – was there evidence presented that would permit a rational jury to conclude beyond a reasonable doubt that Mr. Abu-Jihaad was the source of the national defense information contained in the Battlegroup Document. This is not an easy issue because, very frankly, there is evidence pointing in both directions. Therefore, the question for this Court is whether the evidence of Mr. Abu-Jihaad's innocence was equal or nearly equal to that of his guilt,

taking the evidence in the light most favorable to the Government. *See Triumph Capital Group*, 544 F.3d at 159. The Court concludes that when all of the reasonable inferences are accumulated in the light most favorable to the Government and the evidence is viewed in its totality, there was sufficient evidence to support the jury's finding that Mr. Abu-Jihaad supplied the key national defense information in the Battlegroup Document – that is, that the evidence suggestive of his innocence was not equal nor nearly equal to that of his guilt.

Turning to the evidence of guilt, as an initial matter, a rational jury could have found from the evidence that Mr. Abu-Jihaad had a motive to disclose national defense information to Azzam. Indeed, Mr. Abu-Jihaad does not seriously contend otherwise. From the Azzam websites, which the evidence showed Mr. Abu-Jihaad visited frequently, he knew that Azzam supported the Taliban, al-Qaida, and violent Islamic jihad. In the months leading up to the creation of the Battlegroup Document, Azzam had sought support from its readership for the Taliban, whom Azzam believed would be subject to cruise missile attacks from the U.S. military. Azzam also extolled the virtues of martyrdom, not only on its websites but also in the videos that Mr. Abu-Jihaad purchased from Azzam. Most damning, in his *Cole* e-mail Mr. Abu-Jihaad praised the bombing of the *Cole* as a "martyrdom operation," and derided the United States as an "infidel" and "Kuffar nation." It is also fair to read his e-mail as giving thanks to the "mujahideen" as "american enemies" and as the "true champions and soldiers of Allah." He also seemed pleased that "you can truly see the effects of this psychological warfare taking a toll on junior and high ranking officers." And he stated his belief that the Taliban was too soft on non-Muslims.

Second, the jury had more than sufficient information to conclude that Mr. Abu-Jihaad had access to the information in the Battlegroup Document. There is no question that as a signalman, Mr.

44

Abu-Jihaad has access to the Transit Plan.  He had a "secret" clearance, was member of the navigational division that was working on the Transit Plan, and had access to the chart room where the Transit Plan was kept.  Furthermore, as the Government argued persuasively at trial, the nature of the information contained in the Battlegroup Document is consistent with that which would come from a person, like Mr. Abu-Jihaad, who had access only to the Transit Plan, and not also to the SIPRnet, which contained significantly more classified information.  Also, the information in the Battlegroup Document was limited to the *Constellation* battlegroup, of which the *Benfold* was a part. That is, the document dealt with Mr. Abu-Jihaad's battlegroup and not others.  Thus, there is no information in the Battlegroup Document about the *U.S.S. Boxer* Amphibious Readiness Group, although that group was deploying from San Diego at roughly the same time, or about other carrier groups such as the *U.S.S. Harry Truman* or the *U.S.S. Vincent*.  Furthermore, consistent with someone who had access only to the Transit Plan, the information in the Battlegroup Document covered only the passage to the Arabian Gulf;  it does not contain any specific information about the battlegroup's operations in the Gulf or its return to the United States because that information was not in the Transit Plan.

Third, Mr. Abu-Jihaad also had the opportunity to convey this information to Azzam.  The record showed that he was in frequent communication with Azzam, using a variety of e-mail addresses, and also that not all of the e-mails between Mr. Abu-Jihaad and Azzam were recovered. Notably, he is the only person with a military e-mail address that Azzam chose to save in its address book.  That Azzam viewed Mr. Abu-Jihaad as important enough to save his address is significant. Indeed, according to Agent Bowling who reviewed thousands of documents and e-mails, Mr. Abu-Jihaad appears to be the only military person (with one exception not relevant here) to have

communicated with Azzam during the relevant period of time.  Moreover, the evidence showed that Syad Talha Ahsan, the creator of the Microsoft Word file containing the Battlegroup Document, managed products backlog for Azzam, a particular concern of Mr. Abu-Jihaad in his frequent e-mails with Azzam.  Only an account user for azzamproducts@yahoo.com, such as Mr. Ahsan, could have saved Mr. Abu-Jihaad's e-mail address.

Fourth, Mr. Abu-Jihaad's post-Navy conversations showed that he was – at least at that time – interested in secrecy, since he used coded words to discuss jihad and logistics.  Those conversations could also be understood by a rational jury as indicating that Mr. Abu-Jihaad may well have provided intelligence information while in the Navy.  As recited previously, Mr. Abu-Jihaad stated in 2006 that he could no longer provide "hot meals," or current intelligence, because he was no longer in the military.  But he also told Miguel Colon that "I ain't been working uh, in, in the field of making meals . . . in a long time.  I've been out of that for, uh, quatro years you know."  At the time, Mr. Abu-Jihaad had been out of the military for approximately four years, and the Court agrees with the Government that the jury was entitled to infer from this conversation that four years earlier he had been in the business of "making meals" – that is, disclosing intelligence.

Fifth, the jury had sufficient evidence to conclude beyond a reasonable doubt that the information in the Battlegroup Document was provided by an insider.  The information in the Battlegroup Document appears to come from an insider who has specific knowledge of some things and imperfect knowledge of other matters.  First and foremost, the document contains specific dates about the ammunition loading in Hawaii on March 20, the *Constellation*'s decision to take the Southern route across the Pacific, its port call in Sydney on April 6, and the date for transiting the Strait of Hormuz.  As of March, these specific dates were not known to anyone without access to the

Transit Plan.  Indeed, the stop in Hawaii did not get added to the plan until mid- to late-February.  As the Government argued at trial, and as the Court agrees, it is implausible to suppose that an outsider could have made a lucky guess that there would be an ammunition stop in Hawaii on March 20.  Had an outsider provided this information, he or she would much more likely have provided approximate dates, not the exact dates from the Transit Plan.  Also, the language used in the Battlegroup Document is full of military jargon, not the language that an outsider would likely use.  For example, the Commander of the battlegroup is described by his title COMCRUDESRON 1 (which was close, but inaccurately spelled) and a jury could reasonably infer that the use of such acronyms is consistent with the Government's theory.  Indeed, at several points, the individual who created the document includes bracketed question marks near military jargon like "helos."

It is true that the transit date for the Strait of Hormuz was both inaccurate and not in the Transit Plan.  Instead, the Transit Plan stopped at the CHOP point, which was 600-1000 nautical miles from the Strait, about a two-day sail.  Yet every iteration of the detailed section of the Transit Plan showed the CHOP date as just before midnight on April 29, 2001, the precise date in the Battlegroup Document.  The Government sought to convince the jury that an inexperienced navigator such as Mr. Abu-Jihaad may have confused the CHOP point with the transit through the Strait.  To that end, Admiral Hart testified in response to a leading question that he was sure that "people" sometimes do confuse the CHOP point and the Strait.  He also said that people were often confused about where the CHOP point is located.  The defense chose not to clarify the issue.  Truth be told, the Court was not particularly impressed by the Government's efforts in this regard, and it is not at all clear to the Court that a rational juror could conclude from the evidence that a sailor who had previously been to the Gulf and through the Strait of Hormuz would be one of the "people" who

sometimes confused the Strait – a geographical location – with the CHOP point.  Nonetheless, the Court finds it significant that every iteration of the Transit Plan showed the end of the battlegroup's passage as nighttime on April 29, precisely as noted in the Battlegroup Document.  Furthermore, the Battlegroup Document accurately states that the choice of April 29 was driven by the Navy's desire to boost morale by crossing into the tax-free zone right before the end of a given month, thereby giving the sailors the full month of April as tax-free.  An outsider to the military is unlikely to have known this detail.

The document also ended with this plea: **"Please destroy message."**  If the Battlegroup Document had been created from open-source information or from guesses about port dates based on a review of internet postings, there would be no reason to include such a plea.  Indeed, if the document had been created from open-source information, the jury was entitled to conclude that the document would have identified its sources so that the recipient of the information could evaluate its accuracy and strength.  Thus, for example, if certain dates had been learned from the MIT alumni website, as the defense argued, the jury was entitled to conclude that the document would say so.  Instead, the jury was entitled to infer from the warning at the end of the document and the failure to list any sources that the information was created from a covert source – namely, an insider, not open-source information from the internet.

One other point deserves some mention.  In his e-mail communications with Azzam, Mr. Abu-Jihaad  frequently made spelling and grammatical errors.  Notably, the Battlegroup Document, which the jury was entitled to conclude was created by Mr. Ahsan and contains information provided to him by someone else,  begins, "[Necessary changes made in grammar and spelling and for the sake of clarity]."   This piece of evidence would not be particularly significant in and of itself.  But the

48

Court is required to view the evidence in its totality – not in isolation – and also draw all reasonable inferences in the light most favorable to the jury's verdict.  In that respect, this is yet another piece of the puzzle that points to Mr. Abu-Jihaad.

Of course, as the Court noted at the outset, the evidence in this case was not one-sided at all. For example, on many of the items listed above, the defense views the evidence entirely differently from the Government.  At this point, however, the question is not whether the evidence could have been viewed differently by the jury but rather whether any rational juror could view it as the Government suggests.  *See Triumph Capital Group*, 544 F.3d at 159.  And as indicated above the answer to that question is most certainly yes.

Mr. Abu-Jihaad's best defense focused on three aspects of the evidence.  First, no evidence shows that Mr. Abu-Jihaad actually transmitted the information in the Battlegroup Document. Indeed, no evidence shows precisely who transmitted the information.  It is true that there is no smoking gun in this case.  But a smoking gun is not necessary.  So long as the evidence supports a finding of each essential element beyond a reasonable doubt, a conviction may, as here, be founded entirely on circumstantial evidence and inferences from that evidence.  *See United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence."); *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[T]he prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt.").

Second, Mr. Abu-Jihaad did not seek to hide his communications with Azzam.  He used his military e-mail address on occasion, even though he knew the Navy monitored e-mail use while at sea.  He also watched the Azzam videos on board and shared them with his fellow sailors.  Yet, none

of this evidence shows that Mr. Abu-Jihaad was not guilty.  As the Government argued at trial, the information in the Battlegroup Document appears to have been conveyed to Azzam before the battlegroup left San Diego on March 15 (or at least the jury could have inferred that), and therefore at a time when the military was not monitoring Mr. Abu-Jihaad's e-mail.  Furthermore, it was apparent from the e-mails recovered by Agent Bowling that not all of the e-mails between Azzam and Mr. Abu-Jihaad were saved.  Finally, while Mr. Abu-Jihaad did not hide the Azzam videos, when it came time to send his damaging e-mail about the *Cole*, he did not use his military e-mail address and only signed his first name.

Third, and most significantly, Mr. Abu-Jihaad points out that the Battlegroup Document is full of errors and according to Mr. Abu-Jihaad, these errors show that he could not possibly have been the source of the information.  This is not an insubstantial argument, for there are indeed many errors in the Battlegroup Document.  Admiral Hart testified that the Battlegroup Document was "riddled with errors [and] inaccuracies."  A brief catalog of some, though not all, of the errors follows:

* The document says that March would be tax free, but it was not (April was) and Chief Amador testified that all sailors would know that March would not be tax free.

* Admiral Hart's title is shown in the document as "COMCRUDESRON 1," but that is not the right acronym for his title.

* The duration of the deployment is stated to be until October 4, 2001, but the battlegroup was only on a six-month deployment and would not have been in the Gulf on October 4 as stated in the Battlegroup Document.  The battlegroup returned to San Diego on September 15, 2001.

* Regarding weaknesses of the battlegroup, the document states: "They have nothing to stop small craft with RPG etc. except their Seals' stinger missiles." However, stinger missiles are not used to protect against small craft.  Notably, Mr. Abu-Jihaad's berthmate on the *Benfold* manned a machine gun on deck as the method for dealing with small craft.

50

\*       There was no *U.S.S. Olympia* submarine and the submarines would not pass
        through the Strait of Hormuz on either side of the *Constellation* as depicted
        in the diagram in the document.  Furthermore, the battlegroup would not, and
        did not, pass through the Strait in two columns as shown in the diagram.

\*       April 29 was not the date on which the battlegroup intended to transit the
        Strait of Hormuz.

As explained above, the question for the Court is whether the errors in the Battlegroup

Document are sufficient to equal or nearly equal the evidence of guilt recited above.  The Court does

not believe they are sufficient.  First, some of the errors, such as Admiral Hart's title, could be made

by any sailor, particularly one who commits frequent spelling errors.  Also, there was no evidence

presented about what Mr. Abu-Jihaad knew or did not know about stinger missiles, and his berthmate

testified that he was skeptical of his "scat" team being very effective at night.  The Court has

previously discussed the transit date and does not need to say more on that point.  And as the

Government showed at trial, the diagram may not have been intended to depict a dual-column

formation;  indeed, if one moved the depictions on the right side of the drawing to the bottom of the

left-hand side, it is not inaccurate, except for the submarines.

It is true that other mistakes point away from Mr. Abu-Jihaad;  for example, the statement that

all of March would be tax free and the reference to stingers.  But the jury did not have to conclude

that all of the information in the Battlegroup Document came from a single source, or that Mr. Ahsan

interpreted it properly.  It is the jury's task to resolve any conflicts in the evidence, using their

common sense, good judgment, and experience.  *See Huezo*, 546 F.3d at 182;  *Autuori* 212 F.3d at

114.  Finally, and in any event, the standard is beyond a *reasonable* doubt, not beyond all possible

doubt.  *See, e.g.*, *United States v. Clifton*, 406 F.3d 1173, 1178 (10th Cir. 2005).  Therefore, the

Government "'need not negate every theory of innocence.'" *Triumph Capital Group*, 544 F.3d at 158 (*quoting Glen*, 312 F.3d at 63); *Strauss*, 999 F.2d at 696 ("[T]he government need not have precluded every reasonable hypothesis consistent with innocence." (quotation marks omitted)).

In closing, it bears noting that it is not this Court's task on a motion for judgment of acquittal to independently assess the evidence and to decide if Mr. Abu-Jihaad is guilty or not. Instead, the Court must respect the role of the jury and take pains to ensure that it is not invading the jury's province in the guise of determining whether the evidence supporting a theory of innocence is equal or nearly equal to a finding of guilt. *See United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) ("The ultimate question is not whether *we believe* the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find.*" (emphasis in original)). This was not an open and shut case. In many ways, it was a difficult case for the Government to prove. However, having carefully considered the evidence in its totality and in the light most favorable to the Government, the Court is satisfied that a rational trier of fact could have found beyond a reasonable doubt that Mr. Abu-Jihaad provided classified information in violation of 18 U.S.C. § 793(d). *See Jackson*, 443 U.S. at 319; *Triumph Capital Group*, 544 F.3d at 159. Accordingly, the Court denies his Motion for Judgment of Acquittal on that charge.

**B.**

Mr. Abu-Jihaad was also convicted of providing material support to terrorists in violation of 18 U.S.C. § 2339A and § 2. Section 2339A makes it a crime to provide "material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation" of certain enumerated statutes. *Id.* "Material support or resources" are defined as follows: "currency or other financial securities, financial services, lodging, training, safehouses, false

documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, *personnel*, transportation, *and other physical assets*, except medicine or religious materials." *Id.* § 2339A(b) (emphasis added).  Mr. Abu-Jihaad was charged with  providing "personnel" and "physical assets," knowing or intending that such support would be used in preparation for, or in carrying out, a violation of 18 U.S.C. § 2332(b) – that is, a plan to kill United States nationals.  *See* Indictment [doc. # 6] ¶¶ 28-29.

The jury was asked to answer a special interrogatory regarding the material support element of the charge.  Specifically, the jury was asked whether it found unanimously that the Government had proved beyond a reasonable doubt that Mr. Abu-Jihaad provided material support in the form of: (a) personnel, or (b) physical assets.   The jury answered each interrogatory in the affirmative.  *See* Jury Verdict [doc. # 247].  Therefore, the Court will assess the evidence offered on each ground.

1.    **Physical Assets.**  The Government did not at trial, and does not claim here, that Mr. Abu-Jihaad's provision of national defense information to Azzam was a "physical asset" within the meaning of 18 U.S.C. § 2339A, or that Mr. Abu-Jihaad created the diskette containing the Battlegroup Document.  Instead, the Government argued that "by providing . . . the information that [would end up] in the Microsoft Word document on that floppy disk, [Mr. Abu-Jihaad] essentially set in motion the steps that caused that floppy disk to be created by Ahsan and given to Ahmad." Government's Consolidated Objection [doc. # 289] at 56.  The Government could make this argument because Mr. Abu-Jihaad had also been indicted under 18 U.S.C. § 2(b).  Section 2(b) provides: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."  According to the Government, it was "reasonably foreseeable" to Mr. Abu-Jihaad that whomever he provided information to would

commit it to a physical asset such as a floppy disk.

Taking the evidence in the light most favorable to the Government and fully cognizant of the deference owed to the jury, the Court does not believe that a rational juror could conclude beyond a reasonable doubt that Mr. Abu-Jihaad provided material support to Azzam in the form of a physical asset. The Court says this for two principal reasons.

First and foremost, there was no evidence whatsoever regarding how Mr. Abu-Jihaad transmitted national defense information to Azzam, what was said when the information was provided, or how he expected Azzam would distribute or transmit the information he provided. Consequently, there was no evidence that would suggest that Mr. Abu-Jihaad knew the information he provided would be transcribed into a Microsoft Word document and copied onto a floppy disk, let alone that he "caused" the information to be placed on a floppy disk. What we do know from the evidence is that the Battlegroup Document ended with these words: "**Please destroy message**." Those words are hardly consistent with someone who intends to cause the information to be put into a computer file that would be copied onto a floppy disk and then distributed. Indeed, Mr. Ahsan did precisely the opposite of what he had been told to do. He was told to destroy the message and instead he typed it out and then copied it onto a diskette to deliver it to Mr. Ahmad. As the Court instructed the jury, there are limits to what can be inferred from the evidence. Baseless speculation and conjecture are not proper and are not evidence. *See Siewe v. Gonzales*, 480 F.3d 160, 167 (2d Cir. 2007) ("[S]peculation and conjecture become legally impermissible '[o]nly when there is a complete absence of probative facts to support the conclusion reached.'" (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946))); *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991) (overturning verdict when jury engaged in "rank speculation").

Second, the Government's emphasis on what was supposedly "reasonably foreseeable" to Mr. Abu-Jihaad does not comport with the requirements of 18 U.S.C. § 2(b).  In support of its arguments, the Government cites only two cases, *United States v. Amico*, 486 F.3d 764, 781 (2d Cir. 2007) and *Pereira v. United States*, 347 U.S. 1, 8-9 (1954).  However, *Amico*, a mail fraud case, does not mention, let alone discuss, § 2(b).  *Pereira* is also a mail fraud case.  Although *Pereira* does mention § 2(b), it is unclear from the opinion whether the Supreme Court's decision is based on § 2(b) or the mail fraud statute, because the Court cites a 1917 Supreme Court case that is also a mail fraud case, not a § 2(b) decision.

In *United States v. Gabriel*, 125 F.3d 89 (2d Cir. 1997), the Second Circuit discussed the *mens rea* requirement under § 2(b).  The defendant in that case argued that "willfully" in § 2(b) meant that the Government had to prove that the defendant knowingly violated the law.  The Second Circuit rejected that argument, reasoning that:

> The general rule in criminal cases is that the government need not prove a knowing violation of the law – we see no reason that Congress would change that rule simply because a person caused an innocent intermediary to act.  *The most natural interpretation of § 2(b) is that a defendant with the mental state necessary to violate the underlying section is guilty of violating that section if he intentionally causes another to commit the requisite act.*

*Id.* at 101 (emphasis added).  According to the Second Circuit, § 2(b) establishes that one who "causes the commission of an indispensable element of the offense by an innocent agent . . . is guilty as a principal."  *Id.*; *see, e.g., United States v. Conception,* 983 F.2d 369, 383-84 (2d Cir. 1992) ("[Conception] initiated the gun battle by shooting Gines several times and then turning and firing at others.  Rival drug dealers returned his fire, and Conception continued shooting until his gun jammed.  If the wounds to Ortiz and Reyes were not inflicted by Conception himself, they most

55

certainly were inflicted by other participants in the gun battle, which had been set in motion by Conception's own willful actions.").

Therefore, "to establish a conviction through the use of section 2(b), the government must prove that the defendant had the mental state necessary to violate the underlying criminal statute and that the defendant '*wilfully caused*' another to commit the necessary act." *Gabriel*, 125 F.3d at 99 (emphasis added).[11]  Here, there was no evidence from which a rational jury could conclude beyond a reasonable doubt that Mr. Abu-Jihaad *willfully caused* Mr. Ahsan to violate § 2339A by copying the Battlegroup Document onto a floppy disk.  Indeed, there is no evidence that Mr. Abu-Jihaad even knew that Mr. Ahsan would place the information Mr. Abu-Jihaad provided Azzam into a Microsoft Word document or copy that document on to a floppy disk.  *Compare United States v. Nolan*, 136 F.3d 265, 272 (2d Cir. 1998) ("Mezzetta knew Belush was preparing Roofers' Form 5500 . . .[,] knew that the portfolio reports were false and misleading," and denied Belush additional information requested.).  In sum, knowing that Azzam was a conduit of information to violent Islamic groups (a conclusion the jury was entirely justified in drawing) is quite a different thing from concluding that Mr. Abu-Jihaad willfully caused Mr. Ahsan to create a Microsoft Word document and then copy it onto a diskette.  Accordingly, the Court grants Mr. Abu-Jihaad's motion for a judgment of acquittal insofar as he was convicted of providing physical assets to terrorists in violation of 18 U.S.C. § 2339A and § 2(b).

**2.     Personnel.**  As to "personnel," the Government argued to the jury – and the jury

---

[11]  Thus, the mail fraud cases relied on by the Government can be further distinguished because the underlying mail fraud statute has a different *mens rea* requirement than 18 U.S.C. § 2339A.  *See Gabriel*, 125 F.3d at 102 ("[A] defendant will be convicted through § 2(b) only if the defendant had the mental state necessary to violate the underlying criminal statute.").

accepted – that by providing national defense information to Azzam, Mr. Abu-Jihaad had provided himself as "personnel."  Mr. Abu-Jihaad's conviction for providing personnel presents a much closer question than the conviction for providing physical assets.  Resolution of that issue requires some consideration of the language and legislative history of § 2339A.  The task is made all the more difficult because the Second Circuit has not yet ruled on the scope of the term "personnel" in that statute, Congress amended the definition of "personnel" in § 2339B but not in § 2339A, and the case law that does exist is not entirely consistent.

Section 2339A was enacted in 1994 as part of the Violent Crime Control and Law Enforcement Act, Pub. L. No. 103-322, § 120005(a), 108 Stat. 1796, 2022.  In 1996, Congress added § 2339B as a part of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, § 303, 110 Stat. 1214, 1250.  As amended, § 2339B makes it unlawful to "provide[] material support or resources to a foreign terrorist organization, or attempt[] or conspire[] to do so . . . ."  18 U.S.C. § 2339B(a)(1).  Congress applied the § 2339A definition of "material support and resources" to § 2339B.  *See* 18 U.S.C. § 2339B(g)(4) ("[T]he term 'material support or resources' has the same meaning given that term in section 2339A . . . .").[12]  The term "personnel" remained undefined for the purposes of both sections.

_____

[12]  The term "material support or resources" was originally defined as constituting:

currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, but does not include humanitarian assistance to persons not directly involved in such violations.

In 1996, Congress amended the definition of "material support or resources" to replace the phrase "but does not include humanitarian assistance to persons not directly involved in such violations" with the phrase "except medicine or religious materials." Pub. L. No. 104-132, § 323, 110 Stat. 1214, 1255.

The definition of "material support and resources" was amended in 2001 pursuant to the USA PATRIOT Act, Pub. L. No. 107-56, § 805, 115 Stat. 272, 377,[13] and again in December 2004, pursuant to the Intelligence Reform and Terrorism Prevention Act ("IRTPA"), Pub. L. No. 108-458, § 6603(b), 118 Stat. 3638.  The IRTPA defined "expert advice or assistance" to mean "advice or assistance derived from scientific, technical, or other specified knowledge."  *Id*. § 6603(b), 118 Stat. at 3762 (codified at § 2339A(b)(3)).  It also defined "training" as "instruction or teaching designed to impart a specific skill, as opposed to general knowledge."  *Id*. § 6603(b), 118 Stat. at 3762 (codified at § 2339A(b)(2)).  These definitions were added to § 2339A and, accordingly, applied to both §§ 2339A and 2339B.

In addition, the IRTPA made several changes to the term "personnel."  First, the IRTPA changed "personnel" in § 2339A to "personnel (1 or more individuals who may be or include oneself)."  *Id*. § 6603(b), 118 Stat. at 3762 (codified at § 2339A(b)(1)).  This change was added to clarify that a person can provide himself as personnel.  Second, the IRTPA added a definition of "personnel" to § 2339B:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

---

[13]  The definition of "material support or resources" was amended to include "monetary instruments" and "expert advice or assistance."  Pub. L. No. 107-56, § 805, 115 Stat. 272, 377.

*Id.* § 6603(f), 118 Stat. at 3763 (codified at § 2339B(h)).[14]  Unlike the other changes made by IRTPA

to the definition of "material support and resources," this detailed definition of "personnel" was added

to § 2339B and not to § 2339A.

Notably, all of the legislative history states that the new language added to § 2339B in 2004

was only a *clarification* of the definition of personnel and not a substantive change.  *See* H.R. Rep.

No. 108-724, at 224 (2004), 2004 WL 2282343 (stating that the Act "more clearly defines the term

material support");  *Material Aid for Terrorists: Hearing on S. 2679 Before Senate Judiciary*

*Committee*, 108th Cong. 4 (2004) (statement of Daniel J. Bryant, Assistant Attorney General) ("The

provision further clarifies that individuals who act entirely independent of the foreign terrorist

organization . . . shall not be considered to be working under the foreign terrorist organization's

direction and control.");  151 Cong. Rec. S3655-01 (Apr. 14, 2005) (in debate on repeal of sunset

provisions, stating that "[t]hese provisions clarify the definitions of the terms 'personnel,' 'training',

and 'expert advice or assistance'").

These changes to § 2339B were enacted against a backdrop of numerous legal challenges to

that provision on the ground of vagueness.  Central among those legal challenges was a case brought

by the Humanitarian Law Project in the Ninth Circuit.[15]  In a decision rendered before the 2004

---

[14]  The IRTPA also clarified the degree of knowledge required to violate § 2339B as follows:
"To violate [§ 2339B(a)(1)], a person must have knowledge that the organization is a designated
terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . or that
the organization has engaged or engages in terrorism." *Id.* § 6603(c), 118 Stat. at 3762-63 (codified
at § 2339B(a)(1)).

[15]  The sequence of cases is as follows:  *Humanitarian Law Project v. Reno*, 9 F. Supp. 2d
1176 (C.D. Cal. 1998), *aff'd*, 205 F.3d 1130 (9th Cir. 2000), *on subsequent appeal sub nom.*
*Humanitarian Law Project v. U.S. Dep't of Justice*, 352 F.3d 382 (9th Cir. 2003), *reh. en banc*
*granted*, 382 F.3d 1154 (9th Cir. 2004), *judgment vacated*, 393 F.3d 902 (9th Cir. 2004), *on remand*
*sub nom. Humanitarian Law Project v. Gonzales*, 380 F. Supp. 2d 1134 (C.D.Cal. 2005), *aff'd sub*

amendments, the district court refused to adopt the narrow definition of "personnel" proffered by the

Government:

> Defendants [the government] contend that the term "personnel" is aimed at denying human resources, as the term is commonly understood, *i.e.*, the provision of human resources to proscribed terrorist organizations. Defendants contend that the AEDPA prohibits the act of donation, including sending personnel to PKK or LTTE headquarters to work under their direction. Defendants fail, however, to point to any language in the AEDPA which limits the prohibition on "personnel" to people working at the headquarters and at the direction of foreign terrorist organizations.

*Humanitarian Law Project v. Reno*, 9 F. Supp. 2d 1176, 1203 (C.D. Cal. 1998). Instead, the court

concluded that "the term 'personnel' broadly encompasses the type of human resources which

Plaintiffs seek to provide, including the distribution of LTTE literature and informational materials

and working directly with PKK members at peace conferences and other meetings." *Id.* at 1204. The

court found that this overly-broad definition violated the First Amendment in the context of § 2339B

because it encompassed pure speech, including conduct as benign as handing out pamphlets.[16]

---

*nom. Humanitarian Law Project v. Mukasey*, 509 F.3d 1122 (9th Cir. 2007). *See generally* Robert M. Chesney, *The Sleeper Scenario: Terrorism-Support Laws and the Demands of Prevention*, 42 Harv. J. on Legis. 1, 86 (2005).

[16] Following the amendments to § 2339B in the IRTPA, most courts have rejected overbreadth and vagueness challenges to that provision. *See, e.g., Humanitarian Law Project v. Mukasey*, 509 F.3d 1122, 1136 (9th Cir. 2007) ("As amended by the IRTPA, AEDPA's prohibition on providing 'personnel' is not vague because the ban no longer blurs the line between protected expression and unprotected conduct." (quotation marks and citations omitted)); *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157, 168 (E.D.N.Y. 2008) ("There is no First Amendment right to facilitate terrorism by working under the organization's direction or control or by managing, supervising or directing the operation of a terrorist organization."); *United States v. Warsame*, 537 F. Supp. 2d 1005, 1018 n.9 (D. Minn. 2008) (finding that as amended, § 2339B is not unconstitutionally vague); *United States v. Shah*, 474 F. Supp. 2d 492, 497 (S.D.N.Y. 2007) (applying § 2339B to a defendant who volunteered himself as a medic for al-Qaida). Courts have also rejected vagueness and overbreadth challenges to § 2339A. *See, e.g., United States v. Amawi*, 545 F. Supp. 2d 681, 683-84 (N.D. Ohio 2008); *United States v. Awan*, 459 F. Supp. 2d 167, 178 (E.D.N.Y. 2006).

Other courts, however, interpreted the pre-2004 definition of "personnel" differently.  For instance, in *United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002), the district court concluded that:

> providing "personnel" to HUM or al Qaeda necessarily means that the persons provided to the foreign terrorist organization work under the direction and control of that organization.  One who is merely present with other members of the organization, but is not under the organization's direction and control, is not part of the organization's "personnel." . . . Simply put, the term "personnel" does not extend to independent actors.  Rather, it describes employees or employee-like operatives who serve the designated group and work at its command or . . . who provide themselves to serve the organization.

*Id.* at 572;  *see also id.* at 574 ("The Ninth Circuit's vagueness holding in *Humanitarian Law Project* is neither persuasive nor controlling.");  *id.* at 573 ("'Personnel' refers to individuals who function as employees or quasi-employees – those who serve under the foreign entity's direction or control.");  *United States v. Goba*, 220 F. Supp. 2d 182, 194 (W.D.N.Y. 2002) (agreeing with *Lindh* regarding § 2339B);  *United States v. Marzook*, 383 F. Supp. 2d 1056, 1066 (N. D. Ill. 2005) (same).

In *United States v. Sattar*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004), Judge John G. Koeltl of the Southern District of New York  attempted to find a middle ground between the expansive definition of "personnel" in the *Humanitarian Law Project* cases and the narrow definition in *Lindh*.  Having previously rejected *Lindh*'s definition of personnel, *see United States v. Sattar*, 272 F. Supp. 2d 348, 359 (S.D.N.Y. 2003), the court concluded that "Congress plainly intended to refer to persons engaged in 'preparing for' or 'carrying out' one of the crimes specified in § 2339A . . . that is, persons who are jointly involved in participating in those crimes." *Sattar*, 314 F. Supp. 2d at 298.  Using this definition, the court concluded that a lawyer who had acted in concert with others to make a co-conspirator available was guilty of providing "personnel," regardless of the fact that she was not

acting as an employee or quasi-employee of the terrorist organization. *Id.* at 300.

All of these cases were decided before Congress added the more detailed definition of "personnel" to § 2339B. Thus, as an initial matter, the Court must decide whether the amended definition of "personnel" in § 2339B applies to § 2339A as well, for even the Government concedes that if the amended definition in § 2339B applies to § 2339A, the evidence is wanting. Though the legislative history describes the definition of "personnel" in § 2339B as a mere clarification, the fact that Congress chose not to apply the more detailed definition to § 2339A causes the Court to believe that the definition Congress provided for § 2339B should not apply to § 2339A. *See Warsame*, 537 F. Supp. 2d at 1013 ("Congress's inclusion of an explicit *mens rea* requirement in § 2339A strongly suggests that it chose not to include a specific intent requirement in § 2339B."). The Court must presume that Congress was aware that the definition of "personnel" was relevant to both sections, but chose to include the more detailed definition in one section and not the other. This presumption is even stronger because Congress changed the definition of "personnel" in § 2339A by adding "1 or more individuals who may be or include oneself" at the same time it added the more detailed definition of "personnel" to § 2339B. Nor is there any indication in the legislative history that Congress intended the § 2339B definition to apply to § 2339A. *See, e.g.*, *United States v. Abdi*, 498 F. Supp. 2d 1048, 1058 (S.D. Ohio 2007) (refusing to apply precedents under § 2339B to a case based on § 2339A).

Therefore, the Court is left with the language of § 2339A, which does not define either the word "provide" or "personnel." The Supreme Court has repeatedly explained that "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *See United States v. Smith*, 508 U.S. 223, 228 (1993). Ordinarily, the term "provide" means to make

available, to furnish, and to arrange for, supply, or transfer, *see* Random House Webster's Unabridged

Dictionary (2001), and that is what the Court told the jury (without objection).  *See Sattar*, 314 F.

Supp. 2d at 297 ("The plain and ordinary meaning of the transitive verb 'provide' is to furnish; supply

. . . to make ready . . . to make available; afford.") (quotation marks omitted).  Furthermore, as the

court explained in *Sattar*, there is no reason to suppose from the language of the statute that

"provides" is limited to a physical transfer or delivery of personnel:

> [S]tatutory terms are to be interpreted in their context in light of their placement and purpose
> in the statutory scheme.  A defendant would reasonably be providing material support or
> resources by making these items or services available with the requisite knowledge or intent.
> Limiting the definition of "provides" to the physical transfer of an asset would result in a
> strained and untenable reading of the statute.  Thus, there is no basis to limit the meaning of
> "provides . . . personnel" to the physical transfer of personnel, and not to include making
> personnel available – which is in accord with the ordinary and natural use of the term
> "provide," and which is consistent with its placement in the statute and the purpose of
> proscribing the provision of resources to be used for a prohibited purpose.

*Id.* (citations omitted).

Likewise, the term "personnel" is also not defined in § 2339A.  The plain meaning of that term

includes "a body of persons *employed by or active* in an organization, service or place of work."  *Id.*

at 298;  *see* Random House Webster's Unabridged Dictionary (2001).  In the context of § 2339A, it

seems apparent that the term refers to those individuals who are provided or made available to prepare

for or carry out the crimes prohibited by the statute.  *See Sattar*, 314 F. Supp. 2d at 298.  The

individual need not be an "employee" or "quasi-employee," but there must be some form of

coordination, joint action, or understanding.  *See id.*  Entirely independent action is not sufficient to

qualify as being at least "active in" an organization as required by the definition of personnel.

Therefore, one who makes resources in the form of individuals (including himself) available, or

furnishes individuals (including himself), for the purpose of actively preparing for or carrying out the

crimes prohibited by the statute through some form of coordinated action is guilty of violating § 2339A.  *See, e.g., United States v. Marzook*, 383 F. Supp. 2d 1056, 1064 (N. D. Ill. 2005) (holding that the term "personnel" includes recruiting others to join Hamas).

In sum, the Court is inclined to agree with the definition of "personnel" embraced by Judge Koeltl in *Sattar* and to reject the more narrow definition of "personnel" adopted in *Lindh*.  The Court in *Lindh* did not provide a clear standard for determining who should be considered "employees" or "quasi-employees," except to say that Lindh's conduct clearly fell within the statute.  Furthermore, this Court's interpretation of the plain meaning of the term "personnel" does not support such a limited definition.[17]  And although the Court is cognizant of the fact that Congress amended § 2339B in part because of the Ninth Circuit's expansive definition of "personnel" in *Humanitarian Law Project*, the Court does not believe that the Ninth Circuit's expansive definition is consistent with the plain meaning of phrase "providing . . . personnel."

Thus, the Court applies the definition of providing personnel as stated above and in *Sattar*. The difficulty of applying that definition to the facts of this case arises from the Government's theory of guilt, which was that by disclosing national defense information to Azzam, Mr. Abu-Jihaad was, in effect, making himself available to terrorists for the purpose of killing U.S. nationals.  That is, by providing information alone to Azzam – an act that was not directly prohibited by § 2339A – Mr. Abu-Jihaad provided personnel– that is, Mr. Abu-Jihaad himself – to Azzam, knowing that he or his assistance would be used to prepare for, or carry out, the killing of U.S. nationals.

That theory of guilt puts a strain on the language of the statute. For if the Government's

---

[17]  In any event, the Court concludes that there is insufficient evidence to convict Mr. Abu-Jihaad of providing personnel under either definition.

argument were accepted, an individual who provided a terrorist organization with, say, weapons – perhaps by selling them at market price – would also be deemed to have provided the organization with personnel – namely, the gun dealer himself.  Of course, one can imagine situations where an individual makes both himself and others available to terrorist organizations and also provides the organizations with weapons, money, or other tangible resources.  But that is not invariably the case.  That is, merely providing an organization with a resource, even a prohibited resource, is not necessarily the same thing as providing personnel to prepare for or carry out the prohibited purposes of the statute through some form of coordinated or joint action.  For if that were the case, then much of the definition of "material support or resources" would be entirely redundant;  providing weapons, explosives, or anything else on the list would also automatically constitute the provision of personnel as well.

To be sure, context and facts matter.  Yet, it is context and facts that are entirely missing in this case.  For we do not know how Mr. Abu-Jihaad conveyed the defense information to Azzam or what arrangements, if any, they had with each other.  It could well be that Mr. Abu-Jihaad asked Azzam how he could help in supporting jihad, they told him to send defense information about the movements of the battlegroup so terrorists could attack the battlegroup, and Mr. Abu-jihhad did as requested.  In those circumstances, the Court would have little difficulty concluding that Mr. Abu-Jihaad had volunteered himself as personnel, acting in coordination with Azzam to kill U.S. nationals.  On the other hand, perhaps Mr. Abu-Jihaad on a whim simply sent defense information to Azzam on one occasion, not knowing if Azzam wanted it and without any pre-disclosure or post-disclosure communication with Azzam about the information.  In those circumstances, he surely provided defense information to someone not entitled to receive it, as the Court has previously found, but it

would be linguistically odd to describe that lone, voluntary act as making personnel available to Azzam.[18]   In the parlance of *Triumph Capital Group*, this theory of the evidence is at least equally plausible as the Government's theory of guilt.

The Government recognizes this gap in the evidence and seeks to get around it by pointing to a general request by Azzam to its readership in November 2000, in which it sought aid for the Taliban by requesting money, gas masks, or battlefield medical services.  Of course, Azzam also exhorted its readers to assist in violent  jihad.   But to build a *quid pro quo* or understanding from these generalized requests for assistance is more than the evidence will bear, even taking all reasonable inferences in the light most favorable to the Government.   In short, the evidence showed beyond a reasonable doubt that Mr. Abu-Jihaad provided classified defense information to Azzam. He may also have made himself to available to assist Azzam in violent jihad.  However, we simply do not know that from the evidence presented, even viewing the evidence in the light most favorable to the Government.  Therefore, the Court will grant the Motion for Judgment of Acquittal on the material support charge under 18 U.S.C. § 2339A.

## IV.

Mr. Abu-Jihaad also requests a new trial on two separate grounds.  First, he argues that the Court erred in allowing the jury to watch excerpts of the violent videos that Mr. Abu-Jihaad ordered from Azzam.  Second, he contends that the verdict constitutes a manifest injustice and therefore a new trial is required.

---

[18]  While the jury could have concluded from the conversations with Mr. Chrisman that Mr. Abu-Jihaad had previously disclosed intelligence information, those conversations provided the jury with no information about the manner in which that information was disclosed and cannot be used to overcome the deficiencies in the material support charge.

Before trial, the Court considered at length the issue of the videos and whether the jury should be permitted to view them. *See United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008). The Court assumes familiarity with its prior decision on this issue and sees no reason to alter that decision. As the Court pointed out in its prior ruling, the videos were directly relevant to Mr. Abu-Jihaad's intent and motive and also to Azzam's support for violent jihad. The Government did not show the jury videos that Mr. Abu-Jihaad had never seen before. Much of the communications between Azzam and Mr. Abu-Jihaad related to the videos that were shown to the jury. He had them and viewed them, and therefore the evidence related directly to his knowledge, intent, and motive. *See United States v. Salim*, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) ("[T]he graphic or disturbing nature of a [piece of evidence] alone is not enough to render it inadmissible. Rather, the analysis hinges upon whether the [item] is relevant to the resolution of some disputed point in trial or otherwise aids a jury in a factual determination.").[19] There was simply no way for the jury to learn what information Mr. Abu-Jihaad had received from Azzam without seeing at least portions of the videos he had ordered from Azzam.

Of course, as the Court recognized in its previous ruling, even relevant and probative evidence can be outweighed by possible prejudice. The Supreme Court has described unfair prejudice as an "an undue tendency to suggest decision on an improper basis." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quotation marks omitted); *see United States v. Awadallah*, 436 F.3d 125, 133 (2d Cir. 2006). But the Court took steps to reduce the likely prejudice here and is confident that those

---

[19] For this reason, Mr. Abu-Jihaad's reliance on *United States v. Al Moayad*, 545 F.3d 139 (2d Cir. 2008) is misplaced. In that case, there was no connection between the victim's testimony regarding a suicide bombing in Israel and the defendant. *See id.* at 161 ("The September 2002 bus bombing was almost entirely unrelated to the elements of the charges.").

steps were effective.  First, the Court limited the excerpts that could be played, and the Government showed commendable restraint in the selections it showed the jury.  The excerpts were brief and although on occasion they were violent or gruesome, the violence was no more graphic than the evening news can be, and certainly less graphic than many movies available to teens.  Second, each time the videos were played the Court gave the jury a cautionary instruction that was approved by defense counsel.  The instruction was as follows:

> Ladies and gentlemen of the jury, we've reached the point in the case where the government intends to show to you certain information, images and video clips which may have been available for viewing or purchase from the Azzam Publications website . . . .  Before you hear and see this evidence, it's important to understand the purpose for which this evidence is being offered . . . .

> The evidence that you are going to hear about the Azzam Publications website and the materials available, that may have been available from the website, that evidence does not bear, is not relevant, to the question of whether or not Mr. Abu-Jihaad provided the information contained in the Battle Group document, the so-called Battle Group document, to Azzam Publications, and you may not consider this evidence for that purpose.  The government must prove that element of each offense by other means and by other evidence.

> Rather, the evidence about what may have been available on the Azzam Publications website is being offered as some proof of the other element of the charge, namely whether the information, if it was provided, was done so knowing or intending that it was to be used in preparation for or in carrying out a conspiracy to kill United States nationals, or with reason to believe that such information could be used to the injury of the United States, or to the advantage of any foreign nation.  Sometimes, and I mentioned this in my preliminary instructions, sometimes under our laws and rules of evidence, evidence is admissible for one purpose but it could not be considered by the jury for another purpose. This is one of those instances.

> I am therefore instructing you that whatever conclusions you might draw from the evidence about the content of the Azzam Publications website, this evidence may not be considered by you when it comes time to decide the question of whether the government has proven beyond a reasonable doubt that Mr. Abu-Jihaad provided the information contained in the so-called Battle Group document to Azzam Publications.

> This may also be an occasion to remind you of something I said in the preliminary instructions about your duties as jurors, which is to decide this case objectively,

68

without passion or sympathies.  Some of the evidence that you are about to see, including the videos, includes some depictions of violence or some declarations of religious, political, or personal belief which some people may find distasteful or which some people may disagree with.

The evidence is being offered only for the purpose that I have just explained to you and you should consider it for no other purpose.  You need to keep an open mind about this case and perform your duties as jurors faithfully, regardless of any personal likes or dislikes, opinions, prejudices, or emotions.  That is to say you need to consider this, all of the evidence in this case including this evidence, dispassionately and not allow your personal opinions, your personal beliefs, fears, sympathies, or biases to enter into your deliberations in any respect.  As I said, I will remind you before we do the video clips of this instruction which will also govern those clips as well, though I won't repeat the entire instruction at that time.

Transcript [doc. # 279] at 156-160.  Finally, the Court repeated that instruction in the final jury

charge as follows:

You will recall that during the course of the trial I instructed you that there are some occasions in which evidence is offered and admitted for a limited purpose.  The admission of evidence for a limited purpose occurs in different trials for different reasons.  In this trial, I gave you a limiting instruction concerning the evidence you heard and saw about the content of the Azzam Publications websites and the content of some of the videotapes that were available for purchase there.  I want to remind you again about the law regarding evidence that is admitted for a limited purpose.

The evidence you heard about the content of the Azzam Publications websites does not bear at all on the question of whether or not Mr. Abu-Jihaad sent the information contained in the Battle Group document to Azzam Publications and you may not consider it for that purpose.  The Government must prove that element of the offense by other means.  Rather, this evidence about Azzam Publications was offered as some proof of the other element of the charges – whether the information contained in the Battle Group document, if it was provided, was provided knowing or intending that it was to be used in preparation for, or in carrying out, a conspiracy to kill United States nationals or with reason to believe that such information could be used to the injury of the United States or to the advantage of any foreign nation.  In your final deliberations, you may consider evidence about the content of the Azzam Publications websites only for the limited purpose I have explained and you may not consider it for any other purpose.

Final Jury Instructions [doc. # 244] Ex. 7 at 23-24.

Juries are presumed to follow the instructions they are given, and the Court is aware of no

evidence suggesting otherwise in this case.  The Court is convinced, therefore,  that any potential for prejudice was minimized and that in any event, it was well outweighed by the probative value of the video evidence.  *See, e.g., United States v. Hammond*, 381 F.3d 316, 342 (4th Cir. 2004);  *Abdi*, 498 F. Supp. 2d at 1071-72.

Insofar as the claim of manifest injustice is concerned, the Court has already indicated that it believes that Mr. Abu-Jihaad's trial was fair and free of bias, and accordingly, the Court sees no reason to order a second trial. With the exception of the videos, discussed above, the evidence was introduced without objection from Mr. Abu-Jihaad at trial.  There were no major credibility or impeachment issues and the evidence was not conflicting.  Furthermore, the jury charge was given without objection from either side.  It is true that the Court has granted a judgment of acquittal on one of the charges, but that is not a reason to hold a new trial on the disclosing classified information count.  Even inconsistent verdicts do not ordinarily require a new trial and there was no inconsistency here.  *See Dunn v. United States*, 284 U.S. 390, 391 (1932 ) (Holmes, J.) ("Consistency in the verdict is not necessary.  Each count in an indictment is regarded as if it was a separate indictment.");  *United States v. Mahaffy*, 499 F. Supp. 2d 291, 295 (E.D.N.Y. 2007) ("Inconsistent verdicts are recognized as within a jury's prerogative.").  That is the reason for asking for separate verdicts on each count. The Court told the jury to evaluate each count separately, and the Court has every confidence that the jury did so.  That the Court has granted a judgment of acquittal on one count is not a reason to have any less confidence in the jury's verdict on the classified information count.  And, of course, the Second Circuit may disagree with the Court's assessment of the material support charge.

The Court is well aware that it has more leeway to grant a new trial than it does to grant a motion for judgment of acquittal.  *See Triumph Capital Group,* 544 F.3d at 159.  On a Rule 33

motion, a court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *Sanchez*, 969 F.2d at 1413.  The Court may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.  However, there were no credibility issues in this trial.  All that would occur upon a new trial is a re-trial with all of the same evidence and all of the same witnesses, all the same jury charges, and presumably all the same arguments of counsel.  Rule 33 is not intended to allow a defendant to keep retrying his case until he receives a favorable verdict.  A different jury may well have acquitted Mr. Abu-Jihaad of both charges, but the question before the Court is whether the verdict that *this* jury reached amounted to manifest injustice.  The Court concludes that it did not.  Therefore, a new trial is not needed.  Accordingly, the Court denies the motion for a new trial.

## V.

For the reasons stated, the Court GRANTS IN PART AND DENIES IN PART the Motion for Judgment of Acquittal [doc. # 268].  The Court DENIES the Motion for New Trial [doc. # 266].

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: March 4, 2009.**

71