UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:07-CR-57 (MRK) |
| | : | |
| v. | : | |
| | : | March 27, 2009 |
| HASSAN ABU-JIHAAD | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On April 3, 2009, the Court will sentence the defendant, Hassan Abu-Jihaad, for disclosing national defense information in violation of 18 U.S.C. § 793(d). Having presided over this trial, this Court is familiar with the evidence that, in 2001, the defendant betrayed his country and violated his oath as a U.S. sailor. Just months after suicide bombers murdered sailors aboard the *U.S.S. Cole* in the port of Aden, the defendant was entrusted with access to closely held military information as a signalman aboard his destroyer, the *U.S.S. Benfold*. That information related to the planned movements from San Diego to the Persian Gulf of a U.S. Navy battle group led by the nuclear aircraft carrier *U.S.S. Constellation* He transmitted that information to a website in London that openly espoused violent jihad against the United States and its allies. In an e-mail to the website, the defendant praised the terrorist attack on the *Cole* as a "martyrdom operation." There can be no doubt: When the defendant leaked U.S. military secrets to foreign terrorists, he hoped that they would repeat the horrors of the *Cole* bombing. That conduct warrants the most severe punishment permissible by law – the statutory maximum of ten years in prison.

From the trial and pretrial proceedings, the Court is well aware of the offense conduct, as well as the wiretap and other recordings showing the defendant's continued interest in jihadi activities against U.S. military installations as late as 2006. Accordingly, the Government does not include a lengthy recitation of those facts here, and instead refers the Court to its earlier memoranda

in connection with the motion in limine and the post-trial motions. *See* Documents 110 and 289.

After the Supreme Court's holding in *Booker* rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to calculate the relevant Guidelines range, consider that range along with the other § 3553(a) factors, and impose a sentence that is sufficient, but no greater than necessary, to achieve the purposes of sentencing. *See United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008) (en banc); *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). This memorandum therefore begins, as the Second Circuit suggests, with an explanation of how the Sentencing Guidelines call for the defendant to receive a sentence of 120 months in prison. Next, it reviews how various factors listed in § 3553 likewise militate in favor of a sentence at the statutory maximum.

## I.    The Sentencing Guidelines appropriately call for a sentence of 120 months in prison.

Although the Sentencing Guidelines are now advisory, they remain the "starting point and the initial benchmark" for determining a defendant's sentence. *Gall v. United States*, 128 S. Ct. 586, 596 (2007). The Guidelines are not a "body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113. "A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range." *Cavera*, 550 F.3d at 189 (citing *Gall*, 128 S. Ct. at 596). For the following reasons, the Government agrees with the Probation Office that the defendant's advisory guideline range under Chapters 2 and 3 of the Guidelines Manual exceeds the statutory maximum of 120 months provided by 18 U.S.C. § 793(d). Accordingly, by operation of U.S.S.G. § 5G1.1(a), 120 months becomes the recommended "guideline sentence."

**A.    The defendant's base offense level under U.S.S.G. § 2M3.2(a)(2) is 30 because it involved the willful transmission of intangible information with reason to believe that it could be used to the injury of the United States.**

The Statutory Index for 18 U.S.C. § 793(d) cross-references U.S.S.G. §§ 2M3.2 and 2M3.3. Section 2M3.2 applies here because application note 2 to U.S.S.G. § 2M3.3 specifies that "[i]f the defendant was convicted of 18 U.S.C. § 793(d) . . . for the willful transmission or communication of intangible information with reason to believe that it could be used to the injury of the United States or the advantage of a foreign nation, apply § 2M3.2." That is precisely the charge of which the defendant was convicted in Count Two. Section 2M3.2 pegs the base offense level to the classification level of the leaked information, assigning level 35 for top secret information, and 30 otherwise. Because the information involved in this case was either confidential or secret, base offense level 30 applies. U.S.S.G. § 2M3.2(a)(2).

**B.    The defendant's offense level should be increased by 12 points under U.S.S.G. § 3A1.4(a) because his offense "was intended to promote[] a federal crime of terrorism."**

Section 3A1.4(a) provides for a 12-point enhancement if the offense "is a felony that involved, *or was intended to promote*, a federal crime of terrorism." (Emphasis added.) A defendant need not be convicted of a federal crime of terrorism to trigger this enhancement. Rather, the district court must only find that the defendant "intended his substantive offense of conviction or his relevant conduct *to promote* such a terrorism crime." *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001) (emphasis added). *See United States v. Arnaout*, 431 F.3d 994, 1002-03 (7th Cir. 2005) (holding that § 3A1.4 enhancement is applicable if "defendant's felony conviction or relevant conduct has as one purpose the intent to promote a federal crime of terrorism," and explaining that promotion occurs when "a defendant's offense or relevant conduct *helps or encourages* a federal

3

crime of terrorism") (emphasis added); *United States v. Mandhai*, 375 F.3d 1243, 1247-48 (11th Cir. 2004) ("[T]he terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation. Rather, it is the defendant's purpose that is relevant . . . .") (affirming imposition of enhancement "even though the record reflects that Mandhai lacked both the means and the ability to carry out his defined activity without assistance that was not present"); *see also United States v. Hale*, 448 F.3d 971, 988 (7th Cir. 2006) (re-affirming *Arnaout*). The Battle Group Document was obviously designed to assist others in orchestrating an attack on U.S. naval forces, since the leaked information concerned the planned movements of a U.S. naval battle group to the Persian Gulf, and it discussed the group's perceived vulnerabilities to attack.  The defendant's July 2001 *Cole* e-mail – extolling the bombing as a "martyrdom operation" against the forces of a "kuffar" or infidel nation – dispels whatever doubt there might have been about the defendant's intent in sending classified information to Azzam.

Moreover, an attack on U.S. naval forces by third parties would constitute any number of federal crimes of terrorism.  Application note 1 to § 3A1.4 provides that "[f]or purposes of this guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." That statute provides:

> the term "Federal crime of terrorism" means an offense that –
>
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>
> (B) is a violation of . . . (i) . . . 1114 (relating to killing or attempted killing of officers and employees of the United States), . . ., 2155 (relating to destruction of national defense materials, premises, or utilities),  . . .  2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States) . . . .

4

*See generally United States v. Benkahla*, 530 F.3d 300, 311-13 (4th Cir. 2008) (affirming application of § 3A1.4 enhancement, where defendant obstructed grand jury investigation into federal crimes of terrorism).

The first prong, set forth in paragraph (A), is satisfied here. Through his own words, the defendant demonstrated his belief that attacks on U.S. naval forces in the Gulf region served to intimidate the U.S. military. In his July 2001 e-mail to Azzam Publications, Abu-Jihaad praised the terrorist bombing of the *Cole* as a "martyrdom operation," and commented favorably upon the toll that the mujahideen's "psychological warfare" was having on American military officers:

> i want to let it be known that i have been in the middle east for almost a total of 3 months. for these 3 months you can truly see the effects of this psychological warfare taking a toll on junior and high ranking officers. but after the latest video supporting palestine. the top brass and american officials were running around like headless chickens very afraid, wondering if there is a possible threat. but this time the american population got wind of this and they came to know just how afraid the u.s. government is. thomas l. friedman wrote an article in the new york times called: "what it takes to make the americans turn tail, run." this article was distributed on my ship and most of the sailors said it was so true about the american government, and they feel like they are working for a bunch of scary pussies..........a Brother serving a Kuffar nation..

Moreover, the leak in this case followed close on the heels of a warning on the Azzam website that the United States was expected to attack the Taliban soon, likely using Tomahawk missiles – the same ordnance that was aboard the *Benfold*. Given the timing of the leak in relation to this high-profile announcement on the Azzam site, it is fair to conclude that the defendant intended to retaliate against the United States for its opposition to the Taliban.

The second prong, set forth in paragraph (B), is also satisfied. The recent carnage wrought by the *Cole* bombing left no doubt that a successful attack on naval vessels would kill American sailors and damage Navy ships. Accordingly, by encouraging an attack on the *Constellation* battle

5

group, the defendant was trying to promote violations of at least the following:

      • 18 U.S.C. § 1114, which punishes anyone who "kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties . . . ."

      • 18 U.S.C. § 2155, which punishes anyone who, "with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys . . . or attempts to so injure, [or] destroy . . . any national-defense material . . . or national-defense utilities . . . ." Section 2151 defines "national-defense material" to include "arms, armament, ammunition, . . . munitions, and all other articles of whatever description . . . intended for . . . the use of the United States in connection with the national defense or for use in or in connection with . . . transporting any of [those] materials . . . ." The term "national-defense utilities" is defined by 18 U.S.C. § 2151 to include a "boat . . . or any other means of transportation whatsoever, whereon or whereby such national-defense material, or any troops of the United States, are being or may be transported either within the limits of the United States or upon the high seas or elsewhere . . . ."

      • 18 U.S.C. § 2332(a), which punishes anyone who "kills a national of the United States, while such national is outside the United States . . . ." and § 2332(c), which punishes anyone who "outside the United States engages in physical violence" either "with intent to cause serious bodily injury to a national of the United States" or "with the result that serious bodily injury is caused to a national of the United States." Such an offense may be prosecuted only upon a certification that the offense "was intended to coerce, intimidate, or retaliate against a government or a civilian population." § 2332(d).

Accordingly, the 12-point enhancement under § 3A1.4 is warranted.[1]

---

[1]Even assuming the § 3A1.4 enhancement did not apply, and no other enhancements were applicable, the defendant would still face an offense level of 30 and a Criminal History Category I. That would yield an advisory range of 97-121 months, which encompasses the 120-month statutory maximum. Application note 4 to § 3A1.4 provides that an upward departure would be warranted in cases where one of the prongs of § 2332b(g)(5) is not satisfied. Although it might be technically unusual to seek a "departure" above the range of 97-121, where the statutory maximum falls within that range, in this case the same policy that would favor an upward departure in these circumstances would also favor a sentence at the top of the effective guideline range – that is, 120 months.

**C.**     **The defendant's offense level is also subject to a 2-point increase under U.S.S.G. § 3B1.3 because his offense involved an abuse of a position of public trust.**

If the Court determines that the defendant is subject to the terrorism enhancement of § 3A1.4, his advisory guideline range would be capped at the statutory maximum of 120 months, and there would be no need to consider whether additional enhancements apply. Out of completeness, however, the Government points out that the defendant would also be subject to a 2-point enhancement under U.S.S.G. § 3B1.3.

Section 3B1.3 provides for a 2-point enhancement "[i]f the defendant abused a position of public . . . trust . . . in a manner that significantly facilitated the commission or concealment of the offense . . . ." Application note 1 defines a position of public trust as a one that is "characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *See, e.g., United States v. Parker*, 903 F.2d 91, 104 (1990) (affirming enhancement for security guard who used information to which his position gave him access to provide details to his co-conspirators for a robbery); *United States v. Melendez*, 41 F.3d 797, 799 (2d Cir. 1994) (affirming enhancement where postal worker abused position with postal service that afforded him access to large amounts of cash without accounting controls).

In the present case, the defendant leaked classified information to which he had access as a signalman stationed aboard a destroyer in the United States Navy, and by virtue of a security clearance that permitted him to view confidential and secret material. He was among a restricted number of sailors aboard the *Benfold* who were granted such access. A defendant who breaches his

7

security clearance by disclosing classified information merits an abuse-of-trust enhancement. *See United States v. Ford*, 288 Fed. Appx. 54, 61 (4th Cir. 2008) (unpub.) (holding that abuse-of-trust enhancement was appropriate under § 3B1.3 for NSA employee who held top secret clearance and was able to remove classified documents from his office without detection from his supervisors); *see also United States v. Pitts*, 176 F.3d 239, 246 (4th Cir. 1999) (upholding one-level upward departure, above the two-level § 3B1.3 enhancement for abuse of trust, for supervisory special agent of FBI who leaked classified information to Soviet agents).[2]

### D.    The defendant falls within Criminal History Category VI because he qualifies for the terrorism adjustment set by U.S.S.G. § 3A1.4.

Although the defendant has no criminal convictions and therefore no criminal history points, the terrorism adjustment of § 3A1.4(b) assigns him to Criminal History Category VI. As the Second Circuit has recognized, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).

---

[2]The application of § 3B1.3 would not result in double-counting when combined with § 2M3.2, because it is possible to commit various offenses covered by § 2M3.2 – including, for example, violations of § 793(a)-(c) – without having lawful access to classified information. *See United States v. Pitts*, 973 F. Supp. 576, 583 (E.D. Va. 1997); *see generally United States v. Salim*, 549 F.3d 67, 76 (2d Cir. 2008) (explaining that there is no impermissible double-counting under the Guidelines if an enhancement is triggered by "an additional factor that will not be present in every conviction" under a statute and therefore is not incorporated into the base offense level).

E.  **With offense level 44 and Criminal History Category VI, the defendant faces an advisory Guidelines sentence of 120 months.**

The statutory maximum penalty for a violation of 18 U.S.C. § 793(d) is ten years in prison. By any measure, the Guidelines recommend a sentence at that maximum. With an offense level of 44 (reduced to 43, which is as high as the Guidelines table goes), and a Criminal History Category of VI, he would normally face an advisory sentence of life in prison. Absent the abuse-of-trust enhancement, with an offense level and CHC of 42/VI, he would normally face an advisory range of 360 months to life in prison. Alternatively, with the abuse-of-trust enhancement and without the terrorism enhancement, he would still face an offense level/CHC of 32/I, yielding 121-151 months in prison. In short, whatever the calculation, the Guidelines would normally call for a sentence above the statutory maximum – and so, by operation of § 5G1.1(a), "the statutorily authorized maximum sentence shall be the guideline sentence."

II. **The other factors listed in § 3553(a) militate in favor of a sentence at the statutory maximum for a defendant who betrayed his country by leaking classified information about the planned movements of a U.S. naval group to the Persian Gulf in the months following the bombing of the *U.S.S. Cole.***

When selecting a sentence, the Court must consider various factors outlined in § 3553(a). These include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, and (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the guidelines; (5) policy

9

statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a). The Government discusses the most relevant of these considerations below.

A.    **A 120-month sentence is necessary to account for the nature and circumstances of the offense, § 3553(a)(1), as well as to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, § 3553(a)(2)(A).**

The seriousness of the defendant's crime cannot be overstated. He deliberately leaked classified information to enemies of the United States about the intended movements of a U.S. naval battle group to the Persian Gulf. The Court is well aware of the facts in this case, and the Government will not belabor them here. The defendant betrayed his trust as a U.S. sailor who had been granted a security clearance and given access to closely held information. Moreover, his motive for leaking the classified information was worse than a venal desire for personal gain, as is sometimes the case in § 793(d) prosecutions. Instead, as demonstrated by the July 2001 e-mail and the battle group document itself, the purpose of the leak was to identify vulnerabilities of the *Constellation* battle group so that it could be attacked like the *U.S.S. Cole*. The defendant deliberately sought to endanger the safety of his fellow sailors and the national security of the United States in one of the most strategically important areas of the globe. Just punishment should be proportional to the seriousness of the offense. Here, the defendant's open betrayal of his duties to his shipmates and fellow citizens, and his deliberate attempt to subject them to harm, merits severe punishment.

**B.    The history and characteristics of the defendant, § 3553(a)(1), support a severe punishment.**

The defendant's conduct both before and after his discharge from the Navy militates in favor of a severe punishment.  From the defendant's own words, it is clear that he has long been a proponent of violent jihad against the United States.  In his July 2001 e-mail, he lauded the terrorist attack on the *U.S.S. Cole* as a "martyrdom operation," indicating his belief that divine favor is showered on suicide bombers who murder U.S. sailors.  He offered "takbirs," or praise to God, for his belief that American forces abroad were feeling cowed by mujahideen.  And by describing himself as "a Brother serving a Kuffar [infidel] nation," he made clear that his allegiances lay not with the United States, but rather with the mujahideen whom he praised as the "american enemies."

Recorded conversations introduced during pretrial hearings reinforce the conclusion that the defendant is a dedicated jihadi.  To take one of the most dramatic examples, Abu-Jihaad praised the killings of U.S. soldiers allegedly perpetrated by the so-called "Juba Sniper" in Iraq: "Juba was a cold dude . . . if he's still breathing, may Allah still let him be pluggin' them dudes.  If not, I know he done train more . . . in the skills and tactics that he got . . . 'cuz he was layin' 'em down!"  In another conversation, Abu-Jihaad questioned the Salaafi bona fides of the confidential informant with whom Derrick Shareef was living, because the informant was not "down" with Usama bin Laden, to whom Abujihaad refers in code as "Under the Black Leaves." At another point, the defendant recommended to a friend a jihadi article entitled *Allah is Preparing Us for Victory*. And elsewhere, he lamented the lack of availability of videos relating to violent jihad, other than those being produced by the Maktabah Al-Ansar bookshop.  Perhaps most troubling of all, the defendant had discussed potential sniper attacks on U.S. military installations, and was negotiating to purchase

11

an assault rifle from the confidential informant in Illinois. As late as his arrest, therefore, it is clear that the defendant has remained committed to violent jihad against his own country, and particularly against the U.S. military to which he once belonged.

     **C.**     **A 120-month sentence is necessary to achieve general deterrence, § 3553(a)(2)(B), as well as to promote respect for the law.**

General deterrence is a significant factor in the present case. Although one might argue that the law is unable to deter fanatics who are motivated by an irrational hatred of the United States, they are not the only intended targets of general deterrence. Every person who holds a security clearance could potentially harm the national security interests of the United States by illegally disclosing classified information. By imposing a sentence at the statutory maximum of 10 years, the court would send an unmistakable message that a deliberate leak of classified information to this nation's enemies will result in stern punishment.

Likewise, the sentence in this case must promote respect for the law – not only among potential wrongdoers who may be deterred from committing crimes, but also among law-abiding citizens who need assurance that the criminal justice system will do its utmost to protect them from harm. Those who scrupulously protect classified information entrusted to their care deserve to know that the law values their adherence to duty. And members of the armed forces – who risk their lives every day to protect their fellow citizens – deserve to know that courts will firmly punish anyone like the defendant who betrays his oath and seeks their injury or death.

     **D.**     **A 120-month sentence is necessary to achieve specific deterrence, § 3553(a)(2)(B), and to protect the public from the defendant, § 3553(a)(2)(C).**

Even though the defendant will never again have access to classified information, he

12

nevertheless poses a continuing danger to the public. A sentence at the statutory maximum is necessary to prevent him from committing more crimes during the time of his incapacitation, and to deter him from doing so after his release.  First, as the wiretaps demonstrated, the defendant continued to discuss schemes for attacking U.S. military installations.  He offered to provide logistical support to Derrick Shareef and others who would be willing to be on the front lines of such an attack.  Long after he was discharged from the U.S. Navy and lost access to classified information, Abu-Jihaad remained willing to promote terrorist attacks on the U.S. military. Second, the wiretaps also demonstrate that Abu-Jihaad was negotiating the purchase of an assault rifle through Derrick Shareef and a confidential informant.  In the context of the defendant's discussions with Shareef about engaging in a sniper attack on military installations, Abu-Jihaad's attempts to procure an assault rifle are particularly worrisome. Third, the defendant promoted the radicalization of others.  For example, he became a jihadi mentor to Shareef, who ultimately pleaded guilty to the attempted bombing of a mall in Illinois during the Christmas shopping season.  He was also intercepted having telephone conversations with others, discussing (as noted above) radical propaganda such as the so-called Juba sniper videos and an article extolling violent jihad.

      E.    **A 120-month sentence is necessary to avoid unwarranted sentencing disparities, § 3553(a)(6).**

Congress has instructed sentencing courts to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  The primary purpose of this provision is to eliminate disparity on a national level.  *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008).  The Guidelines remain the most useful tool in ensuring that similarly situated defendants receive similar sentences.

When a judge "correctly calculate[s] and carefully review[s] the Guidelines range, he necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall*, 128 S. Ct. at 599.

Here, the defendant's actions fall squarely within the heartland of § 2M3.2, which governs the unauthorized disclosure of national defense information, as well as within the core of terrorism-motivated offenses covered by § 3A1.4. A sentence at the statutory maximum would promote nationwide consistency in sentencing for similarly situated defendants who leak classified information in an effort to damage the national security interests of the United States.

## Conclusion

By leaking classified information about U.S. Navy ship movements and outlining their perceived vulnerabilities to attack, Hassan Abu-Jihaad was trying to help foreign terrorists replicate the bombing of the *U.S.S. Cole*.  It is hard to say which aspect of his crime is the most serious.  Abu-Jihaad betrayed the trust his country placed in him by granting him access to classified information, when he released it to a website that advocated violent jihad against the United States.  He betrayed the trust of his fellow sailors aboard the *Benfold* and other ships in the *Constellation* battle group, when he tried to expose them to an attack by ambush. And he betrayed his oath as a U.S. sailor, when he forsook the national security of the United States in favor of those who would engage in terrorist violence against the United States.  Hassan Abu-Jihaad is a traitor, and he should be sentenced accordingly.

For all the reasons set forth above, the Government respectfully requests that the Court sentence the defendant to the statutory maximum of ten years in prison.


Respectfully submitted,

NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY

/s/                                                                          /s/

STEPHEN B. REYNOLDS                            ALEXIS L. COLLINS
ASSISTANT U.S. ATTORNEY                        TRIAL ATTORNEY
Federal Bar No. ct19105                             phv1790
157 Church Street, 23d Floor                       Counterterrorism Section
New Haven, CT 06510                                U.S. Department of Justice
(203) 821-3700                                          950 Pennsylvania Ave N.W., Room 2718
fax (203) 773-5377                                    Washington, D.C. 20530
Stephen.Reynolds@usdoj.gov                     (202) 514-0463
                                                              Alexis.Collins@usdoj.gov
/s/

WILLIAM J. NARDINI
ASSISTANT U.S. ATTORNEY
Federal Bar No. ct16012
157 Church Street, 23d Floor
New Haven, CT 06510
(203) 821-3700
fax (203) 773-5377
William.Nardini@usdoj.gov

**Certificate of Service**

I hereby certify that on March 27, 2009, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/
William J. Nardini, Assistant U.S. Attorney